CHAPIN FITZGERALD & BOTTINI LLP
Francis A. Bottini, Jr. (*pro hac vice*)
Keith M. Cochran    (*pro hac vice*)
550 West C Street, Suite 2000
San Diego, California 92101
Telephone: (619) 241-4810
Facsimile: (619) 995-5318
fbottini@cfblawfirm.com
kcochran@cfblawfirm.com

ROBBINS UMEDA LLP
Brian J. Robbins (*pro hac vice*)
George C. Aguilar (*pro hac vice*)
Jay N. Razzouk (*pro hac vice*)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone:  (619) 525-3990
Facsimile:  (619) 525-3991
brobbins@robbinsumeda.com
gaguilar@robbinsumeda.com
jrazzouk@robbinsumeda.com

*Co-Lead Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| In Re First Solar Derivative Litigation, | Case No.: CV12-0769 DGC (Lead Case) |
|---|---|
|  | **Verified Consolidated Shareholder Derivative Complaint** |
|  | **DEMAND FOR JURY TRIAL** |

# TABLE OF CONTENTS

Page

SUMMARY OF ACTION .................................................................................. 2

JURISDICTION AND VENUE........................................................................... 4

THE PARTIES ................................................................................................... 5

    A.    Plaintiffs ........................................................................... 5

    B.    Nominal Defendant ........................................................... 5

    C.    Defendants........................................................................ 6

THE INDIVIDUAL DEFENDANTS CONCEALED MATERIAL
    INFORMATION FROM SHAREHOLDERS ......................................... 9

THE INDIVIDUAL DEFENDANTS ISSUED FALSE AND MISLEADING
    STATEMENTS ..................................................................................... 12

THE TRUTH EMERGES ................................................................................. 62

INSIDER SELLING ALLEGATIONS ............................................................. 65

THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO VIOLATE
    GAAP .................................................................................................. 73

DUTIES OF THE INDIVIDUAL DEFENDANTS ......................................... 94

BREACHES OF DUTIES ................................................................................ 96

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION.............. 97

DAMAGES ...................................................................................................... 98

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ....................... 99

COUNT I ....................................................................................................... 107

COUNT II....................................................................................................... 108

COUNT III ..................................................................................................... 109

PRAYER FOR RELIEF ................................................................................. 109

JURY DEMAND............................................................................................ 111

## SUMMARY OF ACTION

1.      Plaintiffs, long-time shareholders of First Solar, Inc. ("First Solar" or the "Company"), bring this shareholder derivative lawsuit against certain officers and directors of First Solar for state law claims for breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment, and insider trading that occurred between April 30, 2008 and February 29, 2012 (the "Relevant Period").  The wrongs have caused hundreds of millions of dollars in damages to First Solar and exposed the Company to hundreds of millions of dollars in potential liability for violations of the federal securities laws.

2.      First Solar is the largest U.S. solar panel company, manufacturing individual modules and complete turn-key power plants.  Since First Solar went public in 2006, the Company has consistently reported explosive growth in its financial statements.

3.      While First Solar was reporting significant growth during the Relevant Period, however, the Company was selling a substantial number of defective solar panels that would ultimately force the Company to incur a quarter of a billion dollars in warranty costs. Specifically, between June 2008 and June 2009, the Company sold and installed solar panels with manufacturing deficiencies that caused premature power loss.  Rather than promptly disclose the seriousness of the problems facing the Company, First Solar's officers and directors concealed the truth.

4.      Over one year later, in July 2010, First Solar's officers and directors finally revealed that the Company had identified manufacturing issues with certain products manufactured between June 2008 and June 2009.  Yet First Solar's officers and directors still concealed the scope of the manufacturing problems, informing shareholders that only 4% of its products were affected and that the problem had been "addressed."  First Solar's officers and directors downplayed any field performance and reliability issues by noting that the Company had initiated a remediation program to remove and replace the defective solar modules, estimating the cost of the program at $30 million.

5.      Without any further warning, in February 2012, First Solar's officers and directors suddenly revealed the actual staggering impact of the remediation program.  The

Company had incurred nearly $254 million of warranty and related charges for certain underperforming solar panels, nearly 10 times more than originally disclosed to shareholders.  On this news, First Solar's market capitalization plunged 11%, erasing more than $354 million in market capitalization.

6.    The media and analysts noted the staggering charge taken by the Company associated with replacing defective panels.  *Bloomberg News* wrote that in the fourth quarter, the problem led "to warranty claims of $125.8 million in the fourth quarter, or more than half the total spent on the glitch to date.  It also put aside $37.8 million to cover future claims."  *The Wall Street Journal* wrote that the Company "has spent nearly $254 million replacing customers' solar panels that didn't perform as promised and changing its warranty."  Mark Bachman, an analyst at Avian Securities LLC, wrote that the "charges [are] about *10 times* what they said they were going to be when they first reported the issue."  Credit Suisse analyst Satya Kumar wrote in his February 29, 2012 report titled "A quarter billion dollar warranty problem," that "[t]he $253 mm in cumulative warranty and related charges now raises a significant question mark on the reliability and field performance of FSLR's panels – product quality in our view is the most significant metric for a solar companies' long-term survivability."

7.    First Solar's officers and directors, however, knew throughout the Relevant Period the true impact of the remediation program on the Company's financial position and business prospects.  First Solar's management downplayed the field performance and reliability issues as well as the impact of the remediation program, driving the Company's stock to a peak of over $310 per share.   But soon after shareholders discovered the true impact of the remediation program, First Solar stock dropped below $30 per share.

8.    First Solar's officers and directors concealed the true costs of the defective solar panels to personally benefit at the expense of shareholders.  While the Company was downplaying the effect of the remediation program, Defendants Michael J. Ahearn, Jens Meyerhoff, Bruce Sohn, David Eaglesham, James Zhu, James F. Nolan, Michael Sweeney, and J. Thomas Presby unloaded over 3.5 million of their personally held shares of First Solar

stock for proceeds of over **$478 million**.  Tellingly, Michael J. Ahearn, the founder, Chief Executive Officer, and Chairman of the Board of Directors of First Solar, led the charge of this exploit by selling almost 97% of his personally held First Solar stock.

9.     In order to artificially inflate the Company's stock so that Company insiders could cash out to the tune of **$478 million**, First Solar's officers and directors concealed the following three critical factors from shareholders:

(a)     Because the compensation of First Solar's management was contingent upon lowering manufacturing costs and because First Solar's ability to attract new capital and investors was also dependent upon the Company's ability to lower its manufacturing costs, First Solar's officers and directors manipulated First Solar's cost-per-watt metric to show manufacturing efficiency gains that were illusory.

(b)     First Solar's officers and directors intentionally concealed the existence and scope of the manufacturing excursion, in order to delay taking write downs of a quarter of a billion dollars in warranty costs.

(c)     While First Solar traditionally manufactured solar panels for cooler climates, First Solar's modules designed for hot climates were experiencing premature degradation.

10.     Plaintiffs bring this derivative action to (i) recover damages against First Solar's directors and officers for the benefit of the Company and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect First Solar and its shareholders from a repeat of the damaging events described below.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Many of the acts complained of herein occurred in this District and First Solar's principal place of business is located at 350 West Washington Street, Suite 600, Tempe, Arizona 85281, where the day-to-day operations of the Company are directed and managed.

## THE PARTIES

**A.     Plaintiffs**

13.     Plaintiff Eng Kwang Tan is a shareholder of First Solar.  Plaintiff Tan purchased 900 shares of First Solar stock on September 8, 2008 and has continuously held First Solar shares since that time.  Plaintiff Tan is a citizen of Virginia.

14.     Plaintiff Kathleen Morris is a shareholder of First Solar.  She purchased her shares on December 14, 2007 and has continuously held First Solar shares since that time. Plaintiff Morris is a citizen of Michigan.

15.     Plaintiff Eric Feigin is a shareholder of First Solar.  He purchased 10 shares of First Solar stock on August 5, 2009 and has continuously held First Solar shares since that time.  Plaintiff is a citizen of Canada.

16.     Plaintiff Clifford Tindall is a shareholder of First Solar.  He purchased his shares on December 6, 2007 and has continuously held First Solar shares since that time. Plaintiff Tindall is a citizen of Canada.

17.     Plaintiff Britt Nederhood is a shareholder of First Solar.  He purchased his shares on March 18, 2011 and has continuously held First Solar shares since that time. Plaintiff Nederhood is a citizen of Washington.

**B.     Nominal Defendant**

18.     Nominal Defendant First Solar is a Delaware corporation with its principal place of business at 350 West Washington Street, Suite 600, Tempe, Arizona 85281.  First Solar's common stock trades on the NASDAQ Global Market under the ticker symbol "FSLR."

## C.    Defendants

19.    Defendant Michael J. Ahearn ("Ahearn"), the founder of First Solar, has served as the Company's Chairman of the Board of Directors ("Board") since January 2011 and as interim Chief Executive Officer ("CEO") from October 2011 to May 3, 2012.  Defendant Ahearn served as CEO from August 2000 to September 2009 and Executive Chairman from October 2009 to December 2010.  Ahearn received total executive compensation of $4,764,134 in 2008 and $4,280,355 in 2009.  While the Individual Defendants were issuing false and misleading statements, Ahearn sold nearly 3.2 million shares of his First Solar stock on the basis of nonpublic material information for proceeds of over $427 million.  Upon information and belief, Ahearn is a citizen of Arizona.

20.    Defendant Robert J. Gillette ("Gillette") served as the Company's CEO and a director on the Board between October 1, 2009 and October 25, 2011.  Gillette received total executive compensation of $16,552,847 in 2009, $13,314,890 in 2010, and $2,473,655 in 2011.  Upon information and belief, Gillette is a citizen of Arizona.

21.    Defendant Mark R. Widmar ("Widmar") has served as the Company's Chief Financial Officer ("CFO") since April 2011 and Chief Accounting Officer since February 2012.  Widmar received total executive compensation of $3,438,900 in 2011.  Upon information and belief, Widmar is a citizen of Arizona.

22.    Defendant Jens Meyerhoff ("Meyerhoff") served as the Company's CFO between May 2006 and December 31, 2010 and President of the Company's Utility Systems Business between July 2010 and September 30, 2011.  Meyerhoff received total executive compensation of $2,095,482 in 2008, $2,030,796 in 2009, $4,761,668 in 2010, and $1,681,346 in 2011.  While the Individual Defendants were issuing false and misleading statements, Meyerhoff sold 118,827 shares of his First Solar stock on the basis of nonpublic material information for proceeds of $18,577,773.  Upon information and belief, Meyerhoff is a citizen of Arizona.

23.    Defendant James Zhu ("Zhu") served as the Company's Chief Accounting Officer from November 2, 2009 through January 2012.  From January 2011 through March

2011, Defendant Zhu served as the interim CFO.  From June 2007 through October 2009, Defendant Zhu served as the Company's Vice President and Corporate Controller.  Zhu received total executive compensation of $1,360,491 in 2011.  While the Individual Defendants were issuing false and misleading statements, Zhu sold 7,884 shares of his First Solar stock on the basis of nonpublic material information for proceeds of $1,172,000.  Upon information and belief, Zhu is a citizen of Arizona.

24.    Defendant Bruce Sohn ("Sohn") was the Company's President, Operations from February 2011 to April 2011; President from March 2007 to February 2011; and a director from July 2003 to June 2009.  While the Individual Defendants were issuing false and misleading statements, Sohn sold 74,750 shares of his First Solar stock on the basis of nonpublic material information for proceeds of $12,390,248.  Sohn received total executive compensation of $3,050,982 in 2008, $3,059,635 in 2009, and $2,945,503 in 2010.  On information and belief, Sohn is a citizen of Arizona.

25.    Defendant David Eaglesham ("Eaglesham") has been the Company's Chief Technology Officer since November 2009.  Eaglesham joined First Solar as Vice President, Technology in June 2006.  While the Individual Defendants were issuing false and misleading statements, Eaglesham sold 69,983 shares of his First Solar stock on the basis of material nonpublic information for proceeds of $9,645,827.  Eaglesham received total executive compensation in 2009 of $1,926,994.  Upon information and belief, Eaglesham is a citizen of Ohio.

26.    Defendant Craig Kennedy ("Kennedy") has been a director of the Company since September 2007.  He is a member of the Audit Committee.  Upon information and belief, Kennedy is a citizen of Maryland.

27.    Defendant James F. Nolan ("Nolan") has been a director of the Company since February 2003.  While the Individual Defendants were issuing false and misleading statements, Nolan sold 24,000 shares of his First Solar stock on the basis of material nonpublic information for proceeds of $5,351,425.  Upon information and belief, Nolan is a citizen of Florida.

7

28.     Defendant William J. Post ("Post") has been a director of the Company since June 2010.  Upon information and belief, Post is a citizen of Arizona.

29.     Defendant J. Thomas Presby ("Presby") has been a director of the Company since August 2006.  He is the Chairman of the Audit Committee.  While the Individual Defendants were issuing false and misleading statements, Presby sold 1,000 shares of his First Solar stock on the basis of material nonpublic information for proceeds of $137,810.  Upon information and belief, Presby is a citizen of New Jersey.

30.     Defendant Paul H. Stebbins ("Stebbins") has been a director of the Company since December 2006.  He is a member of the Audit Committee.  Upon information and belief, Stebbins is a citizen of Florida.

31.     Defendant Michael Sweeney ("Sweeney") has been a director of the Company since July 2003.  While the Individual Defendants were issuing false and misleading statements, Sweeney sold 24,749 shares of his First Solar stock on the basis of nonpublic material information for proceeds of $4,417,934.  Upon information and belief, Sweeney is a citizen of Minnesota.

32.     Defendant Jose H. Villarreal ("Villarreal") was a director of the Company from September 2007 until May 2012.  Upon information and belief, Villarreal is a citizen of Texas.

33.     Ahearn, Gillette, Widmar, Meyerhoff, Zhu, Sohn, Eaglesham, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of First Solar's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their position with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew

that the adverse facts specified herein had not been disclosed to and were being concealed from shareholders and that the positive representations being made were then materially false and misleading.

34.     Ahearn, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal are sometimes referred to herein as the "Director Defendants."

35.     Kennedy, Presby, and Stebbins are sometimes referred to herein as the "Audit Committee Defendants."

**THE INDIVIDUAL DEFENDANTS CONCEALED MATERIAL INFORMATION FROM SHAREHOLDERS**

**A.     The Individual Defendants Manipulated the Company's Cost-Per-Watt Metric**

36.     Based on a new approach to manufacturing solar panels, First Solar produced solar panels by using small amounts of cadmium and tellurium as the raw materials rather than polysilicon.  Since the solar panels were less efficient than traditional polysilicon panels, First Solar needed to produce its panels at a much lower cost than its competitors in order to compete.  As of June 2009, without subsidies, First Solar's panels were 5-10% more expensive than conventional alternatives.  Thus, First Solar needed to show continued reductions in manufacturing costs to demonstrate progress as an unsubsidized business.  The Company measured manufacturing costs using a metric called cost-per-watt, which was defined as: (total manufacturing costs) ÷ (total watts produced).

37.     The cost-per-watt metric was so important that management's compensation was directly tied to reducing the cost-per-watt metric.  Thus, the Individual Defendants were incentivized to show continued reductions in manufacturing costs.  However, the Individual Defendants achieved these cost reductions by manipulating the cost-per-watt metric.

38.     To carry out the scheme, the Individual Defendants understated First Solar's warranty expenses.  By understating the warranty expenses, the Individual Defendants lowered the manufacturing costs, which in turn caused First Solar's cost-per-watt metric to be understated.  The Individual Defendants were able to conceal and perpetuate the scheme

because the Company included only the current period warranty expense (*i.e.*, only the amount of warranty on products sold in that period) in the cost-per-watt calculation. The Individual Defendants knew that any future warranty charges on defective products would have no impact on the cost-per-watt metric because those future warranty charges would apply to defective products sold in ***prior*** quarters. Accordingly, the Individual Defendants would never be required to reflect those future warranty expenses in First Solar's cost-per-watt metric.

39. Further, the Individual Defendants regularly shipped defective products and included the wattage of the defective products in First Solar's cost-per-watt calculation. Had the Individual Defendants refused to ship the defective products (as they should have), these panels would not have been included as watts produced. First Solar's cost-per-watt metric would have materially increased.

40. The Individual Defendants also manipulated the cost-per-watt metric by artificially increasing the amount of watts used to calculate that metric through the use of a D-rate scam. While manufactured panels are theoretically capable of producing a certain wattage, they do not achieve their full capability in practice. Thus, a reduction in the reported wattage – a D-rating – was applied to the solar panel. Initially, First Solar applied a D-rating in the 12-15% range. However, the Individual Defendants reduced the D-ratings to 6-8% in order to artificially increase the number of watts produced to reduce the cost-per-watt metric.

**B.      The Individual Defendants Concealed the Scope of the Manufacturing Excursion**

41. By the end of 2008, First Solar received numerous complaints about a defect in its solar panels that caused premature power loss. The Individual Defendants termed this problem a "manufacturing excursion" as opposed to a manufacturing defect, which would imply a more severe performance shortcoming.

42. Despite the fact that First Solar received numerous complaints about the premature power loss between June 2008 and June 2009, the Individual Defendants concealed the problems from shareholders until July 2010. In fact, when the Company

1    finally disclosed the manufacturing excursion, the Individual Defendants represented that the

2    Company had identified and addressed a limited problem in June 2009.

3         43.    After revealing the existence of the manufacturing excursion, the Individual

4    Defendants continued to misrepresent its scope.  Throughout the Relevant Period, the

5    Individual Defendants repeatedly represented falsely that (i) the manufacturing excursion

6    was limited to just 4% of the modules manufactured between June 2008 and June 2009; (ii)

7    the problem was known, contained, and fixed; and (iii) the financial impact was limited.  The

8    Individual Defendants falsely stated in August 2010 that the manufacturing excursion would

9    cost $29.5 million.  However, by February 2012, the Individual Defendants were forced to

10   disclose that the manufacturing excursion would cost more than $260 million.

11        44.    The Individual Defendants knew but failed to disclose that (i) the defective

12   modules were not limited to "less than 4%" (or roughly 348,500 modules) of the total

13   products manufactured from June 2008 to June 2009, because, in fact, over 1.5 million

14   modules were affected, (ii) the problem was not mitigated in June 2009, because, in fact, the

15   Company continued to produce and install defective modules beyond June 2009, and (iii) the

16   remediation efforts were not substantially completed because, in fact, the Company had only

17   recognized a fraction of the total excursion-related costs.

18        45.    And even though the Individual Defendants knew about the manufacturing

19   excursion in 2008, the Individual Defendants improperly decreased the Company's warranty

20   reserve rate from 2.24% at 1Q08 to 1.11% at 4Q10.  The decrease in warranty reserve rate

21   was designed to reduce manufacturing costs and therefore reduce First Solar's cost-per-watt

22   metric.

