1  ROBBINS ARROYO LLP
   Brian J. Robbins
2  (Pro Hac Vice; CA SBN 190264)
   George C. Aguilar
3  (Pro Hac Vice; CA SBN 126535)
   Jay N. Razzouk
4  (Pro Hac Vice; CA SBN 258511)
   600 B Street, Suite 1900
5  San Diego, CA  92101
   Telephone: (619) 525-3990
6  Facsimile: (619) 525-3991
   brobbins@robbinsarroyo.com
7  gaguilar@robbinsarroyo.com
   jrazzouk@robbinsarroyo.com
8
   BOTTINI & BOTTINI, INC.
9  Francis A. Bottini, Jr.
   (Pro Hac Vice; CA SBN 175783)
10 7817 Ivanhoe Avenue, Suite 102
   La Jolla, CA  92037
11 Telephone: (858) 914-2001
   Facsimile: (858) 914-2002
12 fbottini@bottinilaw.com

13 Co-Lead Counsel for Plaintiffs

14 [Additional Counsel Listed on Signature Page]

15            IN THE UNITED STATES DISTRICT COURT

16            FOR THE DISTRICT OF ARIZONA

17

18 IN RE FIRST SOLAR            | Case No.: CV12-0769 DGC (Lead Case)
   DERIVATIVE LITIGATION       |
19                             | (Consolidated with Case Nos.:
                               | CV-12-0819-PHX-DGC
20 This documents relates to:   | CV-12-1031-PHX-DGC
                               | CV-12-1144-PHX-DGC
21     ALL ACTIONS              | CV-13-1410-PHX-DGC)

22                             | **VERIFIED CONSOLIDATED**
                               | **AMENDED SHAREHOLDER**
23                             | **DERIVATIVE COMPLAINT**

24                             | **DEMAND FOR JURY TRIAL**

25

26

27

28

1
2

# TABLE OF CONTENTS

Page

SUMMARY OF ACTION ................................................................................. 1

JURISDICTION AND VENUE ......................................................................... 4

THE PARTIES .................................................................................................. 4

    A.    Plaintiffs ............................................................................................ 4

    B.    Nominal Defendant ........................................................................... 5

    C.    Defendants ......................................................................................... 5

THE INDIVIDUAL DEFENDANTS CONCEALED MATERIAL
INFORMATION FROM SHAREHOLDERS ..................................................... 9

    A.    The Individual Defendants Concealed the Scope of the
        Manufacturing Excursion Involving Low Power Modules ......................... 9

    B.    The Individual Defendants Concealed the Heat Degradation Problem ...... 15

    C.    Management Informed the Board About the LPM Manufacturing
        Excursion and the Heat Degradation Issues .............................................. 18

    D.    The Individual Defendants Increased Their Compensation by
        Concealing the Defects and Misreporting Their Finical Impact ................ 22

THE INDIVIDUAL DEFENDANTS CAUSED FIRST SOLAR TO ISSUE
FALSE AND MISLEADING STATEMENTS .................................................... 25

    A.    False Statements Made Between April 30, 2008-May 1, 2009 ................. 25

    B.    False Statements Made Between July 30, 2009-April 29, 2010 ................ 34

    C.    False Statements Made Between July 29, 2010–December 14, 2011 ........ 46

THE TRUTH EMERGES ................................................................................. 68

INSIDER SELLING ALLEGATIONS .............................................................. 72

    A.    Defendant Ahearn's Insider Sales ............................................................ 73

    B.    Defendant Meyerhoff's Insider Sales ...................................................... 74

    C.    Defendant Eaglesham's Insider Sales ...................................................... 75

    D.    Defendant Sohn's Insider Sales ............................................................... 76

    E.    Defendant Sweeney's Insider Sales ......................................................... 76

    F.    Defendant Zhu's Insider Sales ................................................................. 77

    G.    Defendant Nolan's Insider Sales .............................................................. 78

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

H.  Defendant Presby's Insider Sales .................................................. 79

I.  Breakdown of the Insider Selling Defendants' Stock Sales ......................... 79

THE INDIVIDUAL DEFENDANTS CAUSED THE  COMPANY TO VIOLATE GAAP ..................................................................... 84

A.  GAAP Violation: Financial Statements Must Conform with GAAP ........ 84

B.  GAAP Violation: Understated Warranty Reserves.................................... 85

C.  GAAP Violation: Excursion and Heat Degradation Disclosures................ 92

D.  GAAP Violation: Revenue Recognition ..................................................... 96

E.  GAAP Violation:  Timely Write Off Impaired Goodwill........................... 99

F.  The Court Finds Triable Issue in the Class Action Regarding Accounting Fraud ........................................................................................ 103

DUTIES OF THE INDIVIDUAL DEFENDANTS ................................................. 105

A.  Fiduciary Duties ........................................................................................ 105

B.  Audit Committee Duties............................................................................. 105

C.  Control, Access, and Authority ................................................................. 106

D.  Reasonable and Prudent Supervision ....................................................... 106

E.  Code of Business Conduct and Ethics ...................................................... 107

BREACHES OF DUTIES ....................................................................................... 108

CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION............ 109

DAMAGES ............................................................................................................. 110

DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS.................................... 111

A.  Demand Is Futile as to Defendant Ahearn ............................................... 111

B.  Demand Is Futile as to Defendants Sweeney, Nolan, and Presby for Insider Trading ..................................................................................... 113

C.  Demand Is Futile as to Audit Committee Defendants Kennedy, Presby, and Stebbins ................................................................................. 114

D.  Demand Is Futile Because Solar Panels Are First Solar's Core Business....................................................................................................... 115

E.  Demand Is Excused Because the Director Defendants on the Project Development Risk Committee Acted in Bad Faith, and Because the Entire Board Consciously Ignored Known Problems ................................ 117

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

F.   Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment ............................................. 118

G.   Demand Is Futile as to All the Director Defendants for Additional Reasons ................................................................................................. 119

COUNT I ..................................................................................................................... 120

COUNT II .................................................................................................................... 121

COUNT III ................................................................................................................... 122

PRAYER FOR RELIEF .............................................................................................. 122

JURY DEMAND .......................................................................................................... 124

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**SUMMARY OF ACTION**

1.      Plaintiffs, long-time shareholders of First Solar, Inc. ("First Solar" or the "Company"), bring this shareholder derivative lawsuit against certain officers and directors of First Solar for state law claims for breaches of fiduciary duties, abuse of control, gross mismanagement, unjust enrichment, and insider trading that occurred between April 30, 2008 and February 29, 2012 (the "Relevant Period").  The wrongs have caused hundreds of millions of dollars in damages to First Solar and exposed the Company to hundreds of millions of dollars in potential liability for violations of the federal securities laws.

2.      First Solar is the largest U.S. solar panel company, manufacturing individual modules and complete turn-key power plants.  Since First Solar went public in 2006, the Company has consistently reported explosive growth in its financial statements.

3.      While First Solar was reporting significant growth during the Relevant Period, however, the Company was selling a substantial number of defective solar panels that would ultimately force the Company to incur a quarter of a billion dollars in warranty costs. Specifically, between June 2008 and June 2009, the Company sold and installed solar panels with manufacturing deficiencies that caused premature power loss.  Rather than promptly disclose the seriousness of the problems facing the Company, First Solar's officers and directors concealed the truth.

4.      Over one year later, in July 2010, First Solar's officers and directors finally revealed that the Company had identified manufacturing issues with certain products manufactured between June 2008 and June 2009.  Yet First Solar's officers and directors still concealed the scope of the manufacturing problems, informing shareholders that only 4% of its products were affected and that the problem had been "addressed."  First Solar's officers and directors downplayed any field performance and reliability issues by noting that the Company had initiated a remediation program to remove and replace the defective solar modules, estimating the cost of the program at $30 million.

5.      Indeed, the members of First Solar's Board of Directors' (the "Board") actual knowledge of the problems, and their failure to comply with their duty of candor to disclose

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

all known material facts, is demonstrated by the fact that First Solar's Vice President of Technology, Defendant David Eaglesham ("Eaglesham"), informed the Board on April 27, 2011, that the Company's solar modules were degrading at a rate of 11% in hot climates.[1] Mitigation options, including de-rating, were presented, and Defendant Eaglesham informed the Board that the impact of de-rating would be $30 million to $60 million in 2011.[2] Ultimately, the defect and its financial impact ($37.8 million) were not disclosed until the 4Q11 release and a conference call in February 2012, ***nearly a year after Defendant Eaglesham's presentation***.

6.     After concealing this material information for over a year, in February 2012, First Solar's officers and directors suddenly revealed the actual staggering impact of the remediation programs for the two defects.  The Company had incurred nearly $254 million of warranty and related charges for certain underperforming solar panels, nearly ten times more than originally disclosed to shareholders.   On this news, First Solar's market capitalization plunged 11%, erasing more than $354 million in market capitalization.

7.     The media and analysts noted the staggering charge taken by the Company associated with replacing defective panels. *Bloomberg News* wrote that in the fourth quarter, the problem led "to warranty claims of $125.8 million in the fourth quarter, or more than half the total spent on the glitch to date.  It also put aside $37.8 million to cover future claims." *The Wall Street Journal* wrote that the Company "has spent nearly $254 million replacing customers' solar panels that didn't perform as promised and changing its warranty."  Mark Bachman, an analyst at Avian Securities LLC, wrote that the "charges [are] about ***10 times*** what they said they were going to be when they first reported the issue."[3]  Credit Suisse analyst Satya Kumar wrote in his February 29, 2012 report titled "A quarter billion dollar warranty problem," that "[t]he $253 mm in cumulative warranty and related charges now

---

[1] *See Smilovits vs. First Solar, Inc.*, Case No. CV12-00555-PHX-DGC (D. Ariz.), Docket No. 364-1 at 240.

[2] *Id*. at 241.

[3] Emphasis here and throughout this complaint has been added unless noted otherwise.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1 raises a significant question mark on the reliability and field performance of FSLR's panels –

2 product quality in our view is the most significant metric for a solar companies' long-term

3 survivability."

4        8.    Because of reports delivered by First Solar employees and executives like

5 Defendant Eaglesham, First Solar's officers and directors knew throughout the Relevant

6 Period the true impact of the defects and related remediation programs on the Company's

7 financial position and business prospects.  First Solar's management downplayed the field

8 performance and reliability issues as well as the impact of the remediation program, driving

9 the Company's stock to a peak of over $310 per share.    But soon after shareholders

10 discovered the true impact of the remediation program, First Solar stock dropped below $30

11 per share.

12        9.    First Solar's officers and directors concealed the true costs of the defective

13 solar panels to personally benefit at the expense of shareholders.  Indeed, evidence regarding

14 this concealment has allowed a class action for securities fraud to so far survive to the point

15 of trial.  While Defendants were downplaying the effect of the remediation program,

16 Defendants Eaglesham, Michael J. Ahearn ("Ahearn"), Jens Meyerhoff ("Meyerhoff"), Bruce

17 Sohn ("Sohn"), James Zhu ("Zhu"), James F. Nolan ("Nolan"), Michael Sweeney

18 ("Sweeney"), and J. Thomas Presby ("Presby") unloaded over 3.5 million of their personally

19 held shares of First Solar stock for proceeds of over *$478 million*.  Tellingly, Defendant

20 Ahearn, the founder, Chief Executive Officer ("CEO"), and Chairman of the Board, led the

21 charge of this exploit by selling almost 97% of his personally held First Solar stock.

22       10.    In order to artificially inflate the Company's stock so that Company insiders

23 could cash out to the tune of over *$478 million* while increasing their performance-based

24 compensation, First Solar's officers and directors concealed two serious, widespread

25 manufacturing defects – one of which was considered the Company's "biggest smoking gun":

26         (a)    First Solar's officers and directors intentionally concealed the existence

27 and scope of the manufacturing excursion, in order to delay taking write downs of a quarter

28 of a billion dollars in warranty costs; and

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1        (b)     while First Solar traditionally manufactured solar panels for cooler

2 climates, First Solar's modules designed for hot climates were experiencing premature

3 degradation.

4        11.    Plaintiffs bring this derivative action to: (i) recover damages and seek

5 restitution against First Solar's directors and officers for the benefit of the Company; and (ii)

6 require the Company to reform and improve its corporate governance and internal

7 procedures to protect First Solar and its shareholders from a repeat of the damaging events

8 described below.

9                               **JURISDICTION AND VENUE**

10        12.    This Court has jurisdiction over all causes of action asserted herein pursuant to

11 28 U.S.C. § 1332 because Plaintiffs and Defendants are citizens of different states and the

12 amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a

13 collusive action designed to confer jurisdiction on a court of the United States that it would

14 not otherwise have.

15        13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Many of the acts

16 complained of herein occurred in this District and First Solar's principal place of business is

17 located at 350 West Washington Street, Suite 600, Tempe, Arizona 85281, where the day-to-

18 day operations of the Company are directed and managed.

19                                 **THE PARTIES**

20 **A.    Plaintiffs**

21        14.    Plaintiff Eng Kwang Tan ("Tan") is a shareholder of First Solar.  Plaintiff Tan

22 purchased 900 shares of First Solar stock on September 8, 2008, and has continuously held

23 First Solar shares since that time.  At the time he filed suit, Plaintiff Tan was a citizen of

24 Virginia.

25        15.    Plaintiff Kathleen Morris ("Morris") has been a shareholder of First Solar at

26 relevant times.  She purchased her shares on December 14, 2007, and continuously held First

27 Solar shares at relevant times.  At the time she filed suit, Plaintiff Morris was a citizen of

28 Michigan.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

16.     Plaintiff Eric Feigin ("Feigin") is a shareholder of First Solar.  He purchased ten shares of First Solar stock on August 5, 2009, and has continuously held First Solar shares since that time.  At the time he filed suit, Plaintiff was a citizen of Canada.

17.     Plaintiff Clifford Tindall ("Tindall") is a shareholder of First Solar.  He purchased his shares on December 6, 2007, and has continuously held First Solar shares since that time.  At the time he filed suit, Plaintiff Tindall was a citizen of Canada.

18.     Plaintiff Britt Nederhood ("Nederhood") is a shareholder of First Solar.  He purchased his shares on March 18, 2011, and has continuously held First Solar shares since that time.  At the time he filed suit, Plaintiff Nederhood is a citizen of Washington.

**B.     Nominal Defendant**

19.     Nominal defendant First Solar is, and at the time this suit commenced was, a Delaware corporation with its principal place of business at 350 West Washington Street, Suite 600, Tempe, Arizona 85281.  First Solar's common stock trades on the NASDAQ Global Market under the ticker symbol "FSLR."

**C.     Defendants**

20.     Defendant Ahearn, the founder of First Solar, has served as the Company's Chairman of the Board since January 2011 and as interim CEO from October 2011 to May 3, 2012.  Defendant Ahearn served as CEO from August 2000 to September 2009 and Executive Chairman from October 2009 to December 2010.  Defendant Ahearn received total executive compensation of $4,764,134 in 2008 and $4,280,355 in 2009.  While the Individual Defendants (as defined herein) were issuing false and misleading statements, Defendant Ahearn sold nearly 3.2 million shares of his First Solar stock on the basis of non-public, material information for proceeds of over $427 million.  Upon information and belief, Defendant Ahearn was a citizen of Arizona at the time this suit commenced.

21.     Defendant Robert J. Gillette ("Gillette") served as the Company's CEO and a director on the Board between October 1, 2009 and October 25, 2011.  Defendant Gillette received total executive compensation of $16,552,847 in 2009, $13,314,890 in 2010, and $2,473,655 in 2011.  Upon information and belief, Defendant Gillette was a citizen of

1   Arizona at the time this suit commenced.

2       22.     Defendant Mark R. Widmar ("Widmar") has served as the Company's Chief

3   Financial Officer ("CFO") since April 2011 and Chief Accounting Officer since February

4   2012.  Defendant Widmar received total executive compensation of $3,438,900 in 2011.

5   Upon information and belief, Defendant Widmar was a citizen of Arizona at the time this

6   suit commenced.

7       23.     Defendant Meyerhoff served as the Company's CFO between May 2006 and

8   December 31, 2010 and President of the Company's Utility Systems Business between July

9   2010 and September 30, 2011.  Defendant Meyerhoff received total executive compensation

10  of $2,095,482 in 2008, $2,030,796 in 2009, $4,761,668 in 2010, and $1,681,346 in 2011.

11  While the Individual Defendants were issuing false and misleading statements, Defendant

12  Meyerhoff sold 118,827 shares of his First Solar stock on the basis of material, non-public

13  information for proceeds of $18,577,773.   Upon information and belief, Defendant

14  Meyerhoff was a citizen of Arizona at the time this suit commenced.

15      24.     Defendant Zhu served as the Company's Chief Accounting Officer from

16  November 2, 2009 through January 2012.  From January 2011 through March 2011,

17  Defendant Zhu served as the interim CFO.  From June 2007 through October 2009,

18  Defendant Zhu served as the Company's Vice President and Corporate Controller.

19  Defendant Zhu received total executive compensation of $1,360,491 in 2011.  While the

20  Individual Defendants were issuing false and misleading statements, Defendant Zhu sold

21  7,884 shares of his First Solar stock on the basis of material, non-public information for

22  proceeds of $1,172,000.  Upon information and belief, Defendant Zhu was a citizen of

23  Arizona at the time this suit commenced.

24      25.     Defendant Sohn was the Company's President, Operations from February 2011

25  to April 2011; President from March 2007 to February 2011; and a director from July 2003

26  to June 2009.   While the Individual Defendants were issuing false and misleading

27  statements, Defendant Sohn sold 74,750 shares of his First Solar stock on the basis of

28  material, non-public information for proceeds of $12,390,248.  Defendant Sohn received

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

total executive compensation of $3,050,982 in 2008, $3,059,635 in 2009, and $2,945,503 in 2010.  On information and belief, Defendant Sohn was a citizen of Arizona at the time this suit commenced.

26.     Defendant Eaglesham served as the Company's Chief Technology Officer from November 2009 to July 2012.  Defendant Eaglesham joined First Solar as Vice President, Technology in June 2006.   While the Individual Defendants were issuing false and misleading statements, Defendant Eaglesham sold 69,983 shares of his First Solar stock on the basis of material, non-public information for proceeds of $9,645,827.   Defendant Eaglesham received total executive compensation in 2009 of $1,926,994.  Upon information and belief, Defendant Eaglesham was a citizen of Ohio at the time this suit commenced.

27.     Defendant Craig Kennedy ("Kennedy") has been a director of the Company since September 2007.  Defendant Kennedy is a member of the Audit Committee and has been since at least 2008.  Upon information and belief, Defendant Kennedy was a citizen of Maryland at the time this suit commenced.

28.     Defendant Nolan has been a director of the Company since February 2003. While the Individual Defendants were issuing false and misleading statements, Defendant Nolan sold 24,000 shares of his First Solar stock on the basis of material, non-public information for proceeds of $5,351,425.  Upon information and belief, Defendant Nolan was a citizen of Florida at the time this suit commenced.

29.     Defendant William J. Post ("Post") has been a director of the Company since June 2010.  Defendant Post is a member of the Compensation Committee and has been since at least 2011.  Defendant Post is also the Chair of the Project Development Committee and has been since 2011.  Upon information and belief, Defendant Post was a citizen of Arizona at the time this suit commenced.

30.     Defendant Presby has been a director of the Company since August 2006. Defendant Presby is the Chairman of the Audit Committee currently and served as Chairman of the Audit Committee for the entire Relevant Period.  While the Individual Defendants were issuing false and misleading statements, Defendant Presby sold 1,000 shares of his First

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   Solar stock on the basis of material, non-public information for proceeds of $137,810.  Upon

2   information and belief, Defendant Presby was a citizen of New Jersey at the time this suit

3   commenced.

4       31.     Defendant Paul H. Stebbins ("Stebbins") has been a director of the Company

5   since December 2006.  Defendant Stebbins is a member of both the Audit Committee and

6   Compensation Committee and has been since at least 2007.  Defendant Stebbins is also a

7   member of the Project Development Committee and has been since 2011.  Upon information

8   and belief, Defendant Stebbins was a citizen of Florida at the time this suit commenced.

9       32.     Defendant Sweeney has been a director of the Company since July 2003.

10  Defendant Sweeney is Chairman of the Compensation Committee and has been since at least

11  2007.   While the Individual Defendants were issuing false and misleading statements,

12  Defendant Sweeney sold 24,749 shares of his First Solar stock on the basis of material, non-

13  public information for proceeds of $4,417,934.  Upon information and belief, Defendant

14  Sweeney was a citizen of Minnesota at the time this suit commenced.

15      33.     Defendant Jose H. Villarreal ("Villarreal") was a director of the Company from

16  September 2007 until May 2012, as well as Chairman of the Nominating and Governance

17  Committee during the entire Relevant Period.  Upon information and belief, Defendant

18  Villarreal was a citizen of Texas at the time this suit commenced.

19      34.     Defendants Ahearn, Gillette, Widmar, Meyerhoff, Zhu, Sohn, Eaglesham,

20  Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal are sometimes referred to

21  herein as the "Individual Defendants."  The Individual Defendants, because of their positions

22  with the Company, possessed the power and authority to control the contents of First Solar's

23  quarterly reports, press releases and presentations to securities analysts, money and portfolio

24  managers and institutional investors, i.e., the market.  They were provided with copies of the

25  Company's reports and press releases alleged herein to be misleading prior to or shortly after

26  their issuance and had the ability and opportunity to prevent their issuance or cause them to

27  be corrected.  Because of their positions with the Company, and their access to material, non-

28  public information available to them but not to the public, the Individual Defendants knew

that the adverse facts specified herein had not been disclosed to and were being concealed from shareholders and that the positive representations being made were then materially false and misleading.

35.    Defendants Ahearn, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal are sometimes referred to herein as the "Director Defendants."

36.    Defendants Kennedy, Presby, and Stebbins are sometimes referred to herein as the "Audit Committee Defendants."

**THE INDIVIDUAL DEFENDANTS CONCEALED MATERIAL INFORMATION FROM SHAREHOLDERS**

**A.    The Individual Defendants Concealed the Scope of the Manufacturing Excursion Involving Low Power Modules**

37.    By the end of 2008, First Solar received numerous complaints about a defect in its solar panels that caused premature power loss.  The Individual Defendants termed this problem a "manufacturing excursion" as opposed to a manufacturing defect, which would imply a more severe performance shortcoming.

38.    Despite the fact that First Solar received numerous complaints about the premature power loss between June 2008 and June 2009, the Individual Defendants concealed the problems from shareholders until July 2010.  In fact, when the Company finally disclosed the manufacturing excursion, the Individual Defendants represented that the Company had identified and addressed a limited problem in June 2009.

39.    For example, according to evidence presented and the Court's findings in connection with motions for summary judgment in the class action lawsuit, *Smilovits v. First Solar, Inc.*, No. 12-cv-00555 (D. Ariz.) (the "Class Action"):

(a)    First Solar tested solar panel modules as they came off the assembly line.  This entailed a destructive testing process to simulate performance following installation in the field.  The resulting data was tabulated in a Stability Index ("STBi"), which then served as key metric used to estimate the number of modules that could experience premature power degradation.

1        (b)     In April 2008, Michael Koralewski ("Koralewski")[4] e-mailed Defendant

2   Eaglesham regarding STBi data at First Solar's Perrysburg, Ohio, plant.  He wrote: "FYI, ***not***

3   ***a real good trend*** and yes there are more than 10 data points in the monthly groupings."

4        (c)     During an analyst conference call on February 24, 2009, analyst Mark

5   Bachman of Pacific Crest asked Defendant Sohn to comment on "problems with the line this

6   quarter ... to make sure there was no manufacturing problems around, or that accounts for

7   that line calc being down."  The Court found that "Sohn appears to have dodged the question,

8   responding instead that the holidays may have attributed to 'line calc' being down and that

9   First Solar was 'very cautious and careful and [has] a high degree of expectation in terms of

10   the way we operate the factories.'"  The Court also concluded that this statement was "made

11   when First Solar knew of the [low power module ("LPM")] problem and at least some

12   internal estimates had suggested it was severe."

13        (d)     During the second quarter of 2009, Koralewski determined that

14   approximately 2.9 million modules could potentially experience -20% STBi.  This data

15   demonstrated that the magnitude of the power loss defect was severe.

16        (e)     On May 31, 2009, Koralewski e-mailed another First Solar employee,

17   saying "we have a rather serious quality problem that reared up late last week that has

18   escalated over the weekend....  ***We have a significant number of customers who are***

19   ***complaining about lower power modules and it looks real***."

20        (f)     By this time, Defendants Zhu and Sohn were undoubtedly aware of the

21   escalating LPM defect, and Defendant Ahearn began attending meetings addressing the

22   status of the defect – apparently referred to by some as "lower power team" meetings.

23        (g)     Around the second half of 2009, a task force led by Defendant

24   Eaglesham discovered that the power loss was the result of a new manufacturing process

25   implemented in June 2008.  Under the faulty process, a subpopulation of modules, later

26

---

[4] Koralewski served as Vice President of Global Quality from 2006 to 2011, and finally Vice

27   President of Site Operations and Plant Manager from May 2011 until September 2015.

28   Before serving as Vice President of Global Quality, he was Director of Global Quality.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   known as LPMs, could experience power loss of 15% or more within the first several months

2   of installation in the field.

3          (h)     In June 2009, Defendant Eaglesham e-mailed Koralewski, stating

4   "[u]ntil we have a tighter window we should consider the possibility that 10% of the product

5   produced in the last 10 months is affected."

6          (i)     Also in June 2009, First Solar discontinued the manufacturing process

7   that resulted in the LPMs.

8          (j)     During a call with analysts on June 24, 2009, Defendant Eaglesham

9   stated that "our track [record] of field performance and our knowledge of field performance

10  allows us to have faith, high confidence that our product is delivering in the field."  The

11  Court found that this statement was "made when First Solar knew of the LPM problem and at

12  least some internal estimates had suggested it was severe."

13         (k)     Shortly after discovering the defect, First Solar contacted customers to

14  notify them of the LPM defect and offered remediation by removing and replacing LPMs at

15  underperforming sites.  However, as the Court noted, the evidence showed that First Solar

16  executives decided to delay informing customers about the defect until the customers

17  discovered the problem themselves.  Thus, it can be deduced that the customers who were

18  informed about the defect and received prompt remediation were those who had actually

19  experienced problems and complained to First Solar.

20         (l)     First Solar's warranties provided that a customer would send a defective

21  module to the Company for testing, and that First Solar would send a replacement module.

22  The remediation process was complicated by the fact that First Solar could not zero in on

23  defective modules by serial numbers.  Rather, in large installations involving potentially

24  hundreds of modules, it was more efficient for the Company to replace *all* the modules rather

25  than search for the individual LPMs.

26         (m)     In July 2009, low power team meeting notes sent between Defendants

27  Ahearn, Sohn, Meyerhoff, and Eaglesham stated that they *"[m]ust be cautious not to leak*

28  *unnecessary information either internally or externally*."

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

(n)     In preparation for the 2Q09 conference call held on July 30, 2009, Defendant Sohn remarked: "There should not even be a question in the list about [the LPM defect]. *As far as the public is concerned, it does not exist*...."

(o)     In October 2009, Defendant Meyerhoff wrote Defendant Gillette that the LPM is one of "*the biggest smoking gun[s]* we have at the company."

(p)     In May 2010, Defendant Sohn told two First Solar employees that "[w]e should NOT be mentioning an 'excursion' publicly.  E-staff has *consciously* made this decision ...."  "E-Staff" included at relevant times Defendants Ahearn, Gillette, Sohn, Eaglesham, Meyerhoff, Zhu, and Widmar – none of whom disputed this fact in the Class Action.[5]

40.     The forgoing findings, based on evidence submitted in the Class action, demonstrate and confirm that the Individual Defendants were long aware of the LPM defect and its materiality to shareholders, yet made a collective, conscious decision to hide that information from the public.  Indeed, the Court found that there was "evidence that First Solar knew the LPM defect was a serious problem that would concern investors well before it was disclosed. First Solar executives were careful not to release information about the LPM defect to the public, even deciding to delay informing customers until the customers discovered the problem themselves."  The Court further concluded that the e-mails cited above "create a genuine issue of fact as to whether Ahearn, Sohn, Eaglesham, Meyerhoff, Zhu, and Gillette were personally involved in managing the LPM problem." "Several emails," the Court found, "indicate that Defendants wanted to keep the information from becoming public, and took steps to avoid disclosing it in press releases and conference calls."

