**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re First Solar Derivative Litigation | No. CV-12-00769-PHX-DGC |
| | **ORDER** |

Nominal Defendant First Solar, Inc. has filed a motion to dismiss this derivative action for failure to make a pre-suit litigation demand.  Doc. 70.  First Solar has also filed a motion for judicial notice.  Doc. 72.  The motions are fully briefed (Docs. 75, 76, 77, 78), and the Court heard oral argument on June 21, 2016.  For the reasons set forth below, the Court will grant the motion to dismiss.

**I.    Background.[1]**

First Solar is one of the world's largest producers of photovoltaic solar panels.  Its stock is publicly traded on the NASDAQ Global Market.  After going public in 2006, the company experienced explosive growth.  Between 2008 and the beginning of 2012, however, the value of the company's stock fell from nearly $300 per share to less than $50 per share.  This dramatic decline was due in part to the discovery of two serious manufacturing defects which caused the company to incur nearly $254 million in warranty and related charges.  Doc. 67, ¶ 6.

The first of these defects – the Low Power Modules or LPM defect – caused

---

[1] This section draws upon the background section in *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978 (D. Ariz. 2015), and reflects Plaintiffs' allegations.  Citations are to page numbers attached to the top of each page by the Court's CM/ECF system, not the original page numbers at the bottom of the page.

certain panels to experience power loss within months of installation that was greater than warranted by the company. First Solar learned of this issue in March 2009 upon receiving a complaint from one of its German customers.  A task force organized to investigate the issue determined that the defect was caused by a manufacturing process implemented in June 2008.  The company discontinued the process and agreed to remediate affected panels.  The company did not publicly disclose the LPM defect or the associated remediation costs until July 2010.

The second defect – the hot climate defect – caused certain panels to experience premature degradation in hot climates.  The board of directors learned of this issue in April 2011 when the Vice President of Technology, David Eaglesham, gave a report showing that the panels were degrading at a rate of 11% in hot climates.  The company did not disclose the defect or its financial impact until February 2012.  The company ultimately spent $37.8 million to resolve this issue.

On March 15, 2012, a group of shareholders who purchased First Solar stock between April 2008 and February 2012 brought a class action against the company and several of its officers, asserting that the company's failure to disclose the LPM and hot climate defects constituted securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934 and Securities Exchange Commission ("SEC") Rule 10b-5.  *See Smilovits v. First Solar Inc.*, No. 12-CV-00555-PHX-DGC.  Less than one month later, Plaintiffs filed this derivative action without making a litigation demand on the First Solar Board of Directors.  Doc. 1.  The Court stayed this action pending resolution of the securities fraud case.  Doc. 45.

On August 11, 2015, the Court entered an order in the securities fraud litigation granting in part and denying in part First Solar's motion for summary judgment. *Smilovits*, 119 F. Supp. 3d 978.  The Court held that the plaintiffs had presented a triable issue as to whether defendants made material misrepresentations of fact with scienter. *Id.* at 1009.  The Court explained:

Plaintiffs have . . . presented sufficient evidence for a reasonable jury to

conclude that Defendants (1) had a duty to disclose the LPM defect to investors and failed to do so in order to mislead investors, (2) concealed the scope of the LPM defect with the intent to mislead investors, (3) had a duty to disclose the hot climate degradation to investors and failed to do so in order to mislead investors, and (4) engaged in accounting fraud with respect to both defects with intent to mislead investors.

*Id.* On the question of whether plaintiffs in the securities fraud case could establish loss causation, the Court found two irreconcilable lines of cases in the Ninth Circuit. Because the Court found that the plaintiffs could establish loss causation under one line of cases but not the other, the Court certified the question for immediate interlocutory appeal. *Id.* at 1000. The Ninth Circuit accepted the appeal, and it is now pending.

Due to this unexpected delay in concluding the securities fraud litigation, the Court lifted the stay in this case so that Plaintiffs could amend their complaint and Defendants could file a motion to dismiss. Doc. 65. Plaintiffs filed their second amended complaint on March 11, 2016. Doc. 67. The complaint asserts claims for breach of fiduciary duty, insider trading and misappropriation of information, and unjust enrichment. ¶¶ 316-31.

The fiduciary duty claim is brought against eight individuals who were directors between April 30, 2008 and February 29, 2012 – Michael Ahearn, Craig Kennedy, James Nolan, William Post, J. Thomas Presby, Paul Stebbins, Michael Sweeney, and Jose Villarreal. Ahearn was First Solar's CEO during part of the relevant period and is a defendant in the securities fraud litigation. The other seven directors, who will be referred to in this order as "outside directors," are not employees of First Solar and have not been sued in the securities fraud case. The fiduciary duty claim is also brought against five individuals who were officers during the same period – Robert J. Gillette, Mark R. Widmar, James Zhu, Bruce Sohn, and David Eaglesham, all of whom are defendants in the securities fraud litigation. ¶¶ 316-21. Plaintiffs allege that these 13 Defendants breached their fiduciary duties by "knowingly, recklessly, or negligently sign[ing] or approv[ing] the issuance of false annual and quarterly financial statements that misrepresented and failed to disclose the full impact of the [LPM defect] on the

Company's earnings and the premature degradation of modules in hot climates."  ¶ 320. In other words, the fiduciary duty claim is premised on the same wrong alleged in the securities fraud case – failure to disclose the LPM defect and hot climate problem in First Solar's financial reports.   In their opposition to the motion to dismiss, Plaintiffs characterize this as a breach of Defendants' fiduciary duty of candor.  Doc. 75 at 10.

The insider trading claim is brought against Directors Ahearn, Nolan, Sweeney, and Presby, and Officers Meyerhoff, Sohn, and Eaglesham.   Doc. 67 ¶¶ 322-26. Plaintiffs allege that these Defendants sold First Solar common stock on the basis of proprietary, non-public information concerning the manufacturing defects and their likely effect on the company's financial condition.  *Id.*  The unjust enrichment claim names the same defendants and alleges that they "were unjustly enriched as a result of the insider trading profits they received while breaching their fiduciary duties owed to First Solar." ¶ 329.