**C.    The Individual Defendants Concealed the Heat Degradation Problem**

24        46.    Unbeknownst to shareholders, First Solar also faced the premature degradation

25   of modules in hot climates.  The heat degradation issue affected the large solar field power

26   generating facilities that First Solar's Engineering Procurement and Construction division

27   ("EPC") built.

28

47.     First Solar's modules operate differently in different climates.  Because First Solar's business initially concentrated on cool climates, First Solar had little field data available regarding module performance in hot climates.   However, the Individual Defendants knew that, based on a few years of operation, modules in hot climates experienced excessive degradation – an EPC plant in a hot climate would experience a very sharp reduction in power generating ability.

48.     The Individual Defendants knew about the heat degradation effect as early as 2009 but failed to disclose the problem to shareholders.

### THE INDIVIDUAL DEFENDANTS ISSUED FALSE AND MISLEADING STATEMENTS

**A.     False Statements Made Between April 30, 2008-May 1, 2009**

49.     On April 30, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyeroff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 1Q08.  The Company reported net income of $47 million, or $0.57 diluted earnings per share ("EPS") for the first quarter of 2008, as compared to net income of $5 million, or $0.07 diluted EPS, for the same period in the prior year.

50.     On April 30, 2008 during the 1Q08 earnings conference call, Defendant Ahearn falsely stated:

> Conversion efficiency was flat at an average of 10.6% for the quarter. Cost per watt was $1.14.

51.     On May 2, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyeroff, Sohn, and Eaglesham caused First Solar to file its Form 10-Q with the SEC for 1Q08 ("1Q08 10-Q"), which was signed by Defendant Meyerhoff and reiterated the Company's quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins reviewed and approved the 10-Q prior to the time it was issued.  Indeed, they are specifically required to do so as members of the Audit

Committee.  The Charter of the Audit Committee requires the members of the Committee to review with management the financial information to be included in any Forms 10-K, 10-Q, and 8-K.  In addition, the Form 10-Q contained signed certifications pursuant to Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that it disclosed any material changes to the Company's internal control over financial reporting.  Although Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyeroff, Sohn, and Eaglesham were aware of significant product performance problems, the 10-Q incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 29, 2007:

> Problems with product quality or performance **may** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

> \*                    \*                    \*

The 10-Q stated:

**Product warranties**

> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

> Product warranty activity during the three months ended March 29, 2008 and March 31, 2007 was as follows (in thousands):

> \*                    \*                    \*

Product warranty liability, end of period                    $9,261

52.    On July 30, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyeroff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 2Q08.  The Company reported net income of $70 million, or $0.85 diluted EPS for the second quarter of 2008, as compared to net income of $47 million, or $0.58 diluted EPS for the same period in the prior year.

53.     On July 30, 2008, during the 2Q08 earnings conference call, Defendant Ahearn falsely stated: "cost per watt was $1.18."   During the same call, Defendant Meyerhoff reiterated: "Cost per watt was $1.18."

54.     On July 31, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyeroff, Sohn, and Eaglesham caused First Solar to file its 10-Q with the SEC for 2Q08 ("2Q08 10-Q"), which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position. Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-Q prior to the time it was issued.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff.  The 10-Q incorporated the following false statements from the Annual Report on Form 10-K for year ended December 29, 2007:

> Problems with product quality or performance ***may*** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.
>
> *            *            *
>
> ***Product Warranties***
>
> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.
>
> Product warranty activity during the three and six months ended June 28, 2008 and June 30, 2007 was as follows (in thousands):
>
> Product warranty liability, end of period  $10,865

55.     On October 29, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 3Q08.  The Company reported net income of $99

million, or $1.20 diluted EPS for the third quarter of 2008, as compared to net income of $46 million, or $0.58 diluted EPS for the same period in the prior year.

56.     On October 29, 2008, during the 3Q08 earnings conference call, Defendant Ahearn stated:

> Cost per watt in the third quarter was $1.08…. We continue to solidify our position as the lowest cost manufacturer in the industry.
>
> *          *          *
>
> And finally, we are grounded in reality and we take a pragmatic approach to risk. ***We do not knowingly ignore uncertain events that could meaningful[ly] [] impact our business***, but rather attempt to identify them, convert them to opportunities, where possible, and mitigate them where appropriate. We've always tried to be transparent with our key stakeholders with regard to our views and approach to the business and its risk.

During the same call, Defendant Meyerhoff reiterated: "Manufacturing costs per watt for the third quarter was $1.08."

57.     On October 31, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its 10-Q with the SEC for 3Q08 ("3Q08 10-Q"), which was signed by Defendant Meyerhoff. Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-Q prior to the time it was issued. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that the 10-Q had disclosed any material changes to the Company's internal control over financial reporting (no such changes were disclosed). The 10-Q incorporated the following false statement from the 2007 10-K:

> Problems with product quality or performance ***may*** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.
>
> *          *          *
>
> ***Product warranties***
>
> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer

locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

Product warranty activity during the three and nine months ended September 27, 2008 and September 29, 2007 was as follows (in thousands):

*          *          *

Product warranty liability, end of period  $9,858

58.     On February 24, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 4Q08 and year ended December 27, 2008.  The Company reported net income of $133 million or $1.61 diluted EPS, and revenue of $434 million for the fourth quarter of 2008, as compared to net income of $63 million, or $0.77 diluted EPS, and revenue of $201 million, for the same period in the prior year.  The Company further reported net income of $348 million, or $4.24 diluted EPS, and revenue of $1.2 billion for the 2008 fiscal year, as compared to net income of $158 million, or $2.03 diluted EPS, and revenue of $504 million, for the prior year.

59.     On February 24, 2009, during the 4Q08 earnings conference call, Defendant Ahearn stated:

And finally, we reduced our manufacturing costs to $0.98 a watt in Q4. That's down 9% quarter-over-quarter and 12% for the year. Breaking that dollar per watt cost benchmark is a major industry milestone. It is something the industry has been chasing for 20 years…

60.     During that same call, Defendant Meyerhoff reiterated the false cost-per-watt information: "Manufacturing costs per watt for the fourth quarter were $0.98, down 9% quarter-over-quarter and 12% for the year."  On that same call, Defendant Ahearn continued: "Well, so obviously getting below a dollar a watt is a significant milestone and we're really pleased with the organization's ability to execute on that."

61.     Despite the fact that Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham were well aware of a massive heat degradation problem for solar modules installed in the desert Southwest, Meyerhoff stated:

16

What I can tell you, we obviously had revenue recognition for the El Dorado project that we brought on in Q4 that essentially came all through mostly in Q4

62.     During the call, an analyst for Pacific Crest asked the following:

And then, lastly, Bruce, just on that line calc, can you just verify there was no problems with the line this quarter? ...***I just want to make sure there was no manufacturing problems around***, or that accounts for that line calc being down.

In response, Defendant Sohn replied:

[B]ut in terms of operational, the challenge is always is just bringing up the factory and developing the proficiency, recall as we bring a new factory online, like a KLM2 or KLM3, each of these factories is bringing on line capacity in the neighborhood of about 190 megawatts, 170 megawatts, or so, of total capacity.

That is significant capacity and our expectation is to start-up matched from an efficiency perspective, matched from a yield perspective, ***and matched, of course, from a quality and reliability perspective, and so we're very cautious and careful and have a high degree of expectation in terms of the way we operate the factories.*** As the proficiency of the workers develops, the run rate itself will also match.

63.     On February 25, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its 10-K with the SEC for the fiscal year ended December 27, 2008 ("2008 10-K"), which was signed by Defendants Ahearn, Meyerhoff, Nolan, Presby, Stebbins, Sweeney, Kennedy, and Villareal and reiterated the Company's previously announced financial results and financial position. Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-K prior to the time it was issued.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-K was accurate and that they disclosed any material changes to the Company's internal control over financial reporting. The 2008 10-K included the following false statements:

We design and manufacture solar modules using a proprietary thin film semiconductor technology that has allowed us to reduce our average solar module manufacturing costs to among the lowest in the world. In 2008, our

17

average manufacturing costs were $1.08 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

\*       \*       \*

Our thin film technology also has relatively **high energy performance** in low light and **high temperature environments** compared with traditional crystalline silicon solar modules.

\*       \*       \*

Thin film technology has a short history and our thin film technology and solar modules **may** perform below expectations; problems with product quality or performance **may** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

While our power output warranty extends for twenty-five years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions **could** prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future.  For example, our glass-on-glass solar modules **could** break, delaminate or experience power degradation in excess of expectations.   Any widespread product failures **may** damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

\*       \*       \*

Our average manufacturing cost per watt has decreased from $2.94 during 2004 to $1.08 during 2008.

64.    On the March 2, 2009 conference call, despite the fact that Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham were well aware of a massive heat degradation problem for solar modules installed in the desert Southwest, Defendant Meyerhoff falsely stated:

I mean, if you think about the first system we did was the [] 10 megawatt **El Dorado**. That was less than five months. And that was essentially our first pilot, right, **where we drove a lot of learning. So, that gives you a starting point of our capability** that we believe we can ramp.

65.     On March 11, 2009, during the Merrill Lynch Cleantech Leaders Conference, Defendant Meyerhoff stated: "First Solar announced a key milestone in the last quarter.  We are the first company to achieve sub-$1.00 per watt manufacturing cost."

66.     On April 29, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 1Q09.  The Company reported net income of $165 million, or $1.99 diluted EPS, and revenue of $418 million for the first quarter of 2009, as compared to net income of $47 million, or $0.57 diluted EPS, and revenue of $197 million, for the same period in the prior year.

67.     On April 29, 2009, during the 1Q09 earnings conference call, Defendant Meyerhoff stated:

> [O]ur cost per watt produced for the first quarter was $0.93, down 5.1% sequentially as we continued to realize the benefit from increased production and low cost locations, higher line throughput and lower material costs.

68.     On May 1, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its 10-Q with the SEC for 1Q09 ("1Q09 10-Q"), which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-Q prior to the time it was issued.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.  The 10-Q included the following false statements:

> We are one of the lowest cost module manufacturers in the solar industry, as evidenced by the further reduction in our average manufacturing cost per watt from $0.98 in the three months ended December 27, 2008 to $0.93 in the three months ended March 28, 2009…Our cost competitiveness is based on our proprietary technology, which provides lower cost from a ***continuous highly***

*automated industrial manufacturing process*, our scale and our *operational excellence*.... In 2008, we reduced our manufacturing cost per watt by 12%.

\*                    \*                    \*

The increase in MW volume of solar modules sold is attributable to the full production ramp of the first two plants at our Malaysian manufacturing center, commencement of product shipments at the third plant of our Malaysian manufacturing center and *continued improvements to our manufacturing process*.

\*                    \*                    \*

*Product warranties*

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

Product warranty activity during the three months ended March 28, 2009 and March 29, 2008 was as follows (in thousands):

\*                    \*                    \*

Product warranty liability, end of period     $13,557

69.     The 1Q09 10-Q also incorporated the following false statement from the annual report on Form 10-K for year ended December 27, 2008:

Thin film technology has a short history and our thin film technology and solar modules may perform below expectations; problems with product quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

70.     Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham knew or recklessly disregarded that the statements made between April 30, 2008-May 1, 2009 were misleading because they presented a false picture of First Solar's results, by failing to disclose and actively concealing the manufacturing excursion and heat degradation defects.  In particular, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham knew or recklessly disregarded that:

(a)      the April 30, 2008, July 30, 2008, October 29, 2008, February 24, 2009 and April 29, 2009 statements, referred to above, concerning the Company's reported net income, earnings per share, and revenue were materially false and misleading as a result of the Company's understatement of warranty reserves;

(b)      the April 30, 2008, July 30, 2008, October 29, 2008, February 24, 2009, February 25, 2009, March 11, 2009, April 29, 2009 and May 1, 2009 statements, referred to above, concerning the Company's reported cost-per-watt were materially false and misleading because the cost-per-watt metric was understated and manipulated;

(c)      the May 2, 2008, July 31, 2008, October 31, 2008, February 25, 2009 and May 1, 2009 statements, referred to above, concerning potential product quality and performance problems that could lead to material product warranty costs were materially false and misleading because significant product quality and performance problems were already occurring;

(d)      the October 29, 2008 statement, referred to above, regarding "meaningful" "uncertain events" was materially false and misleading because Defendants were concealing product defects that adversely and materially impacted First Solar's business;

(e)      the February 24, 2009 and March 2, 2009 statements, referred to above, concerning a solar project in the Southwestern U.S. were materially false and misleading because the statements concealed the severe heat degradation defect affecting modules installed in hot climates;

(f)      the February 24, 2009, February 25, 2009 and May 1, 2009 statements, referred to above, regarding the Company's successful manufacturing process, "operational excellence," and product reliability were materially false and misleading because the statements concealed pervasive product and manufacturing problems, including the manufacturing excursion and heat degradation defects; and

(g)      the February 25, 2009 statement, referred to above, concerning module conversion efficiency was materially false and misleading because the statements concealed the fact that the module conversion efficiency was increased by manipulating the D-rating.

21

**B.      False Statements Made Between July 30, 2009-April 29, 2010**

71.    On July 30, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 2Q09.  The Company reported net income of $181 million, or $2.11 diluted EPS, and revenue of $526 million for the second quarter of 2009, as compared to net income of $70 million, or $0.85 diluted EPS, and revenue of $267 million, for the same period in the prior year.

72.    On July 30, 2009, during the 2Q09 earnings conference call, Defendant Ahearn made the following false statement:

> Our manufacturing costs came in at $0.87 per watt for the quarter. That is down 6.5% quarter-over-quarter....

73.    On the same call, despite the fact that Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham were well aware of a massive heat degradation problem for solar modules installed in the desert Southwest, Defendant Ahearn made the following misleading statement:  "In terms of California and the *Southwest, nothing specific to report*."

74.    On the same call, Defendant Meyerhoff reiterated the misleading cost-per-watt information: "Cost per watt produced for the second quarter was $0.87, down $0.6 or 6.5% sequentially…"

75.    On August 3, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its 10-Q with the SEC for 2Q09 ("2Q09 10-Q"), which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position. Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-Q prior to the time it was issued.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate and that they

disclosed any material changes to the Company's internal control over financial reporting. The 10-Q included the following false statements:

### Product warranties

We offer warranties on our products and record an estimate of the associated liability based on the following: number of solar modules under warranty at customer locations, historical experience with warranty claims, monitoring of field installation sites, in-house testing of our solar modules and estimated per-module replacement cost.

Product warranty activity during the three and six months ended June 27, 2009 and June 28, 2008 was as follows (in thousands):

Product warranty liability, end of period      $ 17,413

Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham also misrepresented the Company's continued successful manufacturing cost reduction:

We are one of the lowest cost module manufacturers in the solar industry, as evidenced by the further reduction in our average manufacturing cost per watt from $0.98 in the three months ended December 27, 2008 to $0.93 and $0.87 in the three months ended March 28, 2009 and June 27, 2009, respectively.

In particular, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham emphasized the Company's "operational excellence." Defendants also falsely stated:

During the twelve months ended December 27, 2008 we reduced our manufacturing cost per watt by 12% from our cost per watt in the fourth quarter of fiscal 2007. In the first six months of 2009, we further reduced our manufacturing cost per watt by 11% from our cost per watt in the fourth quarter of fiscal 2008.

Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham falsely attributed increased sales volume to "continued improvements [in] our manufacturing process." Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham continued:

> In addition, we increased the average number of sellable watts per solar module by approximately 3% during the six months ended June 27, 2009 compared with the six months ended June 28, 2008.

Although Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham had identified massive defects with their solar modules, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham falsely represented that "there have been no material changes in the risk factors contained in our Annual Report on Form 10-K" relating to product performance problems. Instead, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham directed investors to the following false statement from the 2008 10-K:

> Thin film technology has a short history and our thin film technology and solar modules *may* perform below expectations; problems with product quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

76. On October 28, 2009, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 3Q09. The Company reported net income of $153 million, or $1.79 diluted EPS, and revenue of $481 million for the third quarter of 2009, as compared to net income of $99 million, or $1.20 diluted EPS, and revenue of $349 million, for the same period in the prior year.

77. On October 28, 2009, during the 3Q09 earnings conference call, Defendant Ahearn falsely stated:

The most important takeaway for us is that *we remain on track* to the five year program we laid out at the Analyst Call in terms of manufacturing *cost per watt and conversion efficiency. Things are progressing nicely.*

78.     During the same call, Defendant Meyerhoff repeated the misleading cost-per-watt information:

Cost per watt produced for the third quarter was $0.85, down $0.02 or 2.3% sequentially as we benefited from lower material costs, higher throughput and conversion efficiency….

79.     On October 30, 2009, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its 10-Q with the SEC for 3Q09 ("3Q09 10-Q"), which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-Q prior to the time it was issued.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate. The10-Q included the following false statements:

***Product warranties***

We offer warranties on our products and record an estimate of the associated liability based on the following: number of solar modules under warranty at customer locations, historical experience with warranty claims, monitoring of field installation sites, in-house testing of our solar modules and estimated per-module replacement cost.

Product warranty activity during the three and nine months ended September 26, 2009 and September 27, 2008 was as follows (in thousands):

Product warranty liability, end of period     $20,582

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham also misrepresented its continued successful manufacturing cost reduction:

> We are one of the lowest cost module manufacturers in the solar industry, as evidenced by the further reduction in our average manufacturing cost per watt from $0.98 in the three months ended December 27, 2008 to $0.93, $0.87 and $0.85 in the three months ended March 28, 2009, June 27, 2009 and September 26, 2009, respectively.

In particular, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham emphasized the Company's "***operational excellence***." Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham also falsely stated:

> During the twelve months ended December 27, 2008, we reduced our manufacturing cost per watt by 12% from our cost per watt in the fourth quarter of fiscal 2007. In the first nine months of 2009, we further reduced our manufacturing cost per watt by 13% from our cost per watt in the fourth quarter of fiscal 2008.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham falsely attributed increased sales volume to: "continued improvements [in] our global copy smart manufacturing process." Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham continued:

> In addition, we increased the average number of sellable watts per solar module by approximately 3% during the three months ended September 26, 2009 compared with the three months ended September 27, 2008.

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham had identified massive defects with their solar modules, defendants falsely represented that "there have been no material changes in the risk factors" relating to product performance problems.  Instead, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham directed investors to the following false statement from the 2008 10-K:

> Thin film technology has a short history and our thin film technology and solar modules may perform below expectations; problems with product quality or performance may cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

80.     On December 2, 2009 at the Credit Suisse 2009 Annual Technology Conference, Defendant Meyerhoff falsely stated: "***We're the lowest-cost producer in the industry***.  Our cost-per-watt on a module level is at $0.85 of the third quarter."

81.     On February 18, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 4Q09.  The Company reported net income of $142 million, or $1.65 diluted EPS, and revenue of $641 million for the fourth quarter of 2009, as compared to net income of $133 million or $1.61 diluted EPS and revenue of $434 million, for the same period in the prior year.  Additionally, the Company reported net income of $640 million, or $7.53 diluted EPS, and revenue of $2.1 billion for the 2009 fiscal year, as compared to net income of $348 million or $4.24 diluted EPS and revenue of $ 1.2 billion, for the prior year.