41.     The Individual Defendants knew the estimates regarding the number of LPMs in the field and the number of modules required to remediate the defect directly affected the additional costs First Solar faced as a result of the manufacturing defect.  Generally Accepted Accounting Principles ("GAAP") required First Solar's financial statements to account for

---

[5] According to the Court, Defendants Meyerhoff, Sohn, and Zhu also admitted in deposition that they were part of E-Staff.

these expenses and anticipated liabilities.  Defendants thus began to account for some of the anticipated liabilities relating to its warranty obligations with a "LPM Remediation Accrual."

42.     On July 29, 2010, in conjunction with announcing its earnings for second quarter 2010, First Solar belatedly disclosed the LPM defect and LPM Remediation Accrual for the first time.  This was more than a year after First Solar's brass conclusively identified the LPM defect, terminated the defective manufacturing process, and began the remediation process.

43.     After revealing the existence of the manufacturing excursion, the Individual Defendants continued to misrepresent its scope.  Throughout the Relevant Period, the Individual Defendants repeatedly represented falsely that: (i) the manufacturing excursion was limited to just 4% (or approximately 400,000) of the modules manufactured between June 2008 and June 2009; (ii) the problem was known, contained, and fixed; and (iii) the financial impact was limited.  The Individual Defendants falsely stated in August 2010 that the manufacturing excursion would cost $29.5 million.  However, by February 2012, the Individual Defendants were forced to disclose that the manufacturing excursion would cost more than $260 million.

44.     Belatedly, in its 4Q11 financials, First Solar booked a $125.8 million change to the LPM Remediation Accrual.  This was not reported, however, until the Company's earnings press release in late February 2012.

45.     The Individual Defendants long knew but failed until February 2012 to disclose that: (i) the defective modules were not limited to "less than 4%" (or roughly 400,000 modules) of the total products manufactured from June 2008 to June 2009 because, in fact, over 1.5 million modules were affected; and (ii) the remediation efforts were not substantially completed because, in fact, the Company had only recognized a fraction of the total excursion-related costs.

46.     For example, the Court discussed the following evidence and findings in ruling on the motions for summary judgment in the Class Action:

(a)     "By 1Q10, Koralewski estimated that 450,000 modules were LPMs …."

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

(b)    "In April 2010, Koralewski was informed via email that '[t]he 415K is the limit we have at this time. It is based on the probability of returns, not necessarily the total LPM.'"

(c)    "In June 2010, First Solar discovered that the LPM population could be as large as 1.4 million modules."

(d)    "In December 2010, Koralewski noted: 'We know that there are more LPM out there (warranty worse than 10%) of approximately 500,000 (addition to what is in model).'"

(e)    "An internal report, which was sent to Zhu, noted that as of July 22, 2011, over 2,000 claims had not yet been assessed for validity."

(f)    During the 3Q11 earnings call with analysts on November 3, 2011, Defendant "Widmar stated that '[w]e have substantially concluded the remediation programs associated with this manufacturing excursion.'"  However, earlier, "[i]n an email circulated between Kallenbach, Koralewski, Zhu and Schumaker discussing the upcoming 3Q11 earnings call and agreeing to state that the remediation programs had substantially concluded, Kallenbach responded: 'To be crystal clear the operative term is "substantially concluded."'"  Indeed, Thomas Kuster, who served as First Solar's Vice President of Engineering Procurement and Construction and then its Vice President of System Development, testified at deposition "that at the end of 3Q11 the remediation programs 'had not been substantially concluded. There was still work to be done.'"

(g)    The e-mails cited by plaintiffs in the Class Action, including those referenced above, "identified a potential population of LPMs much larger than the 400,000 that was later disclosed."

(h)    "[T]he 4% disclosure and Widmar's [November 3, 2011] statement were made in connection with earnings releases, with which the Individual Defendants were heavily involved."  Indeed, the Court found important that the Individual Defendants named in the Class Action – Defendants Ahearn, Gillette, Sohn, Eaglesham, Meyerhoff, Zhu, and

1  Widmar – "do not dispute that they authorized all the statements made in First Solar's SEC
2  filings and conference calls."

3         (i)     "[T]he LPM defect [was] a major issue facing First Solar at the time,"
4  and "[i]n fact, it was considered 'the biggest smoking gun' at the company."

5       47.    And even though the Individual Defendants knew about the manufacturing
6  excursion in 2008, the Individual Defendants improperly decreased the Company's warranty
7  reserve rate from 2.24% at 1Q08 to 1.11% at 4Q10.  This directly impacted the Company's
8  reported financial condition, including operational income, which in turn triggered increased
9  performance-based compensation to at least Defendants Ahearn, Gillette, Eaglesham,
10  Meyerhoff, and Sohn.

11  **B.    The Individual Defendants Concealed the Heat Degradation Problem**

12       48.    Unbeknownst to shareholders, First Solar also faced the premature degradation
13  of modules in hot climates.  The heat degradation issue affected the large solar field power
14  generating facilities that First Solar's Engineering Procurement and Construction division
15  ("EPC") built.

16       49.    First Solar's modules operate differently in different climates.  Because First
17  Solar's business initially concentrated on cool climates, First Solar had little field data
18  available regarding module performance in hot climates.  However, the Individual
19  Defendants knew that, based on a few years of operation, modules in hot climates
20  experienced excessive degradation – or a very sharp reduction in power generating ability.

21       50.    To conceal the heat degradation defect from customers and investors,
22  Defendants resorted to "de-rating" of modules.  De-rating is the process by which First Solar
23  labeled modules lower than the wattage at which they tested in order to accommodate for the
24  decline expected to be caused by the heat degradation.  In other words, to give the product
25  some extra padding in order to perform within specifications, the Company lowered the
26  promised specifications.  This was considered the simplest, fasted solution.  Yet, Defendants
27  knew it would significantly impact First Solar's profit margin.

28

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

51.     The Individual Defendants knew about the heat degradation effect as early as 2009 but for years refrained from disclosing the problem to shareholders, even after it became clear it would have a material impact on the Company's financial condition.  For example, according to contentions, evidence, and findings discussed by the Court in connection with motions for summary judgment in the Class Action:

(a)     Defendants appear to have discovered the heat degradation issue in November 2009, when First Solar's Director of Product management disputed the Company's representation that modules would degrade at a rate of 0.7%-0.8% in hot climates.  The director "warned that '[f]ield data is noisy, leading to inability to draw definitive conclusion on long term degradation.'"

(b)     "In January 2010, an employee noted that the 'new degradation rates are higher [than] expected for hot climates.'"

(c)     "In April 2010, a team of First Solar scientists discovered data suggesting that First Solar modules installed in hot climates experienced faster power loss than previously understood."  Specifically:

In April 2010, Adrianne Kimber, First Solar's Director of Performance and Production, along with a technical team, provided more data and analysis regarding degradation rates, and concluded that "total system energy yield in the first 5 years would be less than our current guidance based on -0.7% annual degradation."  She noted that "there is a 95% chance that the true hot climate PV system degradation is greater than 0.7%/year."  The team noted that "First Solar should contemplate a change to external guidance for degradation rates of systems and modules installed in hot climates."  In addition, the team concluded that the data showed modules would "fall[] short of customer expectations by year 7."  Koralewski read the report and concluded that "it is a nice piece of work and data based as we can get at this time."

(d)     "On February 7, 2011, First Solar discovered that the company's Blythe, California plant was producing power at a lower level than its Ontario, Canada plant."

(e)     "In March, the team of scientists concluded that the modules were experiencing a greater 'initial stabilization' in hot climates than previously understood."

(f)     "On March 17, 2011, Eaglesham was notified that the [heat degradation] issue was raised in a staff meeting and 'caused quite a bit of excitement about what should/shouldn't be changed in our financial assumptions.'"

(g)     "Afterwards, an email was sent to First Solar employees, including Meyerhoff and Eaglesham, which addressed the hot climate issue and noted that [u]ntil we receive executive approval to modify our guidance, there is no change to our degradation guidance in any region.'"

(h)     "In late March [2011], a presentation was made to '[o]rient E-Staff to stabilization issue,' which noted that 'hotter sites drop faster, more severely.'"  As discussed above, "E-Staff" included Defendants Ahearn, Gillette, Sohn, Eaglesham, Meyerhoff, Zhu, and Widmar.

(i)     Around March and April 2011, Defendant Eaglesham "noted that a large financial impact" from the heat degradation issue "was imminent."

(j)     "On April 27, 2011, Eaglesham informed E-Staff and the Board of Directors that modules were degrading at a rate of 11% in hot climates."

52.     The Court found that the evidence presented by plaintiffs in the Class Action created a triable issue as to whether defendants – including Defendants Ahearn, Gillette, Sohn, Eaglesham, Meyerhoff, Zhu, and Widmar – knowingly concealed the heat degradation defect rather than disclose it promptly as they were required.  The Court concluded:

> A reasonable jury could find from the evidence that First Solar's representation that its modules degraded at a rate of 0.7%-0.8% in hot climates was misleading. A reasonable jury could also find that Defendants should have disclosed the hot climate problem sooner and that Defendants concealed the problem from customers to avoid disclosure. *The evidence indicates that Eaglesham, Sohn, Meyerhoff, and other members of E-Staff knew about the issue and spent several months trying to mitigate its effects. In April 2011, Eaglesham reported his findings to E-Staff, which concluded that the hot climate degradation issue could have a financial impact of up to $60 million. At that point, all Individual Defendants knew the problem was significant.*

> In addition, *Defendants' concealment of the issue from customers evidences a desire to keep the issue from reaching investors, especially after First Solar had already disclosed the LPM problem less than a year prior*. Like the LPM problem, a jury could conclude that a reasonable investor would consider the existence of the hot climate problem as significantly altering the total mix of information made available

The evidence also creates a question of fact about whether Defendants acted with intent to deceive investors. … Eaglesham presented his findings to the EStaff, which included several, if not all, of the Individual Defendants. A jury might also doubt that Eaglesham consider the defect to be a non-problem when he knew it could cost First Solar up to $60 million. What is more, a jury could find that Defendants concealed the defect for several months before disclosing it, and considered five alternative mitigation strategies, which included doing nothing. Instead of notifying customers about the problem, First Solar de-rated modules. A reasonable jury could find that Defendants concealed the existence of the hot climate defect with the intent to mislead investors, or at the very least, acted recklessly in failing to disclose the problem to customers and investors.

## C. Management Informed the Board About the LPM Manufacturing Excursion and the Heat Degradation Issues

53.     The operative Class Action complaint names First Solar, Ahearn, Gillette, Sohn, Eaglesham, Meyerhoff, Zhu, and Widmar as defendants.  Accordingly, the case and the evidence presented therein do not focus on the knowledge or culpability of Director Defendants Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal, as named in this action.  Nonetheless, based on various factors, including the Company's system for reporting material information to the Board (which, evidence shows, was functioning at the time) and the materiality of the manufacturing defects, it is reasonable to infer at this juncture that the Board, including Director Defendants Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal, were well apprised of the LPM and heat degradation defects and the impact they would have on the Company's financial statements.  Yet, it is clear that these individuals nonetheless conspired with or otherwise acquiesced to the wishes of management to conceal the defects and their devastating impact on First Solar's financial condition.

54.     The Board's knowledge is demonstrated, for example, by actual reports received by the Board regarding the problems, as revealed by the Court in ruling on the motions for summary judgment in the Class Action.  For example, on April 27, 2011, Defendant David Eaglesham, as First Solar's Vice President of Technology, informed the Board – then comprised of Defendants Ahearn, Gillette, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal – that the Company's solar modules were degrading at a

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    rate of 11% in hot climates. Mitigation options, including de-rating, were presented, and

2    Defendant Eaglesham informed the Board that the impact of de-rating would be $30 million

3    to $60 million in 2011.  Despite this, the Board allowed the defect and its financial impact

4    ($37.8 million) to go undisclosed until the release of Q411 financial results and a conference

5    call in February 2012 – ***nearly a year after Defendant Eaglesham's presentation***.

6            55.    Moreover, during 2010 and 2011, Defendants Kennedy, Post, Presby, and

7    Stebbins were members of First Solar's Project Development Risk Committee.  The Project

8    Development Risk Committee oversees the Company's project development and related

9    project finance activities.  During 2011, the committee held four meetings.  As a result of

10   these four meetings attended in 2011 by Defendants Kennedy, Post, Presby, and Stebbins, it

11   is   reasonable   to   assume   such   Defendants   were   presented   with   significant   material

12   information regarding the heat degradation issues surrounding the solar panels, both similar

13   to and in addition to the information provided by Eaglesham to the full Board on April 27,

14   2011.

15           56.    The Board's knowledge of the manufacturing problems is also demonstrated by

16   First Solar's combination of the roles of CEO and Chairman of the Board during most of the

17   Relevant Period.  Defendant Ahearn has served as the Company's Chairman since 2000.

18   During that time, he was also First Solar's CEO from August 2000 to October 2009, and then

19   the Company's Executive Chairman (an executive officer position) from October 2009 to

20   December 31, 2010.  On October 26, 2011, following Defendant Gillette's sudden departure,

21   defendant Ahearn assumed the mantle of interim CEO in addition to his role as Chairman.

22   As part of leading the Company's operations during the Relevant Period, the Company's

23   executives and employees, including Defendant Eaglesham, reported to Defendant Ahearn

24   regarding the heat degradation and manufacturing defect issues.   As detailed above,

25   Defendant Ahearn, in connection with his leadership roles, and as a member of various

26   committees including E-Staff and the "low power team," was regularly informed about the

27   manufacturing defects and colluded with the other Individual Defendants to conceal the truth

28   of the defects and their impact on the Company's financial condition.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

57.     Because First Solar had an executive as Chairman during most of the Relevant Period, the Board was led and advised by an insider of the Company intimately familiar with its day-to-day operations, including smoking guns like the LPM and heat degradation issues. As Chairman and CEO, Defendant Ahearn had the duty to advise his fellow Board members of all material facts concerning the Company's business and operations.  Plaintiffs are therefore entitled to the reasonable inference that Defendant Ahearn either shared or ensured other officers like Defendant Eaglesham shared material facts with the rest of the Board regarding the LPM and heat degradation defects and associated financial implications, as he was required to do pursuant to his duties.

58.     Indeed, the information Defendant Ahearn knew and was required to share with the Board was highly material to First Solar's core business of solar panels.  The LPM defect issue was internally recognized as the Company's biggest "smoking gun."  In addition, the hot climate degradation affected almost ten million modules produced between July 2009 and June 2011 – a large number of modules constituting a massive manufacturing defect that would necessarily need to be, and was in fact, elevated even to the highest echelons of the Company including its Board.  The critical nature of these matters to First Solar and their strategic implications further entitle Plaintiffs to a reasonable inference that the Board knew about the matters.

59.     Moreover, First Solar admits that management directly advised the Board of key risks facing the Company during the Relevant Period.  In Proxy Statements approved and ordered by Defendants Ahearn, Gillette, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villareal stated:

> The Company has a comprehensive risk management process in which management is responsible for identifying and managing the Company's risks and the board and its committees provide oversight in connection with these efforts. Risks are identified, assessed and managed on an ongoing basis and communicated to management during periodic management meetings or otherwise as appropriate. Existing and potential material risks are addressed during periodic senior management meetings, **_resulting in both board and committee discussions_** and public disclosure, as appropriate.

\* \* \*

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

*Management regularly reports on risk-related matters to the board or the relevant committee thereof. Management presentations containing information regarding risks and risk management initiatives are given throughout the year in connection with board and committee quarterly and special meetings as well as other communications as needed or as requested by the board or committee....*[6]

60. Similarly, during the Relevant Period, Defendants Kennedy, Presby, and Stebbins served on the Audit Committee, which was required by its Charter, among other duties, to review with management the financial information to be included in any Forms 10-K, 10-Q, and 8-K. Defendants also confirmed in the Company's Proxy Statements during the Relevant Period that the Audit Committee "oversees financial risks (including risks associated with accounting, financial reporting, enterprise resource planning system implementation, foreign currencies and the collectability of accounts receivable), legal and compliance risks and other risk management functions," and that "the Company's director of risk management reports to the audit committee at least once per year, and has open access to the chair of the audit committee." Thus, it can be reasonably inferred that the members of the Audit Committee – defendants Kennedy, Presby, and Stebbins – were well and regularly informed by management regarding the manufacturing defects and the risks they posed to the Company in terms of financial impact and financial reporting.

61. Although the Board and its committees were informed by management about material risks, public disclosures were not made "as appropriate." The Board, along with the other Individual Defendants, was advised of the concealed facts alleged herein, yet failed to take necessary action to cause such material facts to be disclosed in First Solar's financial results and SEC filings. Thus, the Individual Defendants breached their duties of care, good faith, candor, and loyalty. As a result, Individual Defendants, including the Director Defendants, cannot be indemnified for their misconduct by First Solar under Delaware law.

---

[6] *See, e.g.*, First Solar's Schedule 14A Proxy Statement, at 5, filed with the U.S. Securities and Exchange Commission ("SEC") on April 11, 2012; First Solar's Schedule 14A Proxy Statement, at 5, filed with the SEC on April 13, 2011.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**D.    The Individual Defendants Increased Their Compensation by Concealing the Defects and Misreporting Their Finical Impact**

62.    During 2008, the first year of the Relevant Period, Defendants Ahearn, Gillette, Eaglesham, Meyerhoff, and Sohn's compensation (if not also that of the other Defendants) was set in the same way as 2006-2007, including a component of the bonuses based on achieving operational objectives, including with regard to production volume, module conversion efficiency, watts per module, and total watts sold.  Specifically, total 2008 cash incentive compensation for First Solar's executives was subject to achievement of the following performance goals and metrics:

> 2008 Operational Objectives.  For all associates, including the named executive officers, the compensation committee assessed Company performance based on accomplishment of certain operational objectives established at the beginning of 2008. The objectives were based on operating goals set forth in our confidential ***annual operating plan for production volume, module conversion efficiency, watts per module, cost per watt, total watts sold and plant expansion and organizational build-out.*** Each operational objective was assigned a percentage weighting based on the importance of the factor to the overall performance of the Company. In addition, each operational metric had a target goal with higher targets (or stretch targets) that would result in multipliers between 1.0 and 2.0, and a minimum threshold for each metric which would result in multipliers between 0.5 and 1.0 times, to the metric's weighting. A 1.0 multiplier was assigned to performance at a level that, while not certain at the time targets were set, we expected we could and should be able to achieve by the end of the year. A 2.0 multiplier was assigned to a performance level that was substantially more uncertain (i.e., that we expected we would have only a 50% chance of achieving by year end). If the minimum threshold level of performance was not achieved, the multiplier for the metric was zero. In 2008, the target bonus percentage multiplier for the 2008 operational objectives was calculated at 1.75 because we achieved or substantially exceeded the target metrics on all six performance metrics.[7]

63.    For 2009, bonuses based on similar operational objectives:

> For all associates, including the named executive officers, the compensation committee assessed Company performance based on accomplishment of certain operational objectives established at the beginning of 2009. The objectives were based on operating goals set forth in our confidential annual operating plan for ***total watts shipped, module cost, balance of system cost, module efficiency, advanced modules shipped, achievement of project planning milestones on our customer service and enterprise resource***

---

[7] First Solar's Schedule 14A Proxy Statement, at 21-22, filed with the SEC on April 22, 2009.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

*planning systems, and volume in new markets*. Each operational objective was assigned a percentage weighting based on the importance of the factor to the overall performance of the Company. In addition, each operational metric had a target goal with higher targets (or stretch targets) that would result in multipliers between 1.0 and 2.0 times, and a minimum threshold for each metric which would result in multipliers between 0.5 and 1.0 times, to the metric's weighting. A 1.0 multiplier was assigned to performance at a level that, while not certain at the time targets were set, we expected we could and should be able to achieve by the end of the year. A 2.0 multiplier was assigned to a performance level that was substantially more uncertain (i.e., that we expected we would have only a 50% chance of achieving by year end). If the minimum threshold level of performance was not achieved, the multiplier for the metric was zero. A 3.0 multiplier was assigned to metrics assigned to an aggregate weight of 55% of the bonus metric at performance levels that were assigned a probability of less than 50% of achieving by year end, with the caveat that no 3.0 multiplier would be applied if performance on any of the metrics was less than 1.0. For 2009, operational objectives were calculated at 1.375 because we achieved or substantially exceeded the target metrics on all but two of the seven performance metrics. Because performance on these two metrics was less than 1.0, no 3.0 multiplier was applied.[8]

64.     For 2010, the Company maintained several of the operational metrics, and in addition began to take into account certain financial metrics, such as operating income:

**Targets, Objective and Calculation**

The 2010 annual bonus program was designed around eight performance metrics: (i) **total module watts produced, (ii) module conversion efficiency, (iii) module manufacturing cost per watt at the end of the fourth quarter, (iv) balance of systems cost per watt,** (v) achievement of identified project development milestones (with points assigned to each milestone and a score assigned based on the number of milestones achieved), (vi) the timely "go live" of our enterprise resources planning system, (vii) the timely start-up of our fifth and sixth manufacturing plants in Kulim, Malaysia (referred to as KLM 5 and 6) and **(viii) operating income**.

* * *

*Financial Metric and Target.* The operating income metric is designed to ensure that operational metrics are not achieved at the expense of financial performance and to ensure the focus of our associates on fiscal discipline and profitability.

The operating income metric is employed in two ways under the 2010 annual bonus program: (i) as a threshold (i.e., no incentive compensation was payable under this program unless the Company achieved $317 million in annual operating income, the same threshold under our long-term incentive program), and (ii) as one of the eight weighted metrics under the program used for calculating the bonus amount. With a 25% weighting, the operating income

---

[8] First Solar's Schedule 14A Proxy Statement, at 24, filed with the SEC on April 20, 2009.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

metric was the heaviest weighted metric in the program. The payout factors assigned to the operating income metric were as follows:

| .5 | 1.0 | 1.5 | 2.0 |
|---|---|---|---|
| >$633M | >$792M | >807M | >822M |

***Operating income was calculated at $908 million under the program (which provides for calculation before the impact of stock-based compensation and with foreign exchange rates normalized to the rate used in preparing our annual operating plan) and was therefore scored at 2.0.***

65.     Defendants Ahearn, Gillette, Eaglesham, Meyerhoff, and Sohn, if not also other defendants, received bonuses based on the achievement of the operational and financial (to the extent applicable) goals in 2008, 2009, and 2010.  However, the achievement of these goals was attributable in meaningful part to Defendants' concealment of and failure to properly account for the costs associated with the manufacturing defects.  For example, these Defendants received increased bonuses because the Company improperly reported operating income in excess of $822 million, when it fact it would have been far lower than that in light of the massive under-accrual of expenses relating to fulfilling warranties and the remediation process arising from the LPM defect.  It was not until February 2012 that Defendants belatedly recognized a $164 million pre-tax charge related to warranty and cost in excess of normal warranty expense.

66.     In 2008, for example, Defendant Ahearn earned a cash bonus of $525,000, Defendant Meyerhoff was awarded cash incentive compensation of $263,34, and Defendant Sohn was awarded $330,000.

67.     Between 2008 and 2010, Compensation, including performance based compensation under the non-equity incentive plan, was granted to Defendants Ahearn, Meyerhoff, Sohn, and Gillette as follows:

| Name and Principal Position | Year | Salary ($)(1) | Bonus ($) | Stock Awards ($)(2) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($)(3) | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| **Michael J. Ahearn** | 2010 | — | — | — | — | — | — | — |
| Chairman and (Interim) | 2009 | 525,000 | — | 3,023,128 | — | 721,875 | 10,352 | 4,280 |
| Chief Executive Officer | 2008 | 507,692 | — | 2,309,579 | — | 525,000 | 552-15 | 3,342,823 |
| **Jens Meyerhoff** | 2010 | 454,376 | — | 3,657,605(11) | — | 630,000 | 19,687 | 4,761,668 |
| Chief Financial Officer | 2009 | 390,033 | — | 1,169,184 | — | 451,891 | 19,688 | 2,030,796 |

- 24 -

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| President, Utility Systems Business Group | 2008 | 372,462 | — | 1,442,162 | — | 263,340 | 17,518 | 2,095,482 |
| **Bruce Sohn** | 2010 | 555,000 | — | 1,681,043 | — | 699,300 | 10,160 | 2,945,503 |
| President | 2009 | 461,635 | — | 1,831,296 | — | 686,813 | 79,891 | 3,059,635 |
| | 2008 | 403,846 | — | 2,259,320 | — | 330,000 | 57,816 | 3,050,982 |
| **David Eaglesham** | 2010 | — | — | — | — | — | — | — |
| Chief Technology Officer | 2009 | 318,300 | — | 1,309,784 | — | 288,750 | 10,160 | 1,926,994 |
| | 2008 | — | — | — | — | — | — | — |
| **Robert J. Gillette(5)** | 2010 | 850,000 | 2,500,000-8 | 8,764,538 | -9 | 1,190,000 | 10,352 | 13,314,890 |
| Chief Executive Officer | 2009 | 202,692 | 2,500,000-8 | 9,750,080 | -10 | 3,250,015-12 | 850,000 | 60 | 16,552,847 |
| | 2008 | | | | | | | |

68.     Thus, Defendants Ahearn, Gillette, Eaglesham, Meyerhoff, and Sohn engaged in self-dealing and directly benefited from their concealment of the manufacturing defects.[9]

## THE INDIVIDUAL DEFENDANTS CAUSED FIRST SOLAR TO ISSUE FALSE AND MISLEADING STATEMENTS

### A.     False Statements Made Between April 30, 2008-May 1, 2009

69.     On April 30, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 1Q08.  The Company reported net income of $47 million, or $0.57 diluted earnings per share ("EPS") for the first quarter of 2008, as compared to net income of $5 million, or $0.07 diluted EPS, for the same period in the prior year.

70.     On April 30, 2008 during the 1Q08 earnings conference call, Defendant Ahearn falsely stated:

> Conversion efficiency was flat at an average of 10.6% for the quarter. Cost per watt was $1.14.

71.     On May 2, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its Form 10-Q with the SEC for 1Q08 ("1Q08 10-Q"), which was signed by Defendant Meyerhoff and reiterated the Company's quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins reviewed and approved the 1Q08 10-Q prior to the time it was issued.  Indeed, they are specifically required to do so as members of the Audit Committee.  The Charter of the Audit Committee requires the members of the

[9] *See* First Solar's Schedule 14A Proxy Statement, at 28, filed with the SEC on April 22, 2008.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   Committee to review with management the financial information to be included in any

2   Forms 10-K, 10-Q, and 8-K.  In addition, the 1Q08 10-Q contained signed certifications

3   pursuant to Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Ahearn and  Meyerhoff,

4   stating that the financial information contained in the 1Q08 10-Q was accurate and that it

5   disclosed any material changes to the Company's internal control over financial reporting.

6   Although Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal,

7   Meyerhoff, Sohn, and Eaglesham were aware of significant product performance problems,

8   the 1Q08 10-Q incorporated the following false statement from the Annual Report on Form

9   10-K for the year ended December 29, 2007 ("2007 10-K"):

10          Problems with product quality or performance ***may*** cause us to incur warranty
            expenses, damage our market reputation and prevent us from maintaining or
11          increasing our market share.

12   The 1Q08 10-Q stated:

13          ***Product warranties***

14          We offer warranties on our products and record an estimate of the associated
            liability based on the number of solar modules under warranty at customer
15          locations, our historical experience with warranty claims, our monitoring of
            field installation sites, our in-house testing of our solar modules and our
16          estimated per-module replacement cost.