## II.     Legal Standard.

### A.     Rule 23.1.

Plaintiff shareholders purport to bring this action on behalf of First Solar.  Usually, the decision to initiate litigation on behalf of a corporation is entrusted to the board of directors.  *See Rosenbloom v. Pyott*, 765 F.3d 1137, 1147-48 (9th Cir. 2014) (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991)).   But in cases where the board cannot be trusted to represent the corporation's interests faithfully, individual shareholders may bring derivative claims on the corporation's behalf.  Fed. R. Civ. P. 23.1(a); *see Rosenbloom*, 765 F.3d at 1147-48.

Because the board is presumptively entitled to make the decision to bring suit, shareholders seeking to bring such an action must plead with particularity whether they demanded that the directors bring the action, and, if not, why it would have been futile to make such a demand.  Fed. R. Civ. P. 23.1(b)(3).  This requirement allows the court to determine, at the outset of the litigation, whether the board is capable of representing the interests of the corporation faithfully, or whether a majority of the directors has a conflict

of interest that justifies the plaintiff shareholders' bypassing of the board. *See Kamen*, 500 U.S. at 102. In determining whether plaintiffs have satisfied Rule 23.1's pleading requirement, courts accept the allegations of the complaint as true, draw all reasonable inferences in the plaintiffs' favor, and consider the allegations in combination. *See Rosenbloom*, 765 F.3d at 1155-56; *In re Pfizer Inc. S'holder Derivative Litig.*, 722 F. Supp. 2d 453, 458 (S.D.N.Y. 2010).

### B. Delaware Law of Demand Futility.

"Although Rule 23.1 supplies the pleading standard for assessing allegations of demand futility, the substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Rosenbloom*, 765 F.3d at 1148 (citation and internal quotation marks omitted). Because First Solar is a Delaware corporation, Delaware substantive law applies.

Delaware courts have articulated two standards for evaluating demand futility. The *Aronson* test applies to derivative claims that challenge a specific board decision – "where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties." *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008). To establish demand futility under *Aronson*, the plaintiff must show either (1) a reason to doubt that the directors are disinterested and independent, or (2) a reason to doubt that the challenged transaction was the product of a valid exercise of business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984)). The *Rales* test applies when a specific business decision is not challenged, but where plaintiffs allege a violation of the board's oversight duties. *Id.* To establish demand futility under *Rales*, the plaintiff must show a reason to doubt that the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. *Id.* (citing *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993)).

The line between *Aronson* and *Rales* blurs when a derivative claim alleges wrongdoing by a majority of the board but does not challenge a specific board decision.

*See Rosenbloom*, 765 F.3d at 1150 (collecting cases).  For such hybrid claims, courts excuse demand if "Plaintiffs' particularized allegations create a reasonable doubt as to whether a majority of the board . . . faces a substantial likelihood of personal liability." *Id.*; *see also In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009) ("Demand is not excused solely because the directors would be deciding to sue themselves. . . .  Rather, demand will be excused based on a possibility of personal director liability only in the rare case when . . . 'a substantial likelihood of director liability . . . exists.'") (quoting *Aronson*, 473 A.2d at 815); *In re Pfizer*, 722 F. Supp. 2d at 460 (*Rales* and *Aronson* tests both met "by the Complaint's particularized allegations that a majority of the directors face a substantial threat of personal liability arising from their alleged breach of their non-exculpated fiduciary duties").  It is "a rare case where the circumstances are so egregious that there is a substantial likelihood of liability."  *In re Baxter Int'l, Inc. Shareholders Litig.*, 654 A.2d 1268, 1271 (Del. Ch. 1995) (citing *Aronson*, 473 A.2d at 815).

Delaware law recognizes a presumption that directors act "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Citigroup*, 964 A.2d at 124 (citing *Aronson*, 473 A.2d at 812).  "The burden is on plaintiffs, the party challenging the directors' decision, to rebut this presumption." *Id.*  "Additionally, directors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts."  *Id.* at 133 (citing 8 Del. Code § 141(e)).

"Where directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim based on particularized facts." *Wood*, 953 A.2d at 141.  First Solar's Certificate of Incorporation provides that the Company's directors shall be exculpated to the maximum extent permitted by Delaware law.   Doc. 71-3 at 6.[2]

---

[2] Defendants have asked the Court to take judicial notice of this provision of the Certificate of Incorporation (Doc. 72 at 2), and Plaintiffs do not object (Doc. 76 at 2).

Delaware law recognizes the validity of "[a] provision eliminating or limiting the personal liability of a director to the corporation . . . for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; . . . or (iv) for any transaction from which the director derived an improper personal benefit." Del. Code § 102(b)(7). Thus, in a nondisclosure case such as this one, "plaintiffs must plead particularized factual allegations that support the inference that the disclosure violation was made in bad faith, knowingly or intentionally." *Citigroup*, 964 A.2d at 132 (quotation marks and citation omitted).[3]

## III.   Against Which Board is Demand Futility Tested?

The board of directors sitting when Plaintiffs filed their most recent amendment in March 2016 consists of 11 individuals, four of whom were not on the board when Plaintiffs filed their original complaint in April 2012. In addition, one individual (Defendant Villarreal) has left the board since April 2012. *Compare* Doc. 71-1 at 13 *with* Doc. 71-2 at 15.[4] Thus, as a preliminary matter, the Court must determine whether demand futility is tested against the April 2012 board or the March 2016 board.

The parties agree that *Braddock v. Zimmerman*, 906 A.2d 776 (Del. 2006), provides the framework for deciding this issue. In *Braddock*, the Delaware Supreme

---

[3] *Citigroup* should not be read to suggest that demand will be excused based only on evidence that a majority of the board knowingly failed to disclose facts that happened to be material. As Del. Code § 102(b)(7)(ii) makes clear, a shareholder plaintiff must allege that a majority of the board "knowing[ly] violat[ed]" the law. At minimum, then, the shareholder plaintiff must allege that a majority of the board knew certain facts, knew they were material, and knew they should be disclosed, but nonetheless failed to disclose them. *Cf. Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (directors violate non-exculpable duty of loyalty where they "fail to act in the face of a *known duty to act*, thereby demonstrating a *conscious disregard* for their responsibilities") (emphasis added).