82.     On February 18, 2010, during the 4Q09 earnings conference call, Defendant Meyerhoff stated:

> Cost per watt produced for the fourth quarter was $0.84, down $0.01 and benefited from lower material costs, higher throughput and conversion efficiency....

83.     On February 22, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its 10-K with the SEC for the fiscal year ended December 26, 2009 ("2009 10-K"), which was signed by, among others, Defendants Zhu, Ahearn, Gillette, Nolan, Presby, Stebbins, Sweeney, Kennedy, Villarreal, and Meyerhoff, and reiterated the Company's previously announced financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-K prior to the time it was issued.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the Form 10-K was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.  The 10-K included the following false statements:

> We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $1.23 during 2007 to $0.87 during 2009… Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and permits a continuous highly automated industrial manufacturing process), our scale and our **_operational excellence_**.

> Product warranties….When we recognize revenue for module sales, we accrue a liability for the estimated future costs of meeting our warranty obligations for those modules. We make and revise this estimate based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

> Product warranty liability, end of period      $22,583

> First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In 2009, our total average manufacturing costs were $0.87 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham had identified a manufacturing problem, they falsely touted their module manufacturing capability as "reliable" and directly linked their manufacturing capabilities with their future success:

> We believe that combining our **reliable**, low cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Despite the known massive heat degradation defect, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham falsely claimed:

> Our thin film technology also **has relatively high energy performance** in low light and **high temperature environments** compared with traditional crystalline silicon solar modules.

Despite that problems relating to both the manufacture excursion and heat degradation defects had already occurred, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham did not disclose these problems to investors. Instead, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham misrepresented that the problems "could" occur in the future:

> Thin film technology has a short history and our thin film technology and solar modules **may** perform below expectations; problems with product quality or performance **may cause** us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

> While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules,

we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

84.     During the March 3, 2010, CLSA Asia USA Forum, Defendant Meyerhoff stated:

We obviously, given that we have the benefit of thin-film manufacturing, utilize significant lesser materials. All of these things resulted, by the end of the year, in an $0.83 per watt manufacturing cost, with a core cost of about $0.80, which far leads the industry as of today.

At the same point in time, our cost per watt on the module site scaled significantly. 2009 was a significant year as it relates to cost reduction. ***We were able to lower our cost per watt by 19%***, year-over-year, achieving the $0.80 core cost by the fourth quarter of 2009.

85.     On April 28, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 1Q10.  The Company reported net income of $172 million, or $2.00 diluted EPS, and revenue of $568 million for the first quarter of 2010, as compared to net income of $165 million, or $1.99 diluted EPS, and revenue of $418 million, for the same period in the prior year.

86.     During the April 28, 2010 1Q10 earnings conference call, Defendant Gillette falsely stated: "our cost per watt was $0.81 a watt, which is down 13% year-over-year."  On the same call, Defendant Meyerhoff reiterated the same false cost-per-watt information:

> Turning to cost per watt, cost per watt produced for the first quarter was $0.81, down $0.03…Core manufacturing cost per watt was flat, at $0.80 per watt quarter-over-quarter.

87.     On April 29, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its 10-Q with the SEC for 1Q10 ("1Q10 10-Q"), which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-Q prior to the time it was issued.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.  The 10-Q included the following false statements:

> ***Product warranties***
>
> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.
>
> Product warranty activity during the three months ended March 27, 2010 and March 28, 2009 was as follows (in thousands):
>
> Product warranty liability, end of period     $23,375

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also misrepresented its continued successful cost reduction:

> First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended March 27, 2010, our total average manufacturing costs were $0.81 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham had identified a manufacturing problem (but not yet disclosed to shareholders), they falsely touted their manufacturing capability as "reliable."

> We believe that combining our **reliable**, low cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also stated:

> We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.93 during the three months ended March 28, 2009 to $0.81 during the three months ended March 27, 2010. . . . Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and permits a continuous and highly automated industrial manufacturing process), our scale, and our operational excellence.... During the three months ended March 27, 2010, we reduced our manufacturing cost per watt by 13% from our cost per watt in the three months ended March 28, 2009.

88.     Notwithstanding the problems relating to both the manufacturing excursion and heat degradation defects had already occurred, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham failed to disclose these problems to shareholders.  Instead, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham misrepresented that the problems "may" or "could" occur in the future.  Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and

Eaglesham incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 26, 2009:

> Thin film technology has a short history and our thin film technology and solar modules **may** perform below expectations; problems with product quality or performance **may cause** us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

> While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions **could** prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules **could** break, delaminate or experience power degradation in excess of expectations, our manufacturing operations **could** be subject to process variations that **could** cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

89.     Defendants knew or recklessly disregarded that the statements made between July 30, 2009 and April 29, 2010 were misleading because they presented a false picture of First Solar's results by failing to disclose and actively concealing the excursion and heat degradation defects.  In particular, Defendants knew or recklessly disregarded that:

(a)     the July 30, 2009, October 28, 2009, February 18, 2010, and April 28, 2010 statements, referred to above, concerning the Company's reported net income, earnings per share, and revenue were materially false and misleading as a result of the Company's understatement of warranty reserves;

(b)     the July 30, 2009, August 3, 2009, October 28, 2009, October 30, 2009, December 2, 2009, February 18, 2010, February 22, 2010, March 3, 2010, April 28, 2010, and April 29, 2010 statements, referred to above, concerning the Company's reported cost-per-watt

1   were materially false and misleading because the cost-per-watt metric was understated and

2   manipulated;

3         (c)     the August 3, 2009, October 30, 2009, February 22, 2010 and April 29,

4   2010 statements, referred to above, concerning potential product quality and performance

5   problems that could lead to material product warranty costs were materially false and misleading

6   because significant product quality and performance problems were already occurring;

7         (d)     the February 22, 2010 statement, referred to above, regarding module

8   performance in "high temperature environments" was materially false and misleading because the

9   Company's solar panels were failing and experiencing high failure rates in high temperature

10  climates (*i.e.*, heat degradation);

11        (e)     the July 30, 2009 statement, referred to above, concerning a solar project in

12  the Southwestern U.S. was materially false and misleading because the statement concealed the

13  severe heat degradation defect affecting modules installed in hot climates;

14        (f)     the August 3, 2009, October 30, 2009, February 22, 2010, and April 29,

15  2010 statements, referred to above, regarding the Company's successful manufacturing process,

16  "operational excellence," and product reliability were materially false and misleading because the

17  statements concealed pervasive product and manufacturing problems, including the excursion and

18  heat degradation defects;

19        (g)     the August 3, 2009, October 30, 2009, February 22, 2010 and April 29,

20  2010 statements, referred to above, concerning product warranties were false and misleading

21  because the Company's warranty reserve was materially understated; and

22        (h)     the August 3, 2009 and October 29, 2009 statements, referred to above,

23  concerning the module conversion efficiency were materially false and misleading because the

24  statements concealed the fact that the module conversion efficiency was increased by

25  manipulating the D-rating.

26

27

28

**D.      False Statements Made Between July 29, 2010 and December 14, 2011**

90.      On July 29, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 2Q10.  The Company reported net income of $ 159 million, or $ 1.84 diluted EPS, and revenue of $588 million for the second quarter of 2010, as compared to net income of $181 million, or $2.11 diluted EPS, and revenue of $526 million, for the same period in the prior year.

91.      On the July 29, 2010, 2Q10 earnings conference call, Defendant Gillette stated:

> The cost per watt was $0.76, which is down 13% year over year, and down $0.05 from the first quarter of 2010.

> And we drove the module costs down to a record low number....

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham disclosed the manufacturing excursion for the first time on the conference call, Gillette misrepresented the true nature and extent of the excursion:

> During the period from June of 2008 to June of 2009, a manufacturing excursion occurred, ***affecting less than 4% of the total product manufacturer within the period***. The excursion could result in possible premature power loss in affected modules.

> ***The root cause was identified and subsequently mitigated*** in June of 2009. Ongoing testing confirms the corrective actions are effective. We've been working directly with impacted customers to replace the affected modules and ***these efforts are well underway, and in some cases, complete.***

> Some of these efforts go beyond our normal warranty coverage. We accrued the estimated full costs of these additional efforts in our Q2 results, and Jens will discuss the financial impact in more detail.

During the same call, Defendant Gillette also concealed the heat degradation problem by touting the success of its solar projects in the Southwestern U.S., particularly the El Dorado site:

> Turning now to Copper Mountain, slide 8 shows 48 MW expansion of our original 10 MW installations at the ***El Dorado*** site for Sempra Generation.

> El Dorado is the first site we constructed in North America in late 2008. The expansion also **highlights the progress made in design and execution of utility-scaled solar plants**.
>
> Cimarron project in New Mexico for Southern Company is our first large-scale installation of the Series 3 product. The construction is underway and progressing well.

On the same call, Defendant Meyerhoff repeated the false cost-per-watt information and continued to conceal the heat degradation problem:

> Net sales for the second quarter were $588 million, an increase of 12% year over year and a sequential increase of $20 million compared to the first quarter of 2010.
>
> The sequential increase of 3.5% was mainly driven by a higher percentage of system revenue recognition with a 48 MW Copper Mountain and 30 MW Cimarron project, partially offset by a decrease in module ASPs due to a lower blended foreign exchange rate and mix implications.
>
> Module costs per watt produced for the second quarter was $0.76, down $0.05, benefiting from higher throughput rates, improvement in conversion efficiency....

During this call, when specifically asked about the module problems, Defendant Sohn stated:

> About 4% of the production during the timeframe from June 2008 to 2009 was affected, in the neighborhood of about 30 MW. And we've been working with our customers since that time frame and **expect to continue to do so for about the next six months or so**.

Another analyst on the same call specifically asked First Solar to "put a dollar amount on the module replacement program."  Gillette responded that the excursion problem had already been quantified and reserved for:

> So the cost of the program in total was about $23.4 million, $17.8 million in COGs and $5.6 million that we have reserved in this quarter. **That reserve completes our current estimate** of the cost of the program.

92.     On August 2, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its 10-Q with the SEC for 2Q10 ("2Q10 10-Q"), which was signed by Defendant Zhu and reiterated the Company's quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-Q prior to the time it was issued.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.  The 10-Q included the following false statements:

**_Product warranties_**

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement costs.

Product warranty activity during the three and six months ended June 26, 2010 and June 27, 2009 was as follows (in thousands):

Product warranty liability, end of period     $23,862

93.     Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also misrepresented its continued successful cost reduction:

First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended June 26, 2010, our total average manufacturing costs were $0.76 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

37

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

> We believe that combining our **reliable**, low cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also stated:

> We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our ended June 27, 2009 to $0.76 during the three months ended June 26, 2010.
>
> Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and permits a continuous and highly automated industrial manufacturing process), our scale, and our **operational excellence**.

> During the three months ended June 26, 2010, we reduced our manufacturing cost per watt by 13% from our cost per watt in the three months ended June 27, 2009.

> The increase in the MW volume of solar modules sold was attributable to the full production ramp of our four-plant Malaysian manufacturing center, full production ramp of our Perrysburg, Ohio expansion, **continued improvements** to our manufacturing process, and growth in our systems business. In addition, **we increased the average conversion efficiency of our modules by approximately 3%** during the three months ended June 26, 2010 compared with the three months ended June 27, 2009.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham continued to conceal the true extent and nature of the excursion problem when they reported:

> During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected

38

modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we have accrued additional expenses of $17.8 million in the second quarter of 2010 and $29.5 million in total to date to cover the replacement of the anticipated affected module population in the field.

94.     Notwithstanding that Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 26, 2009:

> Thin film technology has a short history and our thin film technology and solar modules **may** perform below expectations; problems with product quality or performance **may cause** us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

> While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions **could** prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules **could** break, delaminate or experience power degradation in excess of expectations, our manufacturing operations **could** be subject to process variations that **could** cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

95.     On October 28, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused the

Company to issue a press release announcing its financial results for 3Q10.  The Company reported net income of $177 million, or $2.04 diluted EPS, and revenue of $798 million, as compared to net income of $153 million, or $1.79 diluted EPS, and revenue of $481 million, for the same period in the prior year.

96.    On October 28, 2010, during the 3Q10 earnings conference call, Defendant Gillette stated:

> Our manufacturing cost per watt was $0.77, which is down $0.08 or 10% year-over-year, and up $0.01 over Q2 of this year.

During the call, Defendant Gillette continued to conceal the Company's heat degradation problem by touting the success of its solar projects in the Southwestern U.S.:

> In terms of the market, *we've made progress in several areas*…and construction on both the 30 megawatt Cimarron and 48 megawatt Copper Mountain *facilities is progressing very well*. The 290 megawatt Agua Caliente project is fully permitted and initial construction has begun.

During the same call, Defendant Meyerhoff also failed to disclose the heat degradation problem:

> During the third quarter, we experienced strong demand led by growing sales in our [systems] business and by continued strength in our module business. Net sales for the third quarter were $797.9 million with sequential increase of $210 million or 36% compared to the second quarter of 2010. *The increase was primarily driven by* the completion of and revenue recognition for the 60 megawatt [AC] Sarnia phase two project and by continued percentage of completion recognition for the *Copper Mountain and Cimarron projects*, partially offset by a decrease in module average sale prices.

Defendant Meyerhoff also stated:

> Module cost per watt produced for the third quarter was $0.77 up $0.01 sequentially.

In response to an analyst question, Defendant Sohn stated:

1

2       We have good quality systems in place to ensure that *the product that we're*

3       *shipping is - to our standards*.

4   During the same call, Defendant Sohn responded to another analyst question, minimizing the

5   extent of the excursion:

6

7       **Satya Kumar** - *Credit Suisse –Analyst*

8

9       Hi. I was wondering if you could talk about the *factors that were driving the*

10      *accrued expenses* and, specifically, could you talk about whether the warranty

        issues that you had last quarter, *are there any additional allocations you expect to*

11      *make* in the second half of the year compared to the amount that you've already

        disclosed in Q2? Thanks.

12

13      **Bruce Sohn** - *First Solar, Inc. – President*

14

15      As mentioned, the increase in cost was really a direct result of the improvements

        that we're putting into the factories, and we expect to see those generate better

16      efficiencies and performance and lower cost. *In terms of the excursion that we*

        *mentioned last time, there were no additional costs incurred in Q3*.

17

18      97.     On November 1, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby,

19  Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar

20  to file its 10-Q with the SEC for 3Q10 ("3Q10 10-Q"), which was signed by Defendant Zhu

21  and reiterated the Company's previously announced quarterly financial results and financial

22  position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit

23  Committee, reviewed and approved the 10-Q prior to the time it was issued.  In addition, the

24  Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and

25  Meyerhoff, stating that the financial information contained in the Form 10-Q was accurate,

26  that there had been no material changes to the Company's internal control over financial

27

28

41

reporting, and that the Company's internal controls were adequate. The 10-Q included the following false statements:

### *Product warranties*

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

Product warranty activity during the three and nine months ended September 25, 2010 and September 26, 2009 was as follows (in thousands):

Product warranty liability, end of period       $25,032

98.     Defendants Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also misrepresented its continued successful cost reduction:

[W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended September 25, 2010, our total average manufacturing costs were $0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although Defendants Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

We believe that combining our *reliable*, low cost module *manufacturing capability* with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further ....

Defendants Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also stated:

42

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.85 during the three months ended September 26, 2009 to $0.77 during the three months ended September 25, 2010.

Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our **operational excellence**.

\*       \*       \*

During the three months ended September 25, 2010, we reduced our manufacturing cost per watt by 9% from our cost per watt in the three months ended September 26, 2009.

\*       \*       \*

Our increased line run rate was driven by an approximate **3% increase in the average conversion efficiency of solar modules** during the three months ended September 25, 2010 compared with the three months ended September 26, 2009.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham continued to conceal the true nature and extent of the excursion problem when they reported:

The $18.3 million increase in other costs for the nine months ended September 25, 2010 was due to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a **manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period**. The excursion could result in possible premature power loss in the affected modules. The root **cause** was **identified and subsequently mitigated in June 2009**. On-going testing confirms the **corrective actions are effective**. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $22.4 million in the first half of 2010 and $29.5 million in total-to-date to cover the replacement of the anticipated affected module population

43

in the field. We did not incur any incremental costs during the third quarter of 2010.

99.     Notwithstanding that Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future. Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 26, 2009:

> Thin film technology has a short history and our thin film technology and solar modules *may* perform below expectations; problems with product quality or performance *may cause* us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.
>
> *          *          *
>
> While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

100.     On December 8, 2010, at the Barclays Capital Global Technology Conference, Defendant Gillette concealed the heat degradation defect while touting the success of its solar projects in the Southwestern U.S.:

So we hope to be able to look at **announcing a sale on Agua Caliente**, which where we get a lot of questions about [and other things]. It's a big site; it is a 290-megawatt AC, 340-megawatt DC, it is roughly 2,300 acres. So it is a very, very large utility scale plant, and it will be the largest in the world by a factor of 3 to 4 by far.

101.    On December 14, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar to issue a press release announcing its fiscal 2011 financial guidance.  The release stated in part:

First Solar revenue and profit is continuing to grow in 2011," said Rob Gillette, First Solar Chief Executive Officer.  "We are **benefiting from** diversifying global partner demand and an **increase in revenue from utility scale projects**."

102.    On February 24, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Sohn, and Eaglesham caused First Solar to issue a press release announcing its 4Q10 and fiscal year-end 2010 financial results.  The Company reported net sales of $610 million and $1.80 diluted EPS for the quarter ending December 31, 2010.  Additionally, the Company reported net sales of $2,564 million and $7.68 diluted EPS for fiscal year 2010.

103.    On February 24, 2011 in the 4Q10 earnings conference call, Defendant Gillette falsely stated:

Our manufacturing cost per watt was $0.75, which is down $0.09, or 11% year-over-year, and down $0.02 compared to the third quarter.

104.    In the same call, Defendant Zhu repeated the false cost per watt information:

Our module costs per watt in the fourth quarter was $0.75, down $0.02 from prior quarter.

During the call, Defendant Zhu falsely reassured analysts that the claims process for the excursion problem was concluded:

> *During the fourth quarter we reserved an additional $8.5 million for the module replacement program discussed with you in our second-quarter 2010 earnings call. In Q4 we concluded a claims process and based on our field data and execution today, we updated our total replacement cost estimate.*

105.   On February 28, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Sohn, and Eaglesham caused First Solar to file its 10-K with the SEC for the fiscal year ended December 31, 2010 ("2010 10-K"), which was signed by Defendants Zhu, Ahearn, Nolan, Post, Presby, Stebbins, Sweeney, Kennedy, Villarreal, and Gillette, and reiterated the Company's previously announced financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-K prior to the time it was issued.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Gillette and Zhu, stating that the financial information contained in the Form 10-K was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.  The 10-K included the following false statements:

> [W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information.  In 2010, our total average manufacturing costs were $0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.
>
> *      *      *
>
> Our thin-film technology also has relatively **high energy performance** in low light and **high temperature environments** compared with traditional crystalline silicon solar modules.
>
> *      *      *
>
> Thin-film technology has a short history, and our thin-film technology and solar modules and systems **may** perform below expectations; problems with product quality or performance **may** cause us to incur warranty expenses, damage our market reputation, and prevent us from maintaining or increasing our market share.
>
> *      *      *

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* move to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate, or experience power degradation in excess of expectations, and our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and *cause* our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

\*       \*       \*

[W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In 2010, our total average manufacturing costs were $0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

\*       \*       \*

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.87 during 2009 to $0.77 during 2010… Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our *operational excellence*.