17          Product warranty activity during the three months ended March 29, 2008 and
            March 31, 2007 was as follows (in thousands):
18
                                            *   *   *
19
            Product warranty liability, end of period $9,261.
20

21          72.     On July 30, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins,

22   Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press

23   release announcing its financial results for 2Q08.  The Company reported net income of $70

24   million, or $0.85 diluted earnings per share ("EPS") for 2Q08, as compared to net income of

25   $47 million, or $0.58 diluted EPS for the same period in the prior year.

26          73.     On July 31, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins,

27   Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its Form 10-

28   Q with the SEC for 2Q08 ("2Q08 10-Q"), which was signed by Defendant Meyerhoff and

- 26 -

reiterated the Company's previously announced quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 2Q08 10-Q prior to the time it was issued.  In addition, the 2Q08 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff.  The 2Q08 10-Q incorporated the following false statements from the 2007 10-K:

> Problems with product quality or performance **may** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

The 2Q08 10-Q stated:

> ### *Product Warranties*
>
> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.
>
> Product warranty activity during the three and six months ended June 28, 2008 and June 30, 2007 was as follows (in thousands):
>
> Product warranty liability, end of period  $10,865.

74.    On October 29, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 3Q08.  The Company reported net income of $99 million, or $1.20 diluted EPS for 3Q08, as compared to net income of $46 million, or $0.58 diluted EPS for the same period in the prior year.

75.    On October 29, 2008, during the 3Q08 earnings conference call, Defendant Ahearn stated:

> Cost per watt in the third quarter was $1.08….  We continue to solidify our position as the lowest cost manufacturer in the industry.
>
> *   *   *
>
> And finally, we are grounded in reality and we take a pragmatic approach to risk.  ***We do not knowingly ignore uncertain events that could meaningful[ly] [] impact our business***, but rather attempt to identify them, convert them to opportunities, where possible, and mitigate them where appropriate. We've always tried to be transparent with our key stakeholders with regard to our views and approach to the business and its risk.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

76.     On October 31, 2008, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its Form 10-Q with the SEC for 3Q08 ("3Q08 10-Q"), which was signed by Defendant Meyerhoff. Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 3Q08 10-Q prior to the time it was issued.  In addition, the 3Q08 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the 3Q08 10-Q was accurate and that the 3Q08 10-Q had disclosed any material changes to the Company's internal control over financial reporting (no such changes were disclosed).  The 3Q08 10-Q incorporated the following false statement from the 2007 10-K:

> Problems with product quality or performance ***may*** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

The 3Q08 10Q stated:

> ***Product warranties***
>
> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.
>
> Product warranty activity during the three and nine months ended September 27, 2008 and September 29, 2007 was as follows (in thousands):
>
> *   *   *
>
> Product warranty liability, end of period  $9,858.

77.     On February 24, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 4Q08 and year ended December 27, 2008.  The Company reported net income of $133 million or $1.61 diluted EPS, and revenue of $434 million for 4Q08, as compared to net income of $63 million, or $0.77 diluted EPS, and revenue of $201 million, for the same period in the prior year.  The Company further reported net income of $348 million, or $4.24 diluted EPS, and revenue of $1.2 billion for

the 2008 fiscal year, as compared to net income of $158 million, or $2.03 diluted EPS, and revenue of $504 million, for the prior year.

78.    On February 24, 2009, during the 4Q08 earnings conference call, Defendant Ahearn stated:

> And finally, we reduced our manufacturing costs to $0.98 a watt in Q4. That's down 9% quarter-over-quarter and 12% for the year. Breaking that dollar per watt cost benchmark is a major industry milestone. It is something the industry has been chasing for 20 years…

79.    Also during the February 24, 2009 call, analyst Mark Bachman of Pacific Crest asked Defendant Sohn point blank about whether there were "manufacturing problems." Specifically, he asked:

> [L]astly, Bruce, just on that line calc, can you just verify there was no problems with the line this quarter? It seems like that, that that number should be increasing especially as efficiency increased there, and I know that -- I think you had a couple of down days around the holidays, but I just want to make sure there was no manufacturing problems around, or that accounts for that line calc being down.

80.    Despite the fact that Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham were well aware of a massive heat degradation problem for solar modules installed in the desert Southwest, Meyerhoff stated:

> What I can tell you, we obviously had revenue recognition for the El Dorado project that we brought on in Q4 that essentially came all through mostly in Q4

81.    During the call, an analyst for Pacific Crest asked the following:

> And then, lastly, Bruce, just on that line calc, can you just verify there was no problems with the line this quarter? ...*I just want to make sure there was no manufacturing problems around*, or that accounts for that line calc being down.

In response, Defendant Sohn replied:

> [B]ut in terms of operational, the challenge is always is just bringing up the factory and developing the proficiency, recall as we bring a new factory online, like a KLM2 or KLM3, each of these factories is bringing on line capacity in the neighborhood of about 190 megawatts, 170 megawatts, or so, of total capacity.
>
> That is significant capacity and our expectation is to start-up matched from an efficiency perspective, matched from a yield perspective, *and matched, of course, from a quality and reliability perspective, and so we're very cautious and careful and have a high degree of expectation in terms of the way we*

1    *operate the factories.*  As the proficiency of the workers develops, the run rate
2    itself will also match.

3         82.    All told, rather than address any manufacturing problems, Defendant Sohn

4    touted such things as capacity, quality, and reliability, and Defendants' "cautious and careful"

5    approach in operating factories.  As the Court found in ruling on the motions for summary

6    judgment in the Class Action, Defendant Sohn's response appeared to dodge the question.

7    Moreover, as the Court concluded, this statement was "made when First Solar knew of the

8    LPM problem and at least some internal estimates had suggested it was severe."

9         83.    On February 25, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins,

10   Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its Form 10-

11   K with the SEC for the fiscal year ended December 27, 2008 ("2008 10-K"), which was

12   signed by Defendants Ahearn, Meyerhoff, Nolan, Presby, Stebbins, Sweeney, Kennedy, and

13   Villareal and reiterated the Company's previously announced financial results and financial

14   position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit

15   Committee, reviewed and approved the 2008 10-K prior to the time it was issued.  In

16   addition, the 2008 10-K contained signed certifications pursuant to SOX by Defendants

17   Ahearn and Meyerhoff, stating that the financial information contained in the 2008 10-K was

18   accurate and that they disclosed any material changes to the Company's internal control over

19   financial reporting. The 2008 10-K included the following false statements:

20          We design and manufacture solar modules using a proprietary thin film
21          semiconductor technology that has allowed us to reduce our average solar
            module manufacturing costs to among the lowest in the world. In 2008, our
22          average manufacturing costs were $1.08 per watt, which we believe is
            significantly less than those of traditional crystalline silicon solar module
            manufacturers.
23
                                        *   *   *
24
            Our thin film technology also has relatively *high energy performance* in low
25          light and *high temperature environments* compared with traditional
            crystalline silicon solar modules.
26
                                        *   *   *
27
            Thin film technology has a short history and our thin film technology and solar
28          modules *may* perform below expectations; problems with product quality or

- 30 -
VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

While our power output warranty extends for twenty-five years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations. Any widespread product failures *may* damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

84. On the March 2, 2009 conference call, despite the fact that Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham were well aware of a massive heat degradation problem for solar modules installed in the desert Southwest, Defendant Meyerhoff falsely stated:

I mean, if you think about the first system we did was the [] 10 megawatt *El Dorado*. That was less than five months. And that was essentially our first pilot, right, *where we drove a lot of learning. So, that gives you a starting point of our capability* that we believe we can ramp.

85. On April 29, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 1Q09. The Company reported net income of $165 million, or $1.99 diluted EPS, and revenue of $418 million for 1Q09, as compared to net income of $47 million, or $0.57 diluted EPS, and revenue of $197 million, for the same period in the prior year.

86. On May 1, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its Form 10-Q with the SEC for 1Q09 ("1Q09 10-Q"), which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position. Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 1Q09 10-Q prior to the time it was issued. In

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

addition, the 1Q09 10-Q contained signed certifications pursuant to SOX by Defendants Ahearn and Meyerhoff, stating that the financial information contained in the 1Q09 10-Q was accurate and that they disclosed any material changes to the Company's internal control over financial reporting.  The 1Q09 10-Q included the following false statements:

> We are one of the lowest cost module manufacturers in the solar industry, as evidenced by the further reduction in our average manufacturing cost per watt from $0.98 in the three months ended December 27, 2008 to $0.93 in the three months ended March 28, 2009…Our cost competitiveness is based on our proprietary technology, which provides lower cost from a ***continuous highly automated industrial manufacturing process***, our scale and our ***operational excellence***.... In 2008, we reduced our manufacturing cost per watt by 12%.

> \* \* \*

> The increase in MW volume of solar modules sold is attributable to the full production ramp of the first two plants at our Malaysian manufacturing center, commencement of product shipments at the third plant of our Malaysian manufacturing center and ***continued improvements to our manufacturing process***.

> \* \* \*

> **Product warranties**

> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

> Product warranty activity during the three months ended March 28, 2009 and March 29, 2008 was as follows (in thousands):

> \* \* \*

> Product warranty liability, end of period  $13,557.

87.     The 1Q09 10-Q also incorporated the following false statement from the 2008 10-K:

> Thin film technology has a short history and our thin film technology and solar modules may perform below expectations; problems with product quality or performance ***may*** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

88.     On June 24, 2009, Defendants Ahearn, Sohn, Eaglesham, Meyerhoff, and others at the Company held a conference call with analysts.  During the call, Defendant Eaglesham touted: "our track [record] of field performance and our knowledge of field

1  performance allows us to have fairly high confidence that our product is delivering in the

2  field…."  In ruling on the motions for summary judgment in the Class Action, the Court

3  found that this statement was "made when First Solar knew of the LPM problem and at least

4  some internal estimates had suggested it was severe."

5        89.    Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal,

6  Meyerhoff, Sohn, and Eaglesham knew or recklessly disregarded that the statements made

7  between April 30, 2008-June 24, 2009, were misleading because they presented a false

8  picture of First Solar's results, by failing to disclose and actively concealing the

9  manufacturing excursion and heat degradation defects.  In particular, Defendants Ahearn,

10 Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham

11 knew or recklessly disregarded that:

12       (a)    the April 30, 2008, July 30, 2008, October 29, 2008, February 24, 2009,

13 and April 29, 2009 statements, referred to above, concerning the Company's reported net

14 income, EPS, and revenue were materially false and misleading as a result of the Company's

15 understatement of warranty reserves;

16       (b)    the May 2, 2008, July 31, 2008, October 31, 2008, February 25, 2009,

17 and May 1, 2009 statements, referred to above, concerning potential product quality and

18 performance problems that could lead to material product warranty costs were materially

19 false and misleading because significant product quality and performance problems were

20 already occurring;

21       (c)    the October 29, 2008 statement, referred to above, regarding

22 "meaningful" "uncertain events" was materially false and misleading because Defendants

23 were concealing product defects that adversely and materially impacted First Solar's

24 business;

25       (d)    the February 24, 2009 and March 2, 2009 statements, referred to above,

26 concerning a solar project in the Southwestern U.S. were materially false and misleading

27 because the statements concealed the severe heat degradation defect affecting modules

28 installed in hot climates;

1    (e)    the February 24, 2009, February 25, 2009, May 1, 2009, and June 24,

2    2009 statements, referred to above, regarding the Company's successful manufacturing

3    process, "operational excellence," and product reliability were materially false and

4    misleading because the statements concealed pervasive product and manufacturing problems,

5    including the manufacturing excursion and heat degradation defects; and

6    (f)    the February 25, 2009 statement, referred to above, concerning module

7    conversion efficiency was materially false and misleading because the statements concealed

8    the fact that the module conversion efficiency was increased by manipulating the de-rating.

9    **B.    False Statements Made Between July 30, 2009-April 29, 2010**

10    90.    On July 30, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins,

11    Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press

12    release announcing its financial results for 2Q09.  The Company reported net income of

13    $181 million, or $2.11 diluted EPS, and revenue of $526 million for 2Q09, as compared to

14    net income of $70 million, or $0.85 diluted EPS, and revenue of $267 million, for the same

15    period in the prior year.

16    91.    On the same call, despite the fact that Defendants, including Ahearn, Kennedy,

17    Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham, were well

18    aware of a massive heat degradation problem for solar modules installed in the desert

19    Southwest, Defendant Ahearn made the following misleading statement:  "In terms of

20    California and the ***Southwest, nothing specific to report***."

21    92.    Notably, it appears that, in preparation for the July 30, 2009 conference call,

22    Defendants, including Ahearn, Meyerhoff, and Sohn, conspired to keep the LPM defect

23    secret.  For example, Defendant Sohn advised that "[t]here should not even be a question in

24    the list about [the LPM defect].  As far as the public is concerned, it does not exist...."

25    93.    On August 3, 2009, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins,

26    Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its Form 10-Q

27    with the SEC for 2Q09 ("2Q09 10-Q"), which was signed by Defendant Meyerhoff and

28    reiterated the Company's previously announced quarterly financial results and financial

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit

2   Committee, reviewed and approved the 2Q09 10-Q prior to the time it was issued.   In

3   addition, the 2Q09 10-Q contained signed certifications pursuant to SOX by Defendants

4   Ahearn and Meyerhoff, stating that the financial information contained in the 2Q09 10-Q was

5   accurate and that they disclosed any material changes to the Company's internal control over

6   financial reporting.  The 2Q09 10-Q included the following false statements:

7      ***Product warranties***

8      We offer warranties on our products and record an estimate of the associated
       liability based on the following: number of solar modules under warranty at
9      customer locations, historical experience with warranty claims, monitoring of
       field installation sites, in-house testing of our solar modules and estimated per-
10     module replacement cost.

11     Product warranty activity during the three and six months ended June 27, 2009
       and June 28, 2008 was as follows (in thousands):

12     Product warranty liability, end of period  $17,413.

13  Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff,

14  Sohn, and Eaglesham also misrepresented the Company's continued successful manufacturing

15  cost reduction:

16     We are one of the lowest cost module manufacturers in the solar industry, as
       evidenced by the further reduction in our average manufacturing cost per watt
17     from $0.98 in the three months ended December 27, 2008 to $0.93 and $0.87
       in the three months ended March 28, 2009 and June 27, 2009, respectively.
18

19  In particular, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal,

20  Meyerhoff, Sohn, and Eaglesham emphasized the Company's "operational excellence."

21  Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff,

22  Sohn, and Eaglesham falsely attributed increased sales volume to "continued improvements [in]

23  our manufacturing process."  Although Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins,

24  Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham had identified massive defects with their

25  solar modules, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal,

26  Meyerhoff, Sohn, and Eaglesham falsely represented that "there have been no material changes

27  in the risk factors contained in our Annual Report on Form 10-K" relating to product performance

28  problems.   Instead, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney,

Villareal, Meyerhoff, Sohn, and Eaglesham directed investors to the following false statement from the 2008 10-K:

> Thin film technology has a short history and our thin film technology and solar modules *may* perform below expectations; problems with product quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

94.     On October 28, 2009, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 3Q09.  The Company reported net income of $153 million, or $1.79 diluted EPS, and revenue of $481 million for 3Q09, as compared to net income of $99 million, or $1.20 diluted EPS, and revenue of $349 million, for the same period in the prior year.

95.     On October 28, 2009, during the 3Q09 earnings conference call, Defendant Ahearn falsely stated:

> The most important takeaway for us is that *we remain on track* to the five year program we laid out at the Analyst Call in terms of manufacturing *cost per watt and conversion efficiency. Things are progressing nicely.*

96.     On October 30, 2009, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its 10-Q with the SEC for 3Q09 ("3Q09 10-Q"), which was signed by Defendant Meyerhoff and reiterated the Company's previously announced quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 3Q09 10-Q prior to the time it was issued.   In addition, the 3Q09 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the 3Q09 10-Q was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.  The 3Q09 10-Q included the following false statements:

> **Product warranties**
>
> We offer warranties on our products and record an estimate of the associated liability based on the following: number of solar modules under warranty at customer locations, historical experience with warranty claims, monitoring of

field installation sites, in-house testing of our solar modules and estimated per-module replacement cost.

Product warranty activity during the three and nine months ended September 26, 2009 and September 27, 2008 was as follows (in thousands):

Product warranty liability, end of period  $20,582.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham also misrepresented its continued successful manufacturing cost reduction:

We are one of the lowest cost module manufacturers in the solar industry, as evidenced by the further reduction in our average manufacturing cost per watt from $0.98 in the three months ended December 27, 2008 to $0.93, $0.87 and $0.85 in the three months ended March 28, 2009, June 27, 2009 and September 26, 2009, respectively.

In particular, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham emphasized the Company's "**operational excellence**." Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham also falsely stated:

During the twelve months ended December 27, 2008, we reduced our manufacturing cost per watt by 12% from our cost per watt in the fourth quarter of fiscal 2007. In the first nine months of 2009, we further reduced our manufacturing cost per watt by 13% from our cost per watt in the fourth quarter of fiscal 2008.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham falsely attributed increased sales volume to: "continued improvements [in] our global copy smart manufacturing process." Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham continued:

In addition, we increased the average number of sellable watts per solar module by approximately 3% during the three months ended September 26, 2009 compared with the three months ended September 27, 2008.

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham had identified massive defects with their solar modules, defendants falsely represented that "there have been no material changes in the risk factors" relating to product performance problems. Instead, Defendants Gillette, Ahearn,

1 Kennedy, Nolan, Presby, Stebbins, Sweeney, Villareal, Meyerhoff, Sohn, and Eaglesham

2 directed investors to the following false statement from the 2008 10-K:

> Thin film technology has a short history and our thin film technology and solar
> modules may perform below expectations; problems with product quality or
> performance may cause us to incur warranty expenses, damage our market
> reputation and prevent us from maintaining or increasing our market share.

6 97.     On February 18, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby,

7 Stebbins, Sweeney, Villarreal, Meyerhoff, Sohn, and Eaglesham caused the Company to

8 issue a press release announcing its financial results for 4Q09.  The Company reported net

9 income of $142 million, or $1.65 diluted EPS, and revenue of $641 million for 4Q09, as

10 compared to net income of $133 million or $1.61 diluted EPS and revenue of $434 million,

11 for the same period in the prior year.  Additionally, the Company reported net income of

12 $640 million, or $7.53 diluted EPS, and revenue of $2.1 billion for the 2009 fiscal year, as

13 compared to net income of $348 million or $4.24 diluted EPS and revenue of $ 1.2 billion,

14 for the prior year.

15 98.     On February 22, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby,

16 Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar to

17 file its Form 10-K with the SEC for the fiscal year ended December 26, 2009 ("2009 10-K"),

18 which was signed by, among others, Defendants Zhu, Ahearn, Gillette, Nolan, Presby,

19 Stebbins, Sweeney, Kennedy, Villarreal, and Meyerhoff, and reiterated the Company's

20 previously announced financial results and financial position.  Moreover, Defendants Presby,

21 Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the

22 2009 10-K prior to the time it was issued.  In addition, the 2009 10-K contained signed

23 certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the

24 financial information contained in the 2009 10-K was accurate, that there had been no

25 material changes to the Company's internal control over financial reporting, and that the

26 Company's internal controls were adequate.  The 2009 10-K included the following false

27 statements:

> We are the lowest cost PV module manufacturer in the solar industry, based
> on publicly available information, as evidenced by the further reduction in our

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

average manufacturing cost per watt from $1.23 during 2007 to $0.87 during 2009… Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and permits a continuous highly automated industrial manufacturing process), our scale and our **operational excellence**.

Product warranties….When we recognize revenue for module sales, we accrue a liability for the estimated future costs of meeting our warranty obligations for those modules. We make and revise this estimate based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules and our estimated per-module replacement cost.

Product warranty liability, end of period  $22,583.

First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In 2009, our total average manufacturing costs were $0.87 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham had identified a manufacturing problem, they falsely touted their module manufacturing capability as "reliable" and directly linked their manufacturing capabilities with their future success:

We believe that combining our **reliable**, low cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

Despite the known massive heat degradation defect, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham falsely claimed:

Our thin film technology also **has relatively high energy performance** in low light and **high temperature environments** compared with traditional crystalline silicon solar modules.

Despite that problems relating to both the manufacture excursion and heat degradation defects had already occurred, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham did not disclose these problems to investors. Instead, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney,

Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham misrepresented that the problems "could" occur in the future:

> Thin film technology has a short history and our thin film technology and solar modules *may* perform below expectations; problems with product quality or performance *may cause* us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.
>
> While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

99.     On April 28, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 1Q10.  The Company reported net income of $172 million, or $2.00 diluted EPS, and revenue of $568 million for 1Q10, as compared to net income of $165 million, or $1.99 diluted EPS, and revenue of $418 million, for the same period in the prior year.

100.    On April 29, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its Form 10-Q with the SEC for 1Q10 ("1Q10 10-Q"), which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 1Q10 10-Q prior to the time it was issued.  In addition, the 1Q10 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the 1Q10 10-Q was accurate, that there had been no material changes to the Company's internal control over

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

financial reporting, and that the Company's internal controls were adequate. The 1Q10 10-Q included the following false statements:

> ***Product warranties***
>
> We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.
>
> Product warranty activity during the three months ended March 27, 2010 and March 28, 2009 was as follows (in thousands):
>
> Product warranty liability, end of period $23,375.

Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also misrepresented its continued successful cost reduction:

> First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended March 27, 2010, our total average manufacturing costs were $0.81 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham had identified a manufacturing problem (but not yet disclosed to shareholders), they falsely touted their manufacturing capability as "reliable."

> We believe that combining our ***reliable***, low cost module ***manufacturing capability*** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

101.     Notwithstanding the problems relating to both the manufacturing excursion and heat degradation defects had already occurred, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham failed to disclose these problems to shareholders. Instead, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham misrepresented that the problems "may" or "could" occur in the future. Defendants Gillette,

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Villarreal, Zhu, Meyerhoff, Sohn, and

2   Eaglesham incorporated the following false statement from the 2009 10-K:

> Thin film technology has a short history and our thin film technology and solar modules *may* perform below expectations; problems with product quality or performance *may cause* us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.
>
> While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

13      102.   Defendants knew or recklessly disregarded that the statements made between

14   July 30, 2009 and April 29, 2010 were misleading because they presented a false picture of

15   First Solar's results by failing to disclose and actively concealing the excursion and heat

16   degradation defects.  In particular, Defendants knew or recklessly disregarded that:

17              (a)    the July 30, 2009, October 28, 2009, February 18, 2010, and April 28,

18   2010 statements, referred to above, concerning the Company's reported net income, EPS, and

19   revenue were materially false and misleading as a result of the Company's understatement of

20   warranty reserves;

21              (b)    the August 3, 2009, October 30, 2009, February 22, 2010, and April 29,

22   2010 statements, referred to above, concerning potential product quality and performance

23   problems that could lead to material product warranty costs were materially false and

24   misleading because significant product quality and performance problems were already

25   occurring;

26              (c)    the February 22, 2010 statement, referred to above, regarding module

27   performance in "high temperature environments" was materially false and misleading

28

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  because the Company's solar panels were failing and experiencing high failure rates in high

2  temperature climates (i.e., heat degradation);

3          (d)     the July 30, 2009 statement, referred to above, concerning a solar

4  project in the Southwestern U.S. was materially false and misleading because the statement

5  concealed the severe heat degradation defect affecting modules installed in hot climates;

6          (e)     the August 3, 2009, October 30, 2009, February 22, 2010, and April 29,

7  2010 statements, referred to above, regarding the Company's successful manufacturing

8  process, "operational excellence," and product reliability were materially false and

9  misleading because the statements concealed pervasive product and manufacturing problems,

10 including the excursion and heat degradation defects;

11         (f)     the August 3, 2009, October 30, 2009, February 22, 2010, and April 29,

12 2010 statements, referred to above, concerning product warranties were false and misleading

13 because the Company's warranty reserve was materially understated; and

14         (g)     the August 3, 2009 and October 29, 2009 statements, referred to above,

15 concerning the module conversion efficiency were materially false and misleading because

16 the statements concealed the fact that the module conversion efficiency was increased by

17 manipulating the de-rating.

18     103.    During 2009, as with previous years, First Solar's executive officers were paid

19 significant cash incentive bonus compensation tied to performance goals, including total

20 watts shipped, module cost, and module efficiency.

21     104.    For 2009, Defendants Ahearn, Meyerhoff, and Sohn earned cash incentive

22 bonuses of approximately 20% of their salary.  Thus, the cash incentive payments were

23 material to such Defendants.

24     105.    For 2009, the criteria for the award of cash incentive bonuses was as follows:

25         For all associates, including the named executive officers, the compensation
           committee assessed Company performance based on accomplishment of
26         certain operational objectives established at the beginning of 2009. The
           objectives were based on operating goals set forth in our confidential annual
27         operating plan for total watts shipped, module cost, balance of system cost,
           module efficiency, advanced modules shipped, achievement of project
28         planning milestones on our customer service and enterprise resource planning
           systems, and volume in new markets. Each operational objective was assigned

a percentage weighting based on the importance of the factor to the overall performance of the Company. In addition, each operational metric had a target goal with higher targets (or stretch targets) that would result in multipliers between 1.0 and 2.0 times, and a minimum threshold for each metric which would result in multipliers between 0.5 and 1.0 times, to the metric's weighting.[10]

106.    Based on these criteria, Defendants Ahearn, Meyerhoff, Sohn, and Eaglesham were paid the following cash incentive payments in 2009:

| Name and Principal Position | Year | Salary ($)(1) | Bonus ($) | Stock Awards ($)(2) | Option Awards ($)(2) | Non-Equity Incentive Plan Compensation ($)(3) | All Other Compensation ($)(4) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| ichael J. Ahearn(5) | 2009 | 525,000 | — | 3,023,128 | — | 721,875 | 10,352 | 4,280,355 |
| Executive Chairman | 2008 | 507,692 | — | 3,730,890 | — | 525,000 | 552 | 4,764,134 |
| | 2007 | 450,000 | — | 3,007,000 | — | 765,000 | — | 4,222,000 |
| Jens Meyerhoff | 2009 | 390,033 | — | 1,169,184 | — | 451,891 | 19,688 | 2,030,796 |
| Chief Financial Officer | 2008 | 372,462 | — | 1,442,162 | — | 263,340 | 17,518 | 2,095,482 |
| | 2007 | 330,000 | — | 2,841,730 | — | 365,836 | 10,241 | 3,547,807 |
| Bruce Sohn(7) | 2009 | 461,635 | — | 1,831,296 | — | 686,813 | 79,891 | 3,059,635 |
| President, Director | 2008 | 403,846 | — | 2,259,320 | — | 330,000 | 57,816 | 3,050,982 |
| | 2007 | 295,190 | 60,000(13) | 3,274,276(17) | 5,138,025 | 413,266 | 73,402 | 9,254,159 |
| David Eaglesham(9) | 2009 | 318,300 | — | 1,309,784 | — | 288,750 | 10,160 | 1,926,994 |
| Chief Technology Officer | 2008 | — | — | — | — | — | — | — |
| | 2007 | — | — | — | — | — | — | — |

107.    For 2010, First Solar based annual cash incentive bonus payments on the following factors:

The 2010 annual bonus program was designed around eight performance metrics: (i) total module watts produced, (ii) module conversion efficiency, (iii) module manufacturing cost per watt at the end of the fourth quarter, (iv) balance of systems cost per watt, (v) achievement of identified project development milestones (with points assigned to each milestone and a score assigned based on the number of milestones achieved), (vi) the timely "go live" of our enterprise resources planning system, (vii) the timely start-up of our fifth and sixth manufacturing plants in Kulim, Malaysia (referred to as KLM 5 and 6) and (viii) operating income.

108.    For 2010, as was true for prior years, the Company allocated cash bonus incentive payments to be approximately 20% of total employee compensation.

109.    For 2010, First Solar also developed financial metrics in an attempt to ensure that operating metrics correlated to some degree to financial operational goals and successes.

110.    For 2010, even though the "manufacturing excursion" was very bad for First Solar, the Company still awarded significant cash bonuses to its executives.  The following

---

[10] *See* First Solar's Schedule 14A Proxy Report, at 24,  filed with the SEC on April 20, 2010.