[4] Defendants have asked the Court to take judicial notice of the change in composition of First Solar's board between April 2012 and March 2016 (Doc. 72 at 2-3), and Plaintiffs do not object (Doc. 76 at 2).

1    Court explained that "when an amended derivative complaint is filed, the existence of a

2    new independent board of directors is relevant to a Rule 23.1 demand inquiry only as to

3    derivative claims in the amended complaint that are not already validly in litigation." *Id.*

4    at 786.  A claim is "validly in litigation" if (1) "the original complaint was well pleaded

5    as a derivative action," (2) "the original complaint satisfied the legal test for demand

6    excusal," and (3) "the act or transaction complained of in the amendment is essentially

7    the same as the act or transaction challenged in the original complaint." *Id.*  A claim is

8    not validly in litigation unless it "can or has survived a motion to dismiss." *Id.* at 779.

9         Defendants argue that none of Plaintiffs' claims were validly in litigation prior to

10   the filing of the second amended complaint in March 2016 because neither the original

11   complaint nor the first amended complaint adequately pleaded demand futility.  Doc. 70

12   at 14.  Perhaps because they view the choice of board as largely "a moot point," Plaintiffs

13   offer only a half-hearted response.  Doc. 75 at 23.

14        First, Plaintiffs argue that they are excused from establishing demand futility

15   against the current board because the original complaint was not dismissed.  But that fact

16   does not mean that the original complaint "satisfied the legal test for demand excusal."

17   *Braddock*, 906 A.2d at 778.  "[T]he filing of an amended complaint may trigger a new

18   requirement to make demand if the earlier complaint could not have survived a motion to

19   dismiss, even if it had not actually been dismissed."  *In re NYFIX, Inc.*, 567 F. Supp. 2d

20   306, 311 (D. Conn. 2008) (citing *Braddock*, 906 A.2d at 778).

21        Second, Plaintiffs argue that the original complaint adequately pleaded demand

22   futility.  Doc. 75 at 24.  But it is their burden to show as much, *In re Affiliated Computer

23   Servs., Inc. S'holders Litig.*, No. CIV.A. 2821-VCL, 2009 WL 296078, at *8 (Del. Ch.

24   Feb. 6, 2009), and they have not carried it.  Plaintiffs fail to cite even a single allegation

25   from the original complaint that they believe satisfies Rule 23.1(b).  *See* Doc. 75 at 24.

26   Because Plaintiffs have failed to show that their claims were validly in litigation before

27   March 2016, demand futility must be tested against the current board.

28        As already noted, the current board includes four individuals who joined after the

- 8 -

events at issue in this case.  These individuals are considered disinterested as a matter of law.  *See Sandys v. Pincus*, No. CV 9512-CB, 2016 WL 769999, at *15 (Del. Ch. Feb. 29, 2016) ("Siminoff and Doerr are disinterested because they joined the board after the alleged *Caremark* violations occurred.").  As a result, Plaintiffs must show that demand is excused as to six of the seven remaining directors.[5]  Because each of these remaining directors was on the board when the alleged wrongdoing occurred, and continue on the board today, the Court will refer to them in this order as the "continuing directors."

In their briefs, Plaintiffs acknowledged that they cannot establish demand futility against the current board for the insider trading claim because it concerns only four of the 11 directors.  Doc. 75 at 24.  At oral argument, Plaintiffs argued that more than four directors are affected by this claim because proof of the insider trading claim would necessarily establish that the entire board had material, non-public information – which would support a non-disclosure claim against the rest of the continuing directors.  Plaintiffs cite no case where non-defendant directors were deemed unable to make an impartial board decision based on evidence that might be presented against defendant directors if a lawsuit were authorized.  Nor have Plaintiffs shown that the evidence that might be presented in an insider trading claim would create a substantial likelihood of personal liability for the non-defendant directors.  The Court cannot conclude that Plaintiffs' novel theory, explained for the first time during oral argument and not supported by specific evidence or legal authority, rebuts the presumption that the non-defendant directors would act in the company's best interests in responding to the insider trading claim.  *See Citigroup*, 964 A.2d at 124 (recognizing this presumption).

Because Plaintiffs have not shown that more than four directors face a substantial likelihood of personal liability on the insider trading claim, the Court will dismiss the

---

[5] With 11 members on the current board, Plaintiffs must show that demand would have been futile with respect to a majority – at least six.  Because Plaintiffs cannot make this showing with respect to the four new directors, they must show that six of the remaining seven face a substantial likelihood of personal liability on non-exculpated claims.

1   claim.  The unjust enrichment claim derives from the insider trading claim and must also
2   be dismissed.  *See Staehr v. Mack*, No. 07 CIV. 10368 DAB, 2011 WL 1330856, at *10
3   (S.D.N.Y. Mar. 31, 2011) ("Demand futility for an unjust enrichment claim based on
4   insider trading allegations will rise and fall with the insider trading claims.").

5   **IV.   Is Demand Excused as to Plaintiffs' Fiduciary Duty Claim?**

6       Plaintiffs contend that demand is excused against the continuing directors, which
7   constitute a majority of the current board, with respect to their fiduciary duty claim.
8   Plaintiffs allege that these Defendants breached their fiduciary duties by misrepresenting
9   and failing to disclose the LPM defect and the hot climate defect.

10      **A.      LPM Defect.**

11      In the securities fraud litigation, the Court found evidence that First Solar learned
12  about the LPM defect in March 2009, but failed to disclose it publicly until July 2010.
13  *See Smilovits*, 119 F. Supp. 3d at 982-83.  The Court explained:

> Plaintiffs have presented evidence that First Solar knew the LPM defect
> was a serious problem that would concern investors well before it was
> disclosed.  First Solar executives were careful not to release information
> about the LPM defect to the public, even deciding to delay informing
> customers until the customers discovered the problem themselves.