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Sohn, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

We believe that combining our *reliable*, low cost module *manufacturing capability* coupled with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems,… and [to] further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

47

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Sohn, and Eaglesham also falsely stated:

> **Product Warranties…** We accrue warranty costs when we recognize sales, using amounts estimated based on our historical experience with warranty claims, our monitoring of field installation sites, and in-house testing.
>
> \*       \*       \*
>
> Product warranty liability, end of period  $27,894

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Sohn, and Eaglesham continued to conceal the true nature and extent of the excursion problem when they reported:

> The net increase in other costs for 2010 includes $23.7 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred **affecting less than 4%** of the total product manufactured within the period. The excursion **could result** in possible premature power loss in the affected modules. The root cause was **identified and subsequently mitigated** in June 2009. On-going testing confirms that the **corrective actions taken are effective**. We have been working directly with impacted customers to replace the affected modules and these **efforts are well underway and, in some cases, complete**. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $30.8 million in 2010 and $37.9 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $8.5 million in expenses accrued during the fourth fiscal quarter of 2010, reflecting updated best estimates of the total replacement costs, based on our field data and execution to date of the module replacement program.
>
> \*       \*       \*
>
> (1) The above-referenced $28.9 million of accrued nonrecurring expenses in excess of normal product warranty liability and related expenses as of December 31, 2010 consisted of the following, each related to the manufacturing excursion described below: (i) $25.3 million in estimated expenses for certain module replacement efforts voluntarily undertaken by us beyond the normal product warranty (presented in Item 7: "Results of Operations" under "Cost of sales"); and (ii) $3.6 million in estimated nonrecurring post-sale expenses (presented in Item 7: "Results of Operations" under "Selling, general and administrative"). During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result

48

in possible premature power loss in affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage.

106.   On May 3, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to issue a press release announcing its 1Q11 financial results.  The Company reported net sales of $567 million and $1.33 diluted EPS for the quarter ending March 31, 2011.

107.   On May 3, 2011 during the 1Q11 earnings conference call, Defendant Gillette falsely stated:

Core costs, which excludes the ramp penalty and stock-based compensation, was $0.73 per watt, down 9% year-over-year, in-line with our cost reduction roadmap.

On the same call, Defendant Widmar repeated the false cost-per-watt information:

Looking at our cost per watt, our module cost per watt in the first quarter was $0.75, flat with the prior quarter.

108.   On May 5, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to file its 10-Q with the SEC for 1Q11.  The 10-Q included the following false statements:

***Product Warranties***

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

Product warranty activity during the three months ended March 31, 2011 and March 27, 2010 was as follows (in thousands):

*       *       *

49

Product warranty liability, beginning of period   $32,141

\*       \*       \*

First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended March 31, 2011, our total average manufacturing costs were $0.75 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

We believe that combining our **reliable**, low cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, accelerate the adoption of our technology in large scale systems, identify and break constraints to the successful migration to sustainable solar markets, and further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham also stated:

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.81 during the three months ended March 27, 2010 to $0.75 during the three months ended March 31, 2011… Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our **operational excellence**.

\*       \*       \*

Our net sales during the three months ended March 31, 2011 decreased slightly compared with the three months ended March 27, 2010, primarily due to a 14% decrease in our module average selling price, partially offset by an 11% increase in the volume of solar modules sold and a 5% increase in the average conversion efficiency of our solar modules.

\*     \*     \*

Cost of sales for the three months ended March 27, 2010 included $4.5 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred *affecting less than 4%* of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these *efforts are well underway and, in some cases, complete*. Some of these efforts go beyond our normal warranty coverage. No additional expense was accrued in the first quarter of 2011. $37.9 million in total-to-date has been accrued to cover the replacement of the anticipated affected module population in the field.

109.    Notwithstanding that Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 31, 2010:

Thin film technology has a short history and our thin-film technology and solar modules *may* perform below expectations; problems with product quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

\*     \*     \*

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any

51

widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

110.   On August 4, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to issue a press release announcing its 2Q11 financial results.  The Company reported net sales of $533 million and diluted EPS of $0.70 for the quarter ending June 30, 2011.

111.   On August 4, 2011, during the 2Q11 earnings conference call, Defendant Gillette falsely stated:

Module manufacturing cost per watt was $0.75, which is flat quarter over quarter.

112.   On August 5, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to file its 10-Q with the SEC for the quarterly period ended June 30, 2011, which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-Q prior to the time it was issued.  In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Widmar, stating that the financial information contained in the Form 10-Q was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.  The 10-Q included the following false statements:

### Product Warranties

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

Product warranty activity during the three and six months ended June 30, 2011 and June 26, 2010 was as follows (in thousands):

*       *       *

Product warranty liability, end of period  $36,356

*       *       *

[W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended June 30, 2011, our total average manufacturing costs were $0.75 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

We believe that combining our **reliable**, low-cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, accelerate the adoption of our technology in large scale systems, identify and break constraints to the successful migration to sustainable solar markets, and further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham also stated:

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, and our average manufacturing cost per watt declined from $0.76 during the three months ended June 26, 2010 to $0.75 during the three months ended June 30, 2011…. Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our **operational excellence**.

53

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham also stated:

> The increase in the MW volume of solar modules sold was attributable to the full ramp of our eight-line capacity expansion in our Malaysian manufacturing center and a 5% increase in our annual line run rate due to ***improvements in our module average conversion efficiency*** and our line throughput at existing manufacturing facilities.
>
> *       *       *
>
> Cost of sales for the three months ended June 26, 2010 included $17.8 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. We accrued $41.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $3.6 million in expenses accrued during the second quarter of 2011, reflecting updated best estimates of the total replacement costs, based on our field data and execution-to-date of the module replacement program.

113.   Notwithstanding that Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 31, 2010:

> Thin film technology has a short history and our thin-film technology and solar modules ***may*** perform below expectations; problems with product quality

54

or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

*     *     *

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

114.    On September 6, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused the Company to issue a press release falsely touting First Solar's "commitment to product quality and reliability."

> **First Solar, Inc.** today announced that it has extended its material and workmanship warranty from five to ten years.
>
> The new warranty… ***demonstrates the company's commitments to product quality and reliability***… "As one of the world's largest solar module manufacturers, we understand the need for a ***low-risk product*** that is backed by a comprehensive warranty," said Stephan Hansen, managing director of First Solar GmbH.

115.    On October 26, 2011, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to issue a press release announcing its third quarter 2011 financial results. The Company reported net sales of $1,006 million and diluted EPS of $2.25 per share.

116.     On November 3, 2011, during the 3Q11 earnings conference call, Defendant Ahearn stated:

> Today, much of this platform has been built with reduced module manufacturing costs per watt from $ 1.59 in 2005, which was our first full year of production, to $0.74 this past quarter.

117.     On the same call, Defendant Widmar repeated the false cost-per-watt information:

> Module manufacturing costs per watt was $0.74, which is down $0.01 quarter over quarter as a result of higher conversion efficiency.

118.     Widmar continued to misrepresent the true extent of the excursion defect:

> Gross margin was 37.7%, up 1.1 percentage points from the prior quarter. The increase was prior primarily due to higher ASPs, partially offset by increased manufacturing excursion accruals. During the quarter, we incurred $22.1 million of additional costs related to the manufacturing excursion that occurred from June 2008 to June 2009. ***We have substantially concluded the remediation programs associated with this manufacturing excursion***.
>
>     *   *   *
>
> The other was an $8.6 million for estimated post sales expenses related to the previously mentioned manufacturing excursion… It is important to note that we did not take these charges because our estimate of the percentage of modules with defects from the manufacturing excursion has changed. ***It remains still less than 4% of the modules produced from June 2008 to June 2009***.... Rather, these charges represent a higher than originally anticipated remediation cost and to support our value proposition and to increase customer satisfaction.

119.     On the same call, when asked about cost-per-watt, Defendant Widmar stated:

> So when we do the math - and it's very predictable to do the math and understand the improvement and the benefits the ***efficiency gains have on the cost per watt, so we're very confident***.

120.    On November 4, 2011, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to file its 10-Q with the SEC for the quarterly period ended September 30, 2011, which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.   Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 10-Q prior to the time it was issued.   In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Widmar, stating that the financial information contained in the Form 10-Q was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.   The 10-Q included the following false statements:

***Product Warranties***

We offer a limited warranty on our products and record an estimate of the associated warranty obligation based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

Normal product warranty activities during the three and nine months ended September 30, 2011 and September 25, 2010 was as follows (in thousands):

*        *        *

Product warranty liability, end of period  $42,505

*        *        *

[W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended September 30, 2011, our total average manufacturing costs were $0.74 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

57

Although Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable."

> We believe that combining our **reliable**, low-cost   module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, accelerate the adoption of our technology in large scale systems, identify and break constraints to the successful migration to sustainable solar markets, and further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham also stated:

> We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, and our average manufacturing cost per watt declined from $0.77 during the three months ended September 25, 2010 to $0.74 during the three months ended September 30, 2011...Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our **operational excellence**.
>
> *       *       *
>
> The increase in the MW volume of solar modules sold was attributable to the full ramp of our new production lines in Malaysia and Germany and a 6% increase in our annual line run rate due to improvements in our module average conversion efficiency and line throughput at our manufacturing facilities.

Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham continued to conceal the true extent and nature of the excursion problem when they reported:

During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are in most cases complete or well underway for the remaining cases. These efforts go beyond our limited warranty obligation. We accrued $63.6 million in total-to-date manufacturing excursion expense to cover the replacement of the anticipated affected module population in the field. Such amounts include $22.1 million in expenses accrued during the three months ended September 30, 2011, reflecting our most recent best estimates of the total replacement costs, based on our field data and execution-to-date of this excursion related module replacement program.

121.    Notwithstanding that Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 31, 2010:

Thin film technology has a short history and our thin-film technology and solar modules *may* perform below expectations; problems with product quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

*        *        *

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could*

59

cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

122.    On the December 14, 2011 Guidance Call, the following was stated:

**Timothy Arcuri** - Citigroup –Analyst

Hi, guys. I had two things. First of all, a lot of the long-term cost reduction is based upon higher efficiencies. And you've recently **had some issues out in the field with some product that talking to some of your customers seems to be related to the higher efficiency product**. So I'm wondering what the resolution and the risk around some of these issues - some of these power issues going on in the field are? Number one, if you could help us with that risk?

\*       \*       \*

**Mike Ahearn** - First Solar Inc. - Chairman and Interim CEO

I would say on long-term field reliability, that is always a risk when you're changing processes and it has been from the time we went into production. We have had on occasion issues and they are dealt with.  **We cover them. That has all been reflected in our financials.**

The [steady] issues that have been reported that I'm aware of relate to prior years productions. And when we have field problems - when we have positive experience or negative, we take that back into the factory and improve processes but also improve our metrology and our accelerated reliability testing - our predictive ability. And as a result, we are much better able today to measure and assess the long-term field performance of modules coming off the line than we were a year ago, two years ago, five years ago.

\*       \*       \*

So it's not about abandoning quality for – to try to drive efficiency or numbers.

123.    Defendants knew or recklessly disregarded that the statements made between July 29, 2010 and December 14, 2011 were misleading because they presented a false picture of First Solar's results by, among other things, failing to disclose and actively concealing the excursion and heat degradation defects from investors.  In particular, Defendants knew or recklessly disregarded that:

(a) the July 29, 2010, October 28, 2010, February 24, 2011, May 3, 2011, August 4, 2011 and October 26, 2011 statements, referred to above, concerning the Company's reported net income, earnings per share, and revenue were materially false and misleading as a result of the Company's understatement of warranty reserves;

(b) the July 29, 2010, August 2, 2010, October 28, 2010, November 1, 2010, February 24, 2011, February 28, 2011, May 3, 2011, May 5, 2011, August 4, 2011, August 5, 2011, October 26, 2011, November 3, 2011, and November 4, 2011 statements, referred to above, concerning the Company's reported cost-per-watt were materially false and misleading because the cost-per-watt metric was understated and manipulated;

(c) the August 2, 2010, November 1, 2010, February 28, 2011, May 5, 2011, August 5, 2011 and November 4, 2011 statements, referred to above, concerning potential product quality and performance problems that could lead to material product warranty costs were materially false and misleading because significant product quality and performance problems were already occurring;

(d) the February 28, 2011 and December 14, 2011 statements, referred to above, regarding module performance in "high temperature environments" were materially false and misleading because the Company's solar panels were failing and experiencing high failure rates in high temperature climates (*i.e.*, heat degradation);

(e) the July 29, 2010, October 28, 2010, November 1, 2010 and December 22, 2010 statements, referred to above, concerning a solar project in the Southwestern U.S. were materially false and misleading because the statement concealed the severe heat degradation defect affecting modules installed in hot climates;

(f) the February 28, 2011, May 5,2 011, August 5, 2011, September 6, 2011 and November 4, 2011 statements, referred to above, regarding the Company's successful manufacturing process, "operational excellence," and product reliability were materially false and misleading because the statements concealed pervasive product defects and manufacturing problems, including the excursion and heat degradation defects;

(g)      the August 2, 2010, November 1, 2010, February 28, 2011, May 5, 2011 and November 4, 2011 statements, referred to above, concerning product warranties were false and misleading because the Company's warranty reserve was materially understated;

(h)      the July 29, 2010, November 1, 2010, February 28, 2011, May 5, 2011, August 2, 2011, August 5, 2011 and November 4, 2011 statements, referred to above, concerning module conversion efficiency were materially false and misleading because the statements concealed the fact that the module conversion efficiency was increased by manipulating the D-rating; and

(i)      the July 29, 2010, August 2, 2010, October 28, 2010, November 1, 2010, February 24, 2011, February 28, 2011, May 5, 2011, August 5, 2011, November 3, 2011, November 4, 2011, and December 14, 2011 statements, referred to above, regarding the manufacturing excursion were materially false and misleading because the statements concealed the true nature and extent of the excursion problem.  In particular, (i) the defective modules were not limited to "less than 4%" (or roughly 348,500 modules) of the total products manufactured from June 2008 to June 2009, because, in fact, over 1.5 million modules were affected, (ii) the problem was not mitigated in June 2009, because, in fact, the Company continued to produce and install defective modules beyond June 2009, and (iii) the remediation efforts were not substantially completed because, in fact, the Company had only recognized a fraction of the total excursion-related costs.

## THE TRUTH EMERGES

124.   On February 28, 2012, after the market closed, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2011.  For the fourth quarter, the Company reported a net loss of $413 million, or ($4.74) diluted EPS and revenue of $660 million, as compared to net income of $156 million, or $1.80 diluted EPS and revenue of $609.8 million, for the same period the prior year.  For the year, the Company reported a net loss of $39.5 million, or ($0.46) diluted EPS and revenue of $2.8 billion, as compared to net income of $664 million, or $7.68 diluted EPS and revenue

of $2.6 billion for the same period a year ago.  The Company also disclosed, in relevant part, the following:

> Fourth quarter 2011 net sales were $660 million, a decrease of $345 million from the third quarter of 2011, primarily due to the timing of revenue recognition in our systems business and lower volume for module-only sales…

> The fourth quarter of 2011 was impacted by pre-tax charges of $393 million (reducing EPS by $3.90) associated with a non-cash goodwill impairment for our components business, $164 million (reducing EPS by $1.67) related to warranty and cost in excess of normal warranty expense, and $60 million (reducing EPS by $0.43) related to restructuring activities, as announced in December 2011.

125.    On February 29, 2012, the Company filed an annual report for the period ended December 31, 2011 on Form 10-K with the SEC, which was signed by Defendants Ahearn and Widmar, and reiterated the Company's previously announced financial results and financial position.  In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants Ahearn and Widmar, stating that the financial information contained in the Form 10-K was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate..

126.    The 10-K also represented the following, in relevant part:

> 2008-2009 Manufacturing Excursion

> During the period from June 2008 to June 2009, a manufacturing excursion occurred whereby certain modules manufactured during that time period may experience premature power loss once installed in the field.  The root cause of the manufacturing excursion was identified and addressed in June 2009.  Beginning in 2009, we initiated a voluntary remediation program beyond our standard limited warranty pursuant to which we made commitments to customers with systems containing modules manufactured during the relevant period that we would cover certain costs of remediation efforts.  These remediation efforts included module removal, replacement and logistical services and additional compensation payments to customers under certain circumstances.   Our best estimate for costs of our voluntary remediation program, as of and in each fiscal period in question, has

been based on evaluation and consideration of the then-currently available information, including the estimated number of affected modules in the field, historical experience related to our voluntary remediation efforts, customer-provided data related to potentially affected systems and the estimated costs of performing the logistical services covered under our remediation program.

\*       \*       \*

In the fourth quarter of 2011, we accrued additional expenses in excess of standard product warranty liability relating to our voluntary remediation program.  A principal driver behind such additional accrual was our greater understanding as of year-end, obtained through the processing of thousands of claims as described below, of the number of modules not affected in the manufacturing excursion that needed to be removed (and subsequently replaced) in order for us to be able to identify and remedy the number of modules actually affected by the manufacturing excursion....

In response to our communications to customers regarding our intent to undertake a voluntary remediation program, we received more than five thousand customer claims, which covered an installed base greater than our entire production output during the June 2008 - June 2009 timeframe.  In our processing of these claims to date, we have determined that we will take remediation actions in accordance with our voluntary remediation program with respect to approximately 1,100 of such claims, approximately an additional 200 claims could, pending receipt of additional information, qualify for remediation, and the balance of approximately 4,000 claims have been or will be rejected as they did not meet the criteria for participation in our voluntary remediation program (including claims containing insufficient data necessary to evaluate them).  We have expensed $215.7 million total to-date for the estimated costs of remediating systems affected by modules manufactured during the relevant period, including $145.6 million for remediation expenses beyond our limited warranty obligations and $70.1 million in product warranty expense reflecting the net increase in the expected number of replacement modules required in connection with our remediation efforts....

127.   Bloomberg News noted that in the fourth quarter, the warranty problem led "to warranty claims of $125.8 million in the fourth quarter, or more than half the total spent on the glitch to date.  It also put aside $37.8 million to cover future claims."  The Wall Street

Journal reported that the Company "has spent nearly $254 million replacing customers' solar panels that didn't perform as promised and changing its warranty."  Mark Bachman, an analyst at Avian Securities LLC noted that the "charges [are] about 10 times what they said they were going to be when they first reported the issue."