- 44 -

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

excerpt from the Company's Proxy Statement describes the Company's response to the manufacturing excursion when it came time to awarding annual incentive cash compensation:

### Targets, Objective and Calculation

The 2010 annual bonus program was designed around eight performance metrics: (i) **total module watts produced, (ii) module conversion efficiency, (iii) module manufacturing cost per watt at the end of the fourth quarter, (iv) balance of systems cost per watt,** (v) achievement of identified project development milestones (with points assigned to each milestone and a score assigned based on the number of milestones achieved), (vi) the timely "go live" of our enterprise resources planning system, (vii) the timely start-up of our fifth and sixth manufacturing plants in Kulim, Malaysia (referred to as KLM 5 and 6) and **(viii) operating income**.

\* \* \*

*Financial Metric and Target.* The operating income metric is designed to ensure that operational metrics are not achieved at the expense of financial performance and to ensure the focus of our associates on fiscal discipline and profitability.

The operating income metric is employed in two ways under the 2010 annual bonus program: (i) as a threshold (i.e., no incentive compensation was payable under this program unless the Company achieved $317 million in annual operating income, the same threshold under our long-term incentive program), and (ii) as one of the eight weighted metrics under the program used for calculating the bonus amount. With a 25% weighting, the operating income metric was the heaviest weighted metric in the program. The payout factors assigned to the operating income metric were as follows:

| .5 | 1.0 | 1.5 | 2.0 |
|---|---|---|---|
| >$633M | >$792M | >807M | >822M |

**Operating income was calculated at $908 million under the program** (which provides for calculation before the impact of stock-based compensation and with foreign exchange rates normalized to the rate used in preparing our annual operating plan) **and was therefore scored at 2.0**.

Bonus Calculation and Exercise of Downward Discretion.  The calculated payout factor under the 2010 annual bonus program after evaluating all eight metrics was 1.475. However, **the compensation committee exercised downward discretion and reduced the payout factor from 1.475 to 1.4 in light of the financial impact of the manufacturing excursion described in the Company's Annual Report on Form 10-K, filed with the Securities and Exchange Commission on February 28, 2011**, under "Item 7: Management's Discussion and Analysis of Financial Condition and Results of Operations — Results of Operations — Fiscal Years Ended December 31, 2010 and December 26, 2009." The chart below illustrates how the annual bonus was calculated for 2010 for all of our associates including our named executive officers, using a hypothetical base salary and target bonus percentage.

| Target | | Reduced Base | | Bonus | | 2010 Annual |

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

| Bonus | | Salary Percentage | | Multiplier | | Bonus |
|---|---|---|---|---|---|---|
| $400,000 | X | 60% | X | 1.4 | = | $336,000 |

111.   Thus, for an employee earning $400,000 in 2010, First Solar awarded the employee a 1.4 multiplier on his or her base salary, for a bonus of $336,000, notwithstanding the effects of the LPM manufacturing excursion on the Company.

112.   Using these metrics, Defendants Meyerhoff and Sohn were awarded the following cash incentive compensation of $630,000 and $699,300 in 2010:

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| **Jens Meyerhoff** | 2010 | 454,376 | — | 3,657,605) | — | 630,000 | 19,687 | 4,761,668 |
| Chief Financial Officer | 2009 | 390,033 | — | 1,169,184 | — | 451,891 | 19,688 | 2,030,796 |
| President, Utility Systems Business Group | 2008 | 372,462 | — | 1,442,162 | — | 263,340 | 17,518 | 2,095,482 |
| **Bruce Sohn** | 2010 | 555,000 | — | 1,681,043 | — | 699,300 | 10,160 | 2,945,503 |
| President | 2009 | 461,635 | — | 1,831,296 | — | 686,813 | 79,891 | 3,059,635 |
| | 2008 | 403,846 | — | 2,259,320 | — | 330,000 | 57,816 | 3,050,982 |

## C.   False Statements Made Between July 29, 2010–December 14, 2011

113.   On July 29, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 2Q10.  The Company reported net income of $ 159 million, or $ 1.84 diluted EPS, and revenue of $588 million for 2Q10, as compared to net income of $181 million, or $2.11 diluted EPS, and revenue of $526 million, for the same period in the prior year.

114.   Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham disclosed the manufacturing excursion for the first time on the conference call, Gillette misrepresented the true nature and extent of the excursion:

> During the period from June of 2008 to June of 2009, a manufacturing excursion occurred, ***affecting less than 4% of the total product manufacturer within the period***. The excursion could result in possible premature power loss in affected modules.
>
> ***The root cause was identified and subsequently mitigated*** in June of 2009. Ongoing testing confirms the corrective actions are effective. We've been working directly with impacted customers to replace the affected modules and ***these efforts are well underway, and in some cases, complete.***

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Some of these efforts go beyond our normal warranty coverage. We accrued the estimated full costs of these additional efforts in our Q2 results, and Jens will discuss the financial impact in more detail.

115.    During the same call, Defendant Gillette also concealed the heat degradation problem by touting the success of its solar projects in the Southwestern U.S., particularly the El Dorado site:

Turning now to Copper Mountain, slide 8 shows 48 MW expansion of our original 10 MW installations at the *El Dorado* site for Sempra Generation.

El Dorado is the first site we constructed in North America in late 2008. The expansion also *highlights the progress made in design and execution of utility-scaled solar plants*.

Cimarron project in New Mexico for Southern Company is our first large-scale installation of the Series 3 product. The construction is underway and progressing well.

116.    On the same call, Defendant Meyerhoff continued to conceal the heat degradation problem:

Net sales for the second quarter were $588 million, an increase of 12% year over year and a sequential increase of $20 million compared to the first quarter of 2010.

The sequential increase of 3.5% was mainly driven by a higher percentage of system revenue recognition with a 48 MW Copper Mountain and 30 MW Cimarron project, partially offset by a decrease in module ASPs due to a lower blended foreign exchange rate and mix implications.

Module costs per watt produced for the second quarter was $0.76, down $0.05, benefiting from higher throughput rates, improvement in conversion efficiency....

117.    During this call, when specifically asked about the module problems, Defendant Sohn stated:

About 4% of the production during the timeframe from June 2008 to 2009 was affected, in the neighborhood of about 30 MW. And we've been working with our customers since that time frame and *expect to continue to do so for about the next six months or so*.

118.    Another analyst on the same call specifically asked First Solar to "put a dollar amount on the module replacement program." Gillette responded that the excursion problem had already been quantified and reserved for:

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

So the cost of the program in total was about $23.4 million, $17.8 million in COGs and $5.6 million that we have reserved in this quarter. ***That reserve completes our current estimate*** of the cost of the program.

119.     On August 2, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its Form 10-Q with the SEC for 2Q10 ("2Q10 10-Q"), which was signed by Defendant Zhu and reiterated the Company's quarterly financial results and financial position. Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 2Q10 10-Q prior to the time it was issued.  In addition, the 2Q10 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Meyerhoff, stating that the financial information contained in the 2Q10 10-Q was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.  The 2Q10 10-Q included the following false statements:

### *Product warranties*

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty at customer locations, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement costs.

Product warranty activity during the three and six months ended June 26, 2010 and June 27, 2009 was as follows (in thousands):

Product warranty liability, end of period  $23,862.

120.     Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also misrepresented its continued successful cost reduction:

First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended June 26, 2010, our total average manufacturing costs were $0.76 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

- 48 -
VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

121.   Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

> We believe that combining our **reliable**, low cost module **manufacturing capability** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

122.   Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also stated:

> We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our ended June 27, 2009 to $0.76 during the three months ended June 26, 2010.

> Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and permits a continuous and highly automated industrial manufacturing process), our scale, and our **operational excellence**.

> During the three months ended June 26, 2010, we reduced our manufacturing cost per watt by 13% from our cost per watt in the three months ended June 27, 2009.

> The increase in the MW volume of solar modules sold was attributable to the full production ramp of our four-plant Malaysian manufacturing center, full production ramp of our Perrysburg, Ohio expansion, **continued improvements** to our manufacturing process, and growth in our systems business. In addition, **we increased the average conversion efficiency of our modules by approximately 3%** during the three months ended June 26, 2010 compared with the three months ended June 27, 2009.

123.   Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham continued to conceal the true extent and nature of the excursion problem when they reported:

> During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we have accrued additional expenses of $17.8 million in the second quarter of 2010 and $29.5 million in total to date to cover the replacement of the anticipated affected module population in the field.

- 49 -

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

124.    Notwithstanding that Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham incorporated the following false statement from the 2009 10-K:

> Thin film technology has a short history and our thin film technology and solar modules *may* perform below expectations; problems with product quality or performance *may cause* us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.
>
> While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

125.    On October 28, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused the Company to issue a press release announcing its financial results for 3Q10.  The Company reported net income of $177 million, or $2.04 diluted EPS, and revenue of $798 million, as compared to net income of $153 million, or $1.79 diluted EPS, and revenue of $481 million, for the same period in the prior year.

126.    On October 28, 2010, during the 3Q10 earnings conference call, Defendant Gillette stated:

> Our manufacturing cost per watt was $0.77, which is down $0.08 or 10% year-over-year, and up $0.01 over Q2 of this year.

During the call, Defendant Gillette continued to conceal the Company's heat degradation problem by touting the success of its solar projects in the Southwestern U.S.:

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1
2

> In terms of the market, *we've made progress in several areas*…and construction on both the 30 megawatt Cimarron and 48 megawatt Copper Mountain *facilities is progressing very well*. The 290 megawatt Agua Caliente project is fully permitted and initial construction has begun.

3
4

During the same call, Defendant Meyerhoff also failed to disclose the heat degradation problem:

5
6
7
8

> During the third quarter, we experienced strong demand led by growing sales in our [systems] business and by continued strength in our module business. Net sales for the third quarter were $797.9 million with sequential increase of $210 million or 36% compared to the second quarter of 2010. *The increase was primarily driven by* the completion of and revenue recognition for the 60 megawatt [AC] Sarnia phase two project and by continued percentage of completion recognition for the *Copper Mountain and Cimarron projects*, partially offset by a decrease in module average sale prices.

9

In response to an analyst question, Defendant Sohn stated:

10
11

> We have good quality systems in place to ensure that *the product that we're shipping is - to our standards*.

12
13

During the same call, Defendant Sohn responded to another analyst question, minimizing the extent of the excursion:

14
15
16
17

> *Satya Kumar - Credit Suisse –Analyst*
>
> Hi. I was wondering if you could talk about the *factors that were driving the accrued expenses* and, specifically, could you talk about whether the warranty issues that you had last quarter, *are there any additional allocations you expect to make* in the second half of the year compared to the amount that you've already disclosed in Q2? Thanks.

18
19
20
21

> *Bruce Sohn - First Solar, Inc. – President*
>
> As mentioned, the increase in cost was really a direct result of the improvements that we're putting into the factories, and we expect to see those generate better efficiencies and performance and lower cost. *In terms of the excursion that we mentioned last time, there were no additional costs incurred in Q3*.

22
23
24
25
26
27
28

127.    On November 1, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar to file its Form 10-Q with the SEC for 3Q10 ("3Q10 10-Q"), which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 3Q10 10-Q prior to the time it was issued.  In addition, the 3Q10 10-Q contained signed certifications pursuant to SOX by Defendants

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Gillette and Meyerhoff, stating that the financial information contained in the 3Q10 10-Q was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate. The 3Q10 10-Q included the following false statements:

***Product warranties***

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

Product warranty activity during the three and nine months ended September 25, 2010 and September 26, 2009 was as follows (in thousands):

Product warranty liability, end of period  $25,032.

128.    Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also misrepresented its continued successful cost reduction:

[W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended September 25, 2010, our total average manufacturing costs were $0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

129.    Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

We believe that combining our ***reliable***, low cost module ***manufacturing capability*** with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems, and to further ....

130.    Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham also stated:

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.85 during the three months ended September 26, 2009 to $0.77 during the three months ended September 25, 2010.

Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our **operational excellence**.

\* \* \*

During the three months ended September 25, 2010, we reduced our manufacturing cost per watt by 9% from our cost per watt in the three months ended September 26, 2009.

\* \* \*

Our increased line run rate was driven by an approximate **3% increase in the average conversion efficiency of solar modules** during the three months ended September 25, 2010 compared with the three months ended September 26, 2009.

131.   Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham continued to conceal the true nature and extent of the excursion problem when they reported:

The $18.3 million increase in other costs for the nine months ended September 25, 2010 was due to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a **manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period**. The excursion could result in possible premature power loss in the affected modules. The root **cause** was **identified and subsequently mitigated in June 2009**. On-going testing confirms the **corrective actions are effective**. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $22.4 million in the first half of 2010 and $29.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. We did not incur any incremental costs during the third quarter of 2010.

132.   Notwithstanding that Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future. Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham incorporated the following false statement from the Annual Report on Form 10-K for the year ended December 26, 2009:

- 53 -

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Thin film technology has a short history and our thin film technology and solar modules **may** perform below expectations; problems with product quality or performance **may cause** us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

\* \* \*

While our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions **could** prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules **could** break, delaminate or experience power degradation in excess of expectations, our manufacturing operations **could** be subject to process variations that **could** cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which **could** have a material adverse effect on our financial results.

133.   On December 8, 2010, at the Barclays Capital Global Technology Conference, Defendant Gillette concealed the heat degradation defect while touting the success of its solar projects in the Southwestern U.S.:

So we hope to be able to look at **announcing a sale on Agua Caliente**, which where we get a lot of questions about [and other things]. It's a big site; it is a 290-megawatt AC, 340-megawatt DC, it is roughly 2,300 acres. So it is a very, very large utility scale plant, and it will be the largest in the world by a factor of 3 to 4 by far.

134.   On December 14, 2010, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Meyerhoff, Sohn, and Eaglesham caused First Solar to issue a press release announcing its fiscal 2011 financial guidance.  The release stated in part:

First Solar revenue and profit is continuing to grow in 2011," said Rob Gillette, First Solar Chief Executive Officer.  "We are **benefiting from** diversifying global partner demand and an **increase in revenue from utility scale projects**."

135.   On February 24, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Sohn, and Eaglesham caused First Solar to issue a press release announcing its 4Q10 and fiscal year-end 2010 financial results.  The Company

reported net sales of $610 million and $1.80 diluted EPS for 4Q10.  Additionally, the Company reported net sales of $2,564 million and $7.68 diluted EPS for fiscal year 2010.

136.    On February 24, 2011, in the 4Q10 earnings conference call, Defendant Zhu falsely reassured analysts that the claims process for the excursion problem was concluded:

> *During the fourth quarter we reserved an additional $8.5 million for the module replacement program discussed with you in our second-quarter 2010 earnings call. In Q4 we concluded a claims process and based on our field data and execution today, we updated our total replacement cost estimate*.

137.    On February 28, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Sohn, and Eaglesham caused First Solar to file its Form 10-K with the SEC for the fiscal year ended December 31, 2010 ("2010 10-K"), which was signed by Defendants Zhu, Ahearn, Nolan, Post, Presby, Stebbins, Sweeney, Kennedy, Villarreal, and Gillette, and reiterated the Company's previously announced financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 2010 10-K prior to the time it was issued.  In addition, the 2010 10-K contained signed certifications pursuant to SOX by Defendants Gillette and Zhu, stating that the financial information contained in the 2010 10-K was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.  The 2010 10-K included the following false statements:

> [W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information.  In 2010, our total average manufacturing costs were $0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.
>
> *   *   *
>
> Our thin-film technology also has relatively **high energy performance** in low light and **high temperature environments** compared with traditional crystalline silicon solar modules.
>
> *   *   *
>
> Thin-film technology has a short history, and our thin-film technology and solar modules and systems **may** perform below expectations; problems with product quality or performance **may** cause us to incur warranty expenses,

- 55 -

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

damage our market reputation, and prevent us from maintaining or increasing our market share.

\* \* \*

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* move to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate, or experience power degradation in excess of expectations, and our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and *cause* our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

\* \* \*

[W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In 2010, our total average manufacturing costs were $0.77 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

\* \* \*

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.87 during 2009 to $0.77 during 2010… Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our *operational excellence*.

138.    Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Sohn, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

We believe that combining our *reliable*, low cost module *manufacturing capability* coupled with our systems business enables us to more rapidly reduce the price of solar electricity, to accelerate the adoption of our technology in large scale systems,… and [to] further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1       139.    Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney,

2  Post, Villarreal, Zhu, Sohn, and Eaglesham also falsely stated:

3        ***Product Warranties…*** We accrue warranty costs when we recognize sales, using amounts estimated based on our historical experience with warranty claims, our monitoring of field installation sites, and in-house testing.

5                     \*   \*   \*

6      Product warranty liability, end of period  $27,894.

7       140.    Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney,

8  Post, Villarreal, Zhu, Sohn, and Eaglesham continued to conceal the true nature and extent of

9  the excursion problem when they reported:

> The net increase in other costs for 2010 includes $23.7 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred ***affecting less than 4%*** of the total product manufactured within the period. The excursion ***could result*** in possible premature power loss in the affected modules. The root cause was ***identified and subsequently mitigated*** in June 2009. On-going testing confirms that the ***corrective actions taken are effective***. We have been working directly with impacted customers to replace the affected modules and these ***efforts are well underway and, in some cases, complete***. Some of these efforts go beyond our normal warranty coverage. Accordingly, we accrued additional expenses of $30.8 million in 2010 and $37.9 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $8.5 million in expenses accrued during the fourth fiscal quarter of 2010, reflecting updated best estimates of the total replacement costs, based on our field data and execution to date of the module replacement program.

                     \*   \*   \*

> (1) The above-referenced $28.9 million of accrued nonrecurring expenses in excess of normal product warranty liability and related expenses as of December 31, 2010 consisted of the following, each related to the manufacturing excursion described below: (i) $25.3 million in estimated expenses for certain module replacement efforts voluntarily undertaken by us beyond the normal product warranty (presented in Item 7: "Results of Operations" under "Cost of sales"); and (ii) $3.6 million in estimated nonrecurring post-sale expenses (presented in Item 7: "Results of Operations" under "Selling, general and administrative"). During the period from June 2008 to June 2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions are effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    141.   On May 3, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby,

2   Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to issue

3   a press release announcing its 1Q11 financial results.  The Company reported net sales of

4   $567 million and $1.33 diluted EPS for 1Q11.

5    142.   On May 5, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby,

6   Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to file

7   its Form 10-Q with the SEC for 1Q11 (the "1Q11 10-Q").  The 1Q11 10-Q included the

8   following false statements:

### Product Warranties

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

Product warranty activity during the three months ended March 31, 2011 and March 27, 2010 was as follows (in thousands):

*   *   *

Product warranty liability, beginning of period   $32,141.

*   *   *

First, with respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended March 31, 2011, our total average manufacturing costs were $0.75 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

143.   Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins,

Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham had identified a manufacturing

problem, they falsely touted their manufacturing capability as "reliable":

We believe that combining our *reliable*, low cost module *manufacturing capability* with our systems business enables us to more rapidly reduce the price of solar electricity, accelerate the adoption of our technology in large scale systems, identify and break constraints to the successful migration to sustainable solar markets, and further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

- 58 -
VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

144.    Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham also stated:

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, as evidenced by the further reduction in our average manufacturing cost per watt from $0.81 during the three months ended March 27, 2010 to $0.75 during the three months ended March 31, 2011… Our cost competitiveness is based in large part on our proprietary technology (which enables **conversion efficiency improvements** and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our **operational excellence**.

*  *  *

Our net sales during the three months ended March 31, 2011 decreased slightly compared with the three months ended March 27, 2010, primarily due to a 14% decrease in our module average selling price, partially offset by an 11% increase in the volume of solar modules sold and a 5% increase in the average conversion efficiency of our solar modules.

*  *  *

Cost of sales for the three months ended March 27, 2010 included $4.5 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June 2009, a manufacturing excursion occurred **affecting less than 4%** of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these **efforts are well underway and, in some cases, complet**e. Some of these efforts go beyond our normal warranty coverage. No additional expense was accrued in the first quarter of 2011. $37.9 million in total-to-date has been accrued to cover the replacement of the anticipated affected module population in the field.

145.    Notwithstanding that Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham incorporated the following false statement from the 2010 10-K:

Thin film technology has a short history and our thin-film technology and solar modules **may** perform below expectations; problems with product quality or performance **may** cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

*  *  *

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

146.    On August 4, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to issue a press release announcing its 2Q11 financial results.  The Company reported net sales of $533 million and diluted EPS of $0.70 for 2Q11.

147.    On August 5, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to file its Form 10-Q with the SEC for 2Q11 (the "2Q11 10-Q"), which was signed by Defendant Zhu and reiterated the Company's previously announced quarterly financial results and financial position.  Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit Committee, reviewed and approved the 2Q11 10-Q prior to the time it was issued.  In addition, the 2Q11 10-Q contained signed certifications pursuant to SOX by Defendants Gillette and Widmar, stating that the financial information contained in the 2Q11 10-Q was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.  The 2Q11 10-Q included the following false statements:

***Product Warranties***

We offer warranties on our products and record an estimate of the associated liability based on the number of solar modules under warranty, our historical experience with warranty claims, our monitoring of field installation sites, our in-house testing of our solar modules, and our estimated per-module replacement cost.

Product warranty activity during the three and six months ended June 30, 2011 and June 26, 2010 was as follows (in thousands):

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

\* \* \*

Product warranty liability, end of period  $36,356.

\* \* \*

[W]ith respect to our module manufacturing costs, our advanced technology has allowed us to reduce our average module manufacturing costs to the lowest in the world, based on publicly available information. In the three months ended June 30, 2011, our total average manufacturing costs were $0.75 per watt, which we believe is significantly less than those of traditional crystalline silicon solar module manufacturers.

148.    Although Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham had identified a manufacturing problem, they falsely touted their manufacturing capability as "reliable":

We believe that combining our *reliable*, low-cost module *manufacturing capability* with our systems business enables us to more rapidly reduce the price of solar electricity, accelerate the adoption of our technology in large scale systems, identify and break constraints to the successful migration to sustainable solar markets, and further our mission to create enduring value by enabling a world powered by clean, affordable solar electricity.

149.    Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham also stated:

We are the lowest cost PV module manufacturer in the solar industry, based on publicly available information, and our average manufacturing cost per watt declined from $0.76 during the three months ended June 26, 2010 to $0.75 during the three months ended June 30, 2011…. Our cost competitiveness is based in large part on our proprietary technology (which enables conversion efficiency improvements and enables us to produce a module in less than 2.5 hours using a continuous and highly automated industrial manufacturing process, as opposed to a batch process), our scale, and our *operational excellence*.

150.    Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham also stated:

The increase in the MW volume of solar modules sold was attributable to the full ramp of our eight-line capacity expansion in our Malaysian manufacturing center and a 5% increase in our annual line run rate due to *improvements in our module average conversion efficiency* and our line throughput at existing manufacturing facilities.

\* \* \*

Cost of sales for the three months ended June 26, 2010 included $17.8 million related to an increase in estimated expenses for certain module replacement efforts beyond normal warranty. During the period from June 2008 to June

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

2009, a manufacturing excursion occurred affecting less than 4% of the total product manufactured within the period. The excursion could result in possible premature power loss in the affected modules. The root cause was identified and subsequently mitigated in June 2009. On-going testing confirms that the corrective actions taken have been effective. We have been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete. Some of these efforts go beyond our normal warranty coverage. We accrued $41.5 million in total-to-date to cover the replacement of the anticipated affected module population in the field. Such amounts include $3.6 million in expenses accrued during the second quarter of 2011, reflecting updated best estimates of the total replacement costs, based on our field data and execution-to-date of the module replacement program.

151.    Notwithstanding that Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham were already aware of both the manufacturing excursion and the heat degradation defects, they misrepresented that such problems "may" or "could" occur in the future.  Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham incorporated the following false statement from the 2010 10-K:

Thin film technology has a short history and our thin-film technology and solar modules *may* perform below expectations; problems with product quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

\* \* \*

Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

152.    On September 6, 2011, Defendants Gillette, Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused the Company to issue a press release falsely touting First Solar's "commitment to product quality and reliability."  The press release stated, in part:

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

First Solar, Inc. today announced that it has extended its material and workmanship warranty from five to ten years.

The new warranty… *demonstrates the company's commitments to product quality and reliability*… "As one of the world's largest solar module manufacturers, we understand the need for a *low-risk product* that is backed by a comprehensive warranty," said Stephan Hansen, managing director of First Solar GmbH.

153.    On October 26, 2011, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to issue a press release announcing its 3Q11 financial results.  The Company reported net sales of $1,006 million and diluted EPS of $2.25 per share.

154.    On November 3, 2011, during the 3Q11 earnings conference call, Defendant Ahearn stated:

Today, much of this platform has been built with reduced module manufacturing costs per watt from $ 1.59 in 2005, which was our first full year of production, to $0.74 this past quarter.

155.    On the same call, Defendant Widmar continued to misrepresent the true extent of the excursion defect:

Gross margin was 37.7%, up 1.1 percentage points from the prior quarter. The increase was prior primarily due to higher ASPs, partially offset by increased manufacturing excursion accruals. During the quarter, we incurred $22.1 million of additional costs related to the manufacturing excursion that occurred from June 2008 to June 2009. *We have substantially concluded the remediation programs associated with this manufacturing excursion*.

*   *   *

The other was an $8.6 million for estimated post sales expenses related to the previously mentioned manufacturing excursion… It is important to note that we did not take these charges because our estimate of the percentage of modules with defects from the manufacturing excursion has changed. *It remains still less than 4% of the modules produced from June 2008 to June 2009*…. Rather, these charges represent a higher than originally anticipated remediation cost and to support our value proposition and to increase customer satisfaction.

156.    On the same call, Defendant Widmar misleadingly touted efficiency gains:

So when we do the math - and it's very predictable to do the math and understand the improvement and the benefits the *efficiency gains have on the cost per watt, so we're very confident*.

1        157.    On November 4, 2011, Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins,

2    Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham caused First Solar to file its Form

3    10-Q with the SEC for 3Q11 (the "3Q11 10-Q"), which was signed by Defendant Zhu and

4    reiterated the Company's previously announced quarterly financial results and financial

5    position.   Moreover, Defendants Presby, Kennedy, and Stebbins, as members of the Audit

6    Committee, reviewed and approved the 3Q11 10-Q prior to the time it was issued.   In

7    addition, the 3Q11 10-Q contained signed certifications pursuant to SOX by Defendants

8    Ahearn and Widmar, stating that the financial information contained in the 3Q11 10-Q was

9    accurate, that there had been no material changes to the Company's internal control over

10   financial reporting, and that the Company's internal controls were adequate.   The 3Q11 10-Q

11   included the following false statements:

12       ***Product Warranties***

13       We offer a limited warranty on our products and record an estimate of the
         associated warranty obligation based on the number of solar modules under
14       warranty, our historical experience with warranty claims, our monitoring of
         field installation sites, our in-house testing of our solar modules, and our
15       estimated per-module replacement cost.

16       Normal product warranty activities during the three and nine months ended
         September 30, 2011 and September 25, 2010 was as follows (in thousands):
17
                                    *   *   *
18
         Product warranty liability, end of period  $42,505.
19
                                    *   *   *
20
         [W]ith respect to our module manufacturing costs, our advanced technology
21       has allowed us to reduce our average module manufacturing costs to the
         lowest in the world, based on publicly available information. In the three
22       months ended September 30, 2011, our total average manufacturing costs were
         $0.74 per watt, which we believe is significantly less than those of traditional
23       crystalline silicon solar module manufacturers.

24       158.    Although Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney,

25   Post, Villarreal, Zhu, Widmar, and Eaglesham had identified a manufacturing problem, they

26   falsely touted their manufacturing capability as "reliable."

27       We believe that combining our ***reliable***, low-cost   module ***manufacturing
         capability*** with our systems business enables us to more rapidly reduce the
28       price of solar electricity, accelerate the adoption of our technology in large
         scale systems, identify and break constraints to the successful migration to

                                    - 64 -
VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   sustainable solar markets, and further our mission to create enduring value by
2   enabling a world powered by clean, affordable solar electricity.