17  *Id.* at 1003.  The Court found a triable issue of fact on whether the LPM defect was
18  deliberately concealed and whether First Solar's conduct in concealing it constituted
19  securities fraud.  *Id.*

20      In this case, Plaintiffs allege that Defendants violated their fiduciary duty of
21  candor by failing to disclose the LPM defect.  To show that the Director Defendants face
22  a substantial likelihood of liability on this claim, Plaintiffs "must plead particularized
23  factual allegations that support the inference that the disclosure violation was made in
24  bad faith, knowingly or intentionally."  *Citigroup*, 964 A.2d at 132; *see also id.* (directors
25  are liable for breach of fiduciary duty where they "deliberately misinform[] shareholders
26  about the business of the corporation, either directly or by a public statement").[6]

---

[6] These claims are non-exculpable because they involve "acts or omissions not
[taken] in good faith or which involve intentional misconduct."  8 Del. Code § 102(c)(7).

The Court has already found evidence to suggest that Defendant Ahearn – the erstwhile CEO and one of the seven continuing directors – knew of the LPM defect and intentionally failed to disclose it.  *Smilovits*, 119 F. Supp. 3d at 1001-03.  Demand is therefore excused as to him.  But Plaintiffs do not allege facts showing that the other continuing directors – the outside directors – knew of the LPM defect, participated in a decision not to disclose it, or did so in bad faith, knowingly, or intentionally.  Indeed, Plaintiffs do not allege a single fact showing that any of the continuing outside directors knew of the defect and acted to conceal it with wrongful intent.  Instead, Plaintiffs argue that the Court may infer their knowledge, participation, and bad faith from (1) First Solar's corporate governance structure, (2) the fact that the LPM defect affected First Solar's core product, and (3) the clear falsity of First Solar's disclosures.  Alternatively, Plaintiffs argue that even if the continuing outside directors did not knowingly acquiesce in securities fraud, demand is excused under *Aronson*'s second prong because their approval of financial statements was not a valid exercise of business judgment.

### 1.    Corporate Governance Structure.

Plaintiffs argue that several aspects of First Solar's governance structure support the inference that the continuing outside directors learned about the LPM defect long before it was disclosed in July 2010.

### a.    Committee Membership.

Plaintiffs note that three of the continuing outside directors (Kennedy, Presby, and Stebbins) were members of the Audit Committee during the relevant period, and that these three and a fourth (Post) were members of the Project Development Risk Committee ("Risk Committee") between 2010 and 2011.  Doc. 67, ¶¶ 55, 60, 71.  Plaintiffs allege that the Audit Committee was required by its charter "to review with management the financial information to be included in any" SEC filing, and to "oversee[] financial risks . . . legal and compliance risks, and other risk management functions."  ¶ 60.  Plaintiffs allege that the Risk Committee was charged with overseeing the Company's project development and related project finance activities.   ¶ 309.

1  Plaintiffs surmise that the Audit Committee must have discussed the LPM defect during

2  its meetings between March 2009 and July 2010, and that the Risk Committee must have

3  discussed the defect during its meeting in 2010, but they make no factual allegations

4  regarding matters addressed in those meetings.

5         Delaware courts have rejected this method of showing demand futility:

6

7         [P]erhaps most importantly, the Complaint does not sufficiently
   allege that the director defendants had knowledge that any disclosures or

8  omissions were false or misleading or that the director defendants acted in
   bad faith in not adequately informing themselves.   Plaintiffs have not

9  alleged particular facts showing that the director defendants were even
   aware of any misstatements or omissions.  Instead, plaintiffs conclusorily

10  assert that the members of the [Audit and Risk Management] Committee, as
    financial experts, knew the relevant accounting standards, knew or should

11  have known the extent of the Company's exposure to the subprime
    mortgage market, and are therefore responsible for alleged false statements

12  or omissions in Citigroup's financial statements.   Instead of providing
    factual allegations regarding the knowledge or bad faith of the individual

13  director defendants, the Complaint makes broad group allegations about the
    director defendants or the members of the [Audit and Risk Management]

14  Committee.  A determination of whether the alleged misleading statements
    or omissions were made with knowledge or in bad faith requires an analysis

15  of the state of mind of the individual director defendants, and plaintiffs
    have not made specific factual allegations that would allow for such an

16  inquiry.

17

18

19

20  *Citigroup*, 964 A.2d at 134 (footnotes omitted).

21         The same is true here.  Plaintiffs plead no facts with particularity to show that any

22  of the continuing outside directors knew of the LPM defect or its severity, participated in

23  decisions not to disclose it, or did so in bad faith.  "Mere membership on a committee or

24  board, without specific allegations as to defendants' roles and conduct, is insufficient to

25  support a finding that directors were conflicted."  *In re CNET Networks, Inc.*, 483 F.

26  Supp. 2d 947, 963 (N.D. Cal. 2007) (citation omitted); *see also Montini v. Lawler*, No.

27  CIV.A. 12-11296-DJC, 2014 WL 1271696, at *8 (D. Mass. Mar. 26, 2014) ("pleading

28  directorial responsibilities is insufficient to establish a substantial likelihood of liability

even where the Company issued multiple years of incorrect financial statements").  To satisfy Rule 23.1(b), allegations of committee membership must be supplemented by allegations that identify "how the [] Committee learned of [the problem], who presented it with the information, when, or how the committee members' response or lack thereof rendered them active participants in [the concealment]."  *Jones ex rel. CSK Auto Corp. v. Jenkins*, 503 F. Supp. 2d 1325, 1334 (D. Ariz. 2007).  The complaint is entirely devoid of the specific allegations that would allow the Court to reasonably infer that the continuing outside directors were apprised of the LPM defect prior to its disclosure.

### b.  Reporting Relationships.

Plaintiffs allege that Defendant Ahearn had a duty to advise other directors of the LPM defect, and that it is reasonable to infer that he did.  Doc. 67, ¶¶ 56-57.  But "Delaware law does not permit the wholesale imputation of one director's knowledge to every other for demand excusal purposes," *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007), and Plaintiffs fail to allege any specific facts that Ahearn communicated to the rest of the board.