128.    On this news, shares of First Solar dropped $4.10 per share or 11%, to close at $32.30 per share on February 29, 2012.

## INSIDER SELLING ALLEGATIONS

129.    The Individual Defendants' knowledge of the true health of First Solar's business and the extent of the manufacturing deficiencies is also shown in the Insider Selling Defendants' sales of their personally-held First Solar stock.  Defendants, Ahearn, Meyerhoff, Eaglesham, Sohn, Sweeney, Zhu, Nolan, and Presby, were privy to adverse, non-public information which they exploited for their own benefit, to the exclusion of other shareholders, by selling their Company stock before the truth came to light.   While continuously making or causing the Company to make improper statements touting First Solar's purported positive growth, and effectively concealing the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing their solar panels, certain officers and directors sold massive amounts of personally owned Company stock in order to capitalize on the Company's inflated stock price that they had helped create.  In committing these self-serving acts, they breached their fiduciary duty of loyalty that they owe to First Solar and its shareholders.

130.    The sales are summarized in the following chart:

| Defendant | Shares Sold | Proceeds | Percentage of Shares Sold |
| --- | --- | --- | --- |
| Ahearn | 3,239,016 | $427,233,588 | 97% |
| Meyerhoff | 118,827 | $18,577,773 | 80% |
| Eaglesham | 69,983 | $9,645,827 | 94% |
| Sohn | 74,750 | $12,390,248 | 75% |

| | | | |
|---|---|---|---|
| **Sweeney** | 24,749 | $4,417,934 | 91% |
| **Zhu** | 7,884 | $1,172,204 | 48% |
| **Nolan** | 24,000 | $5,351,425 | 92% |
| **Presby** | 1,000 | $137,810 | 18% |
| | | | |
| **Total** | **3,560,209** | **$478,926,810** | |

131.   Defendants sold their stock for as high as $311.14 per share while the lowest price that any Defendant sold First Solar shares was $96.74.

**A.   Defendant Ahearn's Insider Sales**

132.   As the founder, CEO, Chairman of the Board, and a director of First Solar, Defendant Ahearn was a member of Company management and Board and was privy to material, non-public information about the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing the Company's solar panels.   Ahearn was responsible for his statements in SEC filings, which included disclosures concerning the extent of the remediation necessary to respond to the Company's manufacturing deficiencies and the Company's positive growth.   Ahearn engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

133.   While in possession of this knowledge, Defendant Ahearn sold 3,239,016 shares of his personally held First Solar stock for proceeds of $427,233,588.   Ahearn's sales were timed to maximize profit from First Solar's then artificially inflated stock price. Ahearn did not allow his own wealth to suffer and only possessed 101,574 shares when the truth about the remediation costs emerged.   Ahearn's sales are suspicious given that they represented 97% of his holdings.

134.   When questioned during a March 3, 2010 conference call, Defendant Meyerhoff conceded that the timing of Defendant Ahearn's February 2010 sales were

1    suspicious: "Your chairman sold a bunch of stock last week.  What does he know that we

2    don't know."  Meyerhoff responded: "Was this the best timing to do this?  No, it probably

3    wasn't the best timing to do this.  Were we entirely happy about the timing?  No, we were

4    not.  I believe we put this behind us."

5    **B.**    **Defendant Meyerhoff's Insider Sales**

6    135.   As First Solar's President of Utility Systems Business Group and CFO,

7    Defendant Meyerhoff was a member of Company management and was privy to material,

8    non-public information about the extent of remediation efforts needed to respond to the

9    manufacturing deficiencies plaguing the Company's solar panels.  Defendant Meyerhoff was

10   responsible for his statements in SEC filings, which included disclosures concerning the

11   extent of the remediation necessary to respond to the Company's manufacturing deficiencies

12   and the Company's positive growth.  Meyerhoff engaged in insider trading activity at a time

13   when he knew adverse material, non-public information about the Company's impending

14   costly remediation efforts.

15   136.   While in possession of this knowledge, Defendant Meyerhoff sold 118,827

16   shares of his personally held First Solar stock for proceeds of $18,577,773.  Meyerhoff's

17   sales were timed to maximize profit from First Solar's then artificially inflated stock price.

18   Meyerhoff did not allow his own wealth to suffer and only possessed 29,768 shares when the

19   truth about the remediation costs emerged.  Meyerhoff's sales are suspicious given that his

20   stock sales represented 80% of his holdings.

21   **C.**    **Defendant Eaglesham's Insider Sales**

22   137.   As First Solar's Chief Technology Officer, Defendant Eaglesham was a

23   member of Company management and was privy to material, non-public information about

24   the extent of remediation efforts needed to respond to the manufacturing deficiencies

25   plaguing the Company's solar panels.  Defendant Eaglesham was responsible for his

26   statements in SEC filings, which included disclosures concerning the extent of the

27   remediation necessary to respond to the Company's manufacturing deficiencies and the

28   Company's positive growth.  Defendant Eaglesham engaged in insider trading activity at a

time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

138.   While in possession of this knowledge, Defendant Eaglesham sold 69,983 shares of his personally held First Solar stock for proceeds of $9,645,827.  Eaglesham's sales were timed to maximize profit from First Solar's then artificially inflated stock price.  Eaglesham did not allow his own wealth to suffer and only possessed 4,316 shares when the truth about the remediation costs emerged.  Eaglesham's sales are suspicious given that his stock sales represented over 94% of his holdings.

**D.   Defendant Sohn's Insider Sales**

139.   As First Solar's President of Operations and director, Defendant Sohn was a member of Company management and the Board and was privy to material, non-public information about the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing the Company's solar panels.  Defendant Sohn was responsible for his statements in SEC filings, which included disclosures concerning the extent of the remediation necessary to respond to the Company's manufacturing deficiencies and the Company's positive growth.  Defendant Sohn engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

140.   While in possession of this knowledge, Defendant Sohn sold 74,750 shares of his personally held First Solar stock for proceeds of $12,390,248.  Defendant Sohn's sales were timed to maximize profit from First Solar's then artificially inflated stock price.  Sohn's sales are suspicious given that his stock sales represented 75% of his holdings.

**E.   Defendant Sweeney's Insider Sales**

141.   As a director for over eight years, Defendant Sweeney was privy to material, non-public information about the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing the Company's solar panels.  Defendant Sweeney was responsible for his statements in SEC filings, which included disclosures concerning the

extent of the remediation necessary to respond to the Company's manufacturing deficiencies and the Company's positive growth. Sweeney engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

142.    While in possession of this knowledge, Defendant Sweeney sold 24,749 shares of his personally held First Solar stock for proceeds of $4,417,934. Sweeney's sales were timed to maximize profit from First Solar's then artificially inflated stock price. Sweeney did not allow his own wealth to suffer and only possessed 2,361 shares when the truth about the remediation costs emerged. Defendant Sweeney's sales are suspicious given that his stock sales represented 91% of his holdings.

**F.    Defendant Zhu's Insider Sales**

143.    As First Solar's Chief Accounting Officer and Interim CFO, Defendant Zhu was privy to material, non-public information about the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing the Company's solar panels. Defendant Zhu was responsible for his statements in SEC filings, which included disclosures concerning the extent of the remediation necessary to respond to the Company's manufacturing deficiencies and the Company's positive growth. Defendant Zhu engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

144.    While in possession of this knowledge, Defendant Zhu sold 7,884 shares of his personally held First Solar stock for proceeds of $1,172,204. Zhu's sales were timed to maximize profit from First Solar's then artificially inflated stock price. Zhu's sales are suspicious given that his stock sales represented 48% of his holdings.

**G.    Defendant Nolan's Insider Sales**

145.    As a director for over nine years and the designer that led the First Solar team to develop the process for producing large area thin film cadmium telluride solar modules, Defendant Nolan was privy to material, non-public information about the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing the

Company's solar panels.  Defendant Nolan was responsible for his statements in SEC filings, which included disclosures concerning the extent of the remediation necessary to respond to the Company's manufacturing deficiencies and the Company's positive growth.  Nolan engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

146.    While in possession of this knowledge, Defendant Nolan sold 24,000 shares of his personally held First Solar stock for proceeds of $5,351,425.  Nolan's sales were timed to maximize profit from First Solar's then artificially inflated stock price.  Nolan's sales are suspicious given that his stock sales represented over 92% of his holdings.

**H.    Defendant Presby's Insider Sales**

147.    As a director for over five years and Chairman of First Solar's Audit Committee, Defendant Presby was privy to material, non-public information about the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing the Company's solar panels.  Defendant Presby was responsible for his statements in SEC filings, which included disclosures concerning the extent of the remediation necessary to respond to the Company's manufacturing deficiencies and the Company's positive growth. Defendant Presby engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

148.    While in possession of this knowledge, Defendant Presby sold 1,000 shares of his personally held First Solar stock for proceeds of $137,810.  Presby's sales were timed to maximize profit from First Solar's then artificially inflated stock price.  Presby's sales are suspicious given that his stock sales represented over 18% of his holdings.

149.    Combined, defendants Ahearn, Meyerhoff, Eaglesham, Sohn, Sweeney, Zhu, Nolan, and Presby sold over $478 million worth of their Company stock.  The following is a table showing the total insider sales that occurred during the period:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **AHEARN** | 5/15/2008 | 150,000 | $308.81 | $46,187,819.63 |
| | 5/16/2008 | 100,000 | $310.05 | $31,016,585.93 |

| | | | | |
|---|---|---|---|---|
| | 2/22/2010 | 550,000 | $113.11 | $62,208,595.98 |
| | 2/23/2010 | 400,000 | $106.80 | $42,720,069.36 |
| | 2/24/2010 | 350,000 | $105.25 | $36,838,420.69 |
| | 2/25/2010 | 100,000 | $102.39 | $10,239,212.39 |
| | 2/26/2010 | 100,000 | $104.29 | $10,429,400.94 |
| | 2/28/2011 | 6,900 | $149.15 | $1,029,135.00 |
| | 3/1/2011 | 68,900 | $149.25 | $10,283,616.96 |
| | 3/2/2011 | 24,200 | $146.40 | $3,542,850.28 |
| | 3/3/2011 | 40,000 | $148.39 | $5,935,600.60 |
| | 3/4/2011 | 60,000 | $147.21 | $8,832,489.58 |
| | 3/8/2011 | 30,000 | $142.41 | $4,272,365.52 |
| | 3/9/2011 | 24,600 | $142.95 | $3,516,513.13 |
| | 3/10/2011 | 45,400 | $140.03 | $6,357,250.22 |
| | 3/11/2011 | 50,000 | $139.85 | $6,992,653.00 |
| | 3/14/2011 | 110,000 | $146.60 | $16,126,180.00 |
| | 3/15/2011 | 100,000 | $156.55 | $15,654,819.84 |
| | 3/16/2011 | 33,330 | $155.53 | $5,183,715.50 |
| | 3/17/2011 | 26,670 | $156.77 | $4,181,007.90 |
| | 3/18/2011 | 10,000 | $150.19 | $1,501,908.00 |
| | 3/21/2011 | 20,000 | $151.54 | $3,030,750.00 |
| | 3/22/2011 | 20,000 | $149.32 | $2,986,468.00 |
| | 3/23/2011 | 60,000 | $149.82 | $8,989,122.46 |
| | 3/24/2011 | 30,000 | $150.79 | $4,523,633.72 |
| | 3/25/2011 | 40,000 | $149.39 | $5,975,513.40 |
| | 8/8/2011 | 460,000 | $99.56 | $45,798,071.30 |
| | 8/9/2011 | 133,016 | $98.62 | $13,117,906.64 |
| | 8/10/2011 | 96,000 | $101.69 | $9,761,914.42 |
| **Total:** | | **3,239,016** | | **$427,233,588** |
| | | | | |
| **EAGLESHAM** | 4/30/2010 | 15,882 | $148.02 | $2,350,835.28 |
| | 5/18/2010 | 5,000 | $115.36 | $576,802.35 |
| | 8/2/2010 | 10,881 | $126.35 | $1,374,851.07 |
| | 9/1/2010 | 3,627 | $129.74 | $470,580.95 |
| | 10/1/2010 | 3,627 | $146.54 | $531,516.00 |
| | 11/1/2010 | 3,627 | $134.97 | $489,522.63 |
| | 12/1/2010 | 3,627 | $128.78 | $456,207.17 |
| | 1/3/2011 | 3,627 | $132.61 | $480,958.69 |
| | 2/1/2011 | 3,627 | $156.40 | $567,255.64 |
| | 3/1/2011 | 3,627 | $147.54 | $535,115.47 |
| | 3/4/2011 | 1,944 | $146.93 | $285,640.40 |
| | 4/1/2011 | 3,627 | $159.41 | $578,189.99 |
| | 5/2/2011 | 3,627 | $139.09 | $504,497.38 |
| | 6/1/2011 | 3,633 | $122.17 | $443,853.53 |
| **Total:** | | **69,983** | | **$9,645,826.55** |
| | | | | |
| **MEYERHOFF** | 5/13/2008 | 3125 | $291.81 | $895,749.53 |
| | 6/10/2008 | 2702 | $240.76 | $650,137.04 |
| | 7/8/2008 | 3125 | $253.04 | $790,700.49 |
| | 8/12/2008 | 3125 | $254.64 | $795,139.00 |
| | 5/1/2009 | 15,000 | $184.30 | $2,753,766.20 |

| | | | | |
|---|---|---|---|---|
| | | 4/30/2010 | 30,000 | $148.95 | $4,468,476.20 |
| | | 6/16/2010 | 7,500 | $120.17 | $901,275.00 |
| | | 6/17/2010 | 5,000 | $125.33 | $626,650.00 |
| | | 7/8/2010 | 7,500 | $130.16 | $976,200.00 |
| | | 8/2/2010 | 7,500 | $126.41 | $948,075.00 |
| | | 8/4/2010 | 2,500 | $130.06 | $325,150.00 |
| | | 8/17/2010 | 5,000 | $125.62 | $628,104.00 |
| | | 9/1/2010 | 3,125 | $129.01 | $403,156.33 |
| | | 10/1/2010 | 3,125 | $146.45 | $457,665.25 |
| | | 11/1/2010 | 2,500 | $137.29 | $343,225.00 |
| | | 11/4/2010 | 50 | $140.00 | $7,000.00 |
| | | 11/5/2010 | 575 | $140.00 | $80,500.00 |
| | | 12/2/2010 | 2,000 | $130.00 | $260,000.00 |
| | | 12/7/2010 | 500 | $135.00 | $67,500.00 |
| | | 12/15/2010 | 625 | $140.00 | $87,500.00 |
| | | 1/3/2011 | 2,000 | $131.79 | $263,580.00 |
| | | 1/6/2011 | 500 | $134.53 | $67,265.00 |
| | | 1/12/2011 | 625 | $140.00 | $87,500.00 |
| | | 1/24/2011 | 8,000 | $150.59 | $1,204,720.00 |
| | | 2/1/2011 | 3,125 | $156.40 | $488,739.50 |
| | **Total:** | | **118,827** | | **$18,577,773.54** |
| | | | | | |
| | **NOLAN** | 8/4/2008 | 14,000 | $278.22 | $3,839,110.34 |
| | | 2/28/2011 | 10,000 | $152.94 | $1,512,315.00 |
| | **Total:** | | **24,000** | | **$5,351,425.34** |
| | | | | | |
| | **PRESBY** | 11/12/2010 | 1,000 | $137.81 | $137,810.00 |
| | **Total:** | | **1,000** | | **$137,810.00** |
| | | | | | |
| | **SOHN** | 8/28/2008 | 12,750 | $279.05 | $3,557,902.1 |
| | | 8/30/2010 | 12,000 | $126.98 | $1,523,751.40 |
| | | 11/1/2010 | 4,000 | $137.16 | $548,624.00 |
| | | 11/4/2010 | 50 | $140.00 | $7,000.00 |
| | | 11/5/2010 | 4,950 | $140.01 | $693,049.50 |
| | | 11/16/2010 | 4,000 | $137.44 | $549,760.00 |
| | | 12/15/2010 | 5,000 | $140.20 | $701,000.00 |
| | | 12/21/2010 | 4,000 | $132.99 | $531,960.00 |
| | | 1/12/2011 | 5,000 | $140.00 | $700,000.00 |
| | | 1/18/2011 | 9,000 | $140.78 | $1,267,061.00 |
| | | 2/2/2011 | 14,000 | $165.01 | $2,310,140.00 |
| | **Total:** | | **74,750** | | **$12,390,248** |
| | | | | | |
| | **SWEENEY** | 8/29/2008 | 4,999 | $277.84 | $1,387,991.41 |
| | | 5/6/2009 | 6,000 | $197.80 | $1,185,405.00 |
| | | 5/28/2010 | 3,000 | $111.53 | $334,590.00 |
| | | 11/13/2010 | 4,000 | $122.76 | $491,040.00 |
| | | 2/28/2011 | 6,750 | $150.95 | $1,018,908.30 |
| | **Total:** | | **24,749** | | **$4,417,934.71** |
| | | | | | |
| | **ZHU** | 11/16/2009 | 500 | $124.70 | $62,350.00 |

| | 4/30/2010 | 4,062 | $239.61 | $973,315.68 |
|---|---|---|---|---|
| | 2/28/2011 | 3,322 | $152.45 | $506,438.70 |
| **Total:** | | **7,884** | | **$1,172,204** |
| | | | | |
| **Total:** | | **3,560,209** | | **$478,926,810** |

150. While the Insider Selling Defendants sold most of their personally-held Company stock pursuant to 10b5-1 plans, these plans were adopted after the misconduct had already begun. As such, Defendants Ahearn, Meyerhoff, Eaglesham, Sohn, Sweeney, Zhu, Nolan, and Presby knew that First Solar's stock was artificially inflated due to their improper statements when adopting the 10b5-1 plans, and cannot avail themselves of the inference that they did not trade on the material adverse, non-public information.

### THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO VIOLATE GAAP

#### A.  GAAP Violation: Financial Statements Must Conform with GAAP

151. Throughout the Relevant Period, the Individual Defendants represented that the Company's financial statements were presented in conformity with Generally Accepted Accounting Principles ("GAAP"). These representations were materially false and misleading when made because the Individual Defendants, in violation of GAAP and SEC rules, knowingly or recklessly employed improper accounting and disclosure practices that materially misstated the financial results and position of First Solar.

152. Financial statements filed with the SEC are required to be in accordance with GAAP and are the responsibility of the Company. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial

1   statements. 17 C.F.R. §210.10-01(a).[1]  First Solar's corresponding earnings releases filed on

2   Form 8-K also were required to comply SEC Regulation S-K.

3   153.   The Individual Defendants violated GAAP and SEC rules because the Relevant

4   Period financial statements were not prepared in conformity with applicable financial

5   reporting requirements, nor was the financial information a "fair presentation" of First Solar's

6   operations and financial position.   The Individual Defendants did so by not properly

7   accounting for warranty reserves; not disclosing known trends and uncertainties associated

8   with the excursion and heat degradation defects; not disclosing revenue recognition on

9   defective products; and not disclosing goodwill attributed to the OptiSolar and NextLight

10  acquisitions.