3       159.    Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post,

4   Villarreal, Zhu, Widmar, and Eaglesham also stated:

5       We are the lowest cost PV module manufacturer in the solar industry, based
        on publicly available information, and our average manufacturing cost per
6       watt declined from $0.77 during the three months ended September 25, 2010
        to $0.74 during the three months ended September 30, 2011...Our cost
7       competitiveness is based in large part on our proprietary technology (which
        enables **conversion efficiency improvements** and enables us to produce a
8       module in less than 2.5 hours using a continuous and highly automated
        industrial manufacturing process, as opposed to a batch process), our scale,
9       and our **operational excellence**.

10                                    *   *   *

11      The increase in the MW volume of solar modules sold was attributable to the
        full ramp of our new production lines in Malaysia and Germany and a 6%
12      increase in our annual line run rate due to improvements in our module
        average conversion efficiency and line throughput at our manufacturing
13      facilities.

14      160.    Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins, Sweeney, Post,

15   Villarreal, Zhu, Widmar, and Eaglesham continued to conceal the true extent and nature of

16   the excursion problem when they reported:

17      During the period from June 2008 to June 2009, a manufacturing excursion
        occurred affecting less than 4% of the total product manufactured within the
18      period. The excursion could result in possible premature power loss in the
        affected modules. The root cause was identified and subsequently mitigated in
19      June 2009. On-going testing confirms that the corrective actions taken have
        been effective. We have been working directly with impacted customers to
20      replace the affected modules and these efforts are in most cases complete or
        well underway for the remaining cases. These efforts go beyond our limited
21      warranty obligation. We accrued $63.6 million in total-to-date manufacturing
        excursion expense to cover the replacement of the anticipated affected module
22      population in the field. Such amounts include $22.1 million in expenses
        accrued during the three months ended September 30, 2011, reflecting our
23      most recent best estimates of the total replacement costs, based on our field
        data and execution-to-date of this excursion related module replacement
24      program.

25      161.    Notwithstanding that Defendants Ahearn, Kennedy, Nolan, Presby, Stebbins,

26   Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham were already aware of both the

27   manufacturing excursion and the heat degradation defects, they misrepresented that such

28   problems "may" or "could" occur in the future.  Defendants Ahearn, Kennedy, Nolan,

Presby, Stebbins, Sweeney, Post, Villarreal, Zhu, Widmar, and Eaglesham incorporated the following false statement from the 2010 10-K:

> Thin film technology has a short history and our thin-film technology and solar modules *may* perform below expectations; problems with product quality or performance *may* cause us to incur warranty expenses, damage our market reputation and prevent us from maintaining or increasing our market share.

> \* \* \*

> Although our power output warranty extends for 25 years, our oldest solar modules manufactured during the qualification of our pilot production line have only been in use since 2001. Because of the limited operating history of our solar modules, we have been required to make assumptions regarding the durability and reliability of our solar modules. Our assumptions *could* prove to be materially different from the actual performance of our solar modules, causing us to incur substantial expense to repair or replace defective solar modules in the future. For example, our glass-on-glass solar modules *could* break, delaminate or experience power degradation in excess of expectations, our manufacturing operations *could* be subject to process variations that *could* cause affected modules to underperform compared to our expectations. Any widespread product failures may damage our market reputation and cause our sales to decline and require us to repair or replace the defective modules, which *could* have a material adverse effect on our financial results.

162.   On the December 14, 2011 Guidance Call, the following was stated:

**Timothy Arcuri** - *Citigroup –Analyst*

Hi, guys. I had two things. First of all, a lot of the long-term cost reduction is based upon higher efficiencies. And you've recently ***had some issues out in the field with some product that talking to some of your customers seems to be related to the higher efficiency product***. So I'm wondering what the resolution and the risk around some of these issues - some of these power issues going on in the field are? Number one, if you could help us with that risk?

\* \* \*

**Mike Ahearn** - *First Solar Inc. - Chairman and Interim CEO*

I would say on long-term field reliability, that is always a risk when you're changing processes and it has been from the time we went into production. We have had on occasion issues and they are dealt with. ***We cover them. That has all been reflected in our financials.***

The [steady] issues that have been reported that I'm aware of relate to prior years productions. And when we have field problems - when we have positive experience or negative, we take that back into the factory and improve processes but also improve our metrology and our accelerated reliability testing - our predictive ability. And as a result, we are much better able today to measure and assess the long-term field performance of modules coming off the line than we were a year ago, two years ago, five years ago.

\* \* \*

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    So it's not about abandoning quality for – to try to drive efficiency or numbers.

2    163.   Defendants knew or recklessly disregarded that the statements made between
3    July 29, 2010 and December 14, 2011 were misleading, because they presented a false picture
4    of First Solar's results by, among other things, failing to disclose and actively concealing the
5    excursion and heat degradation defects from investors.  In particular, Defendants knew or
6    recklessly disregarded that:

7        (a)    the July 29, 2010, October 28, 2010, February 24, 2011, May 3, 2011,
8    August 4, 2011, and October 26, 2011 statements, referred to above, concerning the
9    Company's reported net income, EPS, and revenue were materially false and misleading as a
10   result of the Company's understatement of warranty reserves;

11       (b)    the August 2, 2010, November 1, 2010, February 28, 2011, May 5,
12   2011, August 5, 2011, and November 4, 2011 statements, referred to above, concerning
13   potential product quality and performance problems that could lead to material product
14   warranty costs were materially false and misleading because significant product quality and
15   performance problems were already occurring;

16       (c)    the February 28, 2011 and December 14, 2011 statements, referred to
17   above, regarding module performance in "high temperature environments" were materially
18   false and misleading because the Company's solar panels were failing and experiencing high
19   failure rates in high temperature climates (i.e., heat degradation);

20       (d)    the July 29, 2010, October 28, 2010, November 1, 2010, and December
21   22, 2010 statements, referred to above, concerning a solar project in the Southwestern U.S.
22   were materially false and misleading because the statement concealed the severe heat
23   degradation defect affecting modules installed in hot climates;

24       (e)    the February 28, 2011, May 5, 2011, August 5, 2011, September 6,
25   2011, and November 4, 2011 statements, referred to above, regarding the Company's
26   successful manufacturing process, "operational excellence," and product reliability were
27   materially false and misleading because the statements concealed pervasive product defects
28   and manufacturing problems, including the excursion and heat degradation defects;

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

(f)     the August 2, 2010, November 1, 2010, February 28, 2011, May 5, 2011, and November 4, 2011 statements, referred to above, concerning product warranties were false and misleading because the Company's warranty reserve was materially understated;

(g)     the July 29, 2010, November 1, 2010, February 28, 2011, May 5, 2011, August 2, 2011, August 5, 2011, and November 4, 2011 statements, referred to above, concerning module conversion efficiency were materially false and misleading because the statements concealed the fact that the module conversion efficiency was increased by manipulating the de-rating; and

(h)     the July 29, 2010, August 2, 2010, October 28, 2010, November 1, 2010, February 24, 2011, February 28, 2011, May 5, 2011, August 5, 2011, November 3, 2011, November 4, 2011, and December 14, 2011 statements, referred to above, regarding the manufacturing excursion were materially false and misleading because the statements concealed the true nature and extent of the excursion problem.  In particular: (i) the defective modules were not limited to "less than 4%" (or roughly 348,500 modules) of the total products manufactured from June 2008 to June 2009, because, in fact, over 1.5 million modules were affected; (ii) the problem was not mitigated in June 2009, because, in fact, the Company continued to produce and install defective modules beyond June 2009; and (iii) the remediation efforts were not substantially completed because, in fact, the Company had only recognized a fraction of the total excursion-related costs.

**THE TRUTH EMERGES**

164.   On February 28, 2012, after the market closed, the Company issued a press release announcing its financial results for 4Q11 and year ended December 31, 2011.  For 4Q11, the Company reported a net loss of $413 million, or ($4.74) diluted EPS and revenue of $660 million, as compared to net income of $156 million, or $1.80 diluted EPS and revenue of $609.8 million, for the same period the prior year.  For the year, the Company reported a net loss of $39.5 million, or ($0.46) diluted EPS and revenue of $2.8 billion, as

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

compared to net income of $664 million, or $7.68 diluted EPS and revenue of $2.6 billion for the same period a year ago.  The Company also disclosed, in relevant part, the following:

> Fourth quarter 2011 net sales were $660 million, a decrease of $345 million from the third quarter of 2011, primarily due to the timing of revenue recognition in our systems business and lower volume for module-only sales…
>
> The fourth quarter of 2011 was impacted by pre-tax charges of $393 million (reducing EPS by $3.90) associated with a non-cash goodwill impairment for our components business, $164 million (reducing EPS by $1.67) related to warranty and cost in excess of normal warranty expense, and $60 million (reducing EPS by $0.43) related to restructuring activities, as announced in December 2011.

165.    The February 28, 2012 press release also revealed that the Warranty and Cost in Excess of Normal Warranty Expense included:

> (i) $70.1 million in product warranty expense reflecting the net increase in the expected number of replacement modules required in connection with our remediation efforts for the 2008-2009 manufacturing excursion (ii) $37.8 million for an increase in the expected number of warranty claims primarily due to increases related to future claims expected due to modules installed in certain climates (iii) $40.3 million for compensation payments to customers under certain circumstances for power lost prior to the remediation of the customers system under our remediation program and (iv) $62.2 million in connection with our remediation efforts for module removal, replacement and logistical services related to the manufacturing excursion.

Thus, Defendants finally began to disclose the true financial impact of the LPM and heat degradation defects.   The financial impact from the heat degradation amounted to approximately $37.8 million.

166.    On a conference call with analysts, Defendant Ahearn provided additional commentary on the increased warranty expenses.  He stated, "This quarter we incurred $125.8 million in additional warranty reserves to reflect an updated estimate of costs related to the manufacturing excursion that occurred between June 2008 and June 2009."  He added, "The total cost of remediating the manufacturing excursion that occurred from June 2008 to June 2009 now stands at $215.7 million including $145.6 million above and beyond our standard warranty."  Moreover, "there's at least the potential for additional costs of as much as $44 million."

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

167.    During the same call, Defendant Widmar further broke down the additional costs.  He stated:

> The first item is the cost to remove, replace and provide logistical services related to the manufacturing excursion. In the fourth quarter we expensed $23.9 million for these efforts and have expensed $99.7 million to date.

> The second item is expected payment to customers under certain conditions for power loss prior to the remediation of the customer's system. In the fourth quarter we expensed $31.8 million for this compensation and have expensed $45.9 million to date.

> The third item, $70.1 million, is due to an increase in the expected number of replacement modules above our standard warranty rate required for our remediation efforts.

168.    Defendant Windmar also discuss the heat degradation issue and associated costs:

> Finally, we recognized a $37.8 million charge to increase our warranty accrual. We believe our PV modules are potentially subject to increased failure rates in hot climates. As our geographic mix of sales has shifted to hot climates we have increased our warranty accrual. Our experience has shown that our warranty rate for hot climates are slightly higher than the return rates for temperate climates. With this change, our standard warranty accrual rate has been increased by one percentage point to account for potential returns going forward. We will continue to review our warranty accrual rate in the future and will adjust the rate as appropriate to reflect our actual experience.

169.    On February 29, 2012, the Company filed its Form 10-K for the period ended December 31, 2011 with the SEC ("2011 10-K"), which was signed by Defendants Ahearn and Widmar, and reiterated the Company's previously announced financial results and financial position.  In addition, the 2011 10-K contained signed certifications pursuant to SOX by Defendants Ahearn and Widmar, stating that the financial information contained in the 2011 10-K was accurate, that there had been no material changes to the Company's internal control over financial reporting, and that the Company's internal controls were adequate.

170.    The 2011 10-K also represented the following, in relevant part:

2008-2009 Manufacturing Excursion

During the period from June 2008 to June 2009, a manufacturing excursion occurred whereby certain modules manufactured during that time period may

- 70 -

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

experience premature power loss once installed in the field.  The root cause of the manufacturing excursion was identified and addressed in June 2009.  Beginning in 2009, we initiated a voluntary remediation program beyond our standard limited warranty pursuant to which we made commitments to customers with systems containing modules manufactured during the relevant period that we would cover certain costs of remediation efforts.   These remediation efforts included module removal, replacement and logistical services and additional compensation payments to customers under certain circumstances.  Our best estimate for costs of our voluntary remediation program, as of and in each fiscal period in question, has been based on evaluation and consideration of the then-currently available information, including the estimated number of affected modules in the field, historical experience related to our voluntary remediation efforts, customer-provided data related to potentially affected systems and the estimated costs of performing the logistical services covered under our remediation program.

\* \* \*

In the fourth quarter of 2011, we accrued additional expenses in excess of standard product warranty liability relating to our voluntary remediation program.  A principal driver behind such additional accrual was our greater understanding as of year-end, obtained through the processing of thousands of claims as described below, of the number of modules not affected in the manufacturing excursion that needed to be removed (and subsequently replaced) in order for us to be able to identify and remedy the number of modules actually affected by the manufacturing excursion....

In response to our communications to customers regarding our intent to undertake a voluntary remediation program, we received more than five thousand customer claims, which covered an installed base greater than our entire production output during the June 2008 - June 2009 timeframe.  In our processing of these claims to date, we have determined that we will take remediation actions in accordance with our voluntary remediation program with respect to approximately 1,100 of such claims, approximately an additional 200 claims could, pending receipt of additional information, qualify for remediation, and the balance of approximately 4,000 claims have been or will be rejected as they did not meet the criteria for participation in our voluntary remediation program (including claims containing insufficient data necessary to evaluate them).  We have expensed $215.7 million total to-date for the estimated costs of remediating systems affected by modules manufactured during the relevant period, including $145.6 million for remediation expenses beyond our limited warranty obligations and $70.1 million in product warranty expense reflecting the net increase in the expected number of replacement modules required in connection with our remediation efforts....

171.   The 2011 10-K also disclosed that First Solar "had taken a $13.8 million module inventory write-down primarily as a result of the voluntary remediation efforts."

172.   *Bloomberg News* noted that in the fourth quarter, the warranty problem led "to warranty claims of $125.8 million in the fourth quarter, or more than half the total spent on the glitch to date.  It also put aside $37.8 million to cover future claims." *The Wall Street*

*Journal* reported that the Company "has spent nearly $254 million replacing customers' solar panels that didn't perform as promised and changing its warranty." Mark Bachman, an analyst at Avian Securities LLC noted that the "charges [are] about 10 times what they said they were going to be when they first reported the issue."

173. Gordon Johnson, managing director of Axiom Capital Management, appeared on CNBC to comment on First Solar's manufacturing failures, lack of candor, and potentially dire situation. He stated, in relevant part:

> Their stuff is not working in the field. That's effectively what's happening. Forget about the fact that they massively missed earnings. This is a huge red flag. It brings into question whether they will be able to do projects here in the U.S. This is a game changer.

> We heard from our checks in Germany that this is not a one-time issue. And the fact that banks are becoming cautious on lending to First Solar projects suggests that there is a fundamental problem with their modules. . . . This is new. This is huge, and it is potentially going to be a game ender.

> This has been a problem that First Solar has had in the past, and as was asked on the call by one of our competitors, they told us that this problem was, you know, was fixed. And it is not fixed. So, we need to look into this further. The company will not talk to us. So, we definitely need to do some more checks to see that we are accurate. But at first glance, this is quite negative.

174. On this news, shares of First Solar dropped $4.10 per share or 11%, to close at $32.30 per share on February 29, 2012.

**INSIDER SELLING ALLEGATIONS**

175. The Individual Defendants' knowledge of the true health of First Solar's business and the extent of the manufacturing deficiencies is also shown in Defendants Ahearn, Meyerhoff, Eaglesham, Sohn, Sweeney, Zhu, Nolan, and Presby's (the "Insider Selling Defendants") sales of their personally-held First Solar stock. The Insider Selling Defendants were privy to adverse, non-public information which they exploited for their own benefit, to the exclusion of other shareholders, by selling their Company stock before the truth came to light. While continuously making or causing the Company to make improper statements touting First Solar's purported positive growth, and effectively concealing the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing their solar panels, certain officers and directors sold massive amounts of personally owned

1   Company stock in order to capitalize on the Company's inflated stock price that they had

2   helped create.  In committing these self-serving acts, they violated the Company's Code of

3   Business Conduct and Ethics (*see supra* at ¶280) and breached their fiduciary duty of loyalty

4   that they owe to First Solar and its shareholders.

5       176.   The Insider Selling Defendants' sales are summarized in the following chart:

| Defendant | Shares Sold | Proceeds | Percentage of Shares Sold |
|-----------|-------------|----------|---------------------------|
| Ahearn | 3,239,016 | $427,233,588 | 97% |
| Meyerhoff | 118,827 | $18,577,773 | 80% |
| Eaglesham | 69,983 | $9,645,827 | 94% |
| Sohn | 74,750 | $12,390,248 | 75% |
| Sweeney | 24,749 | $4,417,934 | 91% |
| Zhu | 7,884 | $1,172,204 | 48% |
| Nolan | 24,000 | $5,351,425 | 92% |
| Presby | 1,000 | $137,810 | 18% |
| Total | 3,560,209 | $478,926,810 | |

13      177.   The Insider Selling Defendants sold their stock for as high as $311.14 per share

14  while the lowest price that any Defendant sold First Solar shares was $96.74.

15  **A.    Defendant Ahearn's Insider Sales**

16      178.   As the founder, CEO, Chairman of the Board, and a director of First Solar,

17  Defendant Ahearn was a member of Company management and Board and was privy to

18  material, non-public information about the extent of remediation efforts needed to respond to

19  the manufacturing deficiencies plaguing the Company's solar panels.  Defendant Ahearn was

20  responsible for his statements in SEC filings, which included disclosures concerning the

21  extent of the remediation necessary to respond to the Company's manufacturing deficiencies

22  and the Company's positive growth.  Defendant Ahearn engaged in insider trading activity at

23  a time when he knew adverse material, non-public information about the Company's

24  impending costly remediation efforts.

25      179.   While in possession of this knowledge, Defendant Ahearn sold 3,239,016

26  shares of his personally held First Solar stock for proceeds of $427,233,588.  Defendant

27  Ahearn's sales were timed to maximize profit from First Solar's then artificially inflated stock

28  price.  Defendant Ahearn did not allow his own wealth to suffer; he only possessed 101,574

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    shares when the truth about the remediation costs emerged.  Defendant Ahearn's sales are

2    suspicious given that they represented 97% of his holdings.

3        180.    For example, directly after First Solar filed its 2009 10-K, Defendant Ahearn

4    sold a total of 1,500,000 shares for total proceeds of $162,435,699.  This was 51% of his

5    holdings at the time, and 46% of the total shares sold throughout the entire Relevant Period.

6    These sales were not pursuant to a 10b5-1 plan.

7        181.    When questioned during a March 3, 2010 conference call, Defendant

8    Meyerhoff conceded that the timing of Defendant Ahearn's February 2010 sales were

9    suspicious:  "Your chairman sold a bunch of stock last week.  What does he know that we

10   don't know."  Defendant Meyerhoff responded: ***"Was this the best timing to do this?  No, it***

11   ***probably wasn't the best timing to do this.  Were we entirely happy about the timing?  No,***

12   ***we were not.  I believe we put this behind us."***

13       182.    Since the truth emerged in February 2012, Defendant Ahearn has made ***no***

14   sales, either manually or pursuant to a 10b5-1 plan.  This further confirms that he traded with

15   the intent to maximize his personal profits by selling his First Solar stock before the truth

16   was revealed about the Company's business and the manufacturing deficiencies.

17   **B.    Defendant Meyerhoff's Insider Sales**

18       183.    As First Solar's President of Utility Systems Business Group and CFO,

19   Defendant Meyerhoff was a member of Company management and was privy to material,

20   non-public information about the extent of remediation efforts needed to respond to the

21   manufacturing deficiencies plaguing the Company's solar panels.  Defendant Meyerhoff was

22   responsible for his statements in SEC filings, which included disclosures concerning the

23   extent of the remediation necessary to respond to the Company's manufacturing deficiencies

24   and the Company's positive growth.  Defendant Meyerhoff engaged in insider trading

25   activity at a time when he knew adverse material, non-public information about the

26   Company's impending costly remediation efforts.

27       184.    While in possession of this knowledge, Defendant Meyerhoff sold 118,827

28   shares of his personally held First Solar stock for proceeds of $18,577,773.  Defendant

1  Meyerhoff's sales were timed to maximize profit from First Solar's then artificially inflated
2  stock price.  Defendant Meyerhoff did not allow his own wealth to suffer; he only possessed
3  29,768 shares when the truth about the remediation costs emerged.  Defendant Meyerhoff's
4  sales are suspicious given that his stock sales represented 80% of his holdings.

5     185.   Since the truth emerged in February 2012, Defendant Meyerhoff has made ***no***
6  sales, either manually or pursuant to a 10b5-1 plan.  This further confirms that he traded with
7  the intent to maximize his personal profits by selling his First Solar stock before the truth
8  was revealed about the Company's business and the manufacturing deficiencies.

9  **C.    Defendant Eaglesham's Insider Sales**

10    186.   As First Solar's Chief Technology Officer, Defendant Eaglesham was a
11 member of Company management and was privy to material, non-public information about
12 the extent of remediation efforts needed to respond to the manufacturing deficiencies
13 plaguing the Company's solar panels.  Defendant Eaglesham was responsible for his
14 statements in SEC filings, which included disclosures concerning the extent of the
15 remediation necessary to respond to the Company's manufacturing deficiencies and the
16 Company's positive growth.  Defendant Eaglesham engaged in insider trading activity at a
17 time when he knew adverse material, non-public information about the Company's
18 impending costly remediation efforts.

19    187.   While in possession of this knowledge, Defendant Eaglesham sold 69,983
20 shares of his personally held First Solar stock for proceeds of $9,645,827.  Defendant
21 Eaglesham's sales were timed to maximize profit from First Solar's then artificially inflated
22 stock price.  Defendant Eaglesham did not allow his own wealth to suffer and only possessed
23 4,316 shares when the truth about the remediation costs emerged.  Defendant Eaglesham's
24 sales are suspicious given that his stock sales represented over 94% of his holdings.

25    188.   Since the truth emerged in February 2012, Defendant Eaglesham has made ***no***
26 sales, either manually or pursuant to a 10b5-1 plan.  This further confirms that he traded with
27 the intent to maximize his personal profits by selling his First Solar stock before the truth
28 was revealed about the Company's business and the manufacturing deficiencies.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1
**D.      Defendant Sohn's Insider Sales**

2
        189.    As First Solar's President of Operations and director, Defendant Sohn was a

3
member of Company management and the Board and was privy to material, non-public

4
information about the extent of remediation efforts needed to respond to the manufacturing

5
deficiencies plaguing the Company's solar panels.  Defendant Sohn was responsible for his

6
statements in SEC filings, which included disclosures concerning the extent of the

7
remediation necessary to respond to the Company's manufacturing deficiencies and the

8
Company's positive growth.  Defendant Sohn engaged in insider trading activity at a time

9
when he knew adverse material, non-public information about the Company's impending

10
costly remediation efforts.

11
        190.    While in possession of this knowledge, Defendant Sohn sold 74,750 shares of

12
his personally held First Solar stock for proceeds of $12,390,248.  Defendant Sohn's sales

13
were timed to maximize profit from First Solar's then artificially inflated stock price.

14
Defendant Sohn's sales are suspicious given that his stock sales represented 75% of his

15
holdings.

16
        191.    Since the truth emerged in February 2012, Defendant Sohn has made *no* sales,

17
either manually or pursuant to a 10b5-1 plan.  This further confirms that he traded with the

18
intent to maximize his personal profits by selling his First Solar stock before the truth was

19
revealed about the Company's business and the manufacturing deficiencies.

20
**E.      Defendant Sweeney's Insider Sales**

21
        192.    As a director for over eight years, Defendant Sweeney was privy to material,

22
non-public information about the extent of remediation efforts needed to respond to the

23
manufacturing deficiencies plaguing the Company's solar panels.  Defendant Sweeney was

24
responsible for his statements in SEC filings, which included disclosures concerning the

25
extent of the remediation necessary to respond to the Company's manufacturing deficiencies

26
and the Company's positive growth.  Defendant Sweeney engaged in insider trading activity

27
at a time when he knew adverse material, non-public information about the Company's

28
impending costly remediation efforts.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    193.    While in possession of this knowledge, Defendant Sweeney sold 24,749 shares

2 of his personally held First Solar stock for proceeds of $4,417,934. Defendant Sweeney's

3 sales were timed to maximize profit from First Solar's then artificially inflated stock price.

4 Defendant Sweeney did not allow his own wealth to suffer; he only possessed 2,361 shares

5 when the truth about the remediation costs emerged. Defendant Sweeney's sales are

6 suspicious given that his stock sales represented 91% of his holdings.

7    194.    For example, directly after the First Solar filed its 2010 10-K, Defendant

8 Sweeney sold a total of 6,750 shares for total proceeds of $1,018,908.30. This was 75% of

9 his holdings at the time. This sale was not pursuant to a 10b5-1 plan.

10    195.    Since the truth emerged in February 2012, Defendant Sweeney has made ***no***

11 sales, either manually or pursuant to a 10b5-1 plan. This further confirms that he traded with

12 the intent to maximize his personal profits by selling his First Solar stock before the truth

13 was revealed about the Company's business and the manufacturing deficiencies.

14 **F.    Defendant Zhu's Insider Sales**

15    196.    As First Solar's Chief Accounting Officer and Interim CFO, Defendant Zhu

16 was privy to material, non-public information about the extent of remediation efforts needed

17 to respond to the manufacturing deficiencies plaguing the Company's solar panels.

18 Defendant Zhu was responsible for his statements in SEC filings, which included disclosures

19 concerning the extent of the remediation necessary to respond to the Company's

20 manufacturing deficiencies and the Company's positive growth. Defendant Zhu engaged in

21 insider trading activity at a time when he knew adverse material, non-public information

22 about the Company's impending costly remediation efforts.

23    197.    While in possession of this knowledge, Defendant Zhu sold 7,884 shares of his

24 personally held First Solar stock for proceeds of $1,172,204. Defendant Zhu's sales were

25 timed to maximize profit from First Solar's then artificially inflated stock price. Defendant

26 Zhu's sales are suspicious given that his stock sales represented 48% of his holdings.

27    198.    For example, directly after First Solar filed its 2010 10-K, Defendant Zhu sold

28 a total of 3,322 shares for total proceeds of $506,438.70. This was 100% of his holdings at

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  the time, and 100% of the total shares sold throughout the entire Relevant Period.  This sale

2  was not pursuant to a 10b5-1 plan.

3       199.   Since the truth emerged in February 2012, Defendant Zhu has made **no** sales,

4  either manually or pursuant to a 10b5-1 plan.  This further confirms that he traded with the

5  intent to maximize his personal profits by selling his First Solar stock before the truth was

6  revealed about the Company's business and the manufacturing deficiencies.

7  **G.**    **Defendant Nolan's Insider Sales**

8       200.   As a director for over nine years and the designer that led the First Solar team

9  to develop the process for producing large area thin film cadmium telluride solar modules,

10  Defendant Nolan was privy to material, non-public information about the extent of

11  remediation efforts needed to respond to the manufacturing deficiencies plaguing the

12  Company's solar panels.  Defendant Nolan was responsible for his statements in SEC filings,

13  which included disclosures concerning the extent of the remediation necessary to respond to

14  the Company's manufacturing deficiencies and the Company's positive growth.  Defendant

15  Nolan engaged in insider trading activity at a time when he knew adverse material, non-

16  public information about the Company's impending costly remediation efforts.

17       201.   While in possession of this knowledge, Defendant Nolan sold 24,000 shares of

18  his personally held First Solar stock for proceeds of $5,351,425.  Defendant Nolan's sales

19  were timed to maximize profit from First Solar's then artificially inflated stock price.

20  Defendant Nolan's sales are suspicious given that his stock sales represented over 92% of his

21  holdings.