Plaintiffs cite *Wal-Mart Stores, Inc. v. Indiana Electrical Workers Pension Trust Fund IBEW*, 95 A.3d 1264 (Del. 2014), to bolster their argument that Ahearn's knowledge can be imputed to other directors, but *Wal-Mart* only illustrates what is missing from the complaint.  It held that a plaintiff could "establish director knowledge . . . by establishing that [the company's] officers were in a 'reporting relationship' to [its] directors, *that those officers did in fact report to specific directors, and that those officers received key information* regarding" the relevant issue.  *Id.* at 1273 (emphasis added).  Plaintiffs allege that Ahearn had a duty to report material facts about the company to the board (Doc. 67, ¶ 59), but they do not allege facts showing that he actually did so.

### c.  Internal Reporting System.

Plaintiffs allege that First Solar had a functioning internal reporting system that should have brought material information regarding the LPM defect to the board's attention long before it was disclosed.  Doc. 67, ¶¶ 307-08.  They cite a proxy statement

filed by First Solar in April 2012 (after the events at issue in this case):

> The Company has a comprehensive risk management process in which management is responsible for identifying and managing the Company's risks and the board and its committees provide oversight in connection with these efforts. Risks are identified, assessed and managed on an ongoing basis and communicated to management during periodic management meetings or otherwise as appropriate. Existing and potential material risks are addressed during periodic senior management meetings, resulting in both board and committee discussions and public disclosures, as appropriate.

¶ 307.  Citing *In re Pfizer Inc. Shareholder Derivative Litigation*, 722 F. Supp. 2d 453, and *In re Abbott Labs Derivative Shareholders Litigation*, 325 F.3d 795 (7th Cir. 2003), Plaintiffs argue that the Court should presume that the process described in the company's proxy statement was followed.

The Court does not agree.  The complaint in *Pfizer* included considerably more detail than the complaint in this case:

> [T]he Complaint details at great length a large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct and chose to disregard it.  These include, for example, the reports to the board of the Neurontin and Genotropin settlements, a large number of FDA violation notices and warning letters, several reports to Pfizer's compliance personnel and senior executives of continuing kickbacks and off-label marketing, and the allegations of the qui tam lawsuits.  Many of these disturbing reports were received during the same time that the board was obligated by the 2002 and 2004 [corporate integrity agreements with the FDA] to pay special attention to these very problems.

*Pfizer*, 722 F. Supp. 2d at 460-61 (record citations omitted).  Plaintiffs in this case have provided no comparable allegations of actual reports to the board or special agreements with a government agency to monitor the very kinds of wrongdoing addressed in the reports and alleged in the complaint.

The complaint in *Abbott* was also more detailed.  It alleged that the FDA wrote two warning letters regarding illegal activities to the chairman of the board, wrote a third warning letter to the CEO and a member of the board, and entered into a Voluntary

1  Compliance Plan with Abbott that it later terminated due to continuing violations. The

2  complaint also alleged that these problems were reported in the Wall Street Journal and

3  Bloomberg News, as well as SEC disclosures filed by Abbott, and that board members on

4  the audit committee knew of them.  325 F.3d at 799-801, 806.  With such detailed

5  allegations, little inference was required to conclude that the board members knew of the

6  non-compliance problems.  Although *Abbott* stated that "[w]here a corporation has a

7  corporate governance structure in place," it is reasonable to "assume the corporate

8  governance procedures were followed," *id.* at 806, the case included many factual

9  allegations in addition to the corporate governance structure.  This case does not.  The

10  Court cannot conclude that the existence of internal risk management procedures allows

11  the Court to infer that the continuing outside directors each knowingly chose not to

12  disclose the LPM defect.[7]

13         **2.     Core Products Doctrine.**

14         "In demand futility cases, courts have repeatedly emphasized that it is especially

15  plausible to infer board interest in and knowledge of developments related to a product

16  that is critical to a company's success or is otherwise of special importance to it."

17  *Rosenbloom*, 765 F.3d at 1154 (collecting cases).  This inference is entertained because

18  "[i]t is absurd to suggest that the Board of Directors would not discuss" critical issues

19  pertaining to the company's core product.  *No. 84 Employer-Teamster Joint Council*

20  *Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 943 n.21 (9th Cir. 2003).

21         Plaintiffs argue that the continuing outside directors must have known about the

22  LPM defect before it was disclosed because it was a serious problem affecting First

23  Solar's core product.  Doc. 75 at 16-17.  Defendants argue that the core products doctrine

24  _____

25         [7] At oral argument, Plaintiffs pointed to meetings held by First Solar executives on
   the hot climate defect in March and April 2011 as evidence that the internal reporting
26  system was functioning.  But even if the internal system was delivering information to
   the officers, Plaintiffs have provided no factual evidence that the system was reliably
27  conveying this information to directors.  Plaintiffs offer absolutely no direct evidence that
   information about the LPM defect was conveyed to the directors during the relevant
28  period.

1  does not apply in derivative cases because it conflicts with Rule 23.1(b)'s particularity
2  requirement.  Doc. 70 at 16.

3      Defendants are correct that many courts, including this one, have found the core
4  products doctrine inapplicable to derivative cases.  *See In re Yahoo! Inc. S'holder*
5  *Derivative Litig.*, No. 11-CV-3269-CRB, 2015 WL 9319307, at *9 (N.D. Cal. Dec. 23,
6  2015) ("this doctrine has no application in derivative litigation"); *CSK Auto Corp.*, 503 F.
7  Supp. 2d at ("'allegations of knowledge explained solely by the directors' service as
8  directors, without more, are insufficient as a matter of law – even where, as here, the
9  plaintiff alleges that the matters in suit relate to the corporation's core business'")
10 (quoting *Ferre v. McGrath*, No. 06 CIV.1684 CM, 2007 WL 1180650, at *6 (S.D.N.Y.
11 Feb. 16, 2007); alterations incorporated).  But the Ninth Circuit's most recent statement is
12 to the contrary.  *Rosenbloom* makes clear that courts may rely on the importance of a
13 particular product to the company as one factor in determining whether the directors
14 knew about developments related to that product.  *Rosenbloom*, 765 F.3d at 1154.