11  **B.     GAAP Violation: Understated Warranty Reserves**

12  154.   The Individual Defendants violated GAAP by failing to properly and timely

13  recognize warranty contingencies related to known product defects.   A warranty is an

14  obligation incurred in connection with the sale of goods or services that may require further

15  performance by the seller after the sale has taken place.  Accounting Standards Codification

16  ("ASC") 460-10-25 "Guarantees," governs the accounting for warranty obligations incurred

17  in connection with the sale of goods or services.   ASC 460 states that because of the

18  uncertainty surrounding claims that may be made under warranties, warranty obligations fall

19  within the definition of a loss contingency as defined under ASC 450.  GAAP, ASC 450-20,

20  Loss Contingencies, requires an accrual of losses from warranty obligations by a charge to

21  _____

22  [1] On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued Statement
    of Financial Accounting Standards ("SFAS") No. 168, *The FASB Accounting Standards*

23  *Codification and the Hierarchy of Generally Accepted Accounting Principles* – a

24  replacement of FASB Statement No. 162. *FASB Accounting Standards Codification* ("ASC")
    became the source of authoritative U.S. accounting and reporting standards for

25  nongovernmental entities, in addition to guidance issued by the SEC, effective for financial

26  statements issued for reporting periods that ended after September 15, 2009. The
    Codification did not change existing U.S. GAAP. These allegations use the current

27  references to U.S. GAAP, unless otherwise indicated there are no applicable changes within

28  the Relevant Period.

income (in the case of First Solar the charge would be in the form of a warranty reserve) if, at the time the financial statements are issued, it is probable that a warranty obligation or potential loss has been incurred, and the loss can be reasonably estimated.[2]  The purpose of these conditions is to require accrual of losses (charge to income in terms of an expense) when they are reasonably estimable and relate to the current or a prior period.[3]

155.   Warranty obligations represent a loss contingency under ASC Topic 450-20 that must be accrued for in a company's financial statements.  GAAP further requires that the cost of an express or implied warranty obligation, under which manufacturing flaws in certain of the Company's solar panels were agreed to be remedied, should be accrued at the time the sale was recognized.  ASC Topic 450-20 further requires that when it is probable that an entity will incur a warranty obligation, the entity must record an accrual (charge against income) for the reasonably estimated potential costs.

156.   Because of its 25-year performance guarantee, First Solar was required to maintain warranty reserves sufficient to cover estimated future remediation costs on every product it sold since the inception of the Company in 2002.  While an accurate estimate of 25-year performance was not possible to calculate based on the Company's limited history, the Individual Defendants deemed it reasonable to base the warranty reserves primarily on four factors: (1) historical claim experience (*i.e.*, defect rates); (2) the number of solar modules covered under warranty; (3) the cost to remediate a claim (*i.e.*, the current cost to replace a defective solar module with a new solar module); and (4) monitoring of module performance at field installation sites.  The Individual Defendants caused the Company to represent that it monitored these factors closely and adjusted the Company's warranty reserves as needed.   In the event that a specifically-identified product defect was encountered, the historical claims experience (across all products ever sold by the Company)

_____

[2]      *See also* ASC 460, Guarantees, for uniform guidance.

[3]      If the losses cannot be reasonably estimated, disclosure is required in the footnotes to the financial statements as described in detail below.

was clearly not indicative of future claims for the products affected by that particular defect. Therefore, if the defect was significant, the Company was required to increase its warranty reserve to account for specific losses on the affected products in addition to maintaining warranty reserves across all remaining products at the historical defect rate.

157.   The modules affected by the excursion were clearly expected to experience higher defect rates than what the Company had historically experienced.  As such, the "estimate of the number of solar modules that would require replacement" (one of the inputs to the warranty reserve calculation) was required to be increased.[4]  Applying the existing warranty reserve to a specific product defect problem, such as the excursion, without increasing the reserve would leave the reserve coverage on all remaining modules severely understated.[5]  For a specifically-identified product defect, such as the excursion or the heat degradation defect, the Company was required to set aside additional specific reserves to cover the future remediation costs that were known to be above and beyond the Company's historical defect rate.  From the moment the Individual Defendants received, and ignored, their first warning regarding the issues surrounding the "manufacturing excursion," they were on notice that the Company's solar panels were not operating to published and agreed to standards, resulting in the Company incurring substantial costs to remediate and warrant its defective products.

158.   The Company readily admitted that the "manufacturing excursion was identified June 2009" and the heat degradation defect was also known by the Individual Defendants by no later than 2Q09.  The product performance problems had surfaced in the

---

[4]      "Should we change our estimate of the number of solar modules that would require replacement and/or the replacement cost per solar module, we would account for that change in estimate in accordance with GAAP."  (Response to SEC Comment Letter filed August 9, 2006.)

[5]      As explained herein, First Solar had material product quality problems outside of the excursion and heat degradation defects.  Thus, the existing reserve was understated to begin with and certainly was not sufficient to cover general product quality problems across all modules and specific problems such as the excursion and heat degradation.

form of customer complaints and the Company was investigating the issue to determine the cause.  Further, First Solar had material product quality problems outside of the excursion and heat degradation defects that existed as of the start of the Relevant Period.  Therefore, under ASC 450, warranty reserves to account for these specific product problems were required to be increased, or if the losses could not be reasonably estimated, disclosures of loss contingencies were required in the footnotes to the Company's financial statements.  The Individual Defendants did neither.  In fact, the Individual Defendants did just the opposite and deliberately, steadily and consistently decreased the Company's reserve coverage[6] from 2.24% at 1Q08 to 1.11% at 4Q10.

159.   The decrease in warranty coverage was no accident.   The Individual Defendants knowingly and deliberately decreased the reserve by booking a "change in estimate of warranty liability" every quarter.  As described above, the Individual Defendants caused the Company to represent that First Solar's estimate (and the resulting accounting entry to change the estimate) was based on several factors including the total number of modules that had been installed in the field, any updated information as to the defect rate and performance of those modules, and the current manufacturing costs for modules requiring replacements.  While the manufacturing costs were declining, this decrease was more than offset by the other factors.  For example, the cumulative number of modules installed in the field and covered under warranty was increasing significantly from the beginning of the Relevant Period as shown in the chart below:

---

[6]      Calculated based on cumulative MW sold since 2002.

160.    In addition, the most updated information available to the Individual Defendants regarding defect rates and product performance problems revealed massive problems and indicated defect rates at rates far exceeding the historical defect rate used in the original reserve calculation.  Thus, the only conceivable "change in warranty estimate" that could be recorded was an increase.  However, in each quarter from the second quarter of fiscal year 2008 through the third quarter of fiscal year 2009, the Individual Defendants disclosed cumulative decreases in their "changes in warranty estimate" by over $7.0 million.  Such decreases contributed to the understatement of First Solar's warranty reserves.  The decreases to the warranty estimate[7] resulted in the Company understating its warranty reserve from the start of the Relevant Period in 1Q08, in violation of GAAP.

161.    In 2Q10, First Solar began reserving for excursion remediation costs in two accounts: 1) its warranty reserve (as described above); and 2) an additional excursion liability for costs associated with voluntary remediation efforts that were "beyond . . . normal warranty coverage."  However, a significant portion of the excursion remediation remained

---

[7]    While the overall warranty reserve increased in dollar terms during these periods solely because the Company sold more products in that period, the reserve coverage declined on a percentage basis.  The warranty reserves did not keep pace with the total cumulative modules covered under warranty.

outside the scope of First Solar's regular product warranty including the cost of replacement modules.[8]  In 2Q10, when the excursion was disclosed for the first time, the Individual Defendants caused the Company to assure investors that the problem was limited to "less than 4% of the total product manufactured between June 2008 and June 2009."  This amounted to 30 MW or approximately 348,500 solar modules.[9]  However, as First Solar later revealed, the number of solar modules that required replacement as a result of the excursion was approximately 1.5 million – almost 4 times higher than what was originally represented by First Solar.[10]  As a result, the Company's warranty reserve was understated by over $90 million based on excursion-related costs alone.  When the heat degradation defects and general product quality problems are factored in, the Company's warranty reserve was unquestionably materially understated.  As shown in the chart below, the Company failed to increase its warranty reserve – in fact, the Company actually decreased its warranty coverage – to account for costs associated with the excursion and heat degradation until the very end of the Relevant Period, when the Company was forced to record over $125 million in losses and increase its reserve coverage from just 1.3% to over 4.6% – a 250% increase.[11]

---

[8]    The warranty costs associated with replacement modules have totaled over $100 million or roughly 40% of the $267 million in total excursion expenses recorded by First Solar to date.

[9]    Based on First Solar's average power rating of 76 watts per module during 2010.

[10]    This calculation is based on: (i) approximately $90 million in "product warranty expense reflecting the net increase in the expected number of replacement modules required in connection with our remediation efforts" recorded in 4Q11 through 2Q12 and (ii) First Solar's average power rating per module of 80 watts and average manufacturing cost per watt of $0.73 during 4Q11-1Q12.

[11]    In 4Q11, the Individual Defendants admitted that they had failed to reserve for heat degradation during the Relevant Period when First Solar recorded an almost $40 million "catch-up" adjustment to the Company's warranty reserves (and increased the Company's reserve coverage going forward) to account for the remediation costs associated heat degradation defects.

1
2
3
4
5
6
7
8
9
10
11
12



13    162.    Likewise, the Company's additional accrual for "voluntary" remediation costs

14  that were "beyond . . . normal warranty coverage" were also materially understated from

15  2Q10 through the end of the Relevant Period.  As of 2Q10, the Individual Defendants caused

16  the Company to set aside only $27.4 million in this account to cover all remaining

17  "voluntary" remediation costs that were beyond the scope of First Solar's standard warranty.

18  This figure represented just 16% of the actual remaining "voluntary" remediation costs the

19  Company would incur over the next eight quarters.  Furthermore, the Individual Defendants

20  understood that failing to make First Solar's customers whole would cause even more

21  customer defection and damages leading to additional material lost revenue and reputation.

22  First Solar's accrual for "voluntary" remediation costs remained materially understated until

23  4Q11 when the Company finally increased its estimate of these costs to $145.6 million.

24    163.    Between the warranty reserve and the additional accrual for costs "beyond . . .

25  normal warranty coverage" described above, the Individual Defendants understated the

26
27
28

Company's reported estimate of excursion-related costs by as much as 650% until 4Q11.[12] If they were unable to reasonably estimate the excursion-related remediation costs, the Individual Defendants were required under GAAP to make specific disclosures to warn investors about the true scope of the excursion problem.   An estimate of costs that understates actual costs by 650% is not the level of reasonableness required under GAAP to disclose an estimate of a loss contingency without supplemental disclosures warning investors of possible additional losses.

164.   The Individual Defendants blamed the processing of the majority of claims in 4Q11 as the reason for their understatement of excursion-related cost estimates during the Relevant Period and, therefore, claimed they did not have insight into the full extent of the problem until that time.   Taken at face value, this explanation is an admission that the excursion costs could not have been reasonably estimated and the Individual Defendants were, therefore, required under GAAP to make the necessary disclosures.   In any event, the explanation fails for several reasons.   First, the cause of the problem was admitted, identified and quantified by 2Q09.   If the cause of the excursion and quantity of affected modules were known at that date, the timing of actually processing the claims would not have affected the estimate of total remediation costs.   Second, it was previously represented that product defects involving power output degradation, such as the excursion, mostly occur in the "early life cycle stage (*typically the first 3-6 months*)" after the solar modules are installed.[13] Further, it was also represented that the Individual Defendants had a sufficient operating history to provide evidence of this behavior.   Therefore, it does not follow that the Individual Defendants could not have known about the totality of the excursion-related problems until 30-42 months after the modules were manufactured (June 2008-June 2009 until February

---

[12]     Based on disclosed estimate of total excursion-related costs at 2Q10 compared to total actual total excursion-related costs through 2Q12 of $267.6 million.

[13]     First Solar response to SEC Comment Letter filed August 9, 2006.

2012).  Certain Individual Defendants repeatedly represented that First Solar had processed claims throughout the Relevant Period and had finished processing claims before 4Q11:

> **July 29, 2010**: "We've been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage.  We accrued the estimated full costs of these additional efforts in our Q2 results, and Jens will discuss the financial impact in more detail."

> **February 24, 2011**: "In Q4[2010] we concluded a claims process and based on our field data and execution today, we updated our total replacement cost estimate."

> **November 3, 2011**: "We have substantially concluded the remediation programs associated with the manufacturing excursion."

> **December 14, 2011**: "We have had on occasion issues and they are dealt with.  We cover[ed] them.  That has all been reflected in our financials."

165.   The Individual Defendants either knowingly understated the Company's warranty reserve and estimate of excursion-related costs *or* they knowingly lacked a basis to make reasonable estimate of such costs.  In the latter case, disclosing any amount of warranty reserve and estimate of excursion-related costs, without the additional required disclosures described below, resulted in materially false and misleading statements in each of First Solar's Relevant Period financial statements.[14]

## C.   GAAP Violation: Excursion and Heat Degradation Disclosures

166.   The Individual Defendants also were required to disclose the heat degradation defect when it was known.  SEC Regulation S-K Item 303, "Management's Discussion and Analysis" requires a discussion of results of operations and other information necessary to an understanding of a registrant's financial condition, changes in financial condition and results of operations.   "This includes unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or

---

[14]      The requirement that a loss accrual can only be booked if the amount of loss can be reasonably estimated "is intended to prevent accrual in the financial statements of amounts so uncertain as to impair the integrity of those statements." ASC 450-20-25-2.

unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue."[15] In each of its Relevant Period financial statements, the Individual Defendants blatantly violated the GAAP and SEC disclosure rules to conceal the truth about the heat degradation defect.

167.   Further and as described above, the excursion and heat degradation defects were loss contingencies specifically covered under ASC 450 ("Obligations related to product warranties and product defects").  Under ASC 450, the Individual Defendants were required to cause First Solar to either set aside adequate reserves for these loss contingencies in its financial statements or, at a minimum, disclose the nature and scope of the loss contingencies in the footnotes of its Relevant Period financial statements.  Because First Solar did not adequately reserve for the excursion or heat degradation in its Relevant Period financial statements, Defendants were required by GAAP to disclose the nature and scope of these material loss contingencies in the footnotes of its Relevant Period financial statements.  By failing to do so, the Individual Defendants violated GAAP.

168.   From 2Q10 through 3Q11, the Company cryptically disclosed minimal details regarding the excursion and disclosed a reserve that was purportedly sufficient to cover all future remediation costs.  The financial statements reflecting the misleading disclosures of the excursion violated GAAP provisions ASC 450[16] and ASC 275.[17]

---

[15] The SEC stated that the MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."  (SEC Financial Reporting Release No. 36.)

[16] The requirement that a loss accrual can only be booked if the amount of loss can be reasonably estimated "is intended to prevent accrual in the financial statements of amounts so uncertain as to impair the integrity of those statements."[16]  In fact "[d]isclosure is preferable to accrual when a reasonable estimate of loss cannot be made."[16]  Therefore, under ASC 450, if the Individual Defendants could not make a reasonable estimate of the excursion-related costs, disclosing any estimate of excursion-related costs, without the additional required information, resulted in materially false and misleading statements in each of First Solar's Relevant Period financial statements.

[17] The Individual Defendants also knew or were reckless in not knowing that it was at least reasonably possible the estimate would change materially in the near term.  The Individual

169.   The Individual Defendants failed to make any such disclosures until it was too late.  The disclosure required under ASC 275 regarding its estimate of excursion costs was first made in its 2011 Form 10-K:

> We must also make an estimate for the cost of the remediation program described further in "2008-2009 Manufacturing Excursion."  Our estimates for the remediation program have changed, and may in the future change, significantly in light of our ongoing remediation efforts and our continued analysis of remaining claims. . . .  In light of the additional data we gained from processed claims, as well as experience from our remediation efforts, our estimates have been subject to change.

170.   The purpose behind the disclosure requirements under ASC 450 and ASC 275 is to warn investors about the extent of losses the Company faced as a result of the excursion.  Under ASC 450 and ASC 275, the Individual Defendants had acceptable disclosure options but did not comply with any of them.  Instead, the Individual Defendants caused First Solar to provide what it purported were reasonably certain estimates of excursion-related remediation costs only to later reveal further losses throughout the Relevant Period, including a massive $170 million loss in the 4th quarter of 2011.  The Company's disclosed estimate of excursion-related costs was subject to almost quarterly increases – the exact set of circumstances requiring disclosure under ASC 450 and ASC 275.

171.   GAAP and SEC rules also require disclosure of vulnerabilities from concentrations in particular geographical areas.  (ASC 275-10-50).  Specifically, certain concentrations and the vulnerability and risks associated with a particular geographic region were required to be disclosed if it was at least reasonably possible that the Company's sales, revenues, or income would be materially affected.

---

Defendants were required, under ASC 275, to disclose this material fact to investors. ASC 275 requires specific additional disclosures regarding estimates of loss contingencies if information known to management prior to the issuance of the financial statements indicates that it is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future events and the effect of the change would be material to the financial statements.

172.   The Individual Defendants were required by GAAP and SEC rules to disclose the vulnerability and potentially material impact on its sales, revenues, and income from operations in hotter climates like the desert Southwest.  The Individual Defendants, however, said nothing about the massive heat degradation defects during the Relevant Period and never disclosed that heat degradation was having a severe impact on its solar power projects located in hot climates – particularly in the desert Southwest.

173.   Despite their knowledge during the Relevant Period of the massive heat degradation defect, the Individual Defendants nevertheless caused the Company to continue to report the success and revenue generated from its large scale solar projects predominately located in the desert Southwest.  The repeated false disclosures were vital in demonstrating that the Company was successfully accomplishing its goal of shifting its sales mix to large scale solar projects predominantly located in the desert Southwest.  As the Individual Defendants began touting First Solar's solar power system achievements in early 2009, they concealed the material fact that the solar panels were experiencing heat degradation which would severely affect the Company's operations.  Accordingly, during the Relevant Period and in violation of GAAP and SEC rules, the Individual Defendants caused First Solar to make the material false and misleading statements and disclosures regarding its net sales and performance of its solar systems built in hot climates – predominantly located in the Southwestern U.S.

174.   The statements and disclosures made during the Relevant Period were false and misleading because, as described herein, the Individual Defendants caused First Solar to conceal its massive heat degradation defect while reassuring investors that large solar projects sold during the Relevant Period were generating revenue and represented the future growth of the Company.  In violation of GAAP and SEC rules, the Individual Defendants caused First Solar to conceal the negative impact on net sales and operations that were related to the significant trends and uncertainties posed by the heat degradation defect.  Furthermore, the Individual Defendants was required under GAAP to defer revenue on solar module sales on projects in hot climates due to the known heat degradation defects.