22       202.   For example, directly after First Solar filed its 2010 10-K, Defendant Nolan

23  sold a total of 10,000 shares for total proceeds of $1,512,315.  This was 82% of his holdings

24  at the time.  This sale was not pursuant to a 10b5-1 plan.

25       203.   Since the truth emerged in February 2012, Defendant Nolan has made **no** sales,

26  either manually or pursuant to a 10b5-1 plan.  This further confirms that he traded with the

27  intent to maximize his personal profits by selling his First Solar stock before the truth was

28  revealed about the Company's business and the manufacturing deficiencies.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

## H.    Defendant Presby's Insider Sales

204.    As a director for over five years and Chairman of First Solar's Audit Committee, Defendant Presby was privy to material, non-public information about the extent of remediation efforts needed to respond to the manufacturing deficiencies plaguing the Company's solar panels.  Defendant Presby was responsible for his statements in SEC filings, which included disclosures concerning the extent of the remediation necessary to respond to the Company's manufacturing deficiencies and the Company's positive growth. Defendant Presby engaged in insider trading activity at a time when he knew adverse material, non-public information about the Company's impending costly remediation efforts.

205.    While in possession of this knowledge, Defendant Presby sold 1,000 shares of his personally held First Solar stock for proceeds of $137,810.  Defendant Presby's sales were timed to maximize profit from First Solar's then artificially inflated stock price. Defendant Presby's sales are suspicious given that his stock sales represented over 18% of his holdings.

206.    Since the truth emerged in February 2012, Defendant Presby has made only one sale on May 4, 2015, which was not conducted pursuant to a 10b5-1 trading plan.  This further confirms that he traded with the intent to maximize his personal profits by selling his First Solar stock before the truth was revealed about the Company's business and the manufacturing deficiencies.

## I.    Breakdown of the Insider Selling Defendants' Stock Sales

207.    Combined, Insider Selling Defendants Ahearn, Meyerhoff, Eaglesham, Sohn, Sweeney, Zhu, Nolan, and Presby sold over $478 million worth of their Company stock. The following is a table showing the total insider sales that occurred during the Relevant Period:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **AHEARN** | 5/15/2008 | 150,000 | $308.81 | $46,187,819.63 |
| | 5/16/2008 | 100,000 | $310.05 | $31,016,585.93 |
| | 2/22/2010 | 550,000 | $113.11 | $62,208,595.98 |
| | 2/23/2010 | 400,000 | $106.80 | $42,720,069.36 |
| | 2/24/2010 | 350,000 | $105.25 | $36,838,420.69 |

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 2/25/2010 | 100,000 | $102.39 | $10,239,212.39 |
| | 2/26/2010 | 100,000 | $104.29 | $10,429,400.94 |
| | 2/28/2011 | 6,900 | $149.15 | $1,029,135.00 |
| | 3/1/2011 | 68,900 | $149.25 | $10,283,616.96 |
| | 3/2/2011 | 24,200 | $146.40 | $3,542,850.28 |
| | 3/3/2011 | 40,000 | $148.39 | $5,935,600.60 |
| | 3/4/2011 | 60,000 | $147.21 | $8,832,489.58 |
| | 3/8/2011 | 30,000 | $142.41 | $4,272,365.52 |
| | 3/9/2011 | 24,600 | $142.95 | $3,516,513.13 |
| | 3/10/2011 | 45,400 | $140.03 | $6,357,250.22 |
| | 3/11/2011 | 50,000 | $139.85 | $6,992,653.00 |
| | 3/14/2011 | 110,000 | $146.60 | $16,126,180.00 |
| | 3/15/2011 | 100,000 | $156.55 | $15,654,819.84 |
| | 3/16/2011 | 33,330 | $155.53 | $5,183,715.50 |
| | 3/17/2011 | 26,670 | $156.77 | $4,181,007.90 |
| | 3/18/2011 | 10,000 | $150.19 | $1,501,908.00 |
| | 3/21/2011 | 20,000 | $151.54 | $3,030,750.00 |
| | 3/22/2011 | 20,000 | $149.32 | $2,986,468.00 |
| | 3/23/2011 | 60,000 | $149.82 | $8,989,122.46 |
| | 3/24/2011 | 30,000 | $150.79 | $4,523,633.72 |
| | 3/25/2011 | 40,000 | $149.39 | $5,975,513.40 |
| | 8/8/2011 | 460,000 | $99.56 | $45,798,071.30 |
| | 8/9/2011 | 133,016 | $98.62 | $13,117,906.64 |
| | 8/10/2011 | 96,000 | $101.69 | $9,761,914.42 |
| **Total:** | | **3,239,016** | | **$427,233,588** |
| | | | | |
| **EAGLESHAM** | 4/30/2010 | 15,882 | $148.02 | $2,350,835.28 |
| | 5/18/2010 | 5,000 | $115.36 | $576,802.35 |
| | 8/2/2010 | 10,881 | $126.35 | $1,374,851.07 |
| | 9/1/2010 | 3,627 | $129.74 | $470,580.95 |
| | 10/1/2010 | 3,627 | $146.54 | $531,516.00 |
| | 11/1/2010 | 3,627 | $134.97 | $489,522.63 |
| | 12/1/2010 | 3,627 | $128.78 | $456,207.17 |
| | 1/3/2011 | 3,627 | $132.61 | $480,958.69 |
| | 2/1/2011 | 3,627 | $156.40 | $567,255.64 |
| | 3/1/2011 | 3,627 | $147.54 | $535,115.47 |
| | 3/4/2011 | 1,944 | $146.93 | $285,640.40 |
| | 4/1/2011 | 3,627 | $159.41 | $578,189.99 |
| | 5/2/2011 | 3,627 | $139.09 | $504,497.38 |
| | 6/1/2011 | 3,633 | $122.17 | $443,853.53 |
| **Total:** | | **69,983** | | **$9,645,826.55** |
| | | | | |
| **MEYERHOFF** | 5/13/2008 | 3125 | $291.81 | $895,749.53 |
| | 6/10/2008 | 2702 | $240.76 | $650,137.04 |
| | 7/8/2008 | 3125 | $253.04 | $790,700.49 |
| | 8/12/2008 | 3125 | $254.64 | $795,139.00 |
| | 5/1/2009 | 15,000 | $184.30 | $2,753,766.20 |
| | 4/30/2010 | 30,000 | $148.95 | $4,468,476.20 |
| | 6/16/2010 | 7,500 | $120.17 | $901,275.00 |
| | 6/17/2010 | 5,000 | $125.33 | $626,650.00 |
| | 7/8/2010 | 7,500 | $130.16 | $976,200.00 |

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 8/2/2010 | 7,500 | $126.41 | $948,075.00 |
| | 8/4/2010 | 2,500 | $130.06 | $325,150.00 |
| | 8/17/2010 | 5,000 | $125.62 | $628,104.00 |
| | 9/1/2010 | 3,125 | $129.01 | $403,156.33 |
| | 10/1/2010 | 3,125 | $146.45 | $457,665.25 |
| | 11/1/2010 | 2,500 | $137.29 | $343,225.00 |
| | 11/4/2010 | 50 | $140.00 | $7,000.00 |
| | 11/5/2010 | 575 | $140.00 | $80,500.00 |
| | 12/2/2010 | 2,000 | $130.00 | $260,000.00 |
| | 12/7/2010 | 500 | $135.00 | $67,500.00 |
| | 12/15/2010 | 625 | $140.00 | $87,500.00 |
| | 1/3/2011 | 2,000 | $131.79 | $263,580.00 |
| | 1/6/2011 | 500 | $134.53 | $67,265.00 |
| | 1/12/2011 | 625 | $140.00 | $87,500.00 |
| | 1/24/2011 | 8,000 | $150.59 | $1,204,720.00 |
| | 2/1/2011 | 3,125 | $156.40 | $488,739.50 |
| **Total:** | | **118,827** | | **$18,577,773.54** |
| | | | | |
| **NOLAN** | 8/4/2008 | 14,000 | $278.22 | $3,839,110.34 |
| | 2/28/2011 | 10,000 | $152.94 | $1,512,315.00 |
| **Total:** | | **24,000** | | **$5,351,425.34** |
| | | | | |
| **PRESBY** | 11/12/2010 | 1,000 | $137.81 | $137,810.00 |
| **Total:** | | **1,000** | | **$137,810.00** |
| | | | | |
| **SOHN** | 8/28/2008 | 12,750 | $279.05 | $3,557,902.1 |
| | 8/30/2010 | 12,000 | $126.98 | $1,523,751.40 |
| | 11/1/2010 | 4,000 | $137.16 | $548,624.00 |
| | 11/4/2010 | 50 | $140.00 | $7,000.00 |
| | 11/5/2010 | 4,950 | $140.01 | $693,049.50 |
| | 11/16/2010 | 4,000 | $137.44 | $549,760.00 |
| | 12/15/2010 | 5,000 | $140.20 | $701,000.00 |
| | 12/21/2010 | 4,000 | $132.99 | $531,960.00 |
| | 1/12/2011 | 5,000 | $140.00 | $700,000.00 |
| | 1/18/2011 | 9,000 | $140.78 | $1,267,061.00 |
| | 2/2/2011 | 14,000 | $165.01 | $2,310,140.00 |
| **Total:** | | **74,750** | | **$12,390,248** |
| | | | | |
| **SWEENEY** | 8/29/2008 | 4,999 | $277.84 | $1,387,991.41 |
| | 5/6/2009 | 6,000 | $197.80 | $1,185,405.00 |
| | 5/28/2010 | 3,000 | $111.53 | $334,590.00 |
| | 11/13/2010 | 4,000 | $122.76 | $491,040.00 |
| | 2/28/2011 | 6,750 | $150.95 | $1,018,908.30 |
| **Total:** | | **24,749** | | **$4,417,934.71** |
| | | | | |
| **ZHU** | 11/16/2009 | 500 | $124.70 | $62,350.00 |
| | 4/30/2010 | 4,062 | $239.61 | $973,315.68 |
| | 2/28/2011 | 3,322 | $152.45 | $506,438.70 |
| **Total:** | | **7,884** | | **$1,172,204** |
| | | | | |
| **Total:** | | **3,560,209** | | **$478,926,810** |

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1

2      208.    To the extent the Insider Selling Defendants sold their personally-held

3   Company stock pursuant to 10b5-1 plans, these plans were adopted or amended after the

4   misconduct had already begun.  As such, Defendants Ahearn, Meyerhoff, Eaglesham, Sohn,

5   Sweeney, Zhu, Nolan, and Presby knew that First Solar's stock was artificially inflated due to

6   their improper statements when adopting the 10b5-1 plans, and cannot avail themselves of

7   the inference that they did not trade on the material adverse, non-public information.  The

8   existence of a 10b5-1 trading plan, moreover, is an affirmative defense that cannot be

9   considered at the pleading stage.  Any defense based on such plans also requires an

10  additional factual finding of good faith, which also cannot be resolved at the pleading stage.

11  Thus, any analysis of whether the Insider Selling Defendants can attempt to insulate

12  themselves from liability for engaging in massive insider selling based on 10b5-1 trading

13  plans is a highly factual issue that cannot be resolved until after discovery has occurred.

14  Defendants did not file the 10b5-1 trading plans with the SEC and have exclusive possession

15  of the facts regarding the plans, including whether Defendants increased selling under the

16  plans during the Relevant Period, whether they had knowledge of the material, undisclosed

17  facts at the time they set up the plans, and whether they modified the plans or the timing of

18  the sale of stock pursuant to the plans during the Relevant Period.

19      209.    In an unusual pattern demonstrating insider trading, almost none of the Insider

20  Selling Defendants sold stock, including by 10b5-1 plans, after the truth was revealed about

21  the Company's business and the manufacturing defects.  Rather, Defendants Ahearn,

22  Meyerhoff, Eaglesham, Sohn, Sweeney, Zhu, Nolan, and Presby maximized their profits by

23  liquidating vast portions of their First Solar stock before the price got crushed by revelations

24  of the truth long known only by corporate insiders like Defendants.

25      210.    Additionally, the sheer magnitude of Defendants' insider selling done almost

26  exclusively during the Relevant Period raises an inference that Defendants were in

27  possession of material, adverse information about the Company at the time they sold their

28  First Solar stock.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

211.    Moreover, as indicated *supra*, Defendant Meyerhoff conceded that the timing of Defendant Ahearn's February 2010 sales were suspicious:  "Your chairman sold a bunch of stock last week.  What does he know that we don't know."  Meyerhoff responded:  ***"Was this the best timing to do this?  No, it probably wasn't the best timing to do this.  Were we entirely happy about the timing?  No, we were not."***

212.    The statement by Defendant Meyerhoff is an admission of a party opponent that Defendant Ahearn's stock sales, at least those in February 2010, were highly unusual in both amount and timing.  Based on such admission, Plaintiffs are entitled to a reasonable inference that Defendant Ahearn was in possession of material, adverse information about the Company at the time he sold his First Solar stock.

213.    Nonetheless, under Delaware law, a plaintiff alleging insider trading by corporate defendants need not plead particularized facts concerning unusual timing or amounts of insider sales if other particularized allegations demonstrate that the defendants who sold stock had actual knowledge of the undisclosed facts.  As demonstrated herein, the complaint does so since it alleges actual reports provided to the Board concerning undisclosed material facts about the Company's solar panels, as well as the fact that the Board failed to disclose such known facts for a year after being informed of them.  *See, e.g.*, *supra* ¶54.

214.    This insider selling, besides violating Delaware law, also violated the Company's Code of Business Conduct and Ethics.  *See supra* at ¶280.  The Code expressly banned corporate insiders from buying and selling the Company's securities while in possession of material, inside information, including non-public information relating to "problems facing the Company," "profitability," and "financial information."  But selling while in possession of material, non-public information is exactly what the Insider Selling Defendants did.

## THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO VIOLATE GAAP

**A.     GAAP Violation: Financial Statements Must Conform with GAAP**

215.     Throughout the Relevant Period, the Individual Defendants represented that the Company's financial statements were presented in conformity with GAAP.   These representations were materially false and misleading when made because the Individual Defendants, in violation of GAAP and SEC rules, knowingly or recklessly employed improper accounting and disclosure practices that materially misstated the financial results and position of First Solar.

216.     Financial statements filed with the SEC are required to be in accordance with GAAP and are the responsibility of the Company.  GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures, which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).[11]  First Solar's corresponding earnings releases filed on Forms 8-K also were required to comply SEC Regulation S-K.

217.     The Individual Defendants violated GAAP and SEC rules because the Relevant Period financial statements were not prepared in conformity with applicable financial

---

[11] On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles* – a replacement of FASB Statement No. 162. *FASB Accounting Standards Codification* ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009. The Codification did not change existing U.S. GAAP. These allegations use the current references to U.S. GAAP, unless otherwise indicated there are no applicable changes within the Relevant Period.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  reporting requirements, nor was the financial information a "fair presentation" of First Solar's
2  operations and financial position.  The Individual Defendants did so by not properly
3  accounting for warranty reserves; not disclosing known trends and uncertainties associated
4  with the excursion and heat degradation defects; not disclosing revenue recognition on
5  defective products; and not disclosing goodwill attributed to the OptiSolar and NextLight
6  acquisitions.

7  **B.     GAAP Violation: Understated Warranty Reserves**

8  218.    The Individual Defendants violated GAAP by failing to properly and timely
9  recognize warranty contingencies related to known product defects.  A warranty is an
10 obligation incurred in connection with the sale of goods or services that may require further
11 performance by the seller after the sale has taken place.  ASC 460-10-25 "Guarantees,"
12 governs the accounting for warranty obligations incurred in connection with the sale of
13 goods or services.  ASC 460 states that because of the uncertainty surrounding claims that
14 may be made under warranties, warranty obligations fall within the definition of a loss
15 contingency as defined under ASC 450.  GAAP, ASC 450-20, Loss Contingencies, requires
16 an accrual of losses from warranty obligations by a charge to income (in the case of First
17 Solar the charge would be in the form of a warranty reserve) if, at the time the financial
18 statements are issued, it is probable that a warranty obligation or potential loss has been
19 incurred, and the loss can be reasonably estimated.[12]  The purpose of these conditions is to
20 require accrual of losses (charge to income in terms of an expense) when they are reasonably
21 estimable and relate to the current or a prior period.[13]

22 219.    Warranty obligations represent a loss contingency under ASC Topic 450-20
23 that must be accrued for in a company's financial statements.  GAAP further requires that the
24 cost of an express or implied warranty obligation, under which manufacturing flaws in
25 certain of the Company's solar panels were agreed to be remedied, should be accrued at the

[12] *See also* ASC 460, Guarantees, for uniform guidance.

[13] If the losses cannot be reasonably estimated, disclosure is required in the footnotes to the financial statements as described in detail below.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  time the sale was recognized.  ASC Topic 450-20 further requires that when it is probable

2  that an entity will incur a warranty obligation, the entity must record an accrual (charge

3  against income) for the reasonably estimated potential costs.

4       220.    Because of its twenty-five-year performance guarantee, First Solar was

5  required to maintain warranty reserves sufficient to cover estimated future remediation costs

6  on every product it sold since the inception of the Company in 2002.  While an accurate

7  estimate of the twenty-five-year performance was not possible to calculate based on the

8  Company's limited history, the Individual Defendants deemed it reasonable to base the

9  warranty reserves primarily on four factors: (i) historical claim experience (i.e., defect rates);

10 (ii) the number of solar modules covered under warranty; (iii) the cost to remediate a claim

11 (i.e., the current cost to replace a defective solar module with a new solar module); and

12 (iv) monitoring of module performance at field installation sites.  The Individual Defendants

13 caused the Company to represent that it monitored these factors closely and adjusted the

14 Company's warranty reserves as needed.  In the event that a specifically-identified product

15 defect was encountered, the historical claims experience (across all products ever sold by the

16 Company) was clearly not indicative of future claims for the products affected by that

17 particular defect.  Therefore, if the defect was significant, the Company was required to

18 increase its warranty reserve to account for specific losses on the affected products in

19 addition to maintaining warranty reserves across all remaining products at the historical

20 defect rate.

21      221.    The modules affected by the excursion were clearly expected to experience

22 higher defect rates than what the Company had historically experienced.  As such, the

23 "estimate of the number of solar modules that would require replacement" (one of the inputs

24 to the warranty reserve calculation) was required to be increased.[14]  Applying the existing

25 _____

26 [14] "Should we change our estimate of the number of solar modules that would require
   replacement and/or the replacement cost per solar module, we would account for that change
27 in estimate in accordance with GAAP."  (Response to SEC Comment Letter filed August 9,
   2006.)
28

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    warranty reserve to a specific product defect problem, such as the excursion, without

2    increasing the reserve would leave the reserve coverage on all remaining modules severely

3    understated.[15]  For a specifically-identified product defect, such as the excursion or the heat

4    degradation defect, the Company was required to set aside additional specific reserves to

5    cover the future remediation costs that were known to be above and beyond the Company's

6    historical defect rate.  From the moment the Individual Defendants received, and ignored,

7    their first warning regarding the issues surrounding the "manufacturing excursion," they

8    were on notice that the Company's solar panels were not operating to published and agreed to

9    standards, resulting in the Company incurring substantial costs to remediate and warrant its

10   defective products.

11         222.   The Company readily admitted that the "manufacturing excursion was

12   identified June 2009" and the heat degradation defect was also known by the Individual

13   Defendants by no later than 2Q09.  The product performance problems had surfaced in the

14   form of customer complaints and the Company was investigating the issue to determine the

15   cause.  Further, First Solar had material product quality problems outside of the excursion

16   and heat degradation defects that existed as of the start of the Relevant Period.  Therefore,

17   under ASC 450, warranty reserves to account for these specific product problems were

18   required to be increased, or if the losses could not be reasonably estimated, disclosures of

19   loss contingencies were required in the footnotes to the Company's financial statements.  The

20   Individual Defendants did neither.  In fact, the Individual Defendants did just the opposite

21   and deliberately, steadily, and consistently decreased the Company's reserve coverage[16] from

22   2.24% at 1Q08 to 1.11% at 4Q10.

---

[15] As explained herein, First Solar had material, product quality problems outside of the excursion and heat degradation defects.  Thus, the existing reserve was understated to begin with and certainly was not sufficient to cover general product quality problems across all modules and specific problems such as the excursion and heat degradation.

[16] Calculated based on cumulative megawatts sold since 2002.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

223.   The decrease in warranty coverage was no accident.   The Individual Defendants knowingly and deliberately decreased the reserve by booking a "change in estimate of warranty liability" every quarter.  As described above, the Individual Defendants caused the Company to represent that First Solar's estimate (and the resulting accounting entry to change the estimate) was based on several factors including the total number of modules that had been installed in the field, any updated information as to the defect rate and performance of those modules, and the current manufacturing costs for modules requiring replacements.  While the manufacturing costs were declining, this decrease was more than offset by the other factors.  For example, the cumulative number of modules installed in the field and covered under warranty was increasing significantly from the beginning of the Relevant Period as shown in the chart below:



224.   In addition, the most updated information available to the Individual Defendants regarding defect rates and product performance problems revealed massive problems and indicated defect rates at rates far exceeding the historical defect rate used in the original reserve calculation.  Thus, the only conceivable "change in warranty estimate" that could be recorded was an increase.  However, in each quarter from 2Q08 through 3Q09, the Individual Defendants disclosed cumulative decreases in their "changes in warranty estimate" by over $7 million.  Such decreases contributed to the understatement of First

1  Solar's warranty reserves.  The decreases to the warranty estimate[17] resulted in the Company

2  understating its warranty reserve from the start of the Relevant Period in 1Q08, in violation

3  of GAAP.

4  225.    In 2Q10, First Solar began reserving for excursion remediation costs in two

5  accounts: (i) its warranty reserve (as described above); and (ii) an additional excursion

6  liability for costs associated with voluntary remediation efforts that were "beyond ... normal

7  warranty coverage."  However, a significant portion of the excursion remediation remained

8  outside the scope of First Solar's regular product warranty including the cost of replacement

9  modules.[18]  In 2Q10, when the excursion was disclosed for the first time, the Individual

10  Defendants caused the Company to assure investors that the problem was limited to "less

11  than 4% of the total product manufactured between June 2008 and June 2009."  This

12  amounted to thirty megawatts or approximately 348,500 solar modules.[19]  However, as First

13  Solar later revealed, the number of solar modules that required replacement as a result of the

14  excursion was approximately 1.5 million – almost four times higher than what was originally

15  represented by First Solar.[20]  As a result, the Company's warranty reserve was understated by

16  over $90 million based on excursion-related costs alone.  When the heat degradation defects

17  and general product quality problems are factored in, the Company's warranty reserve was

18  unquestionably materially understated.  As shown in the chart below, the Company failed to

19  increase its warranty reserve – in fact, the Company actually decreased its warranty coverage

20

---

21  [17] While the overall warranty reserve increased in dollar terms during these periods solely
because the Company sold more products in that period, the reserve coverage declined on a
22  percentage basis.  The warranty reserves did not keep pace with the total cumulative modules
covered under warranty.

23  [18] The warranty costs associated with replacement modules have totaled over $100 million or
24  roughly 40% of the $267 million in total excursion expenses recorded by First Solar to date.

25  [19] Based on First Solar's average power rating of 76 watts per module during 2010.

26  [20] This calculation is based on: (i) approximately $90 million in "product warranty expense
reflecting the net increase in the expected number of replacement modules required in
27  connection with our remediation efforts" recorded in 4Q11 through 2Q12; and (ii) First
Solar's average power rating per module of 80 watts and average manufacturing cost per watt
28  of $0.73 during 4Q11-1Q12.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   – to account for costs associated with the excursion and heat degradation until the very end

2   of the Relevant Period, when the Company was forced to record over $125 million in losses

3   and increase its reserve coverage from just 1.3% to over 4.6% – a 250% increase.[21]



16   226.   Likewise, the Company's additional accrual for "voluntary" remediation costs

17   that were "beyond ... normal warranty coverage" were also materially understated from 2Q10

18   through the end of the Relevant Period.  As of 2Q10, the Individual Defendants caused the

19   Company to set aside only $27.4 million in this account to cover all remaining "voluntary"

20   remediation costs that were beyond the scope of First Solar's standard warranty.  This figure

21   represented just 16% of the actual remaining "voluntary" remediation costs the Company

22   would incur over the next eight quarters.  Furthermore, the Individual Defendants understood

23   that failing to make First Solar's customers whole would cause even more customer defection

24   and damages leading to additional material lost revenue and reputation.  First Solar's accrual

---

[21] In 4Q11, the Individual Defendants admitted that they had failed to reserve for heat degradation during the Relevant Period when First Solar recorded an almost $40 million "catch-up" adjustment to the Company's warranty reserves (and increased the Company's reserve coverage going forward) to account for the remediation costs associated heat degradation defects.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  for "voluntary" remediation costs remained materially understated until 4Q11 when the

2  Company finally increased its estimate of these costs to $145.6 million.

3     227.    Between the warranty reserve and the additional accrual for costs "beyond ...

4  normal warranty coverage" described above, the Individual Defendants understated the

5  Company's reported estimate of excursion-related costs by as much as 650% until 4Q11.[22] If

6  they were unable to reasonably estimate the excursion-related remediation costs, the

7  Individual Defendants were required under GAAP to make specific disclosures to warn

8  investors about the true scope of the excursion problem.   An estimate of costs that

9  understates actual costs by 650% is not the level of reasonableness required under GAAP to

10  disclose an estimate of a loss contingency without supplemental disclosures warning

11  investors of possible additional losses.

12     228.    The Individual Defendants blamed the processing of the majority of claims in

13  4Q11 as the reason for their understatement of excursion-related cost estimates during the

14  Relevant Period and, therefore, claimed they did not have insight into the full extent of the

15  problem until that time.   Taken at face value, this explanation is an admission that the

16  excursion costs could not have been reasonably estimated and the Individual Defendants

17  were, therefore, required under GAAP to make the necessary disclosures.   In any event, the

18  explanation fails for several reasons.  First, the cause of the problem was admitted, identified

19  and quantified by 2Q09.  If the cause of the excursion and quantity of affected modules were

20  known at that date, the timing of actually processing the claims would not have affected the

21  estimate of total remediation costs.   Second, it was previously represented that product

22  defects involving power output degradation, such as the excursion, mostly occur in the "early

23  life cycle stage (*typically the first 3-6 months*)" after the solar modules are installed.[23]

24  Further, it was also represented that the Individual Defendants had a sufficient operating

25  history to provide evidence of this behavior.   Therefore, it does not follow that the Individual

---

26  [22] Based on disclosed estimate of total excursion-related costs at 2Q10 compared to total
actual total excursion-related costs through 2Q12 of $267.6 million.

27  [23] First Solar response to SEC Comment Letter filed August 9, 2006.

28

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  Defendants could not have known about the totality of the excursion-related problems until

2  thirty to forty-two months after the modules were manufactured (June 2008-June 2009 until

3  February 2012).  Certain Individual Defendants repeatedly represented that First Solar had

4  processed claims throughout the Relevant Period and had finished processing claims before

5  4Q11:

> **July 29, 2010**: "We've been working directly with impacted customers to replace the affected modules and these efforts are well underway and, in some cases, complete.  Some of these efforts go beyond our normal warranty coverage.  We accrued the estimated full costs of these additional efforts in our Q2 results, and Jens will discuss the financial impact in more detail."

> **February 24, 2011**: "In Q4[2010] we concluded a claims process and based on our field data and execution today, we updated our total replacement cost estimate."

> **November 3, 2011**: "We have substantially concluded the remediation programs associated with the manufacturing excursion."

> **December 14, 2011**: "We have had on occasion issues and they are dealt with. We cover[ed] them.  That has all been reflected in our financials."