15     In the absence of *any* factual allegations that the outside continuing directors were
16 informed of the LPM problem, however, the Court cannot rely on the core products
17 doctrine to find sufficient knowledge.  Such bare reliance would eviscerate Rule 23.1(b)'s
18 requirement that demand futility be pleaded with particularity.  In addition, as a Delaware
19 court has said, "[u]nder our law, to establish liability for misstatements . . . shareholder
20 plaintiffs must show that the misstatement was made knowingly or in bad faith."
21 *Citigroup*, 964 A.2d at 135.  The core products doctrine does not make that showing.

22     At oral argument, Plaintiffs asserted that First Solar made significant corporate
23 decisions during the relevant time, discontinuing the faulty manufacturing process and
24 offering to remediate panels affected by the LPM defect.  Plaintiffs contend that such
25 significant corporate decisions would not have been made without input from the board.
26 The Court finds this no more persuasive than a stand-alone core products doctrine.
27 Plaintiffs point to no direct evidence that the continuing outside directors were involved
28 in these decisions.  Nor do they cite anything in the company bylaws requiring directorial

approval of these decisions, or evidence that the directors were previously involved in similar decisions.  At bottom, Plaintiffs' argument is an invitation for the Court to intuit how a corporation like First Solar would conduct its decisionmaking.  Delaware law requires more.  *Cf. Citigroup*, 964 A.2d 134 (faulting shareholder plaintiffs for failing to allege "particularized facts showing that the director defendants were . . . aware of misstatements or omissions").

### 3.    *Oxford Health*.

In *In re Oxford Health Plans, Inc.*, 192 F.R.D. 111 (S.D.N.Y. 2000), the plaintiffs alleged that the company's directors breached their fiduciary duties by making material misstatements on financial statements, and argued that "[k]nowledgeable or reckless conduct may be inferred from contrasting the actual facts with the public statements claimed to be misleading."  *Id.* at 117.  The court in effect employed a *res ipsa loquitur* analysis to conclude that only bad faith conduct could explain the misstatements.

Plaintiffs ask the Court to follow *Oxford Health* and hold that bad faith on the part of the continuing directors can be inferred from their approval of financial statements that were extremely inaccurate.  Doc. 75 at 18.  But even a significant disparity between a company's statements and its actual financial position will not support an inference of director bad faith absent *some* indication that the directors were aware of the disparity.  *See Montini*, 2014 WL 1271696, at *8 (refusing to excuse demand under *Oxford Health* because plaintiffs "allege[d] no facts demonstrating the majority of the Board's contemporaneous knowledge" that statement was false); *Impax Labs*, 2015 WL 5168777, at *8 ("'The existence of false and misleading financial statements, by itself, is insufficient to establish a substantial likelihood of liability for a non-exculpated claim on the part of outside directors.'") (quoting *Kococinski v. Collins*, 935 F. Supp. 2d 909, 920 (D. Minn. 2013); alterations incorporated).

Nor does the fact that the directors signed financial disclosures satisfy this requirement.  As the court explained in *Citigroup*:

[T]he Complaint does not contain specific factual allegations that reasonably suggest sufficient board involvement in the preparation of the disclosures that would allow me to reasonably conclude that the director defendants face a substantial likelihood of personal liability.  Plaintiffs do not allege facts suggesting that the director defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions.  The Complaint merely alleges that Citigroup's financial statements contained false statements and material omissions and that the director defendants reviewed the financial statements pursuant to their responsibilities under the [Audit and Risk Management] Committee charter.  Thus, I am unable to reasonably conclude that the director defendants face a substantial likelihood of liability.

*Id.* at 134.

### 4.    ***Aronson*'s Second Prong.**

Plaintiffs argue that demand futility can be established by showing that the board was grossly negligent in approving the false financial statements. Doc. 75 at 21; *see* Doc. 67, ¶ 310.  Defendants disagree, arguing that gross negligence cannot give rise to a substantial likelihood of personal liability because First Solar has exculpated its directors from negligence claims pursuant to 8 Del. Code § 102(b)(7).

Plaintiffs rely on *McPadden v. Sidhu*, 964 A.2d 1262 (Del. Ch. 2008).  *McPadden* did find demand excused under *Aroson*'s second prong, even though the corporation had a provision adopting an exculpatory provision.  But there was no question in that case that *Aronson* applied, because the plaintiffs were challenging a specific board decision: the sale of a subsidiary to a former officer of the corporation.  Plaintiffs in this case do not challenge a specific board decision.  They allege instead that Defendants violated their fiduciary duty of candor when they failed to disclose the LPM defect.  Doc. 75 at 10.  Thus, *Rales*, not *Aronson*, supplies the standard for pleading demand futility.  As explained in *Citigroup*:

Where, however, plaintiffs complain of board inaction and do not challenge a specific decision of the board, there is no 'challenged transaction,' and the ordinary *Aronson* analysis does not apply.  Instead, to show demand futility where the subject of the derivative suit is not a business decision of the board, a plaintiff must allege particularized facts that 'create a reasonable

doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to the demand."

964 A.2d at 120 (citing *Rales*, 634 A.2d at 933-34).

Plaintiffs cite no case holding that an allegation of gross negligence against a director, without more, renders that director incapable of exercising independent and disinterested business judgment in responding to a demand, particularly when the director is exculpated from liability for gross negligence.[8]  Rather, the presumption of director independence is overcome only where it appears that the director may face "a substantial likelihood of director liability."  *Rosenbloom*, 765 F.3d at 1150; *Citigroup*, 964 A.2d at 121.  Where, as here, a company has adopted an exculpatory provision, allegations of gross negligence are insufficient to establish a substantial likelihood of director liability.  *See Wood*, 953 A.2d at 141 ("Where directors are contractually or otherwise exculpated from liability for certain conduct, then a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts.") (citation and quotation marks omitted); *Citigroup*, 964 A.2d at 132 (in light of company's exculpatory provision, "plaintiffs must plead particularized factual allegations that support the inference that the disclosure violation was made in bad faith, knowingly or intentionally") (citation and quotation marks omitted).  Thus, even assuming that Plaintiffs had alleged gross negligence with sufficient particularity to satisfy Rule 23.1(b) – an assumption the Court doubts given the pleading deficiencies identified above – the Court could not find demand excusal on the basis of these allegations.