**D.      GAAP Violation: Revenue Recognition**

175.    Further, the Individual Defendants were precluded from recognizing revenue associated with the sales of solar panels that were not adequately reserved for, as the Company did not fulfill its sales obligation to customers.

176.    During the Relevant Period, First Solar sold every solar module with a guaranteed specification "that solar modules installed in accordance with agreed-upon specifications will produce at least 90% of their power output rating during the first 10 years following their installation and at least 80% of their power output rating during the following 15 years."  When First Solar went public in 2006, the Company represented to the SEC that this performance guarantee was, in fact, a specification: "The minimum average watt per module is a specification requirement…."[18]  If a solar module did not meet its performance specification, it typically could not be repaired and was therefore replaced.

177.    In accordance with revenue recognition rules promulgated by GAAP and the SEC, First Solar was required to defer revenue if it had not previously demonstrated that its solar modules actually met the stated 90% power output rating during the first 10 years and at least 80% power output rating during the following 15 years.  Revenue recognition rules[19]

---

[18]    First Solar's August 9, 2006 letter to the SEC.

[19]    The overarching concept for revenue recognition (ASC  605-10-25-1) states:

Paragraph 83(b) of FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, states that revenue is not recognized until earned.  That paragraph states that an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.

Additionally, ASC 60-10-S99-1 states:

(b)      Customer acceptance.

After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs….Customer acceptance provisions may be included in a contract,

regarding seller specified performance criteria (ASC 605-10-S99, SAB Topic 13.A.3b, question 1(c)) specifically state:

> Customer acceptance provisions generally allow the customer to cancel the arrangement when a seller delivers a product that the customer has not yet agreed to purchase or delivers a product that does not meet the specifications of the customer's order.  In those cases, revenue should not be recognized because a sale has not occurred.

> *       *       *

> (c) Acceptance provisions based on seller-specified objective criteria.  An example of such a provision is one that gives the customer a right of return or replacement if the delivered product is defective or fails to meet the vendor's published specifications for the product.  Such rights are generally identical to those granted to all others within the same class of customer and for which satisfaction can be generally assured without consideration of conditions specific to the customer.  Provided the seller has previously demonstrated that the product meets the specified criteria, the staff believes that these provisions are not different from general or specific warranties and should be accounted for as warranties in accordance with Statement 5 [Section 460-10-25].  In this case, the cost of potentially defective goods must be reliably estimable based on a demonstrated history of substantially similar transactions. . . . However, if the seller has not previously demonstrated that the delivered product meets the seller's specifications, the staff believes that revenue should be deferred until the specifications have been objectively achieved.

> *       *       *

> If an arrangement includes customer acceptance criteria or specifications that cannot be effectively tested before delivery or installation at the customer's site, the staff believes that revenue recognition should be deferred until it can be demonstrated that the criteria are met.  (ASC 605-10-S99-1, SAB Topic 13.A.3b ques. 1 and 2)

---

among other reasons, to enforce a customer's rights to (1) test the delivered product, (2) require the seller to perform additional services subsequent to delivery of an initial product or performance of an initial service (*e.g.*, a seller is required to install or activate delivered equipment), or (3) identify other work necessary to be done before accepting the product.  The staff presumes that such contractual customer acceptance provisions are substantive, bargained-for terms of an arrangement.  Accordingly, when such contractual customer acceptance provisions exist, the staff generally believes that the seller should not recognize revenue until customer acceptance occurs or the acceptance provisions lapse.

178.   In violation of these revenue recognition rules, even though the Individual Defendants did not and could not reliably demonstrate that the 25-year performance specification was met at the time the solar modules were sold, they caused First Solar to improperly recognize revenue on the unsupported ground that existing research and diligent monitoring and observation of installed solar modules would purportedly allow evaluation and confirmation that performance specifications were being met.   First Solar explained:

> Only a long period of time observing the actual performance of our solar modules in various field settings will confirm how they will actually perform over their estimated 25 year useful life ….We also monitor approximately 102,000 of our solar modules in use by end users, and can extrapolate future performance expectations from the observed performance of these modules.…While thin film based modules do not have as extensive operating history over the estimated 25 year useful life, their electrical performance characteristics are generally well understood and researched.…Based on this research it is understood that the power degradation typically follows an asymptotic function, with most degradation occurring in the early life cycle stage (typically the first 3-6 month) before their performance stabilizes at their rated power.  (8/9/06 SEC Comment Letter.)

179.   In accordance with GAAP, and consistent with what they had represented to the SEC when they went public in 2006, the Individual Defendants should have, at a minimum, deferred revenue recognition on modules sold in hot climates due to the degradation problem.

180.   The more widespread problem affecting First Solar's performance specifications was the heat degradation defect.   No later than 2009, the Individual Defendants were aware of the premature and severe power degradation in solar modules installed in hotter climates.   The heat degradation defect especially affected the large solar field power generating facilities that First Solar's EPC division built.   The heat degradation defect was first detected at the El Dorado plant located in Southern Nevada.[20]   The heat

---

[20]   First Solar had supplied the original modules for the new 10MW plant that was completed in December, 2008. First Solar had also handled engineering, procurement and construction as well as monitoring and plant maintenance.  (http://www.pvtech.org/news/ sempra_selects_first_solar_for_50mw_ addition _to_el_dorado_plant_says_analys.). First Solar completed the plant in 4Q10.

1  degradation defect was so bad that it was necessary to begin replacing panels almost

2  immediately after a solar field generating plant became operational.

3      181.    Thus, it was clear that First Solar "ha[d] not previously demonstrated that the

4  delivered product meets the seller's specifications" and it was uncertain whether the

5  Company had delivered the product specified in the arrangement, as required by GAAP

6  (ASC 605-10-S99, SAB Topic 13.A.3b, question 1(c)).  GAAP therefore required revenue

7  on those units installed in hot climates, particularly in the U.S. desert Southwest, to be

8  deferred.  *Id.*   Additionally, the American Institute of Certified Public Accountants

9  ("AICPA") issued a Practice Alert addressing this specific issue.  Practice Alert 95-1

10  "Revenue Recognition Issues" identifies as an example of unusual revenue recognition

11  practices: "Sales with substantial uncertainty about seller's ability to comply with

12  performance guarantees."  Accordingly, the Individual Defendants violated GAAP and SEC

13  rules by recognizing, and failing to defer, revenue for solar modules installed in hot climates.

14      **E.    GAAP Violation:  Timely Write Off Impaired Goodwill**

15      182.    The Individual Defendants violated GAAP by failing to timely impair First

16  Solar's components segment[21] goodwill.  Goodwill, at the time it is acquired, is an asset

17  representing future economic benefits that increases shareholders' equity.  Goodwill is

18  obtained by purchasing a company for more than the fair value of the identifiable assets

19  acquired.  The Company's $393.4 million of components segment goodwill came from two

20  acquisitions: the OptiSolar Inc. ("OptiSolar") acquisition that took place in April 2009 and

21  the NextLight Renewable Power, LLC ("NextLight") acquisition that took place in July

22  2010, which resulted in $259.7 million and $142.1 million in goodwill, respectively.

23      183.    The Individual Defendants disclosed in the Company's annual reports in Form

24  10-K filed with the SEC that the Company "**would record any impairment [to goodwill] in**

---

[21] The Company operates its business in two segments: (i) the components segment, which involves the design, manufacture, and sale of solar modules; and (ii) the systems segment, which involves the sale of solar modules coupled with the engineering, procurement, and construction of the solar PV power plant.

1    *accordance with [Financial Accounting Standards (FASB)] Accounting Standards*

2    *Codification (ASC) 350, Intangibles – Goodwill and Other*."  According to ASC 350, the

3    GAAP guidance specifically related to goodwill impairment, "*[g]oodwill of a reporting unit*

4    *shall be tested for impairment on an annual basis and between annual tests in certain*

5    *circumstances*."  The Individual Defendants further represented in these same statements

6    that they "test goodwill for impairment at least annually in the fourth quarter."  The

7    Individual Defendants also represented in the Company's quarterly reports in Forms 10-Q

8    that they "*test goodwill for impairment at least annually, or sooner, if facts or*

9    *circumstances between scheduled annual tests indicate that it is more likely than not that*

10   *the fair value of a reporting unit that has goodwill might be less than its carrying value*."

11          184.   The Individual Defendants were required to perform a two-step process that

12   begins with an estimation of the fair value of the reporting unit (*i.e*., the components

13   segment).  Step one of the annual impairment test is to identify potential impairment by

14   comparing the fair value of the reporting unit to its carrying amount (this includes goodwill).

15   ASC 350-20-35-4.  If the fair value of a reporting unit exceeds its carrying amount, goodwill

16   of the reporting unit is considered not impaired.  ASC 350-20-35-6.  If the carrying amount

17   of reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss

18   shall be recognized in an amount equal to that excess. The loss recognized cannot exceed the

19   carrying amount of goodwill.  ASC 350-20-35-11.

20          185.   Goodwill is also to be tested for impairment between annual tests if an event

21   occurs or circumstances change that would more likely than not[22] reduce the fair value of a

22   reporting unit below its carrying amount.[23]  ASC 350-20-35-30.  The Individual Defendants

23   were required to test the components' segment goodwill prior to the fourth quarter of 2011

---

[22] More likely than not is defined by GAAP as greater than a 50% chance.

[23] ASC 350-20-35-30 notes, among other things, that a significant adverse change in legal factors and business climate; adverse action or assessment by a regulator; and unanticipated competition, to be key indicators that would require an interim impairment test.

1   because they knew there was little hope the value from the OptiSolar and NextLight

2   acquisitions would be realized.

3       186.   By the end of 2008, it was becoming increasingly clear to the Individual

4   Defendants that the solar energy market was shifting from Europe to the United States.

5   Analyst Christopher Blansett put it best in his JPMorgan Securities Inc. report published on

6   November 18, 2008, stating:

7       **Geographical Mix**

8       First Solar sells the majority of its products in Europe, specifically Germany
        which has historically been and remains its largest market. We expect
9       Germany to remain the primary sales region for First Solar in C09 due to its
        favorable subsidy and strong relationship and supply agreements with vendors
10      in that country. However, ***we do expect the company to focus more on the US
        solar energy market given the recent extension of the Federal ITC and
11      eventual phase out of the German subsidy for solar energy***.

12      187.   Not surprisingly, First Solar spent 2009 and 2010 acquiring companies, mainly

13   OptiSolar and NextLight, with a large pipeline of projects mainly concentrated in California

14   and the Southwestern United States.   OptiSolar's goodwill primarily represented the

15   synergies and economies of scale the Individual Defendants expected would benefit First

16   Solar's solar module business from having control over OptiSolar's project pipeline.

17   NextLight's goodwill derived from the greater degree of vertical integration expected from

18   using First Solar's own solar modules in the acquired projects in the Southwestern United

19   States.

20      188.   This new market (and new climate), however, exposed its own set of problems.

21   The Company's PV modules were not suitable for hotter climates and were "subject to

22   increased failure rates."   In its most recent Form 10-K for fiscal year 2011, First Solar

23   disclosed:

24

25      ***We believe our PV modules are potentially subject to increased failure rates
        in hot climates***. This assumption is based on technical literature, data that we
26      have developed internally including through accelerated-life testing, our
        analysis of modules returned under warranty, and our analysis of performance
27      data from systems that we monitor under [operating and maintenance]
        agreements. ***Processes that are accelerated by higher ambient temperatures
28      include stress corrosion cracking in glass, polymer creepage and impurity
        diffusion processes***.

189.   As a result, because First Solar did not have a sufficient product that was suitable for hotter climates, the acquisitions of OptiSolar and NextLight would not bring the Company the benefits it expected.  The Individual Defendants failed to properly account for the corresponding goodwill impairment that would necessarily result, or they were reckless in not timely and/or properly evaluating the integration of the Company's products into the corresponding projects they spent approximately $700 million in cash and stock between 2009 and 2010 in acquiring.  A review of "technical literature" and review of "modules returned under warranty" related to the Company's products installed within the OptiSolar and NextLight projects is sufficient evidence of the existing products' incompatibility for hotter climates early on, and should have been the triggering event for goodwill impairment testing.  As analyst Satya Kumar from Credit Suisse Securities (USA) LLC ("Credit Suisse") noted on February 29, 2012:

> ***Ongoing warranty charges also higher***. The warranty accrual costs have increased costs by 1 c/watt leading to an additional $37.8mm in 4Q11 charges. ***FSLR [First Solar] expects a higher return rate of its panels as mix shifts to geographies with hotter temperatures as its panels appear to fail at a higher rate in hotter climates. This is the first time FSLR is talking about this issue, although we have heard of this issue in our discussions with industry contacts (it is always difficult to ascertain whether such industry chatter are material or not which is why we had not raised this issue. For example, FSLR noted the construction roadmap for Topaz is on track, whereas industry magazines widely reported delays). FIELD RELIABILITY is THE MOST IMPORTANT METRIC for solar panels*** and doubly so for thin film panels which have a lower 20-year field performance track record compared to c-Si panels. The fact that FSLR is reporting performance issues in the field in the first few years and is accruing higher charges on an ongoing basis is worrying – as the hotter regions tend to make more sense for solar. We are concerned this may not be the last time we hear of the warranty related issues for FSLR.

190.   Rather than perform all the necessary impairment tests as required by GAAP, the Individual Defendants chose to ignore known facts that would have deemed the goodwill impaired.  The Individual Defendants indicated that the goodwill related to these acquisitions primarily represented "***expected synergies, economies of scale and vertical integration***."  As indicated in First Solar's fiscal year 2011 Form 10-K, almost none of the elements of the acquired goodwill ever materialized.  This was exacerbated by the fact that the entire amount associated with the OptiSolar and NextLight acquisitions were eliminated in one reporting

1   period.  Simply stated, First Solar was made to grossly overpay for the acquisitions and

2   could not justify the inflated goodwill of OptiSolar and NextLight, but did not disclose this

3   fact until February 2012.

4        191.   In an attempt to disguise the impaired goodwill of previous reporting periods,

5   the Individual Defendants hid behind a change in GAAP as it relates to the analyzing

6   goodwill impairment as their basis for finally recording components segment goodwill

7   impairment in Q411.  In September 2011, the FASB issued Accounting Standards Update

8   No. 2011-08, Intangibles-Goodwill and Other (Topic 350) ("ASU 2011-08").  ASU 2011-08

9   allows companies to "qualitatively assess" whether it is more likely than not (*i.e.*, a

10  likelihood of greater than 50%) that the fair value of a reporting unit is less than its carrying

11  amount.  If that is the case, the Company would have to perform the annual two-step

12  impairment test (as noted above).  Adoption of ASU 2011-08 is required for fiscal years

13  beginning after December 15, 2011.  Early adoption is permitted, including for annual and

14  interim goodwill impairment tests performed as of a date before September 15, 2011, if an

15  entity's financial statements for the most recent annual or interim period have not yet been

16  issued or, for nonpublic entities, have not yet been made available for issuance.  ASU 2011-

17  08.  According to the Company's annual report Form 10-K filed with the SEC on February

18  29, 2012, the Individual Defendants chose to implement the requirements of ASU 2011-08

19  as of October 1, 2011.  However, the Individual Defendants noted in the same Form 10-K

20  that "***the adoption of ASU 2011-08 did not have an impact on our financial position,***

21  ***results of operations, or cash flows***."

22       192.   The key impact of ASU 2011-08 is whether the Individual Defendants needed

23  to apply the two-step impairment test based on their qualitative assessment.  The Individual

24  Defendants correctly determined that the two-step approach was necessary during their

25  assessment as of October 1, 2011.  However, they chose to finally test and impair the

26  components segment goodwill when it was already too late.  No material facts emerged in

27  the fourth quarter of 2011 that did not exist in previous reporting periods that would have

28  enabled the Individual Defendants to accurately justify the components segment goodwill

values in accordance with GAAP and SEC rules.  GAAP prior to and after the issuance of ASU 2011-08 required the Individual Defendants to test the components segment goodwill on an interim basis when facts and circumstances lead to adverse changes in the business climate.   The Individual Defendants knew that the components segment and related acquisition goodwill was impaired, grossly inflating the Company' financial position and earnings, yet did not timely recognize a goodwill impairment.

### DUTIES OF THE INDIVIDUAL DEFENDANTS

**1.    Fiduciary Duties**

193.    By reason of their positions as officers, directors, and/or fiduciaries of First Solar and because of their ability to control the business and corporate affairs of First Solar, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage First Solar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of First Solar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

194.    Each director and officer of the Company owes to First Solar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**2.    Audit Committee Duties**

195.    In addition to these duties, the Audit Committee Defendants owed specific duties, under the Audit Committee's Charter to review and approve quarterly and annual

financial statements, earnings press releases, and the Company's internal controls over financial reporting. Some of the Audit Committee's responsibilities included:

- Review and discuss with management and the independent auditors the Company's Form 10-Q report prior to its filing, and the results of the independent auditors' review of interim financial information pursuant to Statement on Auditing Standards 61. Such meeting shall include a review and discussion of the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- Meet to review and discuss with management and the independent auditors the Company's Annual Report on Form 10-K prior to its filing, including the financial statements contained therein and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

- Discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies or the investing public. Discussions of earnings press releases as well as financial information and earnings guidance may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made).

### 3.     Control, Access, and Authority

196.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of First Solar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the public statements issued by First Solar.

197.    Because of their advisory, executive, managerial, and directorial positions with First Solar, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of First Solar.

198.    At all times relevant, each of the Individual Defendants was the agent of each of the other Individual Defendants and of First Solar, and was at all times acting within the course and scope of such agency.

### 4.     Reasonable and Prudent Supervision

199.    To discharge their duties, the officers and directors of First Solar were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of First Solar were required to, among other things:

      (a)   refrain from acting upon material inside corporate information to benefit themselves;

      (b)   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

      (c)   conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (d)   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

      (e)   remain informed as to how First Solar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

      (f)   ensure that First Solar was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

200.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of First Solar, the absence of good faith on their part, and a reckless disregard for their duties to First Solar and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to First Solar.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of First Solar's Board.

201.    The Individual Defendants each breached their duty of loyalty and good faith by allowing the other Individual Defendants to cause, or by themselves causing, the Company to misrepresent the Company's financial results and prospects, and by failing to prevent employees and/or officers of the Company from taking such illegal actions.   In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws.  As a result, First Solar has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

202.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their liability.   The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

203.    During all relevant times, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal that the Company's business prospects and financial results were misrepresented.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

204.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.   During this time, the Individual Defendants caused the Company to issue false and misleading statements regarding First Solar's cost-per-watt metric, the manufacturing excursion, and heat degradation issues.

205.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and insider selling; and (ii) disguise the Company's disclosures.

206.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

207.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**DAMAGES**

208.     The Individual Defendants' wrongful conduct was the direct and proximate cause of damages First Solar has suffered, and will suffer, in numerous ways.