14  229.   The Individual Defendants either knowingly understated the Company's

15  warranty reserve and estimate of excursion-related costs *or* they knowingly lacked a basis to

16  make reasonable estimate of such costs.  In the latter case, disclosing any amount of

17  warranty reserve and estimate of excursion-related costs, without the additional required

18  disclosures described below, resulted in materially false and misleading statements in each of

19  First Solar's Relevant Period financial statements.[24]

20  **C.   GAAP Violation: Excursion and Heat Degradation Disclosures**

21  230.   The Individual Defendants also were required to disclose the heat degradation

22  defect when it was known.  SEC Regulation S-K Item 303, "Management's Discussion and

23  Analysis" requires a discussion of results of operations and other information necessary to an

24  understanding of a registrant's financial condition, changes in financial condition and results

25  of operations.   "This includes unusual or infrequent transactions, known trends or

---

[24] The requirement that a loss accrual can only be booked if the amount of loss can be reasonably estimated "is intended to prevent accrual in the financial statements of amounts so uncertain as to impair the integrity of those statements." ASC 450-20-25-2.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  uncertainties that have had, or might reasonably be expected to have, a favorable or

2  unfavorable material effect on revenue, operating income or net income and the relationship

3  between revenue and the costs of the revenue."[25] In each of its Relevant Period financial

4  statements, the Individual Defendants blatantly violated the GAAP and SEC disclosure rules

5  to conceal the truth about the heat degradation defect.

6      231.  Further and as described above, the excursion and heat degradation defects

7  were loss contingencies specifically covered under ASC 450 ("Obligations related to product

8  warranties and product defects").  Under ASC 450, the Individual Defendants were required

9  to cause First Solar to either set aside adequate reserves for these loss contingencies in its

10  financial statements or, at a minimum, disclose the nature and scope of the loss contingencies

11  in the footnotes of its Relevant Period financial statements.  Because First Solar did not

12  adequately reserve for the excursion or heat degradation in its Relevant Period financial

13  statements, Defendants were required by GAAP to disclose the nature and scope of these

14  material loss contingencies in the footnotes of its Relevant Period financial statements.  By

15  failing to do so, the Individual Defendants violated GAAP.

16      232.  From 2Q10 through 3Q11, the Company cryptically disclosed minimal details

17  regarding the excursion and disclosed a reserve that was purportedly sufficient to cover all

18  future remediation costs.  The financial statements reflecting the misleading disclosures of

19  the excursion violated GAAP provisions ASC 450[26] and ASC 275.[27]

20

---

21  [25] The SEC stated that the management's discussion and analysis (MD&A) should "give

22  investors an opportunity to look at the registrant through the eyes of management by
   providing a historical and prospective analysis of the registrant's financial condition and
   results of operations, with a particular emphasis on the registrant's prospects for the future."

23  (SEC Financial Reporting Release No. 36.)

24  [26] The requirement that a loss accrual can only be booked if the amount of loss can be

25  reasonably estimated "is intended to prevent accrual in the financial statements of amounts
   so uncertain as to impair the integrity of those statements."[26]   In fact "[d]isclosure is
   preferable to accrual when a reasonable estimate of loss cannot be made."[26]  Therefore, under

26  ASC 450, if the Individual Defendants could not make a reasonable estimate of the
   excursion-related costs, disclosing any estimate of excursion-related costs, without the

27  additional required information, resulted in materially false and misleading statements in
   each of First Solar's Relevant Period financial statements.

28

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

233.     The Individual Defendants failed to make any such disclosures until it was too late.  The disclosure required under ASC 275 regarding its estimate of excursion costs was first made in its 2011 10-K:

> We must also make an estimate for the cost of the remediation program described further in "2008-2009 Manufacturing Excursion."  Our estimates for the remediation program have changed, and may in the future change, significantly in light of our ongoing remediation efforts and our continued analysis of remaining claims. . . .  In light of the additional data we gained from processed claims, as well as experience from our remediation efforts, our estimates have been subject to change.

234.     The purpose behind the disclosure requirements under ASC 450 and ASC 275 is to warn investors about the extent of losses the Company faced as a result of the excursion.  Under ASC 450 and ASC 275, the Individual Defendants had acceptable disclosure options but did not comply with any of them.  Instead, the Individual Defendants caused First Solar to provide what it purported were reasonably certain estimates of excursion-related remediation costs only to later reveal further losses throughout the Relevant Period, including a massive $170 million loss in 4Q11.  The Company's disclosed estimate of excursion-related costs was subject to almost quarterly increases – the exact set of circumstances requiring disclosure under ASC 450 and ASC 275.

235.     GAAP and SEC rules also require disclosure of vulnerabilities from concentrations in particular geographical areas.  (ASC 275-10-50).  Specifically, certain concentrations and the vulnerability and risks associated with a particular geographic region were required to be disclosed if it was at least reasonably possible that the Company's sales, revenues, or income would be materially affected.

---

[27] The Individual Defendants also knew or were reckless in not knowing that it was at least reasonably possible the estimate would change materially in the near term.  The Individual Defendants were required, under ASC 275, to disclose this material fact to investors. ASC 275 requires specific additional disclosures regarding estimates of loss contingencies if information known to management prior to the issuance of the financial statements indicates that it is at least reasonably possible that the estimate of the effect on the financial statements of a condition, situation, or set of circumstances that existed at the date of the financial statements will change in the near term due to one or more future events and the effect of the change would be material to the financial statements.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

236.    The Individual Defendants were required by GAAP and SEC rules to disclose the vulnerability and potentially material impact on its sales, revenues, and income from operations in hotter climates like the desert Southwest.  The Individual Defendants, however, said nothing about the massive heat degradation defects during the Relevant Period and never disclosed that heat degradation was having a severe impact on its solar power projects located in hot climates – particularly in the desert Southwest.

237.    Despite their knowledge during the Relevant Period of the massive heat degradation defect, the Individual Defendants nevertheless caused the Company to continue to report the success and revenue generated from its large scale solar projects predominately located in the desert Southwest.  The repeated false disclosures were vital in demonstrating that the Company was successfully accomplishing its goal of shifting its sales mix to large scale solar projects predominantly located in the desert Southwest.  As the Individual Defendants began touting First Solar's solar power system achievements in early 2009, they concealed the material fact that the solar panels were experiencing heat degradation which would severely affect the Company's operations.  Accordingly, during the Relevant Period and in violation of GAAP and SEC rules, the Individual Defendants caused First Solar to make the material false and misleading statements and disclosures regarding its net sales and performance of its solar systems built in hot climates – predominantly located in the Southwestern U.S.

238.    The statements and disclosures made during the Relevant Period were false and misleading because, as described herein, the Individual Defendants caused First Solar to conceal its massive heat degradation defect while reassuring investors that large solar projects sold during the Relevant Period were generating revenue and represented the future growth of the Company.  In violation of GAAP and SEC rules, the Individual Defendants caused First Solar to conceal the negative impact on net sales and operations that were related to the significant trends and uncertainties posed by the heat degradation defect. Furthermore, the Individual Defendants was required under GAAP to defer revenue on solar module sales on projects in hot climates due to the known heat degradation defects.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

**D.     GAAP Violation: Revenue Recognition**

239.    Further, the Individual Defendants were precluded from recognizing revenue associated with the sales of solar panels that were not adequately reserved for, as the Company did not fulfill its sales obligation to customers.

240.    During the Relevant Period, First Solar sold every solar module with a guaranteed specification "that solar modules installed in accordance with agreed-upon specifications will produce at least 90% of their power output rating during the first 10 years following their installation and at least 80% of their power output rating during the following 15 years."  When First Solar went public in 2006, the Company represented to the SEC that this performance guarantee was, in fact, a specification: "The minimum average watt per module is a specification requirement…."[28]  If a solar module did not meet its performance specification, it typically could not be repaired and was therefore replaced.

241.    In accordance with revenue recognition rules promulgated by GAAP and the SEC, First Solar was required to defer revenue if it had not previously demonstrated that its solar modules actually met the stated 90% power output rating during the first ten years and at least 80% power output rating during the following fifteen years.  Revenue recognition rules[29]  regarding seller specified performance criteria (ASC 605-10-S99, SAB Topic 13.A.3b, question 1(c)) specifically state:

---

[28] First Solar's August 9, 2006 letter to the SEC.

[29] The overarching concept for revenue recognition (ASC  605-10-25-1) states:

> Paragraph 83(b) of FASB Concepts Statement No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, states that revenue is not recognized until earned.  That paragraph states that an entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.

Additionally, ASC 60-10-S99-1 states:

> (b)      Customer acceptance.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Customer acceptance provisions generally allow the customer to cancel the arrangement when a seller delivers a product that the customer has not yet agreed to purchase or delivers a product that does not meet the specifications of the customer's order.  In those cases, revenue should not be recognized because a sale has not occurred.

* * *

(c) Acceptance provisions based on seller-specified objective criteria.  An example of such a provision is one that gives the customer a right of return or replacement if the delivered product is defective or fails to meet the vendor's published specifications for the product.  Such rights are generally identical to those granted to all others within the same class of customer and for which satisfaction can be generally assured without consideration of conditions specific to the customer.  Provided the seller has previously demonstrated that the product meets the specified criteria, the staff believes that these provisions are not different from general or specific warranties and should be accounted for as warranties in accordance with Statement 5 [Section 460-10-25].  In this case, the cost of potentially defective goods must be reliably estimable based on a demonstrated history of substantially similar transactions. . . . However, if the seller has not previously demonstrated that the delivered product meets the seller's specifications, the staff believes that revenue should be deferred until the specifications have been objectively achieved.

* * *

If an arrangement includes customer acceptance criteria or specifications that cannot be effectively tested before delivery or installation at the customer's site, the staff believes that revenue recognition should be deferred until it can be demonstrated that the criteria are met.  (ASC 605-10-S99-1, SAB Topic 13.A.3b ques. 1 and 2)

242.    In violation of these revenue recognition rules, even though the Individual Defendants did not and could not reliably demonstrate that the twenty-five-year performance specification was met at the time the solar modules were sold, they caused First Solar to improperly recognize revenue on the unsupported ground that existing research and diligent

After delivery of a product or performance of a service, if uncertainty exists about customer acceptance, revenue should not be recognized until acceptance occurs….Customer acceptance provisions may be included in a contract, among other reasons, to enforce a customer's rights to (1) test the delivered product, (2) require the seller to perform additional services subsequent to delivery of an initial product or performance of an initial service (*e.g.*, a seller is required to install or activate delivered equipment), or (3) identify other work necessary to be done before accepting the product.  The staff presumes that such contractual customer acceptance provisions are substantive, bargained-for terms of an arrangement.  Accordingly, when such contractual customer acceptance provisions exist, the staff generally believes that the seller should not recognize revenue until customer acceptance occurs or the acceptance provisions lapse.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  monitoring and observation of installed solar modules would purportedly allow evaluation

2  and confirmation that performance specifications were being met.  First Solar explained:

> Only a long period of time observing the actual performance of our solar
> modules in various field settings will confirm how they will actually perform
> over their estimated 25 year useful life ….We also monitor approximately
> 102,000 of our solar modules in use by end users, and can extrapolate future
> performance expectations from the observed performance of these
> modules.…While thin film based modules do not have as extensive operating
> history over the estimated 25 year useful life, their electrical performance
> characteristics are generally well understood and researched.…Based on this
> research it is understood that the power degradation typically follows an
> asymptotic function, with most degradation occurring in the early life cycle
> stage (typically the first 3-6 month) before their performance stabilizes at their
> rated power.  (8/9/06 SEC Comment Letter.)

243.    In accordance with GAAP, and consistent with what they had represented to

the SEC when they went public in 2006, the Individual Defendants should have, at a

minimum, deferred revenue recognition on modules sold in hot climates due to the

degradation problem.

244.    The more widespread problem affecting First Solar's performance

specifications was the heat degradation defect.   No later than 2009, the Individual

Defendants were aware of the premature and severe power degradation in solar modules

installed in hotter climates.  The heat degradation defect especially affected the large solar

field power generating facilities that First Solar's EPC division built.  The heat degradation

defect was first detected at the El Dorado plant located in Southern Nevada.[30]  The heat

degradation defect was so bad that it was necessary to begin replacing panels almost

immediately after a solar field generating plant became operational.

245.    Thus, it was clear that First Solar  "ha[d] not previously demonstrated that the

delivered product meets the seller's specifications" and it was uncertain whether the

Company had delivered the product specified in the arrangement, as required by GAAP

---

[30] First Solar had supplied the original modules for the new ten megawatt plant that was completed in December, 2008.  First Solar had also handled engineering, procurement and construction as well as monitoring and plant maintenance.  (http://www.pvtech.org/news/ sempra_selects_first_solar_for_50mw_ addition _to_el_dorado_plant_says_analys.).  First Solar completed the plant in 4Q10.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

(ASC 605-10-S99, SAB Topic 13.A.3b, question 1(c)).  GAAP therefore required revenue on those units installed in hot climates, particularly in the U.S. desert Southwest, to be deferred.  *Id*.  Additionally, the American Institute of Certified Public Accountants ("AICPA") issued a Practice Alert addressing this specific issue.  Practice Alert 95-1 "Revenue Recognition Issues" identifies as an example of unusual revenue recognition practices: "Sales with substantial uncertainty about seller's ability to comply with performance guarantees."  Accordingly, the Individual Defendants violated GAAP and SEC rules by recognizing, and failing to defer, revenue for solar modules installed in hot climates.

**E.      GAAP Violation:  Timely Write Off Impaired Goodwill**

246.    The Individual Defendants violated GAAP by failing to timely impair First Solar's components segment[31] goodwill.  Goodwill, at the time it is acquired, is an asset representing future economic benefits that increases shareholders' equity.  Goodwill is obtained by purchasing a company for more than the fair value of the identifiable assets acquired.  The Company's $393.4 million of components segment goodwill came from two acquisitions: the OptiSolar Inc. ("OptiSolar") acquisition that took place in April 2009 and the NextLight Renewable Power, LLC ("NextLight") acquisition that took place in July 2010, which resulted in $259.7 million and $142.1 million in goodwill, respectively.

247.    The Individual Defendants disclosed in the Company's Annual Reports on Forms 10-K filed with the SEC that the Company "would record any impairment [to goodwill] in accordance with [Financial Accounting Standards (FASB)] Accounting Standards Codification (ASC) 350, Intangibles – Goodwill and Other."  According to ASC 350, the GAAP guidance specifically related to goodwill impairment, "[g]oodwill of a reporting unit shall be tested for impairment on an annual basis and between annual tests in certain circumstances."  The Individual Defendants further represented in these same statements that they "test goodwill for impairment at least annually in the fourth quarter."

---

[31] The Company operates its business in two segments: (i) the components segment, which involves the design, manufacture, and sale of solar modules; and (ii) the systems segment, which involves the sale of solar modules coupled with the engineering, procurement, and construction of the solar photovotaic (PV) power plant.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

The Individual Defendants also represented in the Company's Quarterly Reports on Forms 10-Q that they "test goodwill for impairment at least annually, or sooner, if facts or circumstances between scheduled annual tests indicate that it is more likely than not that the fair value of a reporting unit that has goodwill might be less than its carrying value."

248.   The Individual Defendants were required to perform a two-step process that begins with an estimation of the fair value of the reporting unit (i.e., the components segment).  Step one of the annual impairment test is to identify potential impairment by comparing the fair value of the reporting unit to its carrying amount (this includes goodwill). ASC 350-20-35-4.  If the fair value of a reporting unit exceeds its carrying amount, goodwill of the reporting unit is considered not impaired.  ASC 350-20-35-6.  If the carrying amount of reporting unit goodwill exceeds the implied fair value of that goodwill, an impairment loss shall be recognized in an amount equal to that excess. The loss recognized cannot exceed the carrying amount of goodwill.  ASC 350-20-35-11.

249.   Goodwill is also to be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not[32] reduce the fair value of a reporting unit below its carrying amount.[33]  ASC 350-20-35-30.  The Individual Defendants were required to test the components' segment goodwill prior to 4Q11 because they knew there was little hope the value from the OptiSolar and NextLight acquisitions would be realized.

250.   By the end of 2008, it was becoming increasingly clear to the Individual Defendants that the solar energy market was shifting from Europe to the United States. Analyst Christopher Blansett put it best in his JPMorgan Securities Inc. report published on November 18, 2008, stating:

**Geographical Mix**

---

[32] More likely than not is defined by GAAP as greater than a 50% chance.

[33] ASC 350-20-35-30 notes, among other things, that a significant adverse change in legal factors and business climate; adverse action or assessment by a regulator; and unanticipated competition, to be key indicators that would require an interim impairment test.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

> First Solar sells the majority of its products in Europe, specifically Germany which has historically been and remains its largest market. We expect Germany to remain the primary sales region for First Solar in C09 due to its favorable subsidy and strong relationship and supply agreements with vendors in that country. However, *we do expect the company to focus more on the US solar energy market given the recent extension of the Federal ITC and eventual phase out of the German subsidy for solar energy*.

251. Not surprisingly, First Solar spent 2009 and 2010 acquiring companies, mainly OptiSolar and NextLight, with a large pipeline of projects mainly concentrated in California and the Southwestern United States. OptiSolar's goodwill primarily represented the synergies and economies of scale the Individual Defendants expected would benefit First Solar's solar module business from having control over OptiSolar's project pipeline. NextLight's goodwill derived from the greater degree of vertical integration expected from using First Solar's own solar modules in the acquired projects in the Southwestern United States.

252. This new market (and new climate), however, exposed its own set of problems. The Company's PV modules were not suitable for hotter climates and were "subject to increased failure rates." In its 2011 10-K, First Solar disclosed:

> *We believe our PV modules are potentially subject to increased failure rates in hot climates*. This assumption is based on technical literature, data that we have developed internally including through accelerated-life testing, our analysis of modules returned under warranty, and our analysis of performance data from systems that we monitor under [operating and maintenance] agreements. *Processes that are accelerated by higher ambient temperatures include stress corrosion cracking in glass, polymer creepage and impurity diffusion processes*.

253. As a result, because First Solar did not have a sufficient product that was suitable for hotter climates, the acquisitions of OptiSolar and NextLight would not bring the Company the benefits it expected. The Individual Defendants failed to properly account for the corresponding goodwill impairment that would necessarily result, or they were reckless in not timely and/or properly evaluating the integration of the Company's products into the corresponding projects they spent approximately $700 million in cash and stock between 2009 and 2010 in acquiring. A review of "technical literature" and review of "modules returned under warranty" related to the Company's products installed within the OptiSolar

and NextLight projects is sufficient evidence of the existing products' incompatibility for hotter climates early on, and should have been the triggering event for goodwill impairment testing. As analyst Satya Kumar from Credit Suisse Securities (USA) LLC ("Credit Suisse") noted on February 29, 2012:

> ***Ongoing warranty charges also higher***. The warranty accrual costs have increased costs by 1 c/watt leading to an additional $37.8mm in 4Q11 charges. ***FSLR [First Solar] expects a higher return rate of its panels as mix shifts to geographies with hotter temperatures as its panels appear to fail at a higher rate in hotter climates. This is the first time FSLR is talking about this issue, although we have heard of this issue in our discussions with industry contacts (it is always difficult to ascertain whether such industry chatter are material or not which is why we had not raised this issue. For example, FSLR noted the construction roadmap for Topaz is on track, whereas industry magazines widely reported delays). FIELD RELIABILITY is THE MOST IMPORTANT METRIC for solar panels*** and doubly so for thin film panels which have a lower 20-year field performance track record compared to c-Si panels. The fact that FSLR is reporting performance issues in the field in the first few years and is accruing higher charges on an ongoing basis is worrying – as the hotter regions tend to make more sense for solar. We are concerned this may not be the last time we hear of the warranty related issues for FSLR.

254.     Rather than perform all the necessary impairment tests as required by GAAP, the Individual Defendants chose to ignore known facts that would have deemed the goodwill impaired. The Individual Defendants indicated that the goodwill related to these acquisitions primarily represented "***expected synergies, economies of scale and vertical integration***." As indicated in First Solar's 2011 10-K, almost none of the elements of the acquired goodwill ever materialized. This was exacerbated by the fact that the entire amount associated with the OptiSolar and NextLight acquisitions were eliminated in one reporting period. Simply stated, First Solar was made to grossly overpay for the acquisitions and could not justify the inflated goodwill of OptiSolar and NextLight, but did not disclose this fact until February 2012.

255.     In an attempt to disguise the impaired goodwill of previous reporting periods, the Individual Defendants hid behind a change in GAAP as it relates to the analyzing goodwill impairment as their basis for finally recording components segment goodwill impairment in Q411. In September 2011, the FASB issued Accounting Standards Update No. 2011-08, Intangibles-Goodwill and Other (Topic 350) ("ASU 2011-08"). ASU 2011-08

allows companies to "qualitatively assess" whether it is more likely than not (i.e., a likelihood of greater than 50%) that the fair value of a reporting unit is less than its carrying amount. If that is the case, the Company would have to perform the annual two-step impairment test (as noted above). Adoption of ASU 2011-08 is required for fiscal years beginning after December 15, 2011. Early adoption is permitted, including for annual and interim goodwill impairment tests performed as of a date before September 15, 2011, if an entity's financial statements for the most recent annual or interim period have not yet been issued or, for non-public entities, have not yet been made available for issuance. ASU 2011-08. According to the Company's 2011 10-K, the Individual Defendants chose to implement the requirements of ASU 2011-08 as of October 1, 2011. However, the Individual Defendants noted in the same 2011 10-K that "*the adoption of ASU 2011-08 did not have an impact on our financial position, results of operations, or cash flows*."

256.    The key impact of ASU 2011-08 is whether the Individual Defendants needed to apply the two-step impairment test based on their qualitative assessment. The Individual Defendants correctly determined that the two-step approach was necessary during their assessment as of October 1, 2011. However, they chose to finally test and impair the components segment goodwill when it was already too late. No material facts emerged in 4Q11 that did not exist in previous reporting periods that would have enabled the Individual Defendants to accurately justify the components segment goodwill values in accordance with GAAP and SEC rules. GAAP prior to and after the issuance of ASU 2011-08 required the Individual Defendants to test the components segment goodwill on an interim basis when facts and circumstances lead to adverse changes in the business climate. The Individual Defendants knew that the components segment and related acquisition goodwill was impaired, grossly inflating the Company' financial position and earnings, yet did not timely recognize a goodwill impairment.

**F.    The Court Finds Triable Issue in the Class Action Regarding Accounting Fraud**

257.    The GAAP violations discussed above, especially with regard to the underaccrual for the warranty claims relating to the LPM defect, have been substantially

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1   confirmed in the Class Action litigation.  In ruling on the motions for summary judgment in

2   the Class Action, the Court discussed expert testimony, admissions by defendants, and other

3   evidence that the Court found created triable issues on the question regarding whether the

4   defendants in the Class Action committed accounting fraud.

5      258.   For example, according to the plaintiffs' accounting expert, "First Solar

6   violated GAAP in accruing potential warranty claims related to the LPM problem.

7   Specifically, based on the information available at the time, First Solar 'failed to make

8   appropriate MD&A disclosures concerning the risk that LPM-related warranty estimates

9   were likely to change.'"

10     259.   The Court noted that the accounting expert "identifie[d] several other improper

11  accounting procedures and violations of GAAP."

12     260.   The   expert   also   noted   that:   First   Solar's   outside   auditor,

13  PricewaterhouseCoopers ("PwC"), "did not audit several key disclosures, such as the 4%

14  disclosure in July 2010"; its "audits were not designed to obtain evidence such as e-mails

15  among First Solar's employees'"; it "required First Solar to provide verifications of facts as

16  well as 'numerous representations regarding its financial statements' on which PwC could

17  rely in completing its audits"; and in fact "PwC relied on misrepresentations made by

18  Defendants regarding the facts underlying their financial statements."

19     261.   The defendants in the Class Action – including First Solar and Individual

20  Defendants Ahearn, Gillette, Sohn, Eaglesham, Meyerhoff, Zhu, and Widmar – did "not

21  dispute that PwC was not responsible for confirming the validity of several key facts

22  underlying First Solar's justification for certain accounting practices."

23     262.   The Court found that "there is a question of fact regarding whether First Solar

24  misrepresented facts on which PwC based its audits."

25     263.   The Court also found that:

26     The evidence cited by Plaintiffs creates a genuine dispute of fact regarding
       whether First Solar engaged in accounting violations. [Plaintiffs' account
27     expert's] analysis calls into question the accounting methodologies used by
       First Solar after the LPM defect was disclosed. As noted above, there is
28     evidence that Defendants made misrepresentations regarding the status of the

- 104 -

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

remediation programs. Taken together, a reasonable jury could find that First Solar engaged in accounting fraud.

### DUTIES OF THE INDIVIDUAL DEFENDANTS

**A.    Fiduciary Duties**

264.    By reason of their positions as officers, directors, and/or fiduciaries of First Solar and because of their ability to control the business and corporate affairs of First Solar, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage First Solar in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of First Solar and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

265.    Each director and officer of the Company owes to First Solar and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**B.    Audit Committee Duties**

266.    In addition to these duties, the Audit Committee Defendants owed specific duties, under the Audit Committee's Charter to review and approve quarterly and annual financial statements, earnings press releases, and the Company's internal controls over financial reporting.  Some of the Audit Committee's responsibilities included:

- Review and discuss with management and the independent auditors the Company's Form 10-Q report prior to its filing, and the results of the independent auditors' review of interim financial information pursuant to Statement on Auditing Standards 61.  Such meeting shall include a review  and  discussion  of  the  Company's  disclosures  under

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

"Management's Discussion and Analysis of Financial Condition and Results of Operations."

- Meet to review and discuss with management and the independent auditors the Company's Annual Report on Form 10-K prior to its filing, including the financial statements contained therein and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations", and recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

- Discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies or the investing public.  Discussions of earnings press releases as well as financial information and earnings guidance may be done generally (i.e., discussion of the types of information to be disclosed and the type of presentation to be made).

**C.     Control, Access, and Authority**

267.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of First Solar, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the public statements issued by First Solar.

268.    Because of their advisory, executive, managerial, and directorial positions with First Solar, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of First Solar.

269.    At all times relevant, each of the Individual Defendants was the agent of each of the other Individual Defendants and of First Solar, and was at all times acting within the course and scope of such agency.

**D.     Reasonable and Prudent Supervision**

270.    To discharge their duties, the officers and directors of First Solar were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of First Solar were required to, among other things:

(a)     refrain from acting upon material, inside corporate information to benefit themselves;

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)     remain informed as to how First Solar conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that First Solar was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**E.     Code of Business Conduct and Ethics**

271.     Throughout the Relevant Period, the Company maintained a Code of Business Conduct and Ethics that imposed additional duties and obligations on the Individual Defendants.  The Code stated, for example, that:

> It is the responsibility of all the people at the Company to maintain a work environment that fosters fairness, respect and integrity; and it is our Company policy to be lawful and highly principled in all our business practices. All employees are expected to become familiar with this Code and to apply these guiding principles in the daily performance of their job responsibilities. All employees of the Company are responsible for complying with this Code.

272.     The Code provided specific rules and admonitions with regard to insider trading.  The Code stated, for example:

> There are instances where our employees have information about the Company, its subsidiaries or affiliates or about a company with which we do business that is not known to the investing public. *Such inside information may relate to* … *problems facing the Company* or a company with which we do business; sales; *profitability*; negotiations relating to significant contracts or business relationships; significant litigation; *or financial information*.

- 107 -

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

*If the information is such that a reasonable investor would consider the information important in reaching an investment decision, then the Company employee who holds the information must not buy or sell Company securities, nor provide such information to others, until such information becomes public. . . . Usage of material non-public information in the above manner is not only illegal, but also unethical. . . .*

273.    With regard to financial reporting, the Code provided:

All financial statements and books, records and accounts of the Company must accurately reflect transactions and events and conform both to required legal requirements and accounting principles and also to the Company's system of internal accounting. *As a Company employee, you have the responsibility to ensure that false or intentionally misleading entries are not made by you, or anyone who reports to you, in the Company's accounting records.* Regardless of whether reporting is required by law, *dishonest reporting within the Company, or to organizations or people outside the Company, is strictly prohibited. All officers and employees of the Company that are responsible for financial or accounting matters are also required to ensure the full, fair, accurate, timely and understandable disclosure in all periodic reports* required to by filed by the Company with the Securities and Exchange Commission. This commitment and responsibility extends to the highest levels of our organization, including our Chairman of the Board, Chief Executive Officer, Chief Financial Officer and Controller.

274.    These provisions in the Code supplement and help inform and define Defendants' fiduciary duties under Delaware Law.  The Individual Defendants were required to know and abide by these duties imposed by the Code.

## BREACHES OF DUTIES

275.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of First Solar, the absence of good faith on their part, and a reckless disregard for their duties to First Solar and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to First Solar.  The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of First Solar's Board.

276.    The Individual Defendants each breached their duty of loyalty and good faith by allowing the other Individual Defendants to cause, or by themselves causing, the Company to misrepresent the Company's financial results and prospects, and by failing to prevent employees and/or officers of the Company from taking such illegal actions.  In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the

Company is now the subject of a class action lawsuit that alleges violations of securities laws.  As a result, First Solar has expended, and will continue to expend, significant sums of money.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

277.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their liability.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

278.   During all relevant times, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal that the Company's business prospects and financial results were misrepresented.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

279.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue false and misleading statements regarding the manufacturing excursion and heat degradation issues.

280.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and insider selling; and (ii) disguise the Company's disclosures.

281.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1    282.    Each of the Individual Defendants aided and abetted and rendered substantial

2    assistance in the wrongs complained of herein.  In taking such actions to substantially assist

3    the commissions of the wrongdoing complained of herein, each Individual Defendant acted

4    with knowledge of the primary wrongdoing, substantially assisted the accomplishment of

5    that wrongdoing, and was aware of his overall contribution to and furtherance of the

6    wrongdoing.

7                                          **DAMAGES**

8    283.    The Individual Defendants' wrongful conduct was the direct and proximate

9    cause of damages First Solar has suffered, and will suffer, in numerous ways.

10   284.    The Individual Defendants failed to disclose that the warranty costs and

11   misrepresented the scope of the manufacturing excursion.  The improper statements have

12   devastated First Solar's credibility.  First Solar is now the subject of the Class Action pending

13   in this Court alleging violations of securities laws in connection with the improper financial

14   reporting, false statements, and material omissions.  The Company will face substantial

15   costs, expenses, and a potential adverse verdict in connection with that lawsuit, where the

16   Court has already denied in substantial part both Defendants' motions to dismiss and motions

17   for summary judgment.

18   285.    As a direct and proximate result of the Individual Defendants' actions as

19   alleged above, First Solar's market capitalization has been substantially damaged.

20   286.    Further, as a direct and proximate result of the Individual Defendants' conduct,

21   First Solar has expended and will continue to expend significant sums of money.  Such

22   expenditures include, but are not limited to:

23          (a)    costs incurred in investigating and defending First Solar and certain

24   officers in the class action lawsuit, plus potentially hundreds of millions of dollars in

25   settlement or to satisfy an adverse judgment;

26          (b)    costs incurred from compensation and benefits paid to the Individual

27   Defendants, which compensation was based at least in part on First Solar's artificially-

28   inflated stock price and inflated growth prospects;

(c)     costs incurred from the loss of the Company's customers' confidence in First Solar's products; and

(d)     damages to the Company due to the false and misleading financial statements that the Individual Defendants caused the Company to file.

287.   Moreover, these actions have irreparably damaged First Solar's corporate image and goodwill.  For at least the foreseeable future, First Solar will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that First Solar's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

288.   Plaintiffs bring this action derivatively in the right and for the benefit of First Solar to redress injuries suffered, and to be suffered, by First Solar as a direct result of breaches of fiduciary duty, as well as the aiding and abetting thereof, by the Individual Defendants.  First Solar is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

289.   Plaintiffs will adequately and fairly represent the interests of First Solar in enforcing and prosecuting its rights.

290.   Plaintiffs were shareholders of First Solar at the time of the wrongdoing of which Plaintiffs complain and have been continuously since.

291.   At the time that Plaintiffs Tindall, Nederhood, Morris, Tan, and Feigin filed this action, the Board of First Solar consisted of the following eight directors: Defendants Ahearn, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal.  Plaintiffs did not make a demand on the Board to institute this action against the Individual Defendants because such demand would be a futile and useless act.

### A.     Demand Is Futile as to Defendant Ahearn

292.   Defendant Ahearn faces a substantial likelihood of liability for his individual misconduct.  Defendant Ahearn is a named defendant in the Class Action alleging that he

1    and the Company violated section 10(b) of the Securities Exchange Act of 1934 and SEC

2    Rule 10b-5 when he disseminated or approved false statements.  The Court in the Class

3    Action has denied in substantial part both the defendants' motion to dismiss and their motion

4    for summary judgment.  Defendant Ahearn thus faces a substantial likelihood of liability in

5    that case.

6        293.   If Defendant Ahearn pursued these derivative claims, then that would expose

7    his own misconduct in the Class Action for violations of the federal securities laws.  This, in

8    turn, would impair the defense of the Class Action and greatly increase the probability of

9    Defendant Ahearn's personal liability in the Class Action.  As such, Defendant Ahearn is

10   fatally conflicted, and therefore, unable to render a disinterested decision as to whether the

11   Company should pursue these derivative claims.  Thus, demand is futile as to Defendant

12   Ahearn.

13       294.   Additionally, Defendant Ahearn cannot render an independent decision

14   because he was a high-ranking officer of First Solar.  And according to relevant portions of

15   the Company's 2008-2015 Proxy Statements, Defendant Ahearn is not an independent

16   director pursuant to the requirements of the listing standards of the NASDAQ.  Thus,

17   demand is futile as to Defendant Ahearn.

18       295.   Additionally, Defendant Ahearn is interested because he issued many of the

19   false and misleading statements and signed on the false SEC filings.  Defendant Ahearn

20   therefore faces a substantial likelihood of liability for breaching his fiduciary duties to First

21   Solar shareholders.  Consequently, Defendant Ahearn cannot disinterestedly consider a

22   demand.  Moreover, the false statements that Defendant Ahearn caused First Solar to issue

23   allowed him to meet performance goals that triggered additional incentive compensation.

24   Defendant Ahearn received cash incentive compensation that he would not otherwise have

25   earned but for the manipulation of the Company's metrics, including operating income.

26   Defendant Ahearn thus engaged in self-dealing and directly benefited from the manipulation.

27       296.   Further, Defendant Ahearn engaged in insider trading.  Ahearn sold 3,239,016

28   shares of First Solar stock for proceeds of $427,233,588 while in possession of material,

non-public information.  Defendant Ahearn, because of his high-level positions as Chairman of the Board and CEO of the Company, and due to the reports he regularly received regarding the significant problems with the Company's solar panels, including, but not limited to, the April 27, 2011 report he received from First Solar's Vice President of Technology, Defendant Eaglesham, that the Company's solar modules were degrading at a rate of 11% in hot climates, knew that First Solar issued false and misleading statements. Defendant Ahearn took advantage of this undisclosed information to sell 97% of his stock for considerably more than the stock was worth.  Because Defendant Ahearn faces a substantial likelihood of liability for engaging in insider trading, he is unable to render a disinterested decision on whether to pursue these derivative claims.  As such, demand is futile as to Defendant Ahearn.

**B.     Demand Is Futile as to Defendants Sweeney, Nolan, and Presby for Insider Trading**

297.    Defendants Sweeney, Nolan, and Presby engaged in insider trading.  Defendant Sweeney sold 24,749 shares of First Solar stock for proceeds of $4,417,934 while in possession of material, non-public information.  Defendant Nolan sold 24,000 shares of First Solar stock for proceeds of $5,351,425 while in possession of material, non-public information.  And Defendant Presby sold 1,000 shares of First Solar stock for proceeds of $137,810 while in possession of material, non-public information.  Defendants Sweeney, Nolan, and Presby, because of their high-level positions as directors of the Company, and due to the reports they regularly received regarding the significant problems with the Company's solar panels, including but not limited to, the April 27, 2011 report they received from First Solar's Vice President of Technology, Defendant Eaglesham, that the Company's solar modules were degrading at a rate of 11% in hot climates, knew that First Solar issued false and misleading statements.  Defendants Sweeney, Nolan, and Presby took advantage of this undisclosed information to sell their stock for considerably more than the stock was worth.  Because Defendants Sweeney, Nolan, and Presby face a substantial likelihood of liability for engaging in insider trading, they are unable to render a disinterested decision on

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

whether to pursue these derivative claims.  As such, demand is futile as to Defendants Sweeney, Nolan, and Presby.

**C.      Demand Is Futile as to Audit Committee Defendants Kennedy, Presby, and Stebbins**

298.    Defendants Kennedy, Presby, and Stebbins, as Audit Committee members, were responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and First Solar's internal controls over financial reporting.  Despite these duties, the Audit Committee Defendants knowingly or recklessly reviewed and approved false financial statements and press releases which violated GAAP, including ASC 460-10-25.  Accordingly, Defendants Kennedy, Presby, and Stebbins face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith.  Any demand upon these Defendants is futile.

299.    As members of the Audit Committee, Defendants Kennedy, Presby, and Stebbins were responsible for: (i) the integrity of the Company's financial statements, including the responsibility to comply with GAAP; (ii) the Company's systems of internal controls regarding finance and accounting as established by management; (iii) the qualifications and independence of the independent registered public accounting firm; (iv) the performance of the Company's independent registered public accounting firm; (v) the Company's auditing, accounting, and financial reporting processes generally; and (vi) compliance with the Company's ethical standards for senior officers and all personnel.  Defendants Kennedy, Presby, and Stebbins reviewed and approved First Solar's false and misleading filings with the SEC that misrepresented the cost of the Company's remediation program.  Defendants Kennedy, Presby, and Stebbins, as members of First Solar's Board, each knew, or consciously disregarded, that the public statements in the filings with the SEC were materially false and misleading.  These Defendants, however, failed to correct this materially false and misleading information.  As such, Defendants Kennedy, Presby, and Stebbins face a substantial likelihood of liability.  Thus, demand is futile as to Defendants Kennedy, Presby, and Stebbins.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1

**D.    Demand Is Futile Because Solar Panels Are First Solar's Core Business**

2    300.    When the information at issue pertains to a company's core business or service,

3    as it does here, knowledge of that information may be imputed to the entire board of

4    directors through inference as a matter of law.

5    301.    Here, manufacturing solar panels is First Solar's core business.  And a primary

6    objective of the Company on which its ability to compete and survive hinges is to produce

7    solar panels that are efficient and relatively affordable per watt produced.  For example,

8    Defendant Gillete specifically noted in a February 18, 2010 earnings conference call that:

9    [R]eally fundamentally, our strategy has not changed from what was presented
     back in June of 2009. … Our goal and First Solar's goal overall remains to
10   reach sustainable market economics where we can compete with and be
     positioned versus fossil fuel in the electricity market, and it will grow the
11   market in general much more substantially than the subsidized markets that
     exist today. ***Our technology and driving the costs down will enable us to***
12   ***compete, and we think grow the market overall***.

13   302.    A critical aspect of First Solar's core business and ability to successfully

14   compete in the market hinges on the quality and performance of its solar panels.  Indeed, the

15   LPM manufacturing excursion and the heat degradation defects presented serious issues that

16   drew the attention and concern of First Solar insiders from the staff level all the way up to

17   top management and the Board.

18   303.    As the Court found evidence had demonstrated in the Class Action, the LPM

19   issue "was considered 'the biggest smoking gun' at the company."  E-staff, including

20   Defendants Ahearn, Gillette, Sohn, Eaglesham, Meyerhoff, Zhu, and Widmar were informed

21   about the manufacturing defendants and made conscious decisions to withhold information

22   about them from the public.  In June 2010, First Solar realized that the number of LPMs

23   could be as large as 1.4 million modules.  The Company received thousands of customer

24   requests for remediation of the LPM defect over the course of the Relevant Period.

25   304.    With regard to the heat degradation issue, Defendant Eaglesham was notified

26   in March 2011 that the matter was raised in a staff meeting and its implications for financial

27   assumptions "caused quite a bit of excitement."  Not long thereafter, Defendant Eaglesham

28   also "noted that a large financial impact" from the heat degradation issue "was imminent."

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

He informed the Board in April 2011 regarding the heat degradation.  Also in April 2011, Defendant Eaglesham reported his findings to E-Staff, which concluded that the hot climate degradation issue could have a financial impact of up to $60 million. As the Court found in the Class Action, "[a]t that point, *all* Individual Defendants ***knew the problem was significant***."

305.   Defendant Ahearn knew about both of the defects long before they were publicly disclosed.  As CEO and Chairman of the Board, he was responsible to report or ensure that someone reported to the Board regarding material matters such as the LPM and heat degradation defects.  In addition, the Board had in place a reporting system to ensure that management reported material risks and other material matters to them.  Indeed, this is exactly what happened when Defendant Eaglesham informed the Board in April 2011 about the heat degradation issue.  This internal reporting system appears to have been effective and functioning during the Relevant Period.

306.   Moreover, the entire Board's knowledge of the manufacturing problems is also demonstrated by the combination of the roles of CEO and Chairman during the Relevant Period.  Since at least October 2011, the Board was led and advised by an insider of the Company; indeed its top executive officer Defendant Ahearn.  Given the Chairman's duty to advise his fellow Board members of all material facts concerning the Company's business and operations, Plaintiffs are entitled to a fair inference that First Solar's Chairman and CEO, Defendant Ahearn, was aware of the material adverse facts alleged herein due to his day-to-day running of the Company as CEO, and that he shared such material facts with the rest of the Board, as he was required to pursuant to his duties.  The omitted information was also highly material to First Solar's core business of solar panels, which constitutes another reason that Plaintiffs are entitled to a fair inference of Board knowledge.  *See Rosenbloom v. Pyott*, 765 F.3d 1137 (9th Cir. 2014) (in shareholder derivative actions, district courts must draw all reasonable inferences in plaintiff's favor).

307.   Indeed, First Solar admits that management directly advised the Board of key risks facing the Company during the Relevant Period:

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

> The Company has a comprehensive risk management process in which management is responsible for identifying and managing the Company's risks and the board and its committees provide oversight in connection with these efforts. Risks are identified, assessed and managed on an ongoing basis and communicated to management during periodic management meetings or otherwise as appropriate. Existing and potential material risks are addressed during periodic senior management meetings, resulting in both board and committee discussions and public disclosure, as appropriate.[34]

308.   Thus, as First Solar admits, management, which included Defendants Eaglesham, Widmar, Meyerhoff, Zhu, Sohn, and Ahearn, was responsible for advising the Board concerning risk management during the Relevant Period.  It can thus be reasonably inferred that the Board was thus advised by such persons of the facts regarding material risks known by management alleged herein, yet failed to take necessary action to cause such material facts to be disclosed in First Solar's financial results and SEC filings.  For example, each member of the Board knew and/or failed to act in the face of a known duty to act when they allowed the Company to: (i) conceal the existence of the manufacturing excursion; (ii) conceal the scope of the warranty costs to replace the defective solar panels when the manufacturing excursion was announced; and (iii) issue false and misleading statements regarding the existence and scope of the manufacturing excursion.  As a result, the Director Defendants breached their duties of good faith, candor, and loyalty.  The Defendants' misconduct thus constitutes conduct which cannot be indemnified by First Solar under Delaware law.  The entire Board is therefore interested, as a result of which demand is futile.

**E.      Demand Is Excused Because the Director Defendants on the Project Development Risk Committee Acted in Bad Faith, and Because the Entire Board Consciously Ignored Known Problems**

309.   During 2010 and 2011, Defendants Kennedy, Post, Presby, and Stebbins were members of First Solar's Project Development Risk Committee.  The Project Development Risk Committee oversees the Company's project development and related project finance activities.  During 2010, the Project Development Risk Committee held one meeting; during 2011, the committee held four meetings.  As a result of these five meeting attended in 2010

---

[34] *See* First Solar's Schedule 14A Proxy Statement, at 5, filed with the SEC on April 11, 2012.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

and 2011 by Defendants Kennedy, Post, Presby, and Stebbins, it is reasonable to assume such Defendants were presented with significant material information regarding issues surrounding the solar panels, both similar to and in addition to the information provided by Defendant Eaglesham to the full Board on April 27, 2011.  Despite such actual knowledge of material undisclosed problems at First Solar, Defendants Kennedy, Post, Presby, and Stebbins failed to disclose the material information to the market, thus breaching their duties of candor, good faith, and loyalty.  Such conduct is non-indemnifiable and thus subjects Defendants Kennedy, Post, Presby, and Stebbins to a substantial likelihood of liability.

**F.      Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment**

310.    Defendants Ahearn, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal, constituting the Company's entire current Board, directly made and/or caused the Company to disseminate improper, materially false and misleading public statements concerning, among other things, the true nature and extent of remediation efforts needed by the Company to respond to the manufacturing deficiencies plaguing the Company's solar panels.  For reasons stated herein, each member of the Board knew or should have known that the improper statements did not fairly, accurately, or truthfully convey the Company's true financial condition as required by GAAP, SEC rules and regulations, or other applicable law.  In addition, when deciding whether to sign or approve statements to be publicly disseminated, each member of the Board was bound to inform himself of all reasonably-available material information.  Information concerning the nature and extent of remediation efforts needed by the Company to respond to the manufacturing deficiencies plaguing the Company's solar panels was both reasonably available and material.  Defendants Ahearn, Kennedy, Nolan, Post, Presby, Stebbins, Sweeney, and Villarreal's conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1  **G.     Demand Is Futile as to All the Director Defendants for Additional Reasons**

2          311.    Since December 2010, the Company has had three different CEOs, three

3  different CFOs, the President of its Components Business Group departed, the President of

4  Operations (Defendant Sohn) departed, and the Chief Accounting Officer (Defendant Zhu)

5  departed.  Rather than file lawsuits against these high-level executives for concealing the

6  manufacturing excursion and heat degradation defect, the Board agreed to pay unusually

7  large severance payments to these executives.  In exchange for these payments, the

8  executives are precluded from testifying against the Company or providing any information

9  to civil litigants.  Moreover, the Company's Code of Business Conduct and Ethics expressly

10  provides that the Company will immediately terminate any corporate insiders who engage in

11  illegal insider trading and report the violations  to "the appropriate authorities."  Yet the

12  Board has not taken any such action against the Insider Selling Defendants, even as to

13  Defendant Ahearn, whose timing of sales Defendant Meyerhoff essentially admitted were

14  suspicious.  These further reasons to doubt that the Board would exercise proper business

15  judgment in responding to a demand confirm the futility of making a demand.

16          312.    Demand is also futile because the Board signed the SEC filings that contained

17  the false and misleading statements.  Defendant Ahearn signed each of the SOX

18  Certifications filed with the 1Q08 10-Q, 2Q08 10-Q, 3Q08 10-Q, 1Q09 10-Q, 2Q09 10-Q,

19  and 3Q09 10-Q, all of which were false and materially misleading.  Moreover, Defendants

20  Ahearn Kennedy, Nolan, Presby, Stebbins, Sweeney, and Villareal signed the 2008 10-K,

21  2009 10-K, and 2010 10-K, all of which were false and materially misleading.  Each member

22  of the Board had a duty to make sure the information contained in those filings was correct.

23  In actuality, the information contained in those filings was false and misleading.

24  Accordingly, the Board faces a substantial likelihood of liability for the claims asserted in

25  this action.

26          313.    If First Solar's current officers and directors are protected against personal

27  liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties

28  alleged in this complaint by directors and officers (D&O) insurance, they caused the

1    Company to purchase that insurance for their protection with corporate funds, i.e., monies
2    belonging to the shareholders.  However, Plaintiffs are informed and believe that the D&O
3    insurance policies covering the Individual Defendants in this case contain provisions that
4    eliminate coverage for any action brought directly by First Solar against the Individual
5    Defendants, known as the "insured versus insured exclusion."  As a result, if the Director
6    Defendants were to sue themselves or certain of the officers of First Solar, there would be no
7    D&O insurance protection, and thus, this is a further reason why they will not bring such a
8    suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such
9    insurance coverage exists and will provide a basis for the Company to effectuate recovery.
10   Therefore, the Director Defendants cannot be expected to file the claims asserted in this
11   derivative lawsuit because such claims would not be covered under the Company's D&O
12   insurance policy.

13           314.    Under the factual circumstances described herein, the Individual Defendants
14   are more interested in protecting themselves than they are in protecting First Solar by
15   prosecuting this action.  Therefore, demand on First Solar and its Board is futile and is
16   excused.

17           315.    First Solar has been and will continue to be exposed to significant losses due to
18   the Individual Defendants' wrongdoing.  Yet, the Board has not filed any lawsuits against
19   themselves or others who were responsible for the wrongful conduct.  Thus, members of the
20   Board are breaching their fiduciary duties to the Company and face a sufficiently substantial
21   likelihood of liability for their breaches, rendering any demand upon them futile.

22                                          **COUNT I**

23                   **Against All Defendants for Breach of Fiduciary Duty**

24           316.    Plaintiffs incorporate by reference and reallege each and every allegation
25   contained above, as though fully set forth herein.

26           317.    Defendants owed and owe First Solar fiduciary obligations.  By reason of their
27   fiduciary relationships, Defendants owed and owe First Solar the highest obligation of good
28   faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision.

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

318.   Defendants violated and breached their fiduciary duties of good faith, fair dealing, and loyalty.

319.   Defendants each knowingly, recklessly, or negligently signed or approved the issuance of false annual and quarterly financial statements that misrepresented and failed to disclose the full impact of the manufacturing excursion on the Company's earnings and the premature degradation of modules in hot climates.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

320.   As a direct and proximate result of these Individual Defendants' failure to perform their fiduciary obligations, First Solar has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

321.   Plaintiffs, on behalf of First Solar, have no adequate remedy at law.

### COUNT II

**Against Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn, Eaglesham, and Presby for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information Under Delaware Law**

322.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

323.   At the time of the stock sales set forth herein, Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn, Eaglesham, and Presby knew the information described above, and sold First Solar common stock on the basis of such information.

324.   The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn, Eaglesham, and Presby used for their own benefit when they sold First Solar common stock.

325.   At the time of their stock sales, Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn, Eaglesham, and Presby knew that the Company's financial reporting and future prospects were materially overstated because of the high costs associated with the

1  Company's remediation program.  Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn,

2  Eaglesham, and Presby's sales of First Solar common stock while in possession and control

3  of this material, non-public information was a breach of their fiduciary duties of loyalty and

4  good faith.

5      326.    Since the use of the Company's proprietary information for their own gain

6  constitutes a breach of Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn, Eaglesham,

7  and Presby's fiduciary duties, the Company is entitled to the imposition of a constructive

8  trust on any profits they obtained thereby.

9                                **COUNT III**

10  **Against Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn, Eaglesham, and Presby for Unjust Enrichment**

11

12      327.    Plaintiffs incorporate by reference and reallege each and every allegation

13  contained above, as though fully set forth herein.

14      328.    By their wrongful acts and omissions, Defendants Ahearn, Nolan, Sweeney,

15  Meyerhoff, Sohn, Eaglesham, and Presby were unjustly enriched at the expense of and to the

16  detriment of First Solar.

17      329.    Defendants Ahearn, Nolan, Sweeney, Meyerhoff, Sohn, Eaglesham, and

18  Presby were unjustly enriched as a result of the insider trading profits they received while

19  breaching their fiduciary duties owed to First Solar.

20      330.    Plaintiffs, as shareholders and representatives of First Solar, seeks restitution

21  from these Defendants and seeks an order from this Court disgorging all profits, benefits, and

22  other compensation obtained by these Defendants from their wrongful conduct and fiduciary

23  breaches.

24      331.    Plaintiffs, on behalf of First Solar, have no adequate remedy at law.

25                            **PRAYER FOR RELIEF**

26      WHEREFORE, Plaintiffs pray for judgment as follows:

27

28

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

A.      Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, as well as aiding and abetting breaches of fiduciary duty.

B.      Directing First Solar to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect First Solar and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

- a proposal to strengthen the Board's supervision of the Company's CEO;
- a proposal to strengthen the Company's compliance with GAAP and accounting for warranty reserves;
- a provision to permit the shareholders of First Solar to nominate at least two candidates for election to the Board;
- a proposal to ensure the accuracy of the qualifications of First Solar's directors, executives, and other employees;
- a proposal prohibiting insiders from trading First Solar securities based upon material, non-public information;
- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and
- a provision to appropriately test and then strengthen the internal audit and control functions;

C.      Awarding to First Solar restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

1         D.     Awarding to Plaintiffs the costs and disbursements of the action, including

2    reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

3         E.     Granting such other and further relief as the Court deems just and proper.

4    **JURY DEMAND**

5         Plaintiffs demand a trial by jury.

6    Dated: March 11, 2016               Respectfully submitted,

7                                 ROBBINS ARROYO LLP
                             Brian J. Robbins

8                                 (*Pro Hac Vice*; CA SBN 190264)
                             George C. Aguilar

9                                 (*Pro Hac Vice*; CA SBN 126535)
                             Jay N. Razzouk

10                                (*Pro Hac Vice*; CA SBN 258511)

11                                           */s/George C. Aguilar*

12                                        George C. Aguilar

13                                600 B Street, Suite 1900
                             San Diego, CA  92101

14                                Telephone: (619) 525-3990
                             Facsimile: (619) 525-3991

15                                brobbins@robbinsarroyo.com
                             gaguilar@robbinsarroyo.com

16                                jrazzouk@robbinsarroyo.com

17                                BOTTINI & BOTTINI, INC.
                             Francis A. Bottini, Jr.

18                                (*Pro Hac Vice*; CA SBN 175783)
                             7817 Ivanhoe Avenue, Suite 102

19                                La Jolla, CA  92037
                             Telephone: (858) 914-2001

20                                Facsimile: (858) 914-2002
                             fbottini@bottinilaw.com

21                                Co-Lead Counsel for Plaintiffs

22                                Jonathan A. Dessaules (#019439)
                             DESSAULES LAW GROUP

23                                2700 North Central Avenue, Suite 1250
                             Phoenix, AZ 85004

24                                Telephone: (602) 274-5400
                             Facsimile: (602) 274-5401

25                                idessaules@dessauleslaw.com

26                                GLANCY BINKOW & GOLDBERG LLP
                             Lionel Z. Glancy

27                                Ex Kano S. Sams II*
                             Michael M. Goldberg

28                                1925 Century Park East, Suite 2100
                             Los Angeles, CA 90067

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

1

Telephone: (310) 201-9150
Facsimile: (310) 201-9160
lglancy@glancylaw.com
mmgoldberg@glancylaw.com
esams@glancylaw.com

2

3

4

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Betsy Manifold
Francis M. Gregorek
750 B Street, Suite 2770
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
gregorek@whafh.com

5

6

7

8

9

Executive Committee Counsel for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  1085616

28

- 125 -
**VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT**

## VERIFICATION

I, Eric Feigin, hereby verify that I am a shareholder of First Solar, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Consolidated Amended Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: March 11, 2016

_____
Eric Feigin

## <u>VERIFICATION</u>

I, Eng Kwang Tan, hereby verify that I am a shareholder of First Solar, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct.  I have reviewed the allegations made in this Verified Consolidated Amended Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.  Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  March 10, 2016

E Kwang Tan
_____
Eng Kwang Tan

## VERIFICATION

I, Clifford Tindall, hereby verify that I am a shareholder of First Solar, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Consolidated Amended Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: _Mar 11/16_

_____

Clifford Tindall

## VERIFICATION

I, Britt Nederhood, hereby verify that I am a shareholder of First Solar, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct.  I have reviewed the allegations made in this Verified Consolidated Amended Shareholder Derivative Complaint and to those allegations of which I have personal knowledge I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.  Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 3/9/16

Britt Nederhood
Britt Nederhood

1

**CERTIFICATE OF SERVICE**

2      I hereby certify that on , the attached document was electronically transmitted to the

3   Clerk of the Court using the CM/ECF System which will send notification of such filing and

4   transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

5

6                                          */s/ George C. Aguilar*

7                                          George C. Aguilar

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VERIFIED CONSOL. AMENDED SHAREHOLDER DERIVATIVE COMPLAINT