---

[8] All of Plaintiffs' cases involve challenges to a particular transaction approved by the board.  *See Bakerman v. Sidney Frank Importing Co.*, C.A. No. 1844-N, 2006 Del. Ch. LEXIS 180, at *1 (Del. Ch. Oct. 10, 2006) (sale of substantially all of corporation's assets); *Kahn v. Portnoy*, C.A. No. 3515-CC, 2008 Del. Ch. LEXIS 184, at *1 (Del. Ch. Dec. 11, 2008) (transaction with real estate investment trust); *Aronson*, 473 A.2d at 812 (transaction with subsidiary).

1

       **2.**      **Hot Climate Defect.**

2

      Plaintiffs' allegations regarding the hot climate defect track their LPM allegations,

3

with one exception.  Plaintiffs allege that Eaglesham informed the board on April 27,

4

2011, that the hot climate issued existed.  The Court found evidence of this fact in the

5

securities fraud case:

6

> On April 27, 2011, Eaglesham informed . . . the Board of Directors that
> modules were degrading at a rate of 11% in hot climates.  Mitigation

7

> options, including de-rating, were presented, and Eaglesham informed the
> Board that the impact of de-rating would be $30-$60 million in 2011.

8

> Ultimately, the defect and its financial impact ($37.8 million) were not
> disclosed until the 4Q11 release and a conference call in February 2012,

9

> nearly a year after Eaglesham's presentation.

10

*Smilovits*, 119 F. Supp. 3d at 1007.

11

      The Court cannot conclude, however, that this single factual allegation establishes

12

demand futility where the LPM allegations did not.  True, this allegation suggests that the

13

board was aware of the hot climate defect some 10 months before it was disclosed, but it

14

does not establish that the board members knew that the company would incur significant

15

costs in addressing this defect.  In fact, evidence in the securities fraud case indicates that,

16

around the time of the Eaglesham presentation, First Solar's Director of Global Quality,

17

Michael Koralewksi, concluded that First Solar's existing warranty accrual was sufficient

18

to cover the projected warranty claims from the hot climate defect.  *Smilovits*, 119 F.

19

Supp. 3d at 984.  The board would have been entitled to rely on this conclusion.  *See*

20

*Citigroup*, 964 A.2d at 132 ("directors of Delaware corporations are fully protected in

21

relying in good faith on the reports of officers and experts") (citing 8 Del. Code

22

§ 141(e)).

23

      Nor can the Court infer that the continuing directors acted in bad faith in failing to

24

disclose the hot climate defect between April 2011 and February 2012.  As already noted,

25

Delaware law recognizes a presumption that directors act "on an informed basis, in good

26

faith and in the honest belief that the action taken was in the best interests of the

27

company," and "[t]he burden is on plaintiffs, the party challenging the directors'

28

decision, to rebut this presumption."  *Citigroup*, 964 A.2d at 132.  Plaintiffs have not

alleged particularized facts to overcome this presumption.

### 3.    Summary and *Rosenbloom*.

As explained, the Court must draw all reasonable inferences in Plaintiffs' favor and consider Plaintiffs' allegations in combination. *Rosenbloom*, 765 F.3d at 1155-56. The Court must be cognizant, too, that a shareholder plaintiff can establish demand futility without providing "a smoking gun of Board knowledge." *Id.*  As the Ninth Circuit explained, "precedent holds that plaintiffs can show demand futility by alleging particular facts that support an *inference*" of wrongdoing. *Id.* (emphasis in original).

Bearing all of this in mind, the Court cannot conclude Plaintiffs are entitled to demand excusal.  Plaintiffs have not alleged a single fact showing that any of the continuing outside directors knew of the LPM defect or participated in a decision not to disclose it.  The various allegations about the corporate governance structure suggest, at most, that the directors should have learned about the LPM defect if everything at First Solar was functioning correctly.  But these allegations do not suggest that the directors actually learned about the defect, much less that they failed to disclose this information as the result of bad faith, rather than simple negligence.

The hot-climate-related allegations about the Eaglesham presentation do not produce a different result.  These allegations show only that the board was aware of the hot climate defect about 10 months before publicly disclosing it.  But, critically, the allegations provide no basis for inferring that the board knew that the hot climate defect would have a material financial impact on the company.  As explained, First Solar's Director of Global Quality indicated that existing warranty accruals would cover the defect.  Under Delaware law, the board was entitled to rely on this representation.  Thus, these allegations provide no basis for inferring that the directors acted in bad faith in failing to disclose the financial impact of the hot climate defect earlier.

Even when all of Plaintiffs allegations are considered in combination, as *Rosenbloom* instructs, they do not show that the continuing outside directors face a substantial likelihood of personal liability.  The reality remains that Plaintiffs have failed

to allege a single specific fact showing that the outside directors knew of the LPM defect, and have failed to allege facts from which it can reasonably be inferred that the outside directors knew that the hot climate defect described by Eaglesham would exceed corporate warranty accruals.   Rule 23.1(b) requires that such facts be alleged with particularity, and Plaintiffs simply have failed to do so.

This case contrasts sharply to *Rosenbloom*, upon which Plaintiffs rely most heavily.   In *Rosenbloom*, "Plaintiffs offer[ed] a battery of particularized factual allegations that strongly support[ed] an inference . . . that the Board knew of and did nothing about illegal activity."   765 F.3d at 1152.   For example, Plaintiffs presented evidence that (1) the board closely and regularly monitored off-label sales of Botox; (2) the board received data directly linking the company's sales to fluctuations in off-label sales; (3) the board received repeated warnings from the FDA about illegal promotion of Botox; (4) the illegal conduct involved one of the company's most important products; and (5) the company's illegal conduct "persisted for over a decade, involved several divisions at [the company], and constituted nearly a dozen separate programs."   *Id.* at 1152-54.   After surveying these allegations, the Ninth Circuit concluded:

> It would be surprising, to say the least, if such significant, continuing, and diverse breaches of FDA regulations in relation to a star product at Allergen passed unnoticed by the Board for so long, even as the Board carefully monitored off-label sales, repeatedly discussed and authorized a number of the allegedly illegal programs, and built strategic plans around off-label Botox sales.

*Id.* at 1154.

This case differs from *Rosenbloom* in at least two significant ways.   First, Plaintiffs have not alleged that there was enduring and pervasive misconduct at First Solar.  They allege that there were two manufacturing defects that caused the company to suffer significant economic loss.   Each defect was discrete, and dealt with relatively quickly.   Just over a year passed between March 2009, when First Solar became aware of the LPM defect, and July 2010, when it disclosed the defect.   An even shorter time – 10

months – passed between the time when First Solar first learned of the hot climate defect and its disclosure of that defect.  Second, Plaintiffs have not alleged that the board was warned by government agencies about the alleged misconduct.  With one exception – the Eaglesham report – Plaintiffs have not alleged that the board was informed of the critical facts *by anyone*.  In light of these crucial distinctions, the Court cannot accept Plaintiffs' argument that they are entitled to demand excusal under *Rosenbloom*.

## VI.    Leave to Amend and Attorneys' Fees.

Plaintiffs request leave to amend in the event any of their claims are dismissed. "Leave to amend should be granted if it appears at all possible that the plaintiff can correct the defect."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000).  But "[a] district court may dismiss a complaint without leave to amend if amendment would be futile."  *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) (citation and quotation marks omitted).

Plaintiffs cannot establish demand futility for their insider trading and unjust enrichment claims by pleading additional facts, as these claims implicate only four of 11 directors.  These claims are dismissed without leave to amend.

Plaintiffs' fiduciary duty claim could be cured by pleading "particularized factual allegations that support the inference that the disclosure violation was made in bad faith, knowingly or intentionally."  *Citigroup*, 964 A.2d at 132.  Plaintiffs may be able to discover facts to support these allegations by conducting a books-and-records inspection. *See* 8 Del. Code § 220; *In re Verifone Holdings, Inc.*, No. C 07-06347 MHP, 2009 U.S. Dist. LEXIS 44138, at *36-37 (N.D. Cal. May 26, 2009) (dismissing shareholder derivative case with leave to amend because "Plaintiffs may . . . engage in further investigation to assert additional particularized facts" by conducting a books-and-records inspection); *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1150 (Del. 2011) (shareholder was entitled to inspect books and records "to aid him in pleading demand

futility in a to-be-amended derivative complaint").[9]   Because Plaintiffs could possibly cure their fiduciary duty claim by pleading additional facts, the Court will allow Plaintiffs leave to amend this claim.

Plaintiffs also ask the Court – in the event it dismisses the second amended complaint – to unseal (or at least permit them to access) evidence from the related securities fraud action.  The Court declines to do so.  In lifting the stay in this case, the Court explained that "discovery should not be permitted to supplement allegations of demand futility – allegations that should reflect facts known to Plaintiffs when they elected not to make a demand on First Solar's board."  Doc. 65 at 5; *see In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 493 F.3d 393, 400 (3d Cir. 2007) ("As we have stated, derivative plaintiffs are required to establish that demand would have been futile at the time they commenced litigation.  A corollary of this rule is that discovery generally may not be used to supplement allegations of demand futility."); *Rales*, 634 A.2d at 934 n.10 ("derivative plaintiffs . . . are not entitled to discovery to assist their compliance with Rule 23.1").  Allowing Plaintiffs access to sealed records – obtained after significant discovery – would be tantamount to permitting Plaintiffs to conduct discovery in aid of their demand futility argument.  As before, the Court will exercise its discretion to deny Plaintiffs discovery.  *See Halebian v. Berv*, 644 F.3d 122, 133 (2d. Cir. 2011) (discovery is with the discretion of the district court); *Fagin v. Gilmartin*, 432 F.3d 276, 285 (3d Cir. 2005) (same).[10]

---

[9] Citing *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970, 991 (9th Cir. 1999), Defendants argue that leave to amend should be denied unless Plaintiffs identify specific facts that they plan to add to their complaint.  But since the shareholders in *Silicon Graphics* did not ask for the opportunity to conduct a books-and-records investigation, that case is distinguishable.  In any event, the Ninth Circuit has more recently explained that leave to amend should be granted where, as here, "it appears at all possible that the plaintiff can correct the defect."  *Lopez*, 203 F.3d at 1130.

[10] In addition, any request to unseal portions of the record in the *Smilovits* case should be made in that case, where all parties may be heard.  Plaintiffs have not sought to intervene in *Smilovits* for purposes of seeking to unseal the record despite the fact that summary judgment briefing in that case – which Plaintiffs seek to unseal – was filed more than one year ago.

If leave to amend is granted, Defendants argue that it should be "'conditioned on the plaintiff paying the defendants' attorneys' fees incurred on the initial motion to dismiss.'"  Doc. 70 at 22 (quoting *King*, 12 A.3d at 1151-52).  Plaintiffs do not argue to the contrary.  *See* Doc. 75 at 24.  Given that Plaintiffs are seeking leave to file their *fourth* complaint, the Court agrees that such leave should be contingent on Plaintiffs' payment of the attorneys' fees Defendants incurred in litigating this motion.  If Plaintiffs elect to file an amendment, Defendants may move for attorneys' fees pursuant to Rule 54(d)(2).

**IT IS ORDERED:**

1.    Defendants' motion to dismiss (Doc. 70) is **granted**.  The insider trading and unjust enrichment claims are dismissed **with prejudice**.  The fiduciary duty claim is dismissed **without prejudice**.  Plaintiffs shall file an amended complaint by **September 16, 2016**.

2.    Defendants' request for judicial notice (Doc. 72) is **granted** as to Exhibits A through C, and otherwise **denied** as moot.

Dated this 30th day of June, 2016.


_____
David G. Campbell
United States District Judge