209.    The Individual Defendants failed to disclose that the Company's cost-per-watt metric, the warranty costs, and the scope of the manufacturing excursion were misrepresented.  The improper statements have devastated First Solar's credibility.  First Solar is now the subject of a class action lawsuit pending in the United States District Court District of Arizona (*Smilovits v. First Solar, Inc.*, No. 12-cv-00555), alleging violations of securities laws in connection with the improper financial reporting, false statements, and material omissions.  The Company will face substantial costs, expenses, and a potential adverse verdict in connection with that lawsuit.

210.    As a direct and proximate result of the Individual Defendants' actions as alleged above, First Solar's market capitalization has been substantially damaged.

211.   Further, as a direct and proximate result of the Individual Defendants' conduct, First Solar has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs incurred in investigating and defending First Solar and certain officers in the class action lawsuit, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b)   costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on First Solar's artificially-inflated stock price and inflated growth prospects;

(c)   costs incurred from the loss of the Company's customers' confidence in First Solar's products; and

(d)   damages to the Company due to the false and misleading financial statements that the Individual Defendants caused the Company to file.

212.   Moreover, these actions have irreparably damaged First Solar's corporate image and goodwill.  For at least the foreseeable future, First Solar will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that First Solar's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

213.   Plaintiffs bring this action derivatively in the right and for the benefit of First Solar to redress injuries suffered, and to be suffered, by First Solar as a direct result of breaches of fiduciary duty, as well as the aiding and abetting thereof, by the Individual Defendants.  First Solar is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

214.   Plaintiffs will adequately and fairly represent the interests of First Solar in enforcing and prosecuting its rights.

215.    Plaintiffs were shareholders of First Solar at the time of the wrongdoing of which Plaintiffs complain and have been continuously since.

216.    At the time that Plaintiffs Tindall, Nederhood, Morris, Tan, and Feigin filed this action, the Board of First Solar consisted of the following eight directors: Ahearn, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal.  Plaintiffs did not make a demand on the Board to institute this action against the Individual Defendants because such demand would be a futile and useless act.

**A.    Demand Is Futile As To Defendant Ahearn**

217.    Defendant Ahearn faces a substantial likelihood of liability for his individual misconduct.  Ahearn is a named defendant in a federal class action pending in the United States District Court for the District of Arizona alleging that he and the Company violated § 10(b) of the 1934 Act and Rule 10b-5 when he disseminated or approved false statements.

218.    If Defendant Ahearn pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws.  This, in turn, would impair the defense of the class action and greatly increase the probability of Defendant Ahearn's personal liability in the class action.  As such, Defendant Ahearn is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.  Thus, demand is futile as to Defendant Ahearn.

219.    Additionally, Defendant Ahearn cannot render an independent decision because he was a high-ranking officer of First Solar.  And according to relevant portions of the Company's 2011 proxy statement, Defendant Ahearn is not an independent director pursuant to the requirements of the listing standards of the NASDAQ.  Thus, demand is futile as to Defendant Ahearn.

220.    Additionally, Defendant Ahearn is interested because he issued many of the false and misleading statements and signed on the false SEC filings.  Defendant Ahearn therefore faces a substantial likelihood of liability for breaching his fiduciary duties to First

1    Solar shareholders.   Consequently, Defendant Ahearn cannot disinterestedly consider a

2    demand.

3        221.    Further, Defendant Ahearn engaged in insider trading.  Ahearn sold 3,239,016

4    shares of First Solar stock for proceeds of $427,233,588 while in possession of material non-

5    public information.  Defendant Ahearn, because of his high-level position as Chairman of the

6    Board and Chief Executive Officer of the Company, knew that First Solar issued false and

7    misleading statements.  Defendant Ahearn took advantage of this undisclosed information  to

8    sell 97% of his stock for considerably more than the stock was worth.  Because Defendant

9    Ahearn faces a substantial likelihood of liability for engaging in insider trading, he is unable

10   to render a disinterested decision on whether to pursue these derivative claims.  As such,

11   demand is futile as to Defendant Ahearn.

12
13   **B.    Demand Is Futile As To Defendants Sweeney, Nolan, and Presby For Insider Trading**

14       222.    Defendants Sweeney, Nolan, and Presby engaged in insider trading.  Sweeney

15   sold 24,749 shares of First Solar stock for proceeds of $4,417,934 while in possession of

16   material non-public information.  Nolan sold 24,000 shares of First Solar stock for proceeds

17   of $5,351,425 while in possession of material non-public information.  And Presby sold

18   1,000 shares of First Solar stock for proceeds of $137,810 while in possession of material

19   non-public information.  Defendants Sweeney, Nolan, and Presby, because of their high-

20   level positions as directors of the Company, knew that First Solar issued false and

21   misleading statements.  Defendants Sweeney, Nolan, and Presby took advantage of this

22   undisclosed information to sell their stock for considerably more than the stock was worth.

23   Because Defendants Sweeney, Nolan, and Presby face a substantial likelihood of liability for

24   engaging in insider trading, they are unable to render a disinterested decision on whether to

25   pursue these derivative claims.  As such, demand is futile as to Defendants Sweeney, Nolan,

26   and Presby.

27

28

**C.      Demand Is Futile As To Audit Committee Defendants Kennedy, Presby, and Stebbins**

223.     Defendants Kennedy, Presby, and Stebbins, as Audit Committee members, were responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and First Solar's internal controls over financial reporting.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved false financial statements and press releases which violated GAAP, including ASC 460-10-25.  Accordingly, Defendants Kennedy, Presby, and Stebbins face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon these Defendants is futile.

224.     As members of the Audit Committee, Defendants Kennedy, Presby, and Stebbins were responsible for (i) the integrity of the Company's financial statements, including the responsibility to comply with GAAP; (ii) the Company's systems of internal controls regarding finance and accounting as established by management; (iii) the qualifications and independence of the independent registered public accounting firm; (iv) the performance of the Company's independent registered public accounting firm; (v) the Company's auditing, accounting, and financial reporting processes generally; and (vi) compliance with the Company's ethical standards for senior officers and all personnel. Defendants Kennedy, Presby, and Stebbins reviewed and approved First Solar's false and misleading filings with the SEC that misrepresented the cost of the Company's remediation program.  Defendants Kennedy, Presby, and Stebbins, as members of First Solar's Board, each knew, or consciously disregarded, that the public statements in the filings with the SEC were materially false and misleading.  These Defendants, however, failed to correct this materially false and misleading information.  As such, Defendants Kennedy, Presby, and Stebbins face a substantial likelihood of liability.  Thus, demand is futile as to Defendants Kennedy, Presby, and Stebbins.

**D.     Demand Is Futile Because Solar Panels Are First Solar's Core Business**

225.   The manufacture and design of solar panels represents First Solar's core business.  As such, the Individual Defendants had actual knowledge of the undisclosed facts alleged herein, or acted with reckless disregard of such undisclosed facts, thus breaching their duties of good faith and loyalty and bringing their conduct outside the protection of the business judgment rule.  The Company's stock traded largely on the continued reductions in First Solar's cost-per-watt metric.  The Individual Defendants regularly acknowledged that First Solar's viability as an unsubsidized business depended on its ability to reduce significantly the cost-per-watt metric.  Thus, First Solar's cost-per-watt was one the first topics the Individual Defendants addressed in almost all of the earnings conference calls throughout the Relevant Period.

226.   Defendant Gillete specifically noted in a February 18, 2010 Earnings Conference Call that:

> [R]eally fundamentally, our strategy has not changed from what was presented back in June of 2009. This is a slide that Mike used to present the business and our focus on migrating from existing subsidy business and market places to transitioned markets. Our goal and First Solar's goal overall remains to reach sustainable market economics where we can compete with and be positioned versus fossil fuel in the electricity market, and it will grow the market in general much more substantially than the subsidized markets that exist today. Our technology and driving the costs down will enable us to compete, and we think grow the market overall.

227.   Similarly, Defendant Meyerhoff recognized that, "[o]bviously, we're in the business of driving the cost for solar electricity down rapidly.  We're firm believers that we need to transition our industry as rapidly as possible, away from subsidy dependence."

228.   On February 24, 2009, during the 4Q08 earnings conference call, Defendant Ahearn stated:

> And finally, we reduced our manufacturing costs to $0.98 a watt in Q4. That's down 9% quarter-over-quarter and 12% for the year. Breaking that dollar per watt cost benchmark is a major industry milestone. It is something the industry has been chasing for 20 years…

229.   Because First Solar's cost-per-watt was far from the level necessary to compete with conventional sources of electricity without the benefit of subsidies, the Individual Defendants and analysts were keenly aware of the need for First Solar to maintain a constant and rapid trend toward reducing its cost-per-watt.  As late as June 24, 2009, then-CEO Defendant Ahearn recognized the tremendous gap that First Solar needed to close: "if you take out the subsidies and just look at solar generation costs, let's call it $0.30 to $0.60 a kilowatt hour.  It is basically what has prevailed 5 to 10 times the conventional alternative, if you're just looking at pure fossil fuel and economics."

230.   The Individual Defendants knew if they failed to maintain that constant and rapid trend toward reducing their cost-per-watt, their failure would be noticed by analysts, such as during an August 4, 2011 Earnings Conference Call, during which the following exchange occurred between an analyst and then-CEO Defendant Gillette:

> [Analyst question:] Actually, I had two questions on cost per watt. First of all, I believe it's sort of like comparing apples and oranges when you look at the Chinese, how they report cost per watt and how you report cost per watt. And I'm wondering if you can give us cost per watt calculated the same way that the Chinese do, i.e., stripping out freight and overhead costs.
>
> And then, secondly, I'm wondering if you look at cost per watt year-over-year, it hasn't really gone down, even if you strip out stock-based comp and you strip out the ramp costs. It's down basically $0.01 even though the efficiency is up like 50 bips. And so I'm wondering why that is and why that's going to change going forward.
>
> [Gillette:] We usually don't talk about it, but from what I know in our analysis, what the competitors do is they exclude things like shipping, warranty, recycling, obviously, SBC, capacity ramp and insurance and other production costs and things like that. So, ballpark, on a comparative basis if you looked at our cost per watt on the same basis, about $0.68, in that range, would be the equivalent comparison.

231.   When the information at issue pertains to a company's core business or service, as it does here, knowledge of that information may be imputed to the entire board through

inference as a matter of law.  Thus, each of the members of the First Solar Board are charged with having knowledge of cost-per-watt metric components, the concealment of the manufacturing excursion, and the true scope of the warranty costs to replace the defective solar panels.

232.    Each member of the Board knew and/or failed to act in the face of a known duty to act when they allowed the Company to (i) conceal the existence of the manufacturing excursion; (ii) conceal the scope of the warranty costs to replace the defective solar panels when the manufacturing excursion was announced; (iii) manipulate the cost-per-watt metric; and (iv) issue false and misleading statements regarding the existence and scope of the manufacturing excursion.  Thus, demand is futile as to the entire Board.

**E.    Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

233.    Defendants Ahearn, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal, constituting the Company's entire current Board, directly made and/or caused the Company to disseminate improper, materially false and misleading public statements concerning, among other things, the true nature and extent of remediation efforts needed by the Company to respond to the manufacturing deficiencies plaguing the Company's solar panels.  For reasons stated herein, each member of the Board knew or should have known that the improper statements did not fairly, accurately, or truthfully convey the Company's true financial condition as required by GAAP, SEC rules and regulations, or other applicable law.  In addition, when deciding whether to sign or approve statements to be publicly disseminated, each member of the Board was bound to inform himself of all reasonably-available material information.  Information concerning the nature and extent of remediation efforts needed by the Company to respond to the manufacturing deficiencies plaguing the Company's solar panels was both reasonably available and material.  Ahearn, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal's conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

**F.      Demand Is Futile As To All The Director Defendants For Additional Reasons**

234.    Since December 2010, the Company has had three difference CEOs, three difference CFOs, the President of its Components Business Group departed, the President of Operations (Defendant Sohn) departed, and the Chief Accounting Officer (Defendant Zhu) departed.  Rather than file lawsuits against these high-level executives for concealing the manufacturing excursion and manipulating the cost-per-watt metric, the Board agreed to pay unusually large severance agreements to these executives.  In exchange for these payments, the executives are precluded from testifying against the Company or providing any information to civil litigants.  For this reason, the Board cannot be expected to initiate a lawsuit against the same individuals that the Board granted lucrative severance agreements.  As such, demand is futile.

235.    Demand is also futile because the Board signed the SEC filings that contained the false and misleading statements.  Defendant Ahearn signed each of the Sarbanes-Oxley Certifications filed with the May 2, 2008 Form 10-Q, the July 31, 2008 Form 10-Q, the October 31, 2008 Form 10-Q, the May 1, 2009 Form 10-Q, the August 3, 2009 Form 10-Q, and the November 4, 2011 Form 10-Q, all of which were false and materially misleading.  Moreover, Defendants Ahearn Kennedy, Nolan, Presby, Stebbins, Sweeney, and Villareal signed the Form 10-K filed on February 25, 2009, the Form 10-K filed on February 22, 2010, and the Form 10-K filed on February 28, 2011, all of which were false and materially misleading. Each member of the Board had a duty to make sure the information contained in those filings was correct.  In actuality, the information contained in those filings was false and misleading.  Accordingly, the Board faces a substantial likelihood of liability for the claims asserted in this action.

236.    If First Solar's current officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this complaint by D&O Insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders.  However, Plaintiffs are informed and believe that the D&O Insurance policies

covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by First Solar against the Individual Defendants, known as the "insured versus insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of First Solar, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O insurance policy.

237.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting First Solar by prosecuting this action.  Therefore, demand on First Solar and its Board is futile and is excused.

238.    First Solar has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Board has not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, members of the Board are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

### COUNT I

### Against All Defendants for Breach of Fiduciary Duty

239.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

240.    Defendants owed and owe First Solar fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe First Solar the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

241.    Defendants violated and breached their fiduciary duties of good faith, fair dealing, and loyalty.

242.    Defendants each knowingly, recklessly or negligently signed or approved the issuance of false annual and quarterly financial statements that misrepresented and failed to disclose the full impact of the manufacturing excursion on the Company's earnings, the manipulation of the cost-per-watt metric, and the premature degradation of modules in hot climates.   These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

243.    As a direct and proximate result of these Individual Defendants' failure to perform their fiduciary obligations, First Solar has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

244.    Plaintiffs, on behalf of First Solar, have no adequate remedy at law.

## COUNT II

**Against Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn, Eaglesham, and Presby for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information under Delaware Law**

245.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

246.    At the time of the stock sales set forth herein, Defendants Ahearn, Nolan, Sweeney, Meyeroff, Sohn, Eaglesham, and Presby knew the information described above, and sold First Solar common stock on the basis of such information.

247.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendants Ahearn, Nolan, Sweeney, Meyeroff, Sohn, Eaglesham, and Presby used for their own benefit when they sold First Solar common stock.

248.    At the time of their stock sales, Defendants Ahearn, Nolan, Sweeney, Meyeroff, Sohn, Eaglesham, and Presby knew that the Company's financial reporting and future prospects were materially overstated because of the high costs associated with the Company's remediation program.  Defendants Ahearn, Nolan, Sweeney, Meyeroff, Sohn, Eaglesham, and Presby's sales of First Solar common stock while in possession and control

108

of this material, non-public information was a breach of their fiduciary duties of loyalty and good faith.

249.    Since the use of the Company's proprietary information for their own gain constitutes a breach of Defendants Ahearn, Nolan, Sweeney, Meyeroff, Sohn, Eaglesham, and Presby's fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits they obtained thereby.

## COUNT III

**Against Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn, Eaglesham, and Presby for Unjust Enrichment**

250.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

251.    By their wrongful acts and omissions, Defendants Ahearn, Nolan, Sweeney, Meyeroff, Sohn, Eaglesham, and Presby were unjustly enriched at the expense of and to the detriment of First Solar.

252.    Defendants Ahearn, Nolan, Sweeney, Meyeroff, Sohn, Eaglesham, and Presby were unjustly enriched as a result of the insider trading profits they received while breaching their fiduciary duties owed to First Solar.

253.    Plaintiffs, as shareholders and representatives of First Solar, seeks restitution from these Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches.

254.    Plaintiffs, on behalf of First Solar, have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, as well as aiding and abetting breaches of fiduciary duty.

B.      Directing First Solar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect First Solar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

- a proposal to strengthen the Board's supervision of the Company's CEO;

- a proposal to strengthen the Company's compliance with GAAP and accounting for warranty reserves;

- a provision to permit the shareholders of First Solar to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of First Solar's directors, executives, and other employees;

- a proposal prohibiting insiders from trading First Solar securities based upon material non-public information;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.      Awarding to First Solar restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

1

2                              **JURY DEMAND**

3          Plaintiffs demand a trial by jury.

4

5   Dated: August 31, 2012                    CHAPIN FITZGERALD  & BOTTINI
                                              LLP
6

7                                             s/ Francis A. Bottini, Jr.
                                              FRANCIS A. BOTTINI, JR. (admitted
8                                             *pro hac vice*)

9
                                              Francis A. Bottini, Jr. (*pro hac vice*)
10                                            Keith M. Cochran (*pro hac vice*)
                                              550 West C Street, Suite 2000
11                                            San Diego, CA 92101
                                              Telephone: (619) 241-4810
12                                            Facsimile: (619) 995-5318
                                              fbottini@cflawfirm.com
13                                            kcochran@cflawfirm.com

14

15                                            ROBBINS UMEDA LLP
                                              Brian J. Robbins (*pro hac vice*)
16                                            George C. Aguilar (*pro hac vice*)
                                              Jay N. Razzouk (*pro hac vice*)
17                                            600 B Street, Suite 1900
                                              San Diego, CA 92101
18                                            Telephone:  (619) 525-3990
                                              Facsimile:  (619) 525-3991
19                                            brobbins@robbinsumeda.com
                                              gaguilar@robbinsumeda.com
20                                            jrazzouk@robbinsumeda.com

21                                            Jonathan A. Dessaules (#019439)
                                              DESSAULES LAW GROUP
22                                            2700 North Central Avenue, Suite 1250
                                              Phoenix, AZ 85004
23                                            Telephone: (602) 274-5400
                                              Facsimile: (602) 274-5401
24                                            idessaules@dessauleslaw.com

25

26                                            GLANCY BINKOW & GOLDBERG LLP
                                              Lionel Z. Glancy
27                                            Ex Kano S. Sams II*
                                              Michael M. Goldberg
28                                            1925 Century Park East, Suite 2100

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
lglancy@glancylaw.com
mmgoldberg@glancylaw.com
esams@glancylaw.com


WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Betsy Manifold
Francis M. Gregorek
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
gregorek@whafh.com

1

**CERTIFICATE OF SERVICE**

2

3
      I hereby certify that on August 31, 2012, the attached document was electronically

4
transmitted to the Clerk of the Court using the CM/ECF System which will send

5
notification of such filing and transmittal of a Notice of Electronic Filing to all CM/ECF

6
registrants.

7

                           s/ Francis A. Bottini, Jr.

8
                             Francis A. Bottini, Jr.